## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THERESA MARIE SIMEONE, Personal** | : | |
| **Representative of the Estate of Albert** | : | |
| **Francis Simeone, Jr., Deceased, et al.,** | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **BOMBARDIER-ROTAX GMBH,** | : | |
| **Individually and as a Joint Venture** | : | |
| **and/or d/b/a Rotax, et al.,** | : | **No. 02-4852** |
| **Defendants.** | : | |

### MEMORANDUM AND ORDER

**Schiller, J.**                                                                    **March 8, 2005**

This case arises from a plane crash that resulted in the death of two individuals. Presently before this Court is the question of whether Rotax, the Austrian-based manufacturer of the aircraft's engine, should be required to defend itself in Pennsylvania. Three distinct theories of personal jurisdiction are at issue: (1) specific jurisdiction; (2) general jurisdiction; and (3) alter ego jurisdiction, i.e., jurisdiction over one company because it is functionally equivalent to another. While Rotax's activities in Pennsylvania do not subject it to either specific or general jurisdiction in this forum, there is sufficient evidence to sustain jurisdiction over Rotax as the alter ego of Bombardier, Inc. ("Bombardier"). Moreover, the evidence that these two companies were functional equivalents belies Bombardier's assertion that it had no control over the pertinent engine. Therefore, Defendant Rotax's motion to dismiss and Defendant Bombardier's motion for summary judgment are both denied.[1]

---

[1] Defendant Bombardier Corporation (a distinct entity from Defendant Bombardier, Inc.) has also moved for summary judgment and Plaintiffs have agreed that this defendant should be voluntarily dismissed. (Pls.' Opp'n to Def. Rotax's Mot. to Dismiss and Def. Bombardier's Mot. for Summ. J. at 34 n.8 [hereinafter "Pls.' Opp'n].) Accordingly, Bombardier Corporation's motion for summary judgment is granted.

## I.    BACKGROUND

The following facts are undisputed.  On July 22, 2000, Plaintiffs' husbands, Albert Francis Simeone and George Lengyel, were flying through Pennsylvania.  (Am. Compl. ¶ 14; Def. Rotax's Mot. to Dismiss and Def. Bombardier's Mot. for Summ. J. at 2 [hereinafter "Defs.' Mot."].)  Their aircraft contained an engine manufactured by Rotax, an Austrian company with its principle place of business in Gunskirchen, Austria.  (Aff. of Josef Fürlinger ¶ 3.)  Rotax manufactures two-stroke and four-stroke gasoline engines for use in watercrafts, ATVs, snowmobiles, motorcycles, industrial equipment, and airplanes.  (Dep. of Josef Fürlinger of Dec. 3, 2004 at 19-20.)  Between 1998 and 2002, Rotax operated as a wholly-owned subsidiary of Bombardier.  (*Id.* at 34.)  Bombardier is a corporation organized and existing under Canadian law, with its principal place of business in Montreal, Canada.  (Am. Compl. ¶ 4; Def. Bombardier's Ans. ¶ 4.)

Plaintiffs allege that as decedents' aircraft was attempting a landing near York, Pennsylvania, its Rotax-manufactured engine failed.  (Am. Compl. ¶¶ 14, 25.)  The engine failure, according to Plaintiffs, prompted the aircraft to maneuver for an emergency landing, during which it struck power lines controlled by Defendants Jersey Central Power and Light Company and FirstEnergy Corporation.  (*Id.* ¶¶ 25-27.)  The airplane subsequently crashed, killing both of the men aboard.

## II.    ROTAX'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

### A.    Standard of Review

Once a defendant has raised a jurisdictional defense, the burden shifts to the plaintiff to prove that jurisdiction exists in the forum state.  *Imo Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 257 (3d Cir.

1998); *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir. 1996). A court must construe all facts in the light most favorable to the plaintiff when determining whether personal jurisdiction exists. *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002). Nonetheless, a plaintiff may not rest solely on the pleadings to satisfy its burden. *Carteret Sav. Bank, F.A. v. Shushan*, 954 F.2d 141, 146 (3d Cir. 1992). Rather, a plaintiff must present a prima facie case for the exercise of personal jurisdiction with sworn affidavits or other evidence that demonstrates, with reasonable particularity, a sufficient nexus between the defendant and the forum state. *Mellon Bank v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992); *Carteret Sav. Bank*, 954 F.2d at146.

Generally, "to exercise personal jurisdiction over a defendant, a federal court sitting in diversity must undertake a two-step inquiry." *Imo Indus.*, 155 F.3d at 258-59. First, the court must ascertain whether the relevant state long-arm statute permits the exercise of personal jurisdiction. FED. R. CIV. P. 4(e) (2005); *Pennzoil Prods. Co. v. Colelli & Assocs., Inc.*,149 F.3d 197, 200 (3d Cir. 1998) (holding that district court may assert personal jurisdiction "over non-resident defendants to the extent permissible under the law of the state where the district court sits"). Second, the court must determine if the exercise of jurisdiction comports with the Due Process Clause of the Constitution. *Imo Indus.*, 155 F.3d at 259. In Pennsylvania, the two-step inquiry collapses into a single step because the reach of Pennsylvania's long-arm statute is coextensive with the constitutional limits of due process. 42 PA. CONS. STAT. ANN. § 5322 (2005); *Farino,* 960 F.2d at 1221 (finding that Pennsylvania's long-arm statute authorizes Pennsylvania courts "to exercise personal jurisdiction over nonresident defendants to the constitutional limits of the due process clause of the fourteenth amendment"); *Giusto v. Ashland Chem. Co.*, 994 F. Supp. 587, 590 (E.D. Pa. 1998) (same). Under the Due Process clause, a court may not exercise personal jurisdiction over

a non-resident defendant unless there are certain minimum contacts between the defendant and the forum state "such that the maintenance of suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash.,* 326 U.S. 310, 316 (1945) (quotations omitted); *see also Remick v. Manfredy,* 238 F.3d 248, 255 (3d Cir. 2001).

**B.    Discussion**

Defendant Rotax has moved to dismiss the Complaint for lack of personal jurisdiction.  In response, Plaintiffs contend that the record establishes specific jurisdiction, general jurisdiction, and alter ego jurisdiction over Rotax.  For the following reasons, this Court asserts alter ego jurisdiction over Rotax and, accordingly, denies Rotax's motion to dismiss.

1.    *Specific Jurisdiction*

Specific jurisdiction exists only when the defendant has "purposely directed his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or [are] related to' those activities." *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 259 (3d Cir. 2000) (*quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).  This requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." *Burger King*, 471 U.S. at 475 (citations omitted).  With regard to producers or sellers of goods, such as Rotax, the mere foreseeability that a product one sells may end up in the forum state does not render the seller amenable to suit in the forum state. *Pennzoil Prods.,* 149 F.3d at 203 (citations omitted).

a.    The Stream of Commerce Theory

Plaintiffs rely on the stream of commerce theory to establish specific jurisdiction over Rotax. The stream of commerce theory is a means of sustaining jurisdiction in products liability cases in

4

which the product has traveled through an extensive chain of distribution before reaching the ultimate consumer. *Renner v. Lanard Toys Ltd.*, 33 F.3d 277, 280 (3d Cir. 1994). Under this theory, a court may exercise specific jurisdiction "over a nonresident defendant which injected its goods, albeit indirectly, into the forum state and either derived a substantial benefit from the forum state or had a reasonable expectation of deriving a substantial benefit from it." *Portella v. Life-Time Truck Prods., Inc.*, 127 F. Supp. 2d 652, 656 (E.D. Pa. 2000) (citing *Pennzoil Prods.*, 149 F.3d at 203).

Three separate tests exist for finding jurisdiction pursuant to the stream of commerce theory. *See Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102 (1987). Under the first and most stringent test, articulated by Justice O'Connor, "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." *Id.* at 112. Justice O'Connor concluded that personal jurisdiction should not be exercised unless there is "additional conduct" on the part of the defendant that indicates an intent or purpose to serve the market in the forum state; such conduct may include "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Id.* Justice Brennan, who disagreed with Justice O'Connor's "additional conduct" requirement, set forth a second test for asserting jurisdiction, under which the placement of a product into the stream of commerce establishes minimum contacts so long as a defendant "is aware that [its] final product is being marketed in the forum State." *Id.* at 117. Finally, Justice Stevens proposed a third test, suggesting that whether conduct rises to the level of purposeful availment requires a constitutional determination that is affected by "the volume, the value, and the hazardous character" of the products the defendant places

into the stream of commerce.  *Id.* at 122.  As *Asahi* "does not erect any bright-line guideposts," most courts of appeals have avoided choosing one of the three tests over the others "and have instead decided cases based on facts in the record."  *Pennzoil Prods.*, 149 F.3d at 205 (collecting cases).

        b.        Rotax's Contacts with Pennsylvania

According to Plaintiffs, Rotax is subject to specific jurisdiction under any of the *Asahi* tests because Rotax placed its aircraft engines into the stream of commerce with the intent to exploit the United States market.  Rotax's practice is to sell its engines "ex-works" in Austria, which means that Rotax makes the engines available at its premises in Austria and transfers ownership there. (Fürlinger Aff. ¶ 5; Dep. of Claude Ferland of Nov. 12, 2004 at 96.)  Rotax is not registered to do business in Pennsylvania; does not maintain an agent for service of process in Pennsylvania; has no office, warehouse, or other facility in Pennsylvania; does not purchase any goods in Pennsylvania; and pays no taxes in Pennsylvania.  (Fürlinger Aff. ¶¶ 8, 9, 11, 12.)  Nonetheless, Rotax engines routinely find their way into Pennsylvania.  For instance, between 1997 and 2002, over 10,000 recreational products containing Rotax engines were sold in Pennsylvania. (Pls.' App. 00654 (Table of Products Sold).)

Rotax's aircraft engines typically arrive here through a carefully structured distribution network.  (Pls.' App. 00582-00653 (Distribution Agreements).)  Pursuant to this distribution network, Rotax sells its aircraft engines ex-works to authorized distributors, which in turn are in charge of dispersing those engines throughout certain defined territories.  (*Id.*)  Rotax's network includes at least two U.S. distributors, Kodiak Research, Ltd. ("Kodiak") and Rotech Research Canada, Ltd. ("Rotech").  (Pls.' App. 00582-00633; *see also* Fürlinger Dep. at 76.)  Although neither Kodiak nor Rotech is physically located in Pennsylvania, their distribution agreements with Rotax

6

indicate that Rotax has specifically directed them to sell aircraft engines in U.S. territory. (Pls.' App. 00582, 00610.) Kodiak, for instance, ships approximately 1,000 Rotax aircraft engines into the United States each year. (Dep. of Pascal Ronveaux of Apr. 30, 2002 at 84-85.) This figure represents about 20% of the total number of aircraft engines Rotax sells annually. (Fürlinger Dep. at 71.)

Plaintiffs contend that the nature of this distribution network subjects Rotax to jurisdiction under even the most stringent of the *Asahi* tests. Indeed, consistent with Justice O'Connor's test, the Kodiak and Rotech distribution agreements seem to evidence at least some "additional conduct" indicating Rotax's intent to serve the U.S. and Pennsylvania. *Asahi*, 480 U.S. at 112 (stating that such "additional conduct" may include "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State"). The distribution agreements, for example, require Kodiak and Rotech to "advertise, display and demonstrate" Rotax engines in U.S. territory. (Pls.' App. 00584, 00612; *see also* Pls.' App. 01138-01243 (demonstrating that Rotax engines are regularly advertised in Pennsylvania in national aviation publications).) Rotax even provides a specific logo to be used in advertising its engines in this country. (Pls.' App. 00607-00609.) Under the agreements, Rotax also mandates minimum sales quantities, suggests retail prices, and reserves the right to communicate with the purchasers of its products. (Pls.' App. 00584, 00588, 00597, 00612, 00616, 00625.) This evidence leads Plaintiffs to conclude that the most demanding of the *Asahi* tests is satisfied, and accordingly, that the remaining tests are satisfied as well. *See, e.g.*, *Vermeulen v. Renault U.S.A., Inc.*, 985 F.2d 1534, 1548-51 (11th Cir. 1993) (needing only Justice O'Connor's "more stringent

7

'stream of commerce plus' analysis" to find specific jurisdiction over manufacturer that used distributorship network).

It is undisputed, however, that the specific engine in this case did not arrive in Pennsylvania by way of Rotax's U.S. distributors. (Defs.' Mot. at 12 n.1 & 41; Pls.' Opp'n at 29 n.7.) Instead, Rotax used an Austrian distributor to sell the engine to a company called Interplane; this sale occurred in the Czech Republic. (*Id.*) Plaintiffs suggest that, thereafter, Interplane incorporated the engine into an aircraft and sold that aircraft to Albert Simeone.[2] (Pls.' Opp'n at 29 n.7.) Thus, while Rotax certainly intends for some of its aircraft engines to end up in the United States (and perhaps in Pennsylvania, specifically), there is no evidence that Rotax intended this *particular* engine to enter Pennsylvania. In other words, there is no connection here between the activities that Rotax purposefully directed at Pennsylvania and the accident that ultimately occurred. *See BP Chems.*, 229 F.3d at 259 (stating that specific jurisdiction exists only where a defendant purposefully directs his activities at a forum and injuries arise out of or are related to those activities). Without this connection, Plaintiffs cannot satisfy even the most lenient test for jurisdiction, Justice Brennan's, which merely requires that a defendant be "aware that [its] final product is being marketed in the forum State." *Asahi*, 480 U.S. at 117. There is no evidence that, with respect to the specific product at issue, Rotax had such an awareness.

Plaintiffs' argument that the exact path of this engine should not affect this Court's analysis (*see* Pls.' Opp'n at 29 n.7) is not persuasive. Plaintiffs note that the Eleventh Circuit found

---

[2] Interplane was originally a defendant in this case. (*See* Compl. of July 19, 2002.) During oral argument on Rotax's motion, however, Plaintiffs' counsel explained that Plaintiffs dropped their lawsuit against Interplane after learning that the company was uninsured. Plaintiffs' counsel also stated that Plaintiffs were unable to sue the Austrian distributor that provided the engine to Interplane because they did not learn of this distributor's involvement until after the expiration of the statute of limitations.

jurisdiction under the stream of commerce theory in a case where the product at issue was sold in one state and caused injury in another.  *See Renault*, 985 F.2d at 1537, 1552 (finding jurisdiction even though automobile was sold in North Carolina and accident occurred in Georgia).  In *Renault*, though, the automobile arrived in this country through a distributor explicitly charged with serving the U.S. market.  *Id.* at 1537 (observing that it was undisputed that the defendant manufacturer had distributed the 1982 Renault LeCar at issue through its exclusive United States distributor).  The U.S. distributorship agreement was relevant to assessing the manufacturer's intent because that agreement had a direct connection to the injury that ultimately occurred.  *See id.*  Here, by contrast, the parties agree that the product in question did not arrive in the U.S. or in Pennsylvania through Rotax's U.S. distributorship arrangements.  Those agreements thus cannot be used to determine whether Rotax "purposely directed" its product into this forum.

Plaintiffs, therefore, have not shown a sufficient nexus between Rotax and Pennsylvania to subject Rotax to specific jurisdiction in this Court.  *See, e.g.*, *Burger King*, 471 U.S. at 475 (stating that defendant should not be subject to specific jurisdiction based on "random, fortuitous or attenuated contacts" with a forum).  Accordingly, this Court will not assert specific jurisdiction over Rotax.

2.    *General Jurisdiction*

"If general jurisdiction exists, the contacts between the defendant and the forum need not be specifically related to the underlying cause of action in order for an exercise of personal jurisdiction over the defendant to be proper."  *Pinker*, 292 F.3d at 368 n.1; *see also Pennzoil Prods.*, 149 F.3d at 200; *Farino*, 960 F.2d at 1221.  A state may subject a defendant to general jurisdiction, however, only when the defendant's activities in that state are "continuous and systematic."

*Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 416 (1984); *Imo Indus.*, 155 F.3d at 259 n.2. Rotax argues that its marketing activities do not constitute the sort of "continuous and systematic" contact with Pennsylvania that would support the exercise of general jurisdiction. (Defs.' Mot. at 38-39.)

Plaintiffs assert that Rotax's activities in Pennsylvania warrant the exercise of general jurisdiction "[b]ecause thousands of Rotax engines find their way to Pennsylvania through the partnerships and distribution channels established by Rotax." (Pls.' Opp'n at 24.) By relying on Rotax's distribution network to establish its contacts with Pennsylvania, Plaintiffs are essentially seeking to import the stream of commerce theory into the general jurisdiction context. *See Renner*, 33 F.3d at 280 (describing stream of commerce theory as means of sustaining jurisdiction over manufacturers who use distributors to sell products to a forum). Yet, the stream of commerce theory "is relevant only to the exercise of specific jurisdiction; it provides no basis for exercising general jurisdiction over a nonresident defendant." *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 788 (7th Cir. 2003); *see also Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 216 (5th Cir. 2000) ("We have specifically rejected a party's reliance on the stream of commerce theory to support asserting general jurisdiction over a nonresident defendant."); *Electro Med. Equip. Ltd. v. Hamilton Med. AG*, Civ. A. No. 99-579, 1999 WL 1073636, at *8, 1999 U.S. Dist. LEXIS 18483, at *24 (E.D. Pa. Nov. 16, 1999) (stating that stream of commerce theory is species of specific jurisdiction, not general jurisdiction).

As the Fifth Circuit has aptly explained, a conclusion that goods flow into a forum "does not ensure that defendant's relationship with the forum is continuous and systematic, such that it can be sued there for unrelated claims." *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 375 (5th Cir. 1987).

10

In *Bearry*, survivors of individuals who died in a plane crash brought suit in Texas against the nonresident manufacturer of the airplane. *Id.* at 372. Initially, the district court exercised general jurisdiction over the defendant manufacturer, Beech, on the grounds that Beech had "created a stream of commerce with Texas that is so continuous and systematic and of such enormous volume that Beech has established a general presence with the State." *Id.* at 373. On appeal, however, the Fifth Circuit reversed, holding that the fact "that Beech products flow into Texas does not create a general presence in that state" and observing that "[e]ach transaction was completed outside of Texas." *Id.* at 376. The court explained that the notion of general jurisdiction is based on a concept of exchange, by which a nonresident defendant "consents" to be sued in a forum by invoking the benefits and protections of the forum's laws. *Id.* at 375. By carefully requiring that the negotiation and completion of sales to its Texas dealers be made outside of Texas, Beech had not afforded itself the benefits and protections of the laws of Texas, but instead had "calculatedly avoided them." *Id.* at 376.

Here, as in *Bearry*, the nonresident defendant has structured its transactions so as to avoid the benefits and protections of this forum's laws. Rotax's practice is not to sell its engines in Pennsylvania, but rather to make them available in Austria and transfer ownership there. (Fürlinger Aff. ¶ 5; Ferland Dep. at 96.) Moreover, Rotax, like Beech, has no physical presence in the forum state: it is not registered to do business here, does not maintain an agent for service of process here, has no office or bank account here, and pays no taxes here. (Fürlinger Aff. ¶¶ 8, 9, 11, 12, 15); *see also Bearry*, 818 F.2d at 372. Therefore, the fact that Rotax's engines flow into Pennsylvania is not

11

enough to establish general jurisdiction.  *See Bearry*, 818 F.2d at 376.  Accordingly, this Court will

not assert general jurisdiction over Rotax on this basis.[3]

### 3.    *Alter Ego Jurisdiction*

Finally, Plaintiffs suggest that Rotax is subject to the jurisdiction of this Court because at all

times relevant to this litigation, Rotax operated as the alter ego of its parent company, Bombardier.

Bombardier, although not headquartered in Pennsylvania, has not moved to dismiss the Complaint

on jurisdictional grounds and has not challenged Plaintiffs' claim that it "maintains continuous

contact with Pennsylvania by selling approximately 13,000 recreational equipment [sic] to

Pennsylvania each year." (Pls.' Opp'n at 10 n.3.) Bombardier's counsel, moreover, conceded at oral

argument that Bombardier does business in Pennsylvania.  Bombardier, therefore, is undisputedly

subject to general jurisdiction in Pennsylvania.  Consequently, Plaintiffs contend that Pennsylvania's

general jurisdiction over Bombardier extends to Rotax, its wholly-owned subsidiary, on the theory

that the two companies functioned as essentially one entity.

---

[3] The supplemental documents submitted by Plaintiffs on February 9, 2005 do not change
this Court's conclusion that Rotax's activities in Pennsylvania are insufficient to establish
general jurisdiction.  (*See* Pls.' App. 02468-02763 (Harley Davidson Invoices).)  These
documents evidence a recurring business relationship between Rotax and Harley Davidson
Motorcycles and indicate that Rotax made shipments of spare motorcycle parts to Harley
Davidson's York, Pennsylvania manufacturing facility.  (*Id.*)  It is undisputed, however, that
Rotax's "normal practice" is "not to get involved in [] shipping" and that Rotax usually transfers
ownership of its engines at its plant in Austria.  (Ferland Dep. at 96.)  As Rotax's sales of spare
parts to Pennsylvania are not central to its business of producing engines, these sales cannot serve
as the basis for general jurisdiction.  *See, e.g.*, *Orange Prods., Inc. v. Winters*, Civ A. No. 94-CV-
6004, 1995 WL 118461, at *4, 1995 U.S. Dist. LEXIS 3443, at *13 (E.D. Pa. Mar. 21, 1995)
(finding Pennsylvania sales not central to day to day operation of defendant's business
insufficient to establish general jurisdiction); *see also Provident Nat'l Bank v. Cal. Fed. Sav. &
Loan Ass'n*, 819 F.2d 434, 438 (3d Cir. 1987) (discussing distinction between activities
"important" to a defendant's business and activities "central" to that business, and holding that
only the latter suffice to create general jurisdiction).

a.      Overview of Alter Ego Principles

"A subsidiary will be considered the alter-ego of its parent only if the parent exercises control over the activities of the subsidiary." *Directory Dividends, Inc. v. SBC Communications, Inc.*, Civ. A. No. 01-CV-1974, 2003 WL 21961448, at *3, 2003 U.S. Dist. LEXIS 12214, at *8 (E.D. Pa. July 2, 2003) (*quoting Clemens v. Gerber Scientific, Inc.*, Civ. A. No. 87-5949, 1989 WL 3480, at * 1, 1989 U.S. Dist. LEXIS 376, at *4 (E.D. Pa. Jan. 13, 1989)). More precisely, a plaintiff must prove that the parent controls the day-to-day operations of the subsidiary such that the subsidiary can be said to be a mere department of the parent. *Arch v. Am. Tobacco Co.*, 984 F. Supp. 830, 837 (E.D. Pa. 1997) (citation omitted). If a plaintiff makes this showing, a court may exercise personal jurisdiction over either the parent or the subsidiary based on the other's connections to the forum. *See Zwick v. Revco Drug Store*, 580 F. Supp. 64, 66 (W.D. Pa. 1984) (stating that while usual scenario is for jurisdictional contacts of subsidiary to be attributed to parent, reverse situation may also occur); *see also Aamco Automatic Transmissions, Inc. v. Tayloe*, 368 F. Supp. 1283, 1300 (E.D. Pa. 1973) (stating that court's jurisdiction over parent company created argument for jurisdiction over subsidiary companies on alter ego basis).

The question of whether an alter ego relationship exists "should be examined in terms of the legal interrelationship of the entities, the authority to control and the actual exercise of control, the administrative chains of command and organizational structure, the performance of functions, and the public's perception." *In re Latex Gloves Prods. Liab. Litig.*, No. MDL 1148, 2001 WL 964105, at *3, 2001 U.S. Dist. LEXIS 12757, at *12 (E.D. Pa. Aug. 22, 2001). As part of this inquiry, courts in this District often consider the following discrete factors: (1) ownership of all or most of the stock of the subsidiary; (2) common officers and directors; (3) a common marketing image; (4) common

13

use of a trademark or logo; (5) common use of employees; (6) an integrated sales system; (7) interchange of managerial and supervisory personnel; (8) performance of business functions by the subsidiary which the principal corporation would normally conduct through its own agents or departments; (9) marketing by the subsidiary on behalf of the principal corporation, or as the principal's exclusive distributor; and (10) receipt by the officers of the subsidiary corporation of instruction from the principal corporation. *Directory Dividends*, 2003 WL 21961448, at \*3; *In re Latex Gloves Prods.*, 2001 WL 964105, at \*4; *Parker v. DPCE, Inc.*, Civ. A. No. 91-4829, 1992 WL 501273, at \*5, 1992 U.S. Dist. LEXIS 16921, at \*15 (E.D. Pa. Nov. 3 1992); *Superior Coal Co. v. Ruhrkohle, A.G.*, 83 F.R.D. 414, 421 (E.D. Pa. 1979). These factors are best viewed as a non-exclusive guide to help resolve the broader issue of whether the companies have a "single functional and organic identity." *See Directory Dividends*, 2003 WL 21961448, at \*3 (*citing In re Latex Gloves*, 2001 WL 964105, at \*3-4.)

> b.    Rotax's Relationship with Bombardier

The record amply demonstrates that Rotax functioned as the alter ego of Bombardier. First, there is no dispute that between 1998 and 2002, Bombardier owned all the stock of Rotax.[4] (Fürlinger Dep. at 34); s*ee In Re Latex Gloves*, 2001 WL 964105, at \*4 (noting that one hundred percent ownership "may be relevant to a finding of alter-ego or functional identity"). Moreover, although Rotax had its own management team (Ferland Dep. at 32), Bombardier's shareholders had the power to hire the chief executive of that team, known as Rotax's "general manager" (Fürlinger Dep. at 32-33). Rotax's general manager reported to a supervisory board of directors whose

---

[4] This was true until December of 2003, when Bombardier sold its recreational products division. (Ferland Dep. at 12.) According to Plaintiffs, Bombardier Recreational Products, Inc. is now the parent company of Rotax and distributes the same products to the United States as did Rotax's former parent company, Bombardier. (Pls.' Opp'n at 8 n.1.)

membership consisted not only of Rotax employees, but also of community members and Bombardier executives. (Fürlinger Dep. at 31; Ferland Dep. at 29); *see, e.g.*, *Directory Dividends*, 2003 WL 21961448, at *4 (finding that overlap in officers and directors demonstrated unity of identity between companies). The supervisory board, which met quarterly, served as the companies' vehicle for exchanging information about "any major business issues" and the "market conditions" in which Rotax was operating. (Ferland Dep. at 28-29, 34-35.)

A review of the supervisory board's discussions reveals that the Bombardier corporate office, rather than Rotax's own management team, made major business decisions for Rotax. At one board meeting, for instance, a debate ensued concerning the merits of spinning off a portion of Rotax's business into a separate business entity. (Pls.' App. 00909-00910 (Bd. Meeting Mins. of Aug. 22, 2000).) When the chairman commented that he did not think a new company should be formed, Rotax's general manager responded by stating that Rotax would ultimately "make this decision depending on [the] Corporate Office." (*Id.*) On another occasion, the board discussed Bombardier's desire to use Rotax as a corporate shell to facilitate a lease of a Bombardier aircraft to Lufthansa Airlines. (Pls.' App. 00855 (Bd. Meeting Mins. of Mar. 20, 2001).) A Bombardier executive indicated that Lufthansa could not conclude this deal directly with Bombardier's Aerospace Group because "[a]ircraft are registered on a country-specific basis . . . and besides there are also tax aspects." (*Id.*)

Coinciding with the supervisory board meetings were thorough quarterly reviews of Rotax by Bombardier executives. (Ferland Dep. at 19-21.) These executives, working under a Bombardier management entity known as Bombardier Recreational Product group ("BRP"), would visit Rotax and other "divisions" in order to "do a review of [the divisions'] performance versus their budget,

15

are they meeting the target that they had given themselves, are they generating the operating profit that the organization had committed, are they generating the cash that they had committed." (*Id.* at 13, 19-20.) Intertwined with this review process was a "bottoms-up process" by which Bombardier determined Rotax's budget and design. (*Id.* at 25.) Bombardier required all of its divisions to submit monthly financial statements to the corporate office. (Pls.' App. 00836 (Bombardier Policy on Financial Statements).) More significantly, BRP required the divisions to submit preliminary budgets and strategic plans each June for review and challenge. (Ferland Dep. at 22-25.) BRP would consolidate the data provided by each of the divisions to create an "overall plan" to share with the Bombardier corporate office. (*Id.* at 23.) In the month of August, BRP would have "strategic discussions" with the Bombardier corporate office about the overall plan, obtaining feedback "to realign our business priorities." (*Id.*) Between September and December, Rotax and the other divisions would undertake a more detailed budget process, reexamining the initial numbers submitted and updating their strategic plans. (*Id.*) This process concluded with a presentation by BRP "to Bombardier at the head office in the December time frame." (*Id.*) Once finalized, the Bombardier-approved plans were to cover wide-ranging matters such as products, pricing, communication and distribution. (Pls.' App. 00668-00675 (Bombardier Policy on Strategic Plans).)

Bombardier used a policy manual to govern numerous other aspects of its divisions' operations. (Pls.' App. 00668-00842 (Bombardier Policy Manual)); *see Directory Dividends*, 2003 WL 21961448, at *6 (citing parent company's "Code of Business Conduct Policy," which it distributed to its subsidiaries, as evidence of alter ego relationship). The manual, which encompassed Bombardier and all of its divisions and/or subsidiaries, regulated, inter alia: (1) communications and public relations (Pls.' App. 00688-00692); (2) incentive plans (Pls.' App.

16

00722-00729); (3) bids and proposals (Pls.' App. 00731-00732); (4) inventory valuation (Pls.' App. 00733-00734); and (5) internal control procedures (Pls.' App. 00735-00737).  Of particular note, the manual contained disclosure policies requiring new releases, press releases, and other documents containing financial information to be submitted to the corporate committee for review.  (Pls.' App. 00747-00764.)  These disclosure rules effectively precluded a Bombardier division from giving a speech or public presentation on its own behalf unless previously approved by the corporate office. (Pls.' App. 00761.)  The manual also governed staffing issues ranging from hiring to compensation. (Pls.' App. 00817-00834.)  Bombardier standardized performance appraisals, job classification, salary structure, and promotion, and required all of its subsidiaries to hire within the company whenever possible.  (*Id.*)  The policy manual even gave Bombardier control over asset acquisition and disposal, preventing the Bombardier entities from buying or selling capital assets without corporate approval.  (Pls.' App. 00783-00793.)  Although Rotax's former vice president, Josef Fürlinger, suggested that Rotax used this policy manual as merely a "reference document or a guideline," he also explained that this was simply because the company also had to follow Austrian law.  (Fürlinger Dep. at 41-42.)  For instance, he indicated that Rotax had its own traveling policy "to comply with the Austrian law, system and regulations."  (*Id.* at 42.)  Apart from this traveling policy, Fürlinger could recall no other Rotax policy that differed from those set forth in Bombardier's manual.  (*Id.*)

The symmetry between Rotax and Bombardier is further evidenced by Bombardier's extensive interest in and authority over Rotax's products.  *See In Re Latex Gloves*, 2001 WL 964105, at *6 (concluding that integrated sales and product development system revealed functional identity of companies).  While operating as Bombardier's wholly-owned subsidiary, Rotax supplied

17

approximately 45% of its engines directly to Bombardier.  (Ferland Dep. at 40.)  Bombardier, unlike a typical customer, always controlled the outcome of those deals – although the parties would negotiate, BRP's president had the power to make the final decision if an agreement could not be reached.  (*Id.* at 57.)  Rotax could not even develop a new engine without prior authorization from Bombardier.  (*See id.* at 26.)  Conversely, the supervisory board meeting minutes suggest that if Bombardier wished to develop an engine, Rotax's opinion on the matter would not be solicited. (Pls.' App. 0955 (indicating that Rotax would not be asked whether or not it could afford to develop an engine for personal watercraft, but rather would "simply be required to do it").)

Finally, Bombardier's representations to the public indicate that Bombardier viewed Rotax as simply a department of itself.  Phrases blurring the two companies together appeared repeatedly in Bombardier's annual reports.  (Pls.' App. 01016-01026 (Bombardier Annual Reports of 2000, 2001 & 2003).)  For instance, Bombardier treated Rotax's offices as its own by representing that "[a]t its Austrian facilities, Bombardier has a long heritage in manufacturing high-quality, high-performance four-stroke engines" and by reporting that "Rotax engines are designed and built at [BRP's] Austrian facilities."  (Pls.' App. 01020, 01026.)  Bombardier described Rotax engines as a part of BRP's "line" and stated that BRP has a workforce of over 1,200 in Austria.  (Pls.' App. 01021, 01023.)  Bombardier specifically attributed design and manufacturing of Rotax engines to itself when it claimed that "[BRP] teams are working continuously at developing light, economical, more environmentally friendly and high-performance Rotax engines that respond to public and consumers' expectations in an environment which evolves constantly."  (Pls.' App. 01025.)  In sum, Bombardier projected a common marketing image by continuously holding itself and Rotax out to the public "as a single entity that is conveniently departmentalized either nationally or world-wide."

18

*In Re Latex Gloves*, 2001 WL 964105, at *5 (*quoting Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*, 402 F. Supp. 262, 328 (E.D. Pa. 1975)).

In sum, Plaintiffs have adduced sufficient evidence to prove that Bombardier's control over Rotax was "greater than [the degree of control] normally associated with common ownership and directorship." *Id.* at *3 (citations omitted). Fürlinger's bald assertion that Bombardier is not involved with Rotax on a day-to-day basis (Fürlinger Dep. at 33-35) is not enough to refute Plaintiffs' lengthy accounting of the ways in which Bombardier dominated Rotax. As "[a] court must construe all facts in the light most favorable to the plaintiff when determining whether personal jurisdiction exists," *Pinker*, 292 F.3d at 368, this Court holds that Plaintiffs have satisfied their burden of showing that Rotax was a "mere department" of Bombardier, *Arch*, 984 F. Supp. at 837.

### c.    Fair Play and Substantial Justice

Even where an alter ego relationship has been shown, "personal jurisdiction must ultimately be consistent with traditional notions of fair play and substantial justice." *In Re Latex Gloves*, 2001 WL 964105, at *6 (citations omitted). In determining whether exercising jurisdiction would be fair and reasonable, a court must consider, among other things, "the burden on the defendant, the interests of the forum . . . and the plaintiff's interest in obtaining relief." *Asahi*, 480 U.S. at 113. In *Asahi*, the Supreme Court cautioned that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal market should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Id.* at 114. Yet, the Court also observed that "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum will justify even the serious burdens placed on the alien defendant." *Id.*

In this case, asserting jurisdiction over Rotax comports with fair play and substantial justice. Any burden on Rotax, a company headquartered in Austria, to defend itself in a foreign court is outweighed by the substantial interests of the Plaintiffs and this forum. It is undisputed that Plaintiffs are United States citizens and residents of Pennsylvania and that their injuries occurred in Pennsylvania. As a result, Plaintiffs' interest in having this case adjudicated in this state is "manifest." *Renault*, 985 F.2d at 1551. Moreover, "[w]hen a Pennsylvania resident is injured in the Commonwealth, Pennsylvania has a strong interest in providing a forum for the resident and in having the responsible defendants accountable for their actions in Pennsylvania." *Walsh v. Alarm Sec. Group, Inc.*, 157 F. Supp. 2d 501, 507 (E.D. Pa. 2001). Finally, as this is a products liability action, "[t]he interest of the United States in adjudicating this dispute is also manifest, given that it has a compelling interest in protecting persons within its borders from unsafe products that find their way into the country." *Renault*, 985 F.2d at 1551. These substantial interests may only be vindicated by an action against Rotax and Bombardier, as the other companies connected to the product's arrival in Pennsylvania are no longer amenable to suit in this forum. *See supra* Part II.B.1.b. Subjecting Rotax to jurisdiction is therefore fair and reasonable under the present circumstances.

Accordingly, Rotax's motion to dismiss is denied, and personal jurisdiction is asserted over Rotax as the alter ego of Bombardier.

## III.    BOMBARDIER'S MOTION FOR SUMMARY JUDGMENT

### A.    Standard of Review

Summary judgment is appropriate when the admissible evidence fails to demonstrate a dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV.

P. 56(c) (2005); *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247-48 (1986). When the moving

party does not bear the burden of persuasion at trial, that party may meet its burden on summary

judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of

persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thereafter, the

nonmoving party demonstrates a genuine issue of material fact if sufficient evidence is provided to

allow a reasonable jury to find for him at trial. *Anderson*, 477 U.S. at 248. To meet this burden,

the opposing party must point to specific, affirmative evidence in the record and not simply rely on

mere allegations, conclusory or vague statements, or general denials in the pleadings. *Celotex*, 477

U.S. at 324. In reviewing the record, "a court must view the facts in the light most favorable to the

nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d

768, 777 (3d Cir. 1994). Furthermore, a court may not make credibility determinations or weigh the

evidence in ruling upon the motion. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150

(2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

**B.    Discussion**

Bombardier contends that it is entitled to summary judgment on Plaintiffs' strict liability,

negligence, and breach of warranty claims because it did not design, manufacture, sell, or control the

engine in question. In products liability cases, Pennsylvania follows § 402A of the Restatement

(Second) of Torts, under which a plaintiff must prove that: (1) the product was defective; (2) the

defect existed when it left the hands of the defendant; and (3) the defect proximately caused injury

to him or her. *See Putt v. Yates-Am. Mach. Co.*, 722 A.2d 217, 220 (Pa. Super. Ct. 1998) (citation

omitted). Liability attaches to any manufacturer, wholesale or retail dealer, distributor and all

suppliers of a defective product in the chain of distribution, including retailers, partmakers, and

assemblers. *See Balczon v. Mach. Wholesalers Corp.*, 993 F. Supp. 900, 903-04 (W.D. Pa. 1998); *see also* RESTATEMENT (SECOND) OF TORTS § 402A cmt. f (1965). A defendant that exercises no control or possession over the defective product, however, is not strictly liable for injuries sustained by a plaintiff in the use or consumption of that product. *Balczon*, 993 F. Supp. at 905. Bombardier thus argues that the Rotax product at issue was never within Bombardier's control and that Plaintiffs have not satisfied their burden of proving otherwise. (Defs.' Mot. at 46-47.)

Plaintiffs rightly point out that Bombardier's § 402A argument is not relevant to their negligence claim.[5] By its own terms, § 402A is a rule of strict liability that "does not preclude liability based upon the alternative ground of negligence of the seller, where such negligence can be proved." RESTATEMENT (SECOND) OF TORTS § 402A cmt. a; *see also Phillips v. Cricket Lighters*, 841 A.2d 1000, 1008 (Pa. 2003) (noting that strict liability and negligence are distinct legal theories and that a negligence claim cannot be disposed of without inquiring into reasonableness of manufacturer's conduct in creating and distributing product). For this reason, Bombardier's motion for summary judgment is denied as to Plaintiffs' negligence claim.

Regardless, Bombardier's motion is denied in its entirety because genuine issues of fact exist regarding the extent of Bombardier's control over the allegedly defective engine. *Balczon*, the case upon which Bombardier relies almost exclusively, involved a defendant that had acted as a "broker" for the plaintiff's employer in purchasing an allegedly defective press. 993 F. Supp. at 902. The court held that the defendant, Machinery Wholesalers, could not be held strictly liable under § 402A because "Machinery Wholesalers had no control or involvement in the manufacture or design of the Bliss press, was not directly involved in the selection of the press by Lakeview Forge, made no

_____

[5] This argument bears only upon Plaintiffs' claims for breach of warranty and strict liability. *See Kridler v. Ford Motor Co.*, 422 F.2d 1182, 1184 (3d Cir. 1970) (noting § 402A's standards apply to breach of warranty as well as strict liability).

22

representation to its quality or soundness, and had only momentary control over the press." *Id.* at 905. By contrast, in the instant case, Plaintiffs have produced substantial evidence suggesting that Bombardier was intimately involved with the manufacture and distribution of Rotax engines. S*ee supra* Part II.B.3 (discussing evidence of alter ego relationship between the companies). Therefore, Bombardier may qualify as a "seller" subject to § 402A liability. *See Balczon*, 993 F. Supp. at 905.

Accordingly, Bombardier's motion for summary judgment is denied.


**IV.    CONCLUSION**

For the reasons stated above, Rotax's motion to dismiss and Bombardier's motion for summary judgment are denied. An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THERESA MARIE SIMEONE, Personal** | : | |
| **Representative of the Estate of Albert** | : | |
| **Francis Simeone, Jr., Deceased, et al.,** | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **BOMBARDIER-ROTAX GMBH,** | : | |
| **Individually and as a Joint Venture** | : | |
| **and/or d/b/a Rotax, et al.,** | : | **No. 02-4852** |
| **Defendants.** | : | |

**ORDER**

**AND NOW**, this **8ᵗʰ** day of **March, 2005**, upon consideration of Defendant Rotax's Motion to Dismiss Plaintiff's Complaint for Lack of Personal Jurisdiction and Defendants Bombardier Inc.'s and Bombardier Corporation's Motion for Summary Judgment (Document No. 31), Plaintiffs' response thereto, all replies thereon, oral argument on March 2, 2005, and for the foregoing reasons, it is hereby **ORDERED** that:

1.    Defendant Rotax's motion to dismiss for lack of personal jurisdiction is **DENIED**.

2.    Defendant Bombardier, Inc.'s motion for summary judgment is **DENIED**.

3.    Defendant Bombardier Corporation's motion for summary judgment is **GRANTED**.

**BY THE COURT:**


**\s Berle M. Schiller**
**Berle M. Schiller, J.**