+

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THERESA MARIE SIMEONE, Personal | : | |
| Representative of the Estate of Albert Francis | : | |
| Simeone, Jr., Deceased, and THERESA MARIE | : | CIVIL ACTION NO. 02CV4852 |
| SIMEONE, In Her Own Right, and | : | |
| MARY ANN LENGYEL, Personal | : | |
| Representative of the Estate of George Lengyel, | : | |
| Deceased, and MARY ANN LENGYEL, | : | JURY TRIAL DEMANDED |
| In Her Own Right | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| BOMBARDIER CORPORATION GmbH, et al. | : | |
| | : | |
| Defendants. | : | |

---

## BRIEF IN SUPPORT OF DEFENDANT
## BRP-ROTAX GMBH & CO. KG's  and DEFENDANTS BOMBARDIER INC.'S
## MOTION FOR AMENDMENT OF ORDER PURSUANT TO 28 U.S.C. § 1292(b)

Robert J. Kelly, Esq.
  Of Counsel

Suna Lee, Esq.
  On the Brief

398866.2

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iv

PRELIMINARY STATEMENT .......................................................................3

STATEMENT OF FACTS ...............................................................................5

   A. Underlying Motion and the Court's Memorandum and Order ...........................5

   B. The Court's Opinion Does Not Address Numerous Facts in the
      the Record Contradicting the Conclusion that Rotax Was the
      the Alter Ego of Bombardier..................................................................7

LEGAL ARGUMENT .....................................................................................10

   POINT I ...................................................................................................10

      STANDARD OF REVIEW: DISTRICT JUDGE HAS DISCRETION
      TO CERTIFY INTERLOCUTORY ORDERS FINDING PERSONAL
      JURISDICTION OVER NONRESIDENT DEFENDANT AND
      DENYING SUMMARY JUDGMENT FOR IMMEDIATE APPEAL ...........................10

   POINT II ..................................................................................................11

      A SUBSIDIARY CORPORATION IS NOT CONSIDERED AN
      ALTER EGO OF THE PARENT CORPORATION EVEN
      WHERE THE PARENT EXERTS "MACRO-MANAGEMENT"
      OF THE SUBSIDIARY'S OPERATIONS ................................................................11

   A. U.S. Supreme Court Decisions .......................................................................11

   1. *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333 (1925)......................11

   2. *United States v. Bestfoods*, 524 U.S. 51 (1998)..............................................12

   B. Middle District of Pennsylvania and Courts of Appeal ...................................13

   1. *Savin Corporation v. Heritage Copy Products, In*c.,
      661 F.Supp. 463 (M.D. Pa. 1987)................................................................14

   2. *Doe v. Unocal Corporation*, 248F.3d 915 (9th Cir.2001) .............................15

   3. *Hargrave v. Fibreboard Corp.*, 710F.2d 1154 (5th Cir. 1983) ......................17

   4. *Quarles v. Fuqua Industries, Inc.*, 504 F.2d 1358 (10th Cir.1974) .................17

5. District Court Opinions from Other Jurisdictions...........................................................18

POINT III.................................................................................................................................20

THIS COURT'S CONCLUSION THAT ROTAX WAS THE ALTER EGO
OF BOMBARDIER WAS BASED UPON FINDINGS OF BOMBARDIER'S
ALLEGED "MACRO-MANAGEMENT" OF THE "TOP-LEVEL" OF ROTAX'S
OPERATIONS RATHER THAN "MICRO-MANAGEMENT" OF ROUTINE,
DAY-TO-DAY OPERATIONS ...................................................................................20

POINT IV..................................................................................................................................23

JURSIDCTION OVER ROTAX VIA THE ALTER EGO THEORY
DOES NOT COMPORT WITH TRADITIONAL NOTIONS OF
FAIR PLAY AND SUBSTANTIAL JUSTICE IN THE ABSENCE OF
A FULL CONSIDERATION OF GOVERNING LEGAL AUTHORITY
AND EVIDENCE IN THE RECORD...........................................................................23

POINT V ...................................................................................................................................24

AN IMMEDIATE APPEAL OF THIS COURT'S ORDER WILL
MATERIALLY ADVANCE THE ULTIMATE TERMINATION
OF THIS LITIGATION ..............................................................................................24

CONCLUSION..........................................................................................................................25

## TABLE OF AUTHORITIES

### FEDERAL CASES

AT&T v. Compagnie Bruxelles Lambert,
94 F.2d 586 (9th Cir. 1996) ..................................................................17

Akzona, Inc. v. E.I. DuPont DeNemours and Co.,
607 F.Supp. 227 (D.Del. 1984)..............................................................16

Alvarado Morales v. Digital Equipment Corp.,
669 F.Supp. 1173 (D.P.R. 1987 .............................................................19

Arch v. American Tobacco Co., Inc.,
984 F.Supp. 830 (E.D.Pa. 1997) ......................................................14,23

Cannon Manufacturing Co. v. Cudahy Packing Co.,
267 U.S. 333 (1925).......................................................................11,12,15

City of Englewood v. Socialist People's Libyan Arab,
773 F.2d 31 (3d. Cir. 1985).....................................................................10

Clark v. Matsushita Electric Industrial Co., Ltd.,
811 F.Supp. 1061 (M.D.Pa.1993) ..........................................................23

Creative Waste Management, Inc. v. Capitol Environmental Services, Inc.,
No. 04-1060, 2004 U.S.Dist. LEXIS 21497 (E.D. Pa.) .....................11

Croyle v. Texas Eastern Corp.,
464 F.Supp. 377 (W.D. Pa.1979)............................................................23

Dayhoff Inc. v. H.J. Heinz Co.,
86 F.2d 1287 (3d. Cir. 1996)...................................................................11

Doe v. Unocal Corporation,
248 F.3d 915 (9th Cir. 2001) .........................................................14,15,

Fletcher v. Atex, Inc.,
68 F.3d 1451 (2d. Cir. 1995)...................................................................16

Gardemal v. Westin Hotel Company,
186 F.3d 588 (5th Cir. 1999) ................................................................23

Hargrave v. Fibreboard Corp.,
710 F.2d 1154 (5th Cir. 1983) ......................................................14,17,23

Huang v. Sentinel Government Securities,
657 F.Supp. 485  (S.D.N.Y. 1987) ............................................................19

IMO Industrial V. Kiekert AG,
155 F.2d 254 (3d Cir. 1998 ......................................................................11

Joiner v. Ryder System,
966 F.Supp. 1478 (C.D.Ill.1996) ..............................................................16

Juzwin v. Asbestos Corporation, Ltd.,
900 F.2d 686 (3d. Cir. 1990......................................................................10

Kramer Motors, Inc. v. British Leyland, Ltd.,
628 F.2d 1175(9th Cir. 1980) .............................................................17,19

In re: Lupron Marketing and Sales Practices Litigation,
245 F.Supp.2d 280 (D.Mass. 2003) ....................................................14,19,20

Max Daetwyler Corp. v. Meyer,
762 F.2d 290 (3d. Cir. 1985).....................................................................10

Nehemiah v. Athletics Congress of U.S.A.,
765 F.2d 42 (3d Cir. 1985)........................................................................10

Pennzoil Products Co. v. Colelli & Associates, Inc.,
149 F.2d 197 (3d Cir. 1998 .......................................................................10

Poe v. Babcock International, plc,
662 F.Supp. 4 (M.D. Pa.1985).....................................................................23

Quarles v. Fuqua Industries, Inc.,
504 F.2d 1358 (10th Circ. 1974).......................................14,17,18,20,21,23

Savin  Corporation v. Heritage Copy Products, Inc.,
661 F.Supp. 463 (M.D. Pa. 1987) ......................................................13,14,15,23

United States v. Bestfoods,
524 U.S. 51 (1998)..............................................................................12,13,20

Voilas v. Local #731 International Union,
170 F.3d. 367 (3d. Cir. 1999).....................................................................10

Vogt v. Greenmarine Holding, LLC,
No. 1:01cv0311, 2002 U.S.Dist. LEXIS 21013 (N.D.Ga.)............................10,12,13,14,19

## FEDERAL STATUTES

28 U.S.C. § 1292(b) .........................................................................................................10,25

## PRELIMINARY STATEMENT

This is a product liability action arising out of an ultralight aircraft accident which occurred on July 22, 2000 in Pennsylvania. Plaintiff alleges that Rotax, an Austrian corporation, designed, manufactured and/or sold the aircraft's engine. By Memorandum and Order, entered on March 9, 2005, the Court found that Rotax did not have sufficient minimum contacts with Pennsylvania to be subject to either specific or general jurisdiction. Nonetheless, the Court denied Rotax's motion to dismiss for lack of personal jurisdiction on the ground that Rotax was the alter ego of its parent corporation, Bombardier, and therefore, imputed Bombardier's alleged jurisdictional contacts to Rotax. Relying upon this theory, the Court also denied Bombardier's summary judgment motion on the ground that it controlled the engine via its alter ego, Rotax.

The Court's conclusion was based largely upon its findings of Bombardier's formulation of and control over Rotax's general business policies and strategies, i.e. "macro-management" rather than "micro-management."[1]  Factually, the Court relied upon examples of Bombardier's supervision and oversight of Rotax's business as a whole, such as participation in Rotax's supervisory board; investment decisions; and issuance of a policy manual rather than control of routine matters of day-to-day operations. Precedentially, the Court relied principally upon only two District Court opinions and failed to address the ample legal authority to the contrary from the Supreme Court, the Middle District of Pennsylvania, and Courts of Appeals from other jurisdictions which make clear that parental control and management of the "top-level" of the subsidiary's operations do not amount to an alter ego relationship. Those cases expressly caution that to establish an alter ego relationship, plaintiffs must prove that the parent controls the "day

398866.2

to day" operations of the subsidiary to the point where the corporate distinctions are essentially meaningless.

The Opinion does not address the abundant evidence in the record which illustrates that Rotax, not Bombardier, controlled its daily operations. Rotax had its own management team; prepared its own financial and tax statements; maintained its own bank accounts and did not borrow money from Bombardier; procured its own insurance; used a separate electronic communications system; maintained its own logo, manufacturing operation, warranty system, pension, travel policy, patents; used technology different from that offered to it by Bombardier; dealt with Bombardier as a customer; and did not interchange managerial personnel with Bombardier. Despite same, the Court points to only two examples and immediately dismisses them as being either irrelevant or unreliable. Thus, proper interpretation of controlling precedent raises a controlling question of law as to which there is substantial ground for difference of opinion. Moroever, an immediate appeal on this issue will materially advance the ultimate termination of this litigation since a reversal of the Order will conclude the action. Accordingly, Rotax and Bombardier now move for an amendment of the Order to certify same for interlocutory review pursuant to 28 U.S.C. § 1292(b).

---

( . . . continued)
   [1] The term "macro-management" is used by the 9th Circuit Court of Appeals in *Doe v. Unocal Corporation*, 248 F.3d 915, 927 (9th Cir. 2001). While no express definition is provided therein, the Court refers to "formulation of general business policies and strategies" and "dictat[ion] of broad policy decisions."

4

398866.2

## STATEMENT OF FACTS

In the interest of judicial economy, Rotax and Bombardier rely upon the Statement of Facts set forth in the underlying motions. However, Rotax highlights the following from the record:

### A.    Underlying Motion and the Court's Memorandum and Order

Plaintiffs allege that Defendant BRP-Rotax GmbH & Co. KG f/k/a Bombardier-Rotax GmbH & Co. KG (hereinafter "Rotax"), an Austrian corporation, designed, manufactured, and/or sold the engine used in the aircraft. Plaintiffs allege that Rotax is a subsidiary of Defendant Bombardier Inc. (hereinafter referred to as "Bombardier"), a Canadian corporation. On or about December 22, 2004, Rotax moved to dismiss Plaintiffs' Complaint for lack of personal jurisdiction. Bombardier moved for summary judgment on the ground that it did not design, manufacture, sell, or otherwise distribute the engine.[2]

By Order, dated March 8, 2004 and entered on March 9, 2004, this Court, by the Honorable Berle M. Schiller, U.S.D.J., denied both Rotax's and Bombardier's motions.[3]  [See Exhibit A to Kelly Certification]. The Court's conclusions can be summed up in its first paragraph:

> Three distinct theories of personal jurisdiction are at issue:  (1) specific jurisdiction; (2) general jurisdiction; and (3) alter ego jurisdiction, i.e., jurisdiction over one company because it is functionally equivalent to another. While Rotax's activities in Pennsylvania do not subject it to either specific or general

---

[2] Defendant Bombardier Corporation also moved for summary judgment. During the pendency of the motion, Plaintiffs voluntarily dismissed Bombardier Corporation.

[3] Notwithstanding the voluntary dismissal, the Court granted Bombardier Corporation's summary judgment motion. Obviously, no review is sought on that portion of the Court's Order.

398866.2

jurisdiction in this forum, there is sufficient evidence to sustain
jurisdiction over Rotax as the alter ego of Bombardier, Inc.
("Bombardier"). Moreover, the evidence that these two companies
were functional equivalents belies Bombardier's assertion that it
had no control over the pertinent engine. Therefore, Defendant
Rotax's motion to dismiss and Defendant Bombardier's motion for
summary judgment are both denied.

[Exhibit A, p. 1].

The Court held that the "record amply demonstrates that Rotax functioned as the alter ego

of Bombardier." While the Court initially noted Bombardier's 100% ownership of Rotax stock

and executives on Rotax's supervisory board, the Court emphasized that Bombardier (1) "made

major decisions for Rotax"; (2) reviewed Rotax's business plans; and (3) issued its policy

manual to Rotax. The majority of the examples of Bombardier's alleged control of Rotax

identified by Court amounted to participation in the "top-level" of the subsidiary's operations

rather than day-to-day operations. The Court found, *inter alia*, as follows:

- Rotax reported to a supervisory board consisting of some Bombardier executives;
- Bombardier retained authority to hire Rotax's general manager;
- Bombardier made "major business decisions" for Rotax;
- Bombardier reviewed Rotax's performance on a quarterly basis;
- Bombardier determined Rotax's "budget and design" [sic];
- Bombardier required Rotax to submit monthly financial statements, preliminary budgets and strategic plans regarding products, pricing, communication, and distribution;
- Bombardier consolidated data from various divisions to create its "overall plan;"
- Bombardier Policy Manual regulated its divisions' communications and public relations; incentive plans; bids and proposals; inventory valuations; internal control procedures; staffing issues; asset acquisition and sale; and
- Bombardier authorized development of an engine without soliciting Rotax's opinion;
- Bombardier purchased 45% of Rotax's engines and Bombardier retained authority to make final decisions in business negotiations with Rotax.

[Exhibit A, pp. 14-18].

398866.2

*Id.* at 14-19. The Court's Opinion does not expressly state whether Bombardier's alleged control over Rotax's activities was of the "top-level" of Rotax's operations or of its day-to-day operations. *See Id.* at 14-19. Rather, the Opinion simply itemizes the examples of Bombardier's alleged control as being illustrative of an alter-ego relationship. *Id.*

The Court relied upon the alter ego theory not only to assert personal jurisdiction over Rotax, but also to deny Bombardier's motion for summary judgment on the ground that it did not design, manufacture, or distribute the Rotax engine. *Id.* at 22-23. The Court held that "Bombardier's motion [for summary judgment] is denied in its entirety because genuine issues of fact exist regarding the extent of Bombardier's control over the allegedly defective engine." *Id.* at 22.

### B.  The Court's Opinion Does not Address Numerous Facts in the Record Contradicting the Conclusion that Rotax Was the Alter Ego of Bombardier.

The Opinion declines to discuss one of the hallmarks of a judicial finding of an alter ego relationship:  lack of observance of corporate formalities.   The Opinion is also devoid of any findings that Rotax failed to maintain its own offices, management team, books or bank accounts; document its sales transactions with Bombardier; procure its own insurance; or prepare its own budgets or strategic plans. [Exhibit A, pp. 14-19].   While the Opinion mentions that Rotax had its own travel policy despite the Bombardier policy manual, it immediately dismisses same as being only a single example of separateness. [Exhibit A, p. 17].  Likewise, the Opinion dismisses the deposition testimony of Rotax's director specifically stating that Rotax, not Bombardier, controlled its day-to-day business as being unreliable even though his testimony and other deposition testimony is cited in support of examples to the contrary. [Exhibit A, p. 19; see pp. 14-19].

398866.2

The Opinion contains no discussion or apparent consideration of the following evidence in the record that Rotax was separate corporate entity from Bombardier and controlled its own day-to-day operations:

- Rotax is an Austrian corporation with a principal place of business in Gunskirchen, Austria.
  [See Plaintiffs' Complaint, p. 4, annexed as Exhibit B to Certification of Robert J. Kelly, dated December 21, 2004 previously submitted to this Court with underlying motion].
- Bombardier is a Canadian corporation with a principal place of business in Canada.
  *Id.*
- Rotax owns its own property in Austria at which its facilities are located.
  [See Transcript of Deposition Testimony of Josef Fürlinger, dated December 3, 2004, annexed as Exhibit 1 to Certification of Robert J. Kelly, dated February 14, 2005, previously submitted with underlying motion, T65:L11-13].
- Rotax has its own management team, including, a general manager, a vice-president of finance responsible for all of the financial reporting and performance of Rotax, a vice-president for human resources, a vice president for engineering.
  [See Transcript of Deposition Testimony of Claude Ferland, dated November 12, 2004, included in Plaintiffs' Appendix of Exhibits previously submitted with underlying motion, APP-00031-32]
- Rotax's own management team prepares Rotax's budgets and strategic plans in Austria.
  [APP-00021]
- Rotax prepares its own financial, including tax, statements.
  [APP-00033]
- Rotax has its own bank accounts and does not borrow any funds directly from Bombardier.
  [APP-000106-07]
- Rotax procured its own insurance for its engines until July 2001.
  [APP-00068]
- Rotax purchased its own raw materials and not through Bombardier.
  [APP-000107]
- Rotax used separate electronic communication system.
  [APP-00082-83]
- A minority of common officers/directors; majority of supervisory board comprised of Rotax or other Austrian representatives.
  [APP-00029-30]
- Few, if any, common employees.
  [Exhibit 1, T162-63]
- Rotax exercised relative autonomy in its dealings with customers other than Bombardier Inc.
  [Exhibit 1, T63-64]]

8

- Lack of interchange of managerial personnel between Bombardier and Rotax.
  [Exhibit 1, T64-65]
- Rotax maintenance of its own logo.
  [Exhibit 1, T121-24; T126-27]
- Rotax maintenance of its own warranty system.
  [Exhibit 1, T140-42].
- Rotax maintenance of its own manufacturing operation.
  [APP-00098; 00108]
- Rotax maintenance of its own distribution network.
  [APP-00065-66; Exhibit 1, T104-05; T120-21]
- Rotax's used Orbital fuel technology rather than FICHT technology when Bombardier acquired FICHT technology from OMC.
  [APP-00038-41]
- Rotax maintenance of its own pension plan.
  [APP-108]
- Rotax maintenance of its own patents.
  [APP-00069]
- Rotax's sales to Bombardier documented by purchase orders and Bombardier's monetary payment to Rotax for its purchases.
  [APP-89]

9

**LEGAL ARGUMENT**

**POINT I**

**STANDARD OF REVIEW:**
**DISTRICT JUDGE HAS DISCRETION TO CERTIFY INTERLOCUTORY ORDERS**
**FINDING PERSONAL JURISDICTION OVER NONRESIDENT DEFENDANT AND**
**DENYING SUMMARY JUDGMENT FOR IMMEDIATE APPEAL.**

28 U.S.C. § 1292(b) provides that a district judge may certify for immediate appeal an otherwise unappealable order when the judge is of the view that

1)    the order involves a controlling question of law as to which there is substantial ground for difference of opinion; and

2)    an immediate appeal from the order may materially advance the ultimate termination of the litigation.

28 U.S.C. § 1292(b).    The statute provides that if the district judge is indeed of such view, "he shall so state in writing in such order." *Id.* Upon certification by the district judge, the Court of Appeals, in its discretion, may permit the appeal. *See Pennzoil Prods. Co. v. Colelli & Associates, Inc.*, 149 F.2d 197, 200 (3d Cir. 1998).

The Third Circuit Court of Appeals has granted permission for immediate appeal of orders by the district court finding personal jurisdiction over a non-resident defendant pursuant to 28 U.S.C. § 1292(b). *See Pennzoil Prods. Co.*, 149 F.2d at 200; *City of Englewood v. Socialist People's Libyan Arab*, 773 F.2d 31, 32 (3d Cir. 1985); *Nehemiah v. Athletics Congress of U.S.A.*, 765 F.2d 42, 44 (3d Cir. 1985); *Max Daetwyler Corp. v. Meyer*, 762 F.2d 290, 291-92 (3d Cir. 1985). Likewise, the Third Circuit Court of Appeals has granted permission for immediate appeal of orders by the district court denying summary judgment. *Voilas v. Local #731 International Union*, 170 F.3d 367, 370 (3d Cir. 1999); *Juzwin v. Asbestos Corporation, Ltd.*, 900 F.2d 686, 688 (3d Cir. 1990).

10

**POINT II**

**A SUBSIDIARY CORPORATION IS NOT CONSIDERED AN ALTER EGO OF THE
PARENT CORPORATION EVEN WHERE THE PARENT EXERTS "MACRO-
MANAGEMENT" OF THE SUBSIDIARY'S OPERATIONS.**

Once a defendant has raised a jurisdictional defense, the burden shifts to the plaintiff to
prove that jurisdiction exists in the forum state. *Creative Waste Mgmt., Inc. v. Capitol
Environmental Services, Inc.*, No. 04-1060, 2004 U.S. Dist. LEXIS 21497, at *5 (E.D. Pa.
October 22, 2004) (*citing IMO Indus. V. Kiekert AG*, 155 F.2d 254, 257 (3d Cir. 1998); *Dayhoff
Inc. v. H.J. Heinz Co.*, 86 F.2d 1287, 1302 (3d Cir. 1996)). Given the governing legal authority
analyzed below, Plaintiffs in the present case cannot meet that burden.

    A.      <u>**U.S. Supreme Court Decisions**</u>

    1.      ***Cannon Mfg. Co. v. Cudahy Packing Co.,* 267 U.S. 333 (1925)**

Whether a subsidiary corporation can be considered an alter ego of the parent corporation
where the alleged control by the parent is limited to "macro-management" of the subsidiary's
operations rather than management of its daily operations raises a controlling question of law as
to which there is substantial difference of opinion. The Court's Memorandum fails to address
Supreme Court opinions which hold that even where the parent "controls" the subsidiary, an alter
ego relationship is not necessarily found so long as they maintain separate and distinct forms.
For example, in *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333 (1925), the Supreme
Court declined to find jurisdiction over the non-resident defendant parent despite finding that the
parent controlled the subsidiary "immediately and completely," where the existence of the
subsidiary as a distinct corporate entity was observed. In that case, Plaintiff sought to impute the
jurisdictional contacts of a subsidiary corporation to a non-resident defendant parent corporation

11

under the alter ego theory.  In rejecting the contention that an alter ego relationship existed, the

Court reasoned:

> Through ownership of the entire capital stock and otherwise, **the
> defendant dominates the Alabama corporation, immediately
> and completely**; and exerts its control both commercially and
> financially in substantially the same way, and mainly through the
> same individuals, as it does over those selling braches or
> departments of its business not separately incorporation which are
> established to market the Cudahy products in other states  **The
> existence of the Alabama company as a distinct corporate
> entity is, however, in all respects observed.**  Its books are kept
> separate.  All transactions between the two corporations are
> represented by appropriate entries in their respective books in the
> same way as if the two were wholly independent corporations. . .
> .**The corporate separation, though perhaps merely formal, was
> real.  It was not pure fiction.** . . .  [W]e cannot say that for
> purposes of jurisdiction, the business of the Alabama corporation
> in North Carolina became the business of the defendant.

*Id.* at 335-38.  [Emphasis added].  Accordingly, the Court affirmed the district court's dismissal

of the non-resident defendant corporation for lack of personal jurisdiction.  *Id.* at 338.

### 2.   *United States v. Bestfoods*, 524 U.S. 51 (1998)

Likewise in *United States v. Bestfoods,* 524 U.S. 51 (1998), the Supreme Court held that

an alter ego relationship is not found even where the parent corporation is directly involved in

the activities of its subsidiary corporation.[4]  In that case, the EPA sought to impute liability

against a parent corporation for costs in cleaning up the subsidiary's hazardous waste site

arguing that the parent effectively controlled the subsidiary via certain actions taken by an

employee of the parent.  *Id.* at 62.  While the Court declined to make any conclusions with

respect to those actions, the Court nonetheless held generally that a parent can be directly

398866.2

involved in the activities of its subsidiary, such as monitoring the subsidiary's performance; supervising its finance and capital budget decisions; and articulating general policies procedures, as in the present case, without creating an alter ego relationship. *Id.* at 71-72. The Court reasoned:

> . . . [A]cts of direct operation that give rise to parental liability must necessarily be distinguished from the interference that stems from the normal relationship between parent and subsidiary. Again norms of corporate behavior . . . are crucial reference points. Just as we may look to such norms in identifying the limits of presumption that a dual officeholder acts in his ostensible capacity, **so here we may refer to them in distinguishing a parental officer's oversight of a subsidiary from such an officer's control over the operation of the subsidiary's facility. Activities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability.**

*Id.* at 72. [Emphasis added].

**B.      Middle District of Pennsylvania and Courts of Appeal**

The Court's Opinion also does not address reported opinions from the Middle District of Pennsylvania or the Courts of Appeals and District Courts from other jurisdiction which specifically discuss the distinction between "macro-management and micro-management" and which consistently decline to find an alter ego relationship where the alleged control by the parent is limited to what can be described as "top-level" of the subsidiary's operations or supervisory in nature as opposed to management of its day-to-day operations. *See Savin*

---

( . . . continued)
    [4] In *Bestfoods*, the Supreme Court addressed alter ego in the context of liability rather than jurisdiction. However, the analysis is generally applicable. See *Vogt v. Greenmarine Holding, LLC*, No. 1:01cv0311, 2002 U.S. Dist. LEXIS 21013 at * 25, n.8 (N.D. Ga. February 25, 2002).

398866.2

*Corporation v. Heritage Copy Products, Inc.*, 661 F. Supp. 463, 469 (M.D. Pa. 1987)("To establish an alter-ego relationship, it must be proven that the parent controls the **day-to-day affairs** of the subsidiary . . . ."); *Doe v. Unocal Corporation*, 248 F.3d. 915 (9th Cir. 2001) (". . . [P]roper inquiry for an alter ego relationship is whether parent exercised **day-to-day** control of subsidiaries."); *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154 (5th Cir. 1983); *Quarles v. Fuqua Industries, Inc.*, 504 F.2d 1358 (10th Circ. 1974); *In re: Lupron® Marketing and Sales Practices Litig.*, 245 F. Supp. 2d 280 (D.Mass. 2003);; *Vogt v. Greenmarine Holding, LLC*, No. 1:01cv0311, 2002 U.S. Dist. LEXIS 21013 (N.D. Ga. February 25, 2002)[5]. [Emphasis added].

### 1. *Savin Corporation v. Heritage Copy Products, Inc.*, 661 F. Supp. 463, 469 (M.D. Pa. 1987)

In *Savin Corporation v. Heritage Copy Products, Inc*, the District Court declined to impute the jurisdictional contacts of the subsidiary corporation to the defendant non-resident parent corporation on alter ego grounds. The Court did so notwithstanding the parent's control of the subsidiary with respect to "top-level" of the subsidiary's operations and numerous other commonalities such as the parent's majority ownership of the subsidiary's stock; substantial financial support to subsidiary; overlapping officers and directors; consolidation of financial statements; and sharing of office space. *Id.* at 469-71. The Court did not consider these commonalities, even together, to be illustrative of an alter ego relationship. Rather, the Court focused on the nature of the alleged control including: weekly visits by the parent's officer to

---

[5] See also *Arch v. American Tobacco Co., Inc.*, 984 F. Supp. 830, 837 (E.D. Pa. 1997) ("To establish an alter-ego relationship, plaintiffs must prove that [the parent corporation] controls the **day-to-day** operations of [the subsidiary corporation] such that [the subsidiary corporation] can be said to be a mere department of [the parent corporation]." However, in that case, the distinction was not addressed.

398866.2

oversee its investment in the subsidiary; control by the parent of the subsidiary's executive committee; participation by the parent in the determination of the salaries for subsidiary's executives, and the firing of the subsidiary's president. *Id.* at 470. The Court found that such involvement by the parent did not involve control of the subsidiary's daily operations and thus did not illustrate the existence of an alter ego relationship. Relying upon the Supreme Court's decision in *Cannon Mfg. Co. v. Cudahy Packing Co*, *supra*, the Court in *Savin* explained as follows:

> While these facts indicate some degree of control by CDC [the parent] over Savin [subsidiary], **they do not convince the court that CDC exercised the type of control over Savin's day-to-day operations which would evidence an alter ego relationship**. In *Cannon*, the parent controlled its subsidiary "immediately and completely [citation omitted], but the [Supreme] Court there still found that the separation between the corporations was real. **Here, the decisions in which CDC is alleged to have participated involved only the "top-level" of Savin's operations**. This is readily understandable in light of the fact that one CDC officer spent one day per week in the United States dealing with Savin affairs. **Again, the type of control which Heritage is emphasizing appears to be no more than what would be expected from a majority shareholder**.

*Id.* [emphasis added]. In addition, the Court noted that the businesses of the two corporations were entirely different and adhered to formal legal requirements; the subsidiary did not act as a marketing arm for the parent; and no common marketing image or trademark was used. *Id.* at 471. Accordingly, the Court granted the non-resident defendant's motion to dismiss for lack of personal jurisdiction. *Id.* at 472.

2.    *Doe v. Unocal Corporation*, 248 F.3d. 915 (9th Cir. 2001)

Likewise in *Doe v. Unocal Corporation*, 248 F.3d 915 (9th Cir. 2001), the Court of Appeals also declined to find an alter ego relationship where the parent corporation's alleged

15

398866.2

control was limited to "macro-management" of the subsidiary rather than management of its

daily operations.    In that case, the Court cautioned that "the alter ego test is satisfied [only]

where the record indicates that the parent dictates 'every facet [of the subsidiary's] business –

from broad policy decisions to routine matters of day-to-day operation." *Id.* at 926.  Plaintiffs in

that case argued that the subsidiary was the alter ego of the parent since the parent was involved

in the subsidiary's 1) acquisitions, divestments, and capital expenditures; 2) formulation of

general business policies and strategy; and 3) financing, among other factors.  *Id.* at 927.

However, the Court emphasized that "Plaintiffs present[ed] no evidence that Total [wa]s

involved in the day-to-day operations of its subsidiaries."  In rejecting a finding of an alter ego

relationship, the Court reasoned as follows:

> A parent corporation may be directly involved in financing and
> macro-management of its subsidiaries, however, without exposing
> itself to a charge that each subsidiary is merely the alter
> ego.[citation omitted] . . .  Plaintiffs' evidence here establishes
> only that Total is an active parent corporation involved directly in
> decision-making about its subsidiaries' holdings.

*Id.* at 927-928.

The Court further pointed to prior reported opinions from other jurisdictions declining to

find such an alter ego relationship where the parent controlled the subsidiary at the macro level:

*Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1459-60 (2d Cir. 1995) ("no alter ego liability where

parental approval required for leases, major capital expenditures, and the sale of subsidiary's

assets"); *Joiner v. Ryder Sys.*, 966 F. Supp. 1478, 1485 (C.D. Ill. 1996) ("no alter ego liability

where parent approved subsidiaries' acquisitions and capital budget"); *Akzona, Inc. v. E.I.*

*DuPont DeNemours and Co.*, 607 F. Supp. 227, 238 (D.Del. 1984) ("blurring corporate

separateness in language of annual report, overlap of boards of directors, parental approval of

16

398866.2

large capital expenditures, and parental guaranty of third-party loans insufficient to establish alter ego relationship.")[6]  *Id.* at 927.  Accordingly, the Court of Appeals affirmed the district court's dismissal for lack of personal jurisdiction.  *Id.* at 931.

### 3.    *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154 (5th Cir. 1983)

In *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154 (5th Cir. 1983), the Court of Appeals declined to find an alter ego relationship on similar grounds.  The Court noted:

> In terms of K&M's [subsidiary corporation] internal affairs, it appears that T&N [parent corporation] **had complete authority over general policy decisions at K&M**, including such matters as selection of product lines, hiring and firing of K&M officers, and approval of sizable capital investments. **Day-to-day business and operational decisions, however, were made by K&M officers. . . The policymaking authority held and exercised by T&N was no more than that appropriate for a sole shareholder of a corporation**, and certainly not enough to warrant the extraterritorial exercise of jurisdiction over that shareholder . . . .

Id. at 1160-61.  [Emphasis added].    The Court noted that the two entities observed corporate formalities by maintaining separate bank accounts, accounting and payroll systems, insurance contracts, budgets, and financial records.  *Id.* at 1160.  Accordingly, the Court reversed the district court's denial of the motion to dismiss for lack of personal jurisdiction.  *Id.* at 1161.

### 4.    *Quarles v. Fuqua Industries, Inc.*, 504 F.2d 1358 (10th Circ. 1974)

Likewise, in *Quarles v. Fuqua Industries, Inc.*, 504 F.2d 1358 (10th Circ. 1974), the Court of Appeals affirmed the District Court's order concluding that it had no jurisdiction over

---

[6] Not cited but see also from the Ninth Circuit Court of Appeals - *AT&T v. Compagnie Bruxelles Lambert*, 94 F.2d 586, 591 (9th Cir. 1996) (*citing Kramer Motors, Inc. v. British Leyland, Ltd.*, 628 F.2d 1175, 1177 (9th Cir. 1980)) ("We found no alter ego relationship in Kramer even though the parent guaranteed loans for the subsidiary, reviewed and approved the subsidiary's major decisions, placed several of its own directors on the subsidiary's board, and was closely involved in the subsidiary's pricing decisions.")

17

defendant non-resident corporation despite Plaintiffs' allegations that the parent corporation supervised, coordinated, and financially controlled the subsidiary corporation. Plaintiffs pointed to submission of budgets for approval; submission of monthly financial reports; purchase of insurance for subsidiary, and parent's hiring of employees to be made available in advisory capacity to subsidiary. *Id.* at 1363. The District Court found, however, that "[d]uring the period of time Fuqua [parent] owned the stock of Career [subsidiary], the management of the affairs of Career was in the hands of its corporate officers, who managed the affairs of the corporation independently of and **without day-to-day supervision of the operations by Fuqua management** . . . . Fuqua did not direct or supervise the daily business activities of Career. . . .*Id.* [Emphasis added].

Agreeing with the District Court, the Court of Appeals held that such alleged control by the parent corporation did not amount to an alter ego relationship and reasoned as follows:

> . . . [I]t is inherent in the stockholder-corporation relationship that the stockholder should ask for reports, sometimes consult with corporate officers, offer advice, and even object to proposals. . . . **[T]otal participation of Fuqua in the affairs of Career, as determined by the trial court, does not amount to a domination of the day to day business decisions of Career and a disregard of the corporate entity of Career.**

*Id.* at 1363-64. [Emphasis added]. Accordingly, the Court of Appeals affirmed the Trial Court's finding that it had no jurisdiction over the non-resident defendant. *Id.* at 1365.

**5.     District Court Opinions from Other Jurisdictions**

Finally, District Courts from other jurisdictions have acknowledged the distinction between a parent corporation's macro-management and micro-management of the subsidiary's business and declined to find an alter ego relationship in the presence of the former. For instance

18

in *In re: Lupron® Marketing and Sales Practices Litig.*, 245 F. Supp. 2d 280 (D.Mass. 2003),

the Court noted that the bulk of plaintiffs' alter ego theory was based upon customary incidents

of a parent-subsidiary relationship such as "managerial oversight." In granting the motion to

dismiss for lack of personal jurisdiction, the Court explained as follows:

> Plaintiffs' strongest agency argument rests on the allegation that
> Takeda had the ultimate authority to approve TAP's marketing
> strategies. **But a parent's oversight of a subsidiary's business
> plans is not ordinarily a sufficient "plus" to tip the
> jurisdictional scale.** *See Kramer Motors, Inc. v. British Leyland,
> Ltd.*, 628 F.2d 1175, 1177-78 (9th Cir. 1980) (British parent's
> approval of a marketing scheme developed by its United States
> subsidiary did not subject it to personal jurisdiction); *Alvarado
> Morales v. Digital Equipment Corp.*, 669 F. Supp. 1173, 1181
> (D.P.R. 1987) (a parent's authority to approve or reject the plans of
> a subsidiary does not establish parental domination*); Huang v.
> Sentinel Government Securities*, 657 F. Supp. 485, 490 (S.D.N.Y.
> 1987) (foreign parent's approval of a subsidiary's entry into a new
> business did not subject the parent corporation to personal
> jurisdiction). . . . **Parents of wholly-owned subsidiaries
> necessarily control, direct, and supervise subsidiaries to some
> extent.**

*Id.* at 292-93. [Emphasis added].

Likewise, in *Vogt v. Greenmarine Holding, LLC*, No. 1:01cv0311, 2002 U.S. Dist.

LEXIS 21013 (N.D. Ga. February 25, 2002), the District Court addressed the distinction and

declined to find an alter ego relationship to exercise personal jurisdiction over the non-resident

defendant. The Court reasoned as follows:

> Plaintiffs have proffered no evidence to controvert Defendants'
> testimony that OMC observed corporate formalities and operated
> separately from Defendants. **Plaintiffs' proffered "testimony"
> goes only to show the normal activities of an investment
> company in its investment.** In support of their contention that
> Defendants controlled OMC, Plaintiffs primarily cite to the
> involvement of Kingsley and Duberstein in OMC activities.
> Kingsley and Duberstein, however, were members of the board of

directors of OMC.  As such, it is not unusual that they would be involved in OMC's operations.  The Court finds support for this analysis in United States v. Bestfoods, 524 U.S. 51 (1998). . . .

*Id.* at *24-25.  Accordingly, the Court granted the motion to dismiss for lack of personal jurisdiction.  *Id.* at *31.

<h2 style="text-align:center">POINT III</h2>

## THIS COURT'S CONCLUSION THAT ROTAX WAS THE ALTER EGO OF BOMBARDIER WAS BASED UPON ITS FINDINGS OF BOMBADIER'S ALLEGED "MACRO-MANAGEMENT" OF THE "TOP-LEVEL" OF ROTAX'S OPERATIONS RATHER THAN "MICRO-MANAGEMENT" OF ROUTINE, DAY-TO-DAY OPERATIONS.

In its Memorandum and Order, the Court's conclusion that Rotax was the alter ego of Bombardier was based, in large measure, upon Bombardier's alleged macro-management of Rotax's activities rather than management of Rotax's day-to-day operation or lack of observance of corporate formalities between the two corporations.  [Exhibit A pp. 14-19].  The majority of the examples of Bombardier's alleged control of Rotax identified by Court amounted to participation in the "top-level" of the subsidiary's operations rather than day-to-day operations. *Id.*  However, none of the examples cited by the Court are illustrative of Bombardier's control of the routine matters of Rotax's day-to-day operations.  Rather, the examples are illustrative of Bombardier's expected role as an owner:  monitoring of Rotax's performance; supervision of its finance and capital budgets decisions; and articulation of general policies procedures.  In short, involvement in only the "top-level" of Rotax's operations which the Supreme Court, the Middle District of Pennsylvania, and Courts of Appeals specifically held do not amount to an alter ego relationship.  As explained above, those courts held that parental oversight and approval of its subsidiary's "top-level" decisions are to be expected from a parent as the owner of the subsidiary without calling into question the separateness of the corporations.  Even having final approval on

398866.2

such global decisions is not enough to find an alter ego relationship. *See e.g. In re: Lupron®
Marketing and Sales Practices Litig.*, 245 F. Supp. 2d 280, 292-93 (D.Mass. 2003; *Quarles v.
Fuqua Industries, Inc.*, 504 F.2d 1358, 1363-64 (10th Circ. 1974).

The Opinion does not address the significant distinction between a parent corporation's
macro-management and micro-management of the subsidiary in evaluating the existence of an
alter ego relationship or the reported opinions addressing such a distinction. [Exhibit A, pp. 14-
19]. Those cases make clear that to establish an alter ego relationship, plaintiffs must prove that
the parent controls the "day to day" operations of the subsidiary. In holding that its examples of
Bombardier's alleged control of Rotax amounted to an alter ego relationship, the Court relies
upon only two reported opinions – both by the District Courts. *Id.* The Court declines to discuss
the various reported opinions from the Supreme Court, the Middle District of Pennsylvania, and
the Courts of Appeals, described and analyzed above, which hold to the contrary where there is
evidence that the appropriate corporate formalities were observed.

Indeed, the Opinion overlooks the following evidence in the record which illustrates not
only that Rotax and Bombardier observed corporate formalities but that Rotax's day to day
operations was not in fact controlled by Bombardier: 1) Rotax had its own management team
which included a general manager, a vice-president of finance responsible for all of the financial
reporting and performance of Rotax, a vice-president for human resources, a vice president for
engineering [APP-00031-32]; 2) Rotax's own management team prepared Rotax's budgets and
strategic plans in Austria [APP-00021]; 3) Rotax prepared its own financial, including tax,
statements [APP-00033]; 4) Rotax maintained its own bank accounts and did not borrow any
funds directly from Bombardier [APP-000106-07]; 5) Rotax procured its own insurance for its
engines until July 2001 [APP-00068]; 6) Rotax purchased its own raw materials and not through

21

Bombardier [APP-000107]; 7) Rotax had its own electronic communication system – separate from Bombardier [APP-00082-83]; 8) Only a minority of common officers/directors – the majority of Rotax's supervisory board was comprised of Rotax or other Austrian representatives [APP-00029-30]; 9) Few, if any, common employees [Exhibit 1, T162-63]; 10) Rotax exercised relative autonomy in its dealings with customers other than Bombardier Inc [Exhibit 1, T63-64]; 11) Lack of interchange of managerial personnel between Bombardier and Rotax [Exhibit 1, T64-65]; 12) Rotax maintained its own logo [Exhibit 1, T121-24; T126-27]; 13) Rotax maintained its own warranty system [Exhibit 1, T140-42]; 14) Rotax maintained its own manufacturing operation [APP-00098; 00108]; 15) Rotax maintained its own distribution network [APP-00065-66; Exhibit 1, T104-05; T120-21]; 16) Rotax used Orbital fuel technology rather than FICHT technology when Bombardier acquired FICHT technology from OMC [APP-00038-41]; 17) Rotax maintained its own pension plan which Bombardier employees could not use [APP-108]; 18) Rotax maintained its own travel policy [Exhibit 1, T46-47]; 19) Rotax maintained its own patents [APP-00069]; and 20) Rotax recorded its sales to Bombardier via purchase orders. [APP-0089].

The foregoing demonstrates not only that Rotax's existence as a distinct corporate entity was observed by the companies but that it was responsible for its own daily operations. To quote the Supreme Court in *Cannon Mfg. Co.*, "the corporation separation . . . was real . . . it was not pure fiction." Thus, while Bombardier may have exercised macro-management of Rotax's "top-level" of its operations, the fact that the entities observed corporate formalities and that Bombardier did not control Rotax's day-to-day operations was exerted by Bombardier prove that Rotax was not the alter ego of Bombardier. It is respectfully submitted that the Court misinterpreted governing legal authority in concluding the opposite.

398866.2

Finally, the Court's findings of 100% stock ownership, Bombardier's presence on Rotax's supervisory board, and representation of a common marketing image in Bombardier's annual reports, even when taken together, are not determinative of an alter ego relationship. As explained in Defendants' brief in support of the underlying motions, numerous courts have held that such commonalities do not amount to an alter ego relationship. *See Savin Corp.*, 661 F. Supp. at 469 (*citing Hargrave*, 710 F.2d at 1060); *Clark v. Matsushita Elec. Indus. Co., Ltd.*, 811 F. Supp. 1061, 1069 (M.D. Pa. 1993); *Quarles v. Fuqua Industries, Inc.*, 504 F.2d 1358, 1364 (10th Cir. 1974); *Croyle v. Texas Eastern Corp.*, 464 F. Supp. 377, 379 (W.D. Pa. 1979); *Arch v. American Tobacco Co., Inc.*, 984 F. Supp. 830, 838 (E.D. Pa. 1997) (*citing Poe v. Babcock Int'l, plc*, 662 F. Supp. 4, 6 (M.D. Pa. 1985).

## POINT IV

### JURISDICTION OVER ROTAX VIA THE ALTER EGO THEORY DOES NOT COMPORT WITH TRADITIONAL NOTIONS OF FAIR PLAY AND SUBSTANTIAL JUSTICE IN THE ABSENCE OF A FULL CONSIDERATION OF GOVERNING LEGAL AUTHORITY AND EVIDENCE IN THE RECORD.

As the Court readily acknowledged in its Opinion, "even where an alter ego relationship has been shown, 'personal jurisdiction must ultimately be consistent with traditional notions of fair play and substantial justice." [Exhibit A, p. 19 (citation omitted)]. The alter ego doctrine is an equitable remedy which prevents a company from avoiding potential liability by abusing the corporate form. *See Gardemal v. Westin Hotel Company*, 186 F.3d 588, 594 (5th Cir. 1999). The corporate fiction is disregarded when the form has been used as part of a basically unfair device to achieve an inequitable result. *Id.* [citation omitted]. Thus, the doctrine should not be applied broadly and loosely to subject foreign corporations to jurisdiction without a full consideration and analyses of governing legal authority and evidence in the record. Such application by the courts in this country will have reverberating consequences for American business in today's

23

398866.2

global economy.  American corporations with subsidiaries in foreign countries will run the risk of foreign courts likewise loosely and broadly subjecting them to personal jurisdiction based upon allegations of its subsidiaries' jurisdictional contacts.  In the present case, not only is there governing legal authority to the contrary regarding the alter ego theory but there is abundant evidence in the record illustrating that Rotax and Bombardier existed as distinct corporate entities.  Accordingly, subjecting Rotax to personal jurisdiction without full consideration and analyses of the foregoing does not comport with traditional notions of fair play and substantial justice.

**POINT V**

**AN IMMEDIATE APPEAL OF THIS COURT'S ORDER WILL MATERIALLY ADVANCE THE ULTIMATE TERMINATION OF THIS LITIGATION.**

The controlling precedent cited above compels the conclusion that Rotax is not the alter ego of Bombardier.  Should the Court of Appeals permit immediate appeal of this Court's Order and accept the arguments proffered herein, the Court of Appeals will reverse the denial of Rotax's Motion to Dismiss and Bombardier's Motion for Summary Judgment, effectively terminating the litigation.   Accordingly, certification of the Order to allow interlocutory review is warranted.

398866.2

## CONCLUSION

Based upon the reasons set forth above, Defendants BRP Rotax GmbH & Co. KG and Bombardier Inc. respectfully request that this Court amend its Order denying Rotax's Motion to Dismiss and Bombardier's Motion for Summary Judgment, entered on March 9, 2005, to include the statutory language of 28 U.S.C. § 1292(b) with respect to its rulings in Paragraphs 1 through 2 so that Defendants make take an interlocutory review of such rulings in said Order.

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
Attorney for Defendants BRP-Rotax GmbH & Co. KG and Bombardier Inc.

BY: _____
Robert J. Kelly, Esquire
33 Washington Street – 18th Floor
Newark, N.J.  07102

And

By:    Jonathan Dryer, Esq.
P.A. Attorney ID 34496
The Curtis Center-Suite  1130 East
Independence Square West
Philadelphia, PA 19106

Date:  3 | 30 | 05

25

398866.2