## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THERESA MARIE SIMEONE, et al. | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | **CIVIL ACTION NO. 02CV4852** |
| | : | |
| BOMBARDIER-ROTAX GmbH & Co. KG, et al., | : | **NOTICE OF MOTION FOR** |
| | : | **SUMMARY JUDGMENT** |
| Defendants. | : | |
| | : | |
| | : | |

**PLEASE TAKE NOTICE,** upon the annexed Certification of Robert J. Kelly, dated August 22, 2005, the exhibits annexed thereto, and the accompanying Memorandum of Law, the undersigned, attorneys for Defendants, BRP-Rotax GmbH & Co. KG f/k/a Bombardier-Rotax GmbH & Co. KG and Bombardier, Inc., will make application to this Court at a time and place designated by the Court, for an Order pursuant to Rule 56 of the Federal Rules of Civil Procedure, for Summary Judgment dismissing any and all claims against Defendants with prejudice on the ground that there is no genuine issue of material fact and said Defendants are entitled to judgment as a matter of law, and for such other relief as the Court may deem just and proper.

431872.1

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
Attorney for Defendant BRP-Rotax GmbH & Co. KG and
Bombardier Inc. and Bombardier Corporation

BY: _____

Robert J. Kelly, Esquire
33 Washington Street – 18th Floor
Newark, N.J. 07102

And

By:    Jonathan Dryer, Esq.
P.A. Attorney ID 34496
The Curtis Center-Suite 1130 East
Independence Square West
Philadelphia, PA 19106

Dated: August 22, 2005

- 2 -

## CERTIFICATION OF SERVICE

I, Frances J. Almanzar, certify as follows:

I am an attorney with the law firm of WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP, attorneys for Defendants BRP-Rotax GmbH & Co. KG. and Bombardier, Inc.

On August 22, 2005, I caused to be served a copy of said defendants' Motion for Summary Judgment, via hand delivery, upon the following:

> ARTHUR A. WOLK, ESQ.
> ALAN MATTIONI, ESQ.
> CHRISTOPHER J. CERSKI, ESQ.
> THE WOLK LAW FIRM
> 1710-12 Locust Street
> Philadelphia, PA 19103
> Attorneys for Plaintiff

I certify that the original of the foregoing was electronically filed with the United States District Court, Eastern District of Pennsylvania, pursuant to the direct filing system on this same date.

I further certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

Frances J. Almanzar

Dated: August 22, 2005

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THERESA MARIE SIMEONE, Personal | : | |
| Representative of the Estate of Albert Francis | : | |
| Simeone, Jr., Deceased, and THERESA MARIE | : | CIVIL ACTION NO. 02CV4852 |
| SIMEONE, In Her Own Right, and | : | |
| MARY ANN LENGYEL, Personal | : | |
| Representative of the Estate of George Lengyel, | : | |
| Deceased, and MARY ANN LENGYEL, | : | JURY TRIAL DEMANDED |
| In Her Own Right | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| BOMBARDIER CORPORATION GmbH, et al. | : | |
| | : | |
| Defendants. | : | |

---

## MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT
## ON BEHALF OF DEFENDANTS
## BRP-ROTAX GMBH & CO. KG AND BOMBARDIER INC.

---

Robert J. Kelly, Esq.
Of Counsel

Christopher W. McClanahan, Esq.
On the Brief

## **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ............................................................................... ii

PRELIMINARY STATEMENT ........................................................................2

PROCEDURAL BACKGROUND...................................................................3

STATEMENT OF FACTS ..............................................................................4

LEGAL ARGUMENT

STANDARD OF REVIEW ............................................................................13

APPLICABLE STATE LAW..........................................................................13

POINT I

     DEFENDANTS ARE ENTITLED TO SUMMARY
     JUDGMENT AGAINST PLAINTIFF SIMEONE AS
     TO ALL CLAIMS BECAUSE DECEDENT SIMEONE
     EXPRESSLY WAIVED ALL CLAIMS HE OR HIS HEIRS
     MAY HAVE HAD AGAINST DEFENDANTS...................................................14

POINT II

     PLAINTIFFS' STRICT LIABILITY AND NEGLIGENCE
     CLAIMS SHOULD BE DISMISSED BECAUSE DECEDENTS
     EXPRESSLY AND/OR IMPLIEDLY ASSUMED THE RISK
     OF FLYING ULTRALIGHT AIRCRAFT............................................................22

POINT III

    PLAINTIFFS' STRICT LIABILITY CLAIMS FAIL AS A
    MATTER OF LAW BECAUSE PLAINTIFFS CANNOT
    PROVE THE SUBJECT PRODUCT WAS DEFECTIVE
    WHEN IT LEFT THE HANDS OF DEFENDANTS AND
    PLAINTIFFS CANNOT PROCEED ON A MALFUNCTION
    THEORY ..............................................................................................................31

POINT IV

    PLAINTIFFS' REMAINING CLAIMS FAIL AS A MATTER
    OF LAW AND SHOULD BE DISMISSED ..........................................................36

POINT V

    PLAINTIFFS ARE NOT ENTITLED TO PUNITIVE
    DAMAGES BECAUSE THERE IS NO EVIDENCE
    OF OUTRAGEOUS CONDUCT ........................................................................39

CONCLUSION..........................................................................................................39

# TABLE OF AUTHORITIES

## FEDERAL CASES

Altronics of Bethlehem, Inc. v. Repco, Inc.,
957 F.2d 1102 (3rd Cir. 1992)...........................................................................35

Balczon v. Machinery Wholesalers,
933 F.Supp. 900 (W.D. Pa. 1998).............................................................................32

Celotex v. Catrett,
477 U.S. 317 (1986).................................................................................................13

Connors v. Fawn Mining Corp.,
30 F.3d 483  (3rd 1994) ...........................................................................................13

Erie R.R. v. Tompkins,
204 U.S. 64 (1938)...................................................................................................13

Gans v. Mundy,
762 F.2d 338 (3rd Cir. 1985) ..................................................................................13

Mullan v. Quickie Aircraft Corporation,
797 F.2d 845 (10th Cir. 1986) ........................................................................18, 19

Nicholson v. Mount Airy Lodge,
1997 U.S.Dist. LEXIS 21035 (E.D. Pa. 1997) ......................................................18

Peaco v. GF Mgmt. of Pa., Inc.,
2003 U.S.Dist. (E.D. Pa. 2003)...............................................................................35

Schillachi v. Flying Dutchman Motorcycle Club,
751 F.Supp. 1169 (E.D. Pa. 1990).....................................................................17, 18

Scott v. Plante,
532 F.2d 939 (3rd Cir. 1975) ..................................................................................13

Wagner v. Firestone Tire & Rubber Co.,
890 F.2d 652 (3rd Cir. 1989) ..................................................................................23

Weiner v. Mt. Airy Lodge
719 F. Supp. 342 (M.D. Pa. 1989)...........................................................................23

## STATE CASES

Azzarello v. Black Brothers Co.,
480 Pa. 547 (1978)................................................................................................32

Carrender v. Fitterer,
503 Pa. 178; 469 A.2d 120 (1983)........................................................................23

Debbs v. Chrysler Corp.,
810 A.2d 137 (2002)..............................................................................................38

Employers Liability Assur. Corp. v. Greenville Business Men's Association,
423 Pa. 288; 244 A.2d 620 (1966)..................................................................16, 17

Galisson v. Shawnee Mountain Ski Area,
32 Pa.D.& C.4th 450 (1996) .................................................................................24

Gibbs v. Ernst,
538 Pa. 193, 647 A.2d 882 (1994) .......................................................................38

Goodman v. PPG Industries, Inc.,
849 A.2d 1239 (Pa. Super. 2004) .........................................................................37

Guy v. Liederbach,
501 Pa. 47; 459 A.2d 744 (1983)..........................................................................21

Lonon v. Pep Boys, Manny, Moe & Jack,
371 Pa.Super. 291; 538 A.2d 22 (1988)...............................................................23

O'Neill v. Checker Motors Corp.,
389 Pa.Super. 430; 567 A.2d 680 (1989) .............................................................35

Putt v. Yates-American Machine Co.,
722 A.2d 217 (Pa. Super. 1998)...........................................................................32

Riley v. Warren Manufacturing, Inc.,
455 Pa.Super. 384; 688 A.2d (1997).....................................................................32

Roselli v. General Electric Co.,
410 Pa.Super. 223; 599 A.2d 685 (1991)..............................................................34

Rutter v. Northeastern Beaver County School District,
496 Pa. 590; 437 A.2d 1198 (1981)......................................................................23

Salvador v. Atlantic Steel Boiler Co.,
457 Pa. 24; 319 A.2d 903 (1974)..........................................................................37

Scarpitti v. Weborg,
530 Pa. 366; 609 A.2d 147 (1992) ................................................................21

Seaton v. East Windsor Speedway, Inc.,
400 Pa.Super. 134; 582 A.2d 1380 (1990) ....................................................18

Staymates v. ITT Holub Industries,
364 Pa.Super. 37 (1987) .................................................................................23

Valeo v. Pocono International Raceway, Inc.,
347 Pa.Super. 230; 50 A.2d 492 (1985) ...................................................16, 19

Webb v. Zern,
422 Pa. 424, 220 A.2d 853 (1966) .................................................................32

Zimmer v. Mitchell & Ness,
254 Pa.Super. 474; 385 A.2d 437 (1978) ...............................................16,17,19

## REGULATIONS

14 C.F.R. 103.1 ................................................................................................16

## RULES

Fed. R. Civ. P. 12(b)(2) ....................................................................................4

Fed. R. Civ.P. 56(C) .......................................................................................13

## STATUTES

Pennsylvania Code, 42 Pa. C.S. § 2318 ....................................................36, 37

Pennsylvania Code, 42 PA. C.S. § 7102 ...................................................23, 24

## MISCELLANEOUS

Restatement (Second) of Torts §908A (1965) .................................................39

Restatement (Second) of Torts § 402A (1965) .......................................22,31,32

Restatement (Second) of Torts, §496B (1965) ........................................22, 24

Restatement (Second) of Torts, §496C (1965) ........................................22, 30

## PRELIMINARY STATEMENT

This is a product liability action arising out of an ultralight aircraft accident, which occurred on July 22, 2000 in or around York, Pennsylvania. Albert Francis Simeone, Jr. and George Lengyel were killed when the ultralight aircraft that they were flying crashed into a cornfield. Plaintiffs allege that the engine in the ultralight aircraft failed, causing the subject crash. The engine was manufactured by Defendant BRP-Rotax GmbH & Co. KG f/k/a Bombardier-Rotax GmbH & Co. KG, which is a subsidiary of Bombardier Inc. Plaintiff Theresa Marie Simeone is the widow of decedent Albert Francis Simeone, Jr. and Plaintiff Mary Ann Lengyel is the widow of decedent George Lengyel.

Plaintiffs' claims of strict product liability; negligence; breach of warranty (express and implied); and willful and wanton misconduct, fraud and deceit are without any factual or legal basis. Plaintiffs' claims should be dismissed because decedent Simeone expressly waived any claim he (or his heirs) may have had against Defendants; because both decedents assumed the risk associated with flying ultralight aircraft, and because Plaintiffs cannot prove that the subject engine was defective at the time it left the "hands" of Defendants. Further, there is absolutely no evidence whatsoever that Defendants breached any warranty owed to either decedent or that it engaged in any willful and wanton misconduct and/or fraud and deceit. Those claims, too, should be dismissed and this Court should rule as a matter of law that Plaintiffs are not entitled to punitive damages.

Defendants submit this Memorandum of Law in support of their Motion for Summary Judgment dismissing Plaintiffs' Complaint in its entirety. For the reasons articulated in this brief, dismissal is warranted.

- 2 -

## PROCEDURAL BACKGROUND

Plaintiffs Simeone and Lengyel filed this action, in their representative capacities, with the United States District Court, Eastern District of Pennsylvania, on July 19, 2002. [See Plaintiffs' Complaint, attached to Certification of Robert J. Kelly, Esq., dated August 22, 2005 as Exhibit A.]  Thereafter, on June 12, 2003, Plaintiffs filed a First Amended Complaint. [See Plaintiffs' First Amended Complaints attached to Kelly Certification as Exhibit B.][1]

Plaintiffs brought causes of action sounding in strict product liability, negligence, breach of warranty (express and implied), Willful and wanton misconduct, and fraud and deceit against Rotax, the alleged designer, manufacturer and seller of the subject aircraft engine; and Bombardier Inc.; Bombardier Corporation;  as well as other entities. [See Exhibit B]. [2] Defendants denied the material allegations set forth in Plaintiffs' First Amended Complaint. [See Defendants' Answers to First Amended Complaints, attached to Kelly Certification as Exhibit C.]

On or about December 22, 2004, Defendants filed a motion to dismiss as to Rotax and a motion for summary judgment as to Bombardier Inc. and Bombardier Corporation.  In its motion to dismiss, Rotax argued that there were no facts illustrating that it had "minimum contacts" with Pennsylvania sufficient for this Court to exercise personal jurisdiction, and therefore, dismissal

---

[1] Plaintiffs also filed an identical state court Complaint on July 19, 2002 and, subsequently, on June 12, 2003, an Amended Complaint in the Court of Common Pleas, Philadelphia County.  Plaintiffs' state court action was dismissed.

[2] Plaintiffs also brought a cause of action for negligence against Jersey Central Power and Light Company; Metropolitan Edison; Pennsylvania Electric Company; GPU, Inc.; GPU Energy, Inc.; and First Energy Corporation in connection with the maintenance of power lines over the York County airport.  All of these defendants have been dismissed from the case.

433549.1A

was warranted under Fed. R. Civ. P. 12(b)(2). In its application for summary judgment, Bombardier, Inc. and Bombardier Corporation contended that they did not design, manufacturer, or otherwise distribute the allegedly defective engine which is the subject of this litigation. By Memorandum and Order, dated March 8, 2005, this Court granted Bombardier Corporation's motion for summary judgment and dismissed all claims against it, but denied Bombardier Inc.'s motion for summary judgment, holding that there were genuine issues of fact "regarding the extent of Bombardier's control over the allegedly defective engine." [See Memorandum and Order, dated March 8, 2005, attached to Kelly Certification as Exhibit D.]

## STATEMENT OF FACTS

On March 5, 2000, decedent Simeone took a "familiarization" flight on an Interplane Skyboy ultralight aircraft in Zephyrhills, Florida with Ben Dawson, an Interplane employee who was an ultralight pilot and instructor. [See copy of relevant excerpts of testimony from the deposition of Ben Dawson, dated August 12, 2005, attached to Kelly Certification as Exhibit E, T26:L21-25.] Prior to going up in the ultralight aircraft, Decedent Simeone executed a Waiver & Release, in favor of Interplane USA and all of its suppliers, reflecting his understanding of the risk associated with flying ultralight aircraft. The waiver states, in pertinent part:

> In consideration of the permission grated to him to ride, fly and otherwise operate such ultralight vehicle or "aircraft," and the instructions relating thereto, the undersigned releaser unconditionally agrees as follows:
>
> 5.    He acknowledges that no warranties, either expressed or implied, have been given him concerning the safety of the flight, nor the fitness of the aircraft, and that the flight is attempted solely at his own risk.

- 4 -

[See copy of a Release & Waiver, dated March 5, 2000, executed by decedent Simeone, attached to Kelly Certification as Exhibit F.] Mr. Dawson testified, at his deposition, that it was the regular practice and procedure of Interplane to discuss the risks of flying ultralight aircraft with students and customers. Specifically, he testified as follows:

> Q. Was it part of Interplane's regular practice and procedure to discuss with customers the risks involved in ultralight flying...?
>
> A. We would, of course, talk about safety as part of the thing. Flying again, like that thing says, is potentially dangerous and we would tell him just how dangerous it really is and we would say everything has got to be done with these rules because—so you don't get hurt. And, like I say, safety is—we went over—that is why we did stalls over and over again was to cover, make sure that they were capable of doing stall recovery and stuff.

[See Exhibit E, T30:L10-24.]

The next day, March 6, 2005, decedent Simeone placed an order for the purchase of an Interplane USA Skyboy ultralight aircraft. The contract for purchase contained a release of claims in favor of Defendants (as an Interplane supplier), which decedent Simeone executed. The release states:

> RELEASE
>
> I understand that flying ultralight aircraft is a potentially dangerous activity that can result in mishap, injury or death. I acknowledge that no warranties, either express or implied, have been given to me concerning the fitness of the aircraft or any of its parts. I agree to indemnify and hold harmless Interplane USA and its suppliers from any action or cause arising from the sale and use of this aircraft and/or parts.

[See contract between decedent Simeone and Interplane USA, dated March 6, 2000, for the purchase of a Skyboy ultralight airplane, attached to Kelly Certification as Exhibit G.] Ralph

Mandarino, who is either the owner of Interplane or the Trustee of a pension plan that invests in Interplane companies, and who is intimately familiar with the companies' policies and procedures, testified at his deposition as follows:

> Q.    Did Interplane LLC also have a policy of requiring its customers to sign releases or waivers prior to purchase?
>
> A.    Yes.
>
> Q.    Was it Interplane's policy that every customer was required to sign a waiver before the purchase could be completed?
>
> A.    Yes.

[See copy of relevant excerpts of testimony from the deposition of Ralph Mandarino, dated July 28, 2005, attached to Kelly Certification as Exhibit H, T26:L3-10.] Decedent Simeone's pilot logbook reflects that, in addition to flying with Mr. Dawson on the aforementioned two (2) hour familiarization flight on March 5, 2000, he also received an additional four and one-half (4 ½ ) hours of flight instruction from Mr. Dawson on March 6 and 7, 2000. [See copy of decedent Simeone's pilot logbook, attached to Kelly Certification as Exhibit I.]

Decedent Simeone took delivery of the Skyboy on or about May 22, 2000. [See copies of Consolidated Freightways' Invoice and Bill of Lading, attached to Kelly Certification as Exhibit J.] Mr. Mandarino testified that it was an Interplane company policy to provide customers with manuals which pertained to the aircraft. [See Exhibit H, T24:L16-19.] Mr. Dawson also testified that Interplane gave purchasers of its ultralight aircraft copies of the original factory manuals that came with the Rotax engines. [See Exhibit E, T35:L3-8.]    Plaintiff Simeone, at her deposition, confirmed that decedent Simeone received a Skyboy User's Manual and a Rotax Operator's Manual when he purchased his Skyboy ultralight aircraft. [See copy of Skyboy User's Manual, attached to Kelly Certification as Exhibit K; and copy of  Rotax Operator's Manual, attached to

433549.1A

Kelly Certification as Exhibit L; and Excerpts of Transcript of Deposition Testimony of Plaintiff

Theresa Simeone, dated June 22, 2005, attached to Kelly Certification as Exhibit M, T35:L6-

T37:L6.] It was also the policy of Interplane representatives to discuss with purchasers of its

aircraft, the risks of flying the aircraft, specifically pointing out the operating manuals for the

Rotax engine, which was the powerplant for the Skyboy. Mr. Mandarino testified as follows:

> Q.    Was it Interplane LLC's policy to conduct a discussion with
>       potential customers concerning the risks of flying
>       Interplane aircraft?
>
> A.    Yes.
>
> Q.    And in as much detail as you can recall, what was
>       Interplane's policy for the content of that discussion?
>
> A.    The only thing I can recall is Interplane LLC's management
>       pointing out the operating manuals of the Rotax 582 versus
>       the Rotax 912 family of engines, and that is where there is
>       a statement in the operating manual that the 582
>       occasionally stops running, and one must be aware of that.
>
> Q.    And was it Interplane LLC's policy to have this discussion
>       prior to the release of the aircraft to the customer?
>
> A.    Yes.

[See Exhibit H, T26:L10-T27:L3.]

The Skyboy aircraft was damaged when it was originally delivered and decedent

Simeone, shortly thereafter, requested that the freight delivery company inspect the damage,

which it did on June 9, 2000. [See copy of Consolidated Freight Inspection Report, dated June 9,

2000, attached to Kelly Certification as Exhibit N.] Further, the Skyboy, which had originally

arrived partially disassembled, was assembled by decedent Simeone sometime prior to the

inspection. [See Exhibit N.] Subsequently, decedent Simeone filled out a claim with the freight

delivery company, seeking $7,241.50 in restitution for damage to the Skyboy during shipping.

433549.1A

[See copy of Consolidated Freight Loss and Damage Claim form, filled out by decedent Simeone, dated July 17, 2000, attached to Kelly Certification as Exhibit O.] Plaintiff Simeone testified that the damaged Skyboy was repaired prior to the accident, although she was not able to confirm that a qualified aircraft mechanic performed the repairs. [See Exhibit M, T22:L17-T:23-1.]

Plaintiff Simeone testified that decedent Simeone took ultralight flying lessons while he was in Florida, and also took lessons in Pennsylvania from decedent Lengyel. [See Exhibit M, T17:L10-T19:L12.] Decedent Lengyel had been a general aviation pilot for many years. He was also a certified ultralight pilot and instructor. [See copy of decedent Lengyel's Ultralight airplane flight instructor certificate, attached to Kelly Certification as Exhibit P.] William Losey, who traveled with decedents on the date of the accident (discussed more fully, infra), and who took ultralight flying lessons from decedent Lengyel, indicated that decedent Lengyel enjoyed flying low patterns on the opposite side of the airport from the traffic pattern; Mr. Losey, also a general aviation pilot, always refused, opining that there was no good reason for doing that. [See Excerpts of Transcript of Deposition Testimony of William Losey, dated June 17, 2005, attached to Kelly Certification as Exhibit Q, T67:L13-19; T83:L7-15.] Decedent Lengyel also owned an ultralight Challenger aircraft, equipped with a Rotax 503 engine, which he flew two (2) or three (3) times a week. [See Exhibit Q, T22:L10-T23:L6; Excerpts of Transcript of Deposition Testimony of Plaintiff Mary Ann Lengyel, dated June 22, 2005, attached to Kelly Certification as Exhibit R, T18:L3-12; T42:L12-15.]

During the Spring of 2000, Decedent Simeone worked as a sales representative for Interplane LLC. [See Exhibit M, T18:L1-20; Exhibit E, T29:L11-12; and Exhibit H, T37:L23-T38:L8.] He received at least one commission check, in the amount of $1,100.00, in connection

- 8 -

with his sales activities for Interplane LLC. [See Exhibit M, T18:L1-T20; and a copy of a letter, dated June 7, 2000, and a commission check, dated June 1, 2000, from Interplane to decedent Simeone, attached to Kelly Certification as Exhibit S.]

Shortly before the subject fatal accident, decedent Simeone was involved in another ultralight mishap. Decedent Simeone told Mr. Losey that he was flying with another general aviation pilot in decedent Simeone's Skyboy, when the throttle became stuck on full power and they were forced to shut down the engine and land in a farm field. They aircraft hit a rock which caused the landing gear to bend. [See Exhibit Q, T158:L1-T159:L13] Plaintiff Simeone also confirmed that decedent Simeone was involved in this accident [See Exhibit M, T47:L11-20.]

On July 22, 2000, decedents were operating decedent Simeone's Skyboy on the way to an air show in Chambersburg, Pennsylvania. Mr. Losey, who was accompanying decedents, was flying in front of decedents in decedent Lengyel's ultralight Challenger. [See Exhibit Q, T28:L19-T29:L13.] Decedents flew together so that decedent Lengyel could provide flight instruction to decedent Simeone. [See Exhibit Q, T30:L10-18.] The plan called for them to fly all the way to Chambersburg without making any stops. Mr. Losey was going to navigate the flight and decedents were going to follow so that decedent Lengyel could spend more time instructing decedent Simeone. [See Exhibit Q, T34:L18-T35:L4.]

After taking off from decedent Simeone's property (which had an airfield), Mr. Losey only saw decedents, who were following approximately 2,000-3,000 feet behind, once or twice during the flight. [See Exhibit Q, T42:L1-13.] However, decedent Lengyel and Mr. Losey communicated with each other via hand held radios. Approximately halfway to Chambersburg, Mr. Losey received a radio communication from decedent Lengyel stating that decedents wanted

- 9 -

433549.1A

to make an unscheduled stop for fuel in York, Pennsylvania.  He testified, concerning the events

that transpired, as follows:

> Q.   Now, had you intended to stop at York?
>
> A.   No.
>
> Q.   And I take it then that your plan changed at some point; is that correct?
>
> A.   That's correct.  When we got to York -- okay?
>
> Q.   Please.
>
> A.   ...[w]hen we got to York, we --I turned on the radio and when I turned it on they were calling me.  They said, do you have the airport in sight.  And I said, yes, I see it right here.  This is off to my right.  And they said, well, what's your fuel situation?  I said, well, I have a little more than half a tank.  And they said, well, we have a little less than half a tank.
>
> Q.   Could I just stop you right there, Mr. Losey?  When you say they said, who were you speaking to?
>
> A.   Francis and George Lengyel said.
>
> Q.   Were they both speaking to you?
>
> A.   No, only George.  Only George was speaking to me.
>
> Q.   Please continue.
>
> A.   He said, I have a little less than half a tank.  We're going to go into York and top the tanks.  He intended for me to land with them and I said, okay, sounds like a good idea.  Probably really didn't need fuel because the gauges in the Skyboy weren't really linear.  When you got to half a tank you only burned off about three and a half gallons or something like that.  So anyhow, they said to me, we're going to go over to the airport frequency, we'll see you on the ground.  At that point I didn't look back or I think I looked back, I didn't see them.  They were back there -- I was more interested in what was happening at the airport.  I said, okay, I'm going to do the same thing.  So I went over

to the airport frequency and I called the airport and got the information, the active runway. And I never heard them make the call. I was on the -- and I went upwind. There were two airplanes on a downwind. And I went crosswind just beyond the runway and I entered into a downwind and the guy I was following went way out, made a long run, and I stayed behind him, and I didn't turn down until he passed me going back the other way to land, so I was in pattern for a little while. And as I went in and went across the thresholds I called them on the radio and they didn't respond to me. I landed and I went up to the airport and I turned around and got out of the airplane and they never arrived.

[See Exhibit Q, T44:L3-T47:5.] Subsequently, the Skyboy that decedents were flying in was located in a cornfield near the York Airport, in Jackson Township, Pennsylvania. The aircraft had crashed and both decedents had been killed.

After the Federal Aviation Administration declined to conduct an investigation into the cause of the crash, the responsibility was assumed by the Jackson Township Police Department, in particular, Officer Joseph Yatsko. Officer Yatsko was assigned the task of investigating the crash by the Jackson Township Chief of Police, Marcus Ruff. [See excerpts of testimony from the deposition of Joseph Yatsko, dated June 21, 2005, attached to Kelly Certification as Exhibit T, T30:L10-34.] Officer Yatsko's investigation notes reflect that his preliminary conclusion was that the subject engine only had thirty-eight (38) hours of run-time on it and that, at the time of the crash, the engine had maintained compression and was running. [See copy of Officer Yatsko's investigative notes, attached to Kelly Certification as Exhibit U; and Exhibit T, T72:L12-23.] Officer Yatsko did not have the opportunity to send the engine out for further testing because it, along with the aircraft, was released by Chief Ruff to Plaintiff Simeone. [See Exhibit U, T73:L9-24.]

- 11 -

The subject aircraft and its engine were stored for a period of time in a hanger located on Plaintiff Simeone's property. [See copy of Plaintiff Simeone's Answers to First Set of Interrogatories, No. 28, attached to Kelly Certification as Exhibit V.] Thereafter, it was moved to Anglin Aircraft Recovery, in Clayton, Delaware. [See Exhibit V, No. 29]. In or around January 2002, approximately one and one-half (1 ½ ) years after the subject incident, the engine was sent to McSwain Engineering, Inc. in Pensacola, Florida for the purpose of inspection and disassembly by experts for Plaintiffs and Defendants. Inspection and disassembly of the engine occurred on January 21 and 22, 2002, before this litigation was pled. Before the engine was disassembled, Defendants' experts requested that the engine be test-run, but that request was denied by Plaintiffs' attorneys and Mr. McSwain. [See copy of Weldon Garrelts' report, dated July 29, 2005, at p. 2, attached to Kelly Certification as Exhibit W.] Additionally, Defendants experts' request for a pressure check of the engine crankcase in order to see if engine compression had been maintained prior to disassembly, was also denied. [Id.] The engine remained in Plaintiffs (or its agents') possession until at least June 17, 2005. [See Exhibit V, No. 29.]

## LEGAL ARGUMENT

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure sets forth that a motion for summary judgment is proper,

> . . . if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c).

See, Celotex v. Catrett, 477 U.S. 317, 322 (1986). It is well established that if a party can show that there is no genuine issue of material fact, it may move for summary judgment as to the opponent's claims and thereby terminate the litigation against it. Gans v. Mundy, 762 F.2d 338, 343 (3rd Cir. 1985);Cert. Denied 474 U.S. 1010 (1985); Scott v. Plante, 532 F.2d 939, 945 (3rd Cir. 1975). An issue is genuine only if there is a sufficient evidentiary basis upon which a reasonable jury could find for the non-moving party. Connors v. Fawn Mining Corp., 30 F.3d. 483, 489 (3rd. 1994)). The moving party must point to portions of the record which demonstrate the absence of genuine issues and material fact. The opposing party must then set forth a specific showing of a genuine issue for trial. Id., citing Celotex Corp. v. Cartret, 477 U.S. at 323.

## APPLICABLE STATE LAW

The incident which is the subject of this lawsuit occurred in the State of Pennsylvania. The Court's jurisdiction in this case is based on diversity of citizenship. [See Exhibits A and B.] Therefore, the court should apply the substantive law of Pennsylvania. Erie R.R. v. Tompkins, 204 U.S. 64 (1938).

433549.1A

## POINT I

## DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT AGAINST PLAINTIFF SIMEONE AS TO ALL CLAIMS BECAUSE DECEDENT SIMEONE EXPRESSLY WAIVED ALL CLAIMS HE OR HIS HEIRS MAY HAVE HAD AGAINST DEFENDANTS

Plaintiff Simeone's claims of strict product liability; negligence; breach of warranty (express and implied); and willful and wanton misconduct, fraud and deceit should be dismissed in their entirety because decedent Simeone expressly waived, as a matter of law, any and all claims that he (or his heirs) may have had against Defendants. Specifically, decedent Simeone executed a written release specifically relieving Interplane, and all of its parts suppliers, from any claims he may have had relating the purchase and operation of his Interplane Skyboy Ultralight. He also executed another release, absolving Interplane and it suppliers in connection with his familiarization flight. Both releases specifically advised decedent Simeone that flying ultralight aircraft was dangerous.

On March 6, 2000, decedent Simeone entered into an agreement with Interplane to purchase a Skyboy ultralight aircraft. [See Exhibit G.] The sales agreement contained a release, which states:

> RELEASE
>
> I understand that flying ultralight aircraft is a potentially dangerous activity that can result in mishap, injury or death. I acknowledge that no warranties, either express or implied, have been given to me concerning the fitness of the aircraft or any of its parts. I agree to indemnify and hold harmless Interplane USA and its suppliers from any action or cause arising from the sale and use of this aircraft and/or parts.

[Id.]

433549.1A

The day before he signed the above-referenced release in connection with his purchase of

the Skyboy, Decedent Simeone also executed a separate document, entitled, "Release & Waiver,"

dated March 5, 2000, which states, in pertinent part:

> In consideration of the permission grated to him to ride, fly and otherwise operate such ultralight vehicle or "aircraft," and the instructions relating thereto, the undersigned releaser unconditionally agrees as follows:
>
> 1. He hereby waives and releases any and all claims, rights and/or causes of action which he now or may have against (a.) Any person(s), firm or corporation who provided materials, or parts, be they unassembled, partially, or completely assembled, which constitute the ultralight vehicle or "aircraft."
>
> 2. He hereby indemnifies and holds harmless those persons, firms or corporations mentioned above from any and all damages to the person or property of any individual or entity, which arise out of his operation or attempted operation of the herein above mentioned ultralight vehicle or "aircraft."
>
> 6. He acknowledges that no warranties, either expressed or implied, have been given him concerning the safety of the flight, nor the fitness of the aircraft, and that the flight is attempted solely at his own risk.
>
> 7. The contents of this document shall be forever binding upon the releaser, his dependents, parents or legal guardians, heirs, personal representatives and his estate.
>
> 8. He has read this entire document, understands its contents, knows of the truthfulness thereof, and has been provided with a copy of the same.

[See Exhibit F.]  In the instant case, Defendants furnished the engine that powered the subject

Skyboy.  Therefore, Defendants, by the plain language of the contract (sales agreement) entered

into between Interplane and decedent Simeone, are intended beneficiaries of the agreement and

are relieved of any liability as to Plaintiff Simeone.

433549.1A

The applicability of a release, in the context of a purchaser of an ultralight aircraft, appears be a case of first impression in the State of Pennsylvania and this Court. However, a decision by the Tenth Circuit Court of Appeals (discussed below), wherein the Court was confronted with the same issue, is highly instructive. Moreover, Pennsylvania courts routinely uphold exculpation clauses, especially in cases involving dangerous recreational activities. Flying ultralight aircraft is a recreational sport, and one which there can be no doubt is inherently dangerous. 14 C.F.R. 103.1.

A.    **Pennsylvania Courts Enforce Exculpatory Agreements**

Although not favored, Pennsylvania courts recognize as valid, agreements that exculpate a party from liability. In order for an exculpatory agreement to be valid, the following criteria must be met:

1.    The contract must not contravene any policy of the law;
2.    It must be a contract between individuals relating to their private affairs;
3.    Each party must be a free bargaining agent, not simply one drawn into an adhesion contract, with no recourse but to reject the entire transaction;
4.    The agreement must spell out the intent of the parties with the utmost particularity; and
5.    The agreement must be construed strictly and against the party asserting it.

Zimmer v. Mitchell & Ness, 254 Pa. Super. 474, 478; 385 A.2d 437 (1978), affirmed, 490 Pa. 428; 416 A.2d 437 (1980); See also, Employers Liability Assur. Corp. v. Greenville Business Men's Ass'n., 423 Pa. 288; 224 A.2d 620 (1966).

In Valeo v. Pocono International Raceway, Inc., 347 Pa. Super. 230; 50 A.2d 492 (1985), plaintiff sustained injuries as a result of crashing a race car that he was operating. Prior to engaging in the racing activity, plaintiff executed a full release in favor of defendant, waiving his right to bring any claim against defendant for any type of liability. The Court upheld the lower

court's decision that the release was valid. The Court acknowledged that "[a]utomobile racing is hazardous. It gives rise to various situations in which injury or death may result to drivers and mechanics." Id. at 232. Concerning the validity of the agreement, the court explained, "[a]n agreement exculpating the sponsor or a race and the owner of the track does not contravene public policy. It is a contract between individuals pertaining to their private affairs and does not impact generally the rights of members of the public." Id. at 233. Further, the court recognized that plaintiff was not under any compulsion to race and "[e]ach party [was] free to participate or not participate." Id. at 232. The court also determined that the language in the agreement was clear and "where the intention of the parties is spelled out with particularity and the agreement shows an unequivocally expressed purpose to release from liability, the law will give effect to that agreement. Id. at 233.

Similarly, in Schillachi v. Flying Dutchman Motorcycle Club, 751 F. Supp. 1169 (E.D. Pa. 1990), an ATV racer, prior to racing, signed a release which exculpated defendant rack track owner from any liability. Plaintiff was severely injured when the ATV that he was racing crashed. The court, applying Pennsylvania law, held that the release was enforceable, concluding that the release met all the criteria set forth in Zimmer 254 Pa. Super. 474 and Employers Liability Assur. Corp. 423 Pa. 288. The court specifically found that the intent of the parties was clear and specific. It also determined that

> [the] release was entered into between the parties in relation to a purely private matter...Plaintiff here was not dependent upon racing his ATV for a living. Plaintiff was under no compulsion to compete in such races. This is not a case of one abusing a vastly superior bargaining power in its dealings with a party of proportionately ineffective bargaining power regarding the necessities of life.

Schillachi, 751 F. Supp. at 1172. It is noteworthy that plaintiff in that case alleged that he did not read the agreement prior to signing it. The court pointed out that "[t]he law of Pennsylvania is clear. One who is about to sign a contract has a duty to read that contract first." Id. at 1174; See also, Seaton v. East Windsor Speedway, Inc., 400 Pa. Super. 134; 582 A2d 1380, 1382 (1990).

In Nicholson v. Mount Airy Lodge, 1997 U.S. Dist. LEXIS 21035 (E.D. Pa. 1997), plaintiff executed a release in favor of defendant, which stated, "[p]laintiff [agrees] to release defendant 'from all liability and waive any claim for damage arising from any cause whatsoever (except that which is the result of gross negligence).' The express language of the agreement reserves plaintiff's right to assert a claim against defendant for any conduct that amounts to gross negligence." Id. at 9. Although the court recognized that exculpation agreements are valid in Pennsylvania, it denied defendant summary judgment because plaintiff alleged gross negligence and the agreement specifically excluded gross negligence. The court also stated, "[w]hile exclusionary clauses are construed strictly against the party who seeks to avoid liability, the court "must use common sense in interpreting the agreement.'" Id. at 7, citing Weiner v. Mt. Airy Lodge, 719 F. Supp. 342, 345 (M.D. Pa. 1989).

In Mullan v. Quickie Aircraft Corporation, 797 F.2d 845 (10th Cir. 1986), the Tenth Circuit Court of Appeals, applying Colorado law, reversed the lower court, holding that an exculpatory clause executed in favor of Defendant was valid. In that case, Plaintiff suffered injuries as a result of a home-built aircraft accident. He filed suit against defendant, the manufacturer and distributor of the aircraft, alleging negligence, product liability, and breach of warranty. At the time that he purchased the aircraft kit, plaintiff executed a release in favor of defendant, waiving "his rights to assert any claim against [defendant] arising from structural

- 18 -

integrity, performance, flight characteristics, mechanical failure, and safety." Id. at 848.   The Court, analyzing criteria similar to those set forth in Zimmer 254 Pa. Super. 474, supra, held that the exculpatory agreement was valid concluding, "[t]he contract was fairly entered into and the intention of the parties was expressed in clear and unambiguous language.   Thus the disclaimer provision is a conscionable and valid exculpatory agreement." Mullan, 797 F.2d at 853.

**B.    The Subject Agreement is Enforceable**

In the instant matter, there can be no doubt that decedent Simeone executed a valid agreement exculpating Defendants from liability for "all claims, rights and/or causes of action." [See Exhibit G.]  The agreement entered into between Interplane and decedent Simeone meets all of the requirements of a valid release.   Zimmer, 254 Pa. Super. 474. The agreement does not contravene any policy of Pennsylvania law. Further, it was a contract between individuals relating to their private affairs and not a contract of adhesion.   Simply put, decedent Simeone was under no obligation to purchase and fly the subject Skyboy. Valeo 347 Pa. Super. at 232. His decision to purchase and fly the Skyboy was something that he desired to do, notwithstanding his understanding of, and assent to, the risks associated with flying ultralight aircraft.  Plaintiff Simeone testified that prior to purchasing the Skyboy, decedent Simeone spent a few years investigating the different types of ultralight aircraft and obtained various information about ultralight aircraft. [See Exhibit M, T17:L2-15.]

The agreement that Defendants seek to enforce against Plaintiff Simeone is one in which the intentions of the parties are clearly spelled out, in writing.   Specifically, in return for consideration, decedent Simeone agreed to waive any and all claims that he might ever have against any individual or entity (inclusive of Defendants as providers of the aircraft engine), resulting from the purchase and his use of the ultralight Skyboy. [See Exhibits G.]  Nothing

- 19 -

could be clearer. There is no theory of liability that decedent Simeone preserved when he executed the release.

Furthermore, it would be unreasonable for Plaintiffs to claim that decedent Simeone was unaware of the dangers associated with ultralight aircraft or that he was unfamiliar with the terms of the agreement that he executed. First, decedent Simeone, only one day prior to executing the subject release, executed a different waiver (in connection with his familiarization flight) that, on its face, clearly put him on notice that flying ultralight aircraft was dangerous. Further, Decedent Simeone worked as a sales representative for Interplane. [See Exhibit M, T18:L1-T20; and Exhibit H, T29:L11-12.] The duties of an Interplane representative included reviewing Operator's Manuals with customers and advising customers of the potential risks associated with the Skyboy ultralight aircraft and, specifically, that the Rotax 582 was subject to sudden stoppages. [See Exhibit H, T26:L10-T27:L3.] In fact, the Operator's manual, which Plaintiff Simeone confirmed decedent Simeone received when he purchased the Skyboy, specifically states,

> "[t]this engine, by its design, is subject to sudden stoppage! Engine stoppage can result in crash landings. Such crash landings can lead to serious bodily injury or death. Never fly the aircraft equipped with this engine at locations, airspeeds, altitudes, or other circumstances from which a successful no-power landing cannot be made, after sudden engine stoppage…User assumes all risk of use, and acknowledges by his use that he knows the engine is subject to sudden stoppage (emphasis added).

[See Exhibit L.]

There is no doubt that decedent Simeone, in connection with his sales activities, was intimately familiar with the above-referenced language contained in the Operator's Manual. Decedent Simeone expressly waived any claims by his use of the aircraft. The foregoing

433549.1A

demonstrates that Simeone had knowledge of the potential risks involved with the Skyboy and its

engine and, with that knowledge, voluntarily executed the subject releases.

C.    **Defendants are Third-Party Beneficiaries of the Agreement between Decedent
      Simeone and Interplane**

There can be no doubt that Defendants are third-party beneficiaries of the agreement

between decedent Simeone and Interplane  In <u>Scarpitti v. Weborg</u>, 530 Pa. 366; 609 A.2d 147

(1992), the Pennsylvania Supreme Court re-affirmed the test in <u>Guy v. Liederbach</u>, 501 Pa. 47,

459 A.2d 744 (1983), setting forth the criteria with which to determine whether a party is an

intended third-party beneficiary.

> There is thus a two part test for determining whether one is an
> intended third party beneficiary: (1) the recognition of the
> beneficiary's right must be "appropriate to effectuate the intention
> of the parties," and (2) the performance must "satisfy an obligation
> of the promisee to pay money to the beneficiary" or "the
> circumstances indicate that the promisee intends to give the
> beneficiary the benefit of the promised performance."

<u>Scarpitti</u>, 530 Pa. at 371, <u>citing</u> <u>Guy v. Liederbach</u>, 501 Pa. at 60.

In the instant case, the agreement between decedent Simeone and Interplane satisfies both

of the above requirements.  The agreement clearly identifies Defendants, as "suppliers" of the

Interplane Skyboy's engine, as parties to whom the makers of the agreement intended to extend

its benefits. [<u>See</u> Exhibit G.]  Any other conclusion would contravene the clear language of the

contract.  Accordingly, Defendants are intended third-party beneficiaries of the agreement and,

therefore, are not liable to Plaintiff Simeone for any cause of action because Defendants would

have no liability towards decedent Simeone by virtue of his express waiver of all claims.

Accordingly, Defendants submit that decedent Simeone executed a valid release, exculpating Defendants of any liability and, therefore, Plaintiff Simeone's claims against them must be dismissed in their entirety as a matter of law.

## POINT II

### PLAINTIFFS STRICT LIABILITY AND NEGLIGENCE CLAIMS SHOULD BE DISMISSED BECAUSE DECEDENTS EXPRESSLY AND/OR IMPLIEDLY ASSUMED THE RISK OF FLYING ULTRALIGHT AIRCRAFT

Pennsylvania has adopted §402A of the Restatement (Second) of Torts for products liability cases. Restatement (Second) of Torts, §496C (Implied Assumption of Risk) states, in pertinent part:

> … a plaintiff who fully understands a risk of harm to himself or his things caused by the defendant's conduct or by the condition of the defendant's land or chattels, and who nevertheless voluntarily chooses to enter or remain, or to permit his things to enter or remain within the area of that risk, under circumstances that manifest his willingness to accept it, is not entitled to recover for harm within that risk.

Restatement (Second) of Torts, §496B (Express Assumption of Risk) states,

> A plaintiff who by contract or otherwise expressly agrees to accept a risk of harm arising from the defendant's negligent or reckless conduct cannot recover for such harm, unless the agreement is invalid as contrary to public policy.

The Comments to this Section state, in relevant part:

> a. Assumption of risk by express agreement. The risk of harm from the defendant's conduct may be assumed by express agreement between the parties. Ordinarily such an agreement takes the form of a contract, which provides that the defendant is under no obligation to protect the plaintiff, and shall not be liable to him for the consequences of conduct which would otherwise be

> tortious. It is not, however, essential that such an agreement be for
> consideration. A non-contractual consent, as in the case of one
> who rides on a train or enters a place of amusement on a pass, may
> be sufficient. The agreement may be a general one, relieving the
> defendant of all obligation to protect the plaintiff…

Assumption of the risk, under Pennsylvania law, "is a complete defense in a section 402A

products liability action alleging a design defect or failure to warn rising to the level of design

defect." Wagner v. Firestone Tire & Rubber Co., 890 F.2d 652, 657 (3rd Cir. 1989); See also

Lonon v. Pep Boys, Manny, Moe & Jack, 371 Pa. Super. 291, 296-97; 538 A.2d 22, 25 (1988);

Rutter v. Northeastern Beaver County School District, 496 Pa. 590, 613; 437 A.2d 1198, 1209

(1981). In order to be successful, the party asserting an assumption of risk defense must show

that the plaintiff knew of the defect or danger associated with the product and proceeded to use

the product anyway. Wagner 890 F.2d at 657. A plaintiff's knowledge of the risk may "be

proved 'by circumstantial evidence sufficient to permit an inference that the plaintiff was aware

[of] and understood the risk.'" Id., citing Staymates v. ITT Holub Industries, 364 Pa. Super. 37,

49; 537 A.2d 140, 146 (1987). Further, where reasonable minds cannot differ, the court may

determine whether a danger was known or obvious. Carrender v. Fitterer, 503 Pa. 178; 469 A.2d

120 (1983).

## A.    Pennsylvania Code Specifically Applies the Assumption of Risk Doctrine to Certain Dangerous Recreational Activities

The application of the assumption of risk doctrine, to the factual scenario presented in

this case, also appears to be a case of first impression. Ultralight aircraft flying is a relatively

new recreational activity. The Pennsylvania legislature has already codified the doctrine of

assumption of risk and its application to suits involving other potentially dangerous recreational

activities. Pennsylvania Code, 42 Pa. C.S § 7102, specifically provides for the application of the

- 23 -

doctrine of voluntary assumption of risk in cases where individuals engage in off-road vehicle riding and downhill skiing. "It is recognized that as in some other sports, there are inherent risks in the sport of downhill skiing." 42 Pa. C.S. § 7102(H(c)(2); See also, Galisson v. Shawnee Mountain Ski Area, 32 Pa. D.&C.4th 450 (1996).

**B.     Decedent Simeone Expressly and Impliedly Assumed the Risk that Injury and/or Death Could Result from Flying Ultralight Aircraft**

      1.     **Decedent Simeone expressly assumed the risk associated with flying ultralight aircraft**

Decedent Simeone expressly assumed the risk that he might become injured or even die when he decided to purchase the Skyboy and fly the ultralight Skyboy aircraft on July 22, 2000. As such, decedent Simeone's express assumption of the risk negates all of Plaintiff Simeone's claims against Defendants. As discussed supra, at Point I, decedent Simeone executed a written release in favor of Interplane (and Defendants). [See Exhibit G.] The release constitutes an "express agreement between the parties [decedent Simeone and Interplane]." See Comments to Restatement (Second) of Torts, Section 496B (a). Defendants, as set forth at Point I, supra, are third-party beneficiaries of this agreement and, therefore, are not subject to any claims by Plaintiff Simeone. In sum, by contract, decedent Simeone agreed to assume the risks associated with flying the ultralight Skyboy that he purchased, and he waived his (and his heirs') right to sue Interplane and its suppliers based on any theory of liability.

- 24 -

**2.    Decedent Simeone impliedly assumed the risk associated with flying ultralight aircraft**

There are several factors which conclusively demonstrate that decedent Simeone was aware of the defect or dangers associated with his purchase and operation of the Skyboy, and that he assumed the risk of injury and/or death in connection with flying his Skyboy.

First and foremost, as set forth above and at Point I, supra, decedent Simeone executed a release when he purchased the Skyboy, specifically acknowledging,

> ...that flying ultralight aircraft is a potentially dangerous activity that can result in mishap, injury or death. I acknowledge that no warranties, either express or implied, have been given to me concerning the fitness of the aircraft or any of its parts. I agree to indemnify and hold harmless Interplane USA and its suppliers from any action or cause arising from the sale and use of this aircraft and/or parts. (Emphasis added.)

[See Exhibit G.] It is Defendants' position, for the reasons set forth at Point I, supra, and at Point II(A) and (B)(1), above, that this signed contract constitutes a valid express agreement relieving Defendants of any liability towards decedent Simeone (and his heirs). Even if the court concludes that the agreement is not a valid waiver and/or Defendants are not the beneficiary of same, the subject sales contract is nonetheless conclusive evidence that decedent Simeone was aware of the dangers of ultralight flying and, notwithstanding, voluntarily chose to purchase an ultralight aircraft and fly it on July 22, 2000.

Decedent Simeone's knowledge of the dangers of flying ultralight aircraft is also illustrated by his execution of a separate waiver in connection with his Interplane familiarization flight, one day prior to executing the release with his purchase of the Skyboy. Decedent Simeone executed the release in favor of Interplane (and its suppliers), acknowledging "that the

flight is attempted solely at his own risk." [See Exhibits F.]  Additionally, in connection with the

familiarization flight and subsequent flight instruction, decedent Simeone was advised of the

risks of flying ultralight aircraft by Mr. Dawson.  Mr. Dawson, who provided decedent Simeone

with six and one-half (6 ½) hours of total flight instruction testified as follows concerning the

information that he provided to his students:

> Q.    Do you recall…what the course book said about safety
>        risks involved in ultralight flying?
>
> A.    Of course, flying is inherently dangerous and they have
>        some waivers that they had to sign for starters, and the
>        waivers basically said this is a risky adventure and
>        therefore you're assuming the risk when you do fly.

[See Exhibit E, T12:23-T13:5.]

Decedent was also apprised of the need to be able to land the aircraft in the event of an

engine failure.  Mr. Dawson testified that this type of procedure was "heavily stressed." [Id.,

T13:L13-20.]  Further, decedent Simeone practiced engine stalls during his instruction with Mr.

Dawson, who described the process as follows:

> Q.    Do the rules include a rule for being able to land the aircraft
>        in case of sudden engine failure?
>
>                              ***
>
> A.    Yes.
>
> Q.    Did you discuss that with Mr. Simeone at some point?
>
> A.    It says I did stall stuff there. And yes, engine out
>        procedures are—like I say, those are taught early on. After
>        just a few flights we reduce the throttle to idle and show
>        them how the plane will glide and we tell them what speed
>        the airplane should be at that point.  We actually go up to
>        1500, 2000 feet and reduce the power and then glide down
>        as much as 500 feet or so and demonstrating how much the
>        plane will glide and making turns.  Turning while the
>        engine is at idle is also taught as part of the process.

- 26 -

[Id., T31:L13-20.]

Decedent Simeone also was well aware that the Rotax 582 engine was subject to sudden stoppage.  His knowledge of this fact is the only reasonable conclusion, based on the fact that was an Interplane sales representative (who sold at least one (1) aircraft and received a commission for same) , whose duties would have included advising customers that the Rotax 582 engine was subject to sudden stoppage.  [See Exhibit F, T26:L10-T27:3.]  Additionally, decedent Simeone's Operator's Manual clearly stated that the engine was subject to sudden stoppages. [See Exhibit L.]

Even more telling of decedent Simeone's knowledge of the dangers associated with flying ultralight aircraft is the fact that, not long before the fatal incident, he experienced an incident (throttle sticking) associated with flying his Skyboy, requiring him to make an emergency landing in a cornfield.  This caused damage to his aircraft. [See Exhibit Q, T158:L1-T159:L13; and Exhibit M, T47:L11-20.]  Certainly, this experience would have made decedent Simeone aware that flying ultralight aircraft was dangerous.  Notwithstanding this prior incident, decedent Simeone chose to again fly his ultralight aircraft.

Additionally, it is clear that decedent Simeone assumed the risk that his engine could fail during flight because he did not follow the appropriate maintenance schedule concerning the replacement of spark plugs in his Rotax engine.  According to Plaintiffs' own experts, decedent Simeone's aircraft had between 31 and 38 hours of run-time on the engine. [See report authored by Plaintiffs' expert, Manual Raefsky, attached to Kelly Certification as Exhibit X; report authored by Plaintiffs' expert, Donald E. Sommer, attached to Kelly Certification as Exhibit Y; report authored by Plaintiffs' expert, Harold C. Newbold, attached to Kelly Certification as Exhibit Z; and report authored by Plaintiffs' expert, Mark Seader, attached to Kelly Certification

- 27 -

433549.1A

as Exhibit AA.] Officer Yatsko's investigative notes reflect that the engine had thirty-eight (38) hours of run-time at the time of the crash. [See Exhibit U.] Mr. Raefsky concluded that there is no evidence that the spark plugs were not the original plugs. [See Exhibit X.] However, the Rotax Operator's Manual specifically states that the spark plugs should be inspected after twelve and one-half (12 ½) hours of engine use and the spark plugs should be replaced after twenty five (25) hours of operation. [See Exhibit L, Chapter 32.] Therefore, decedent Simeone ran his aircraft engine for an additional thirteen (13) hours without changing the spark plugs.

Additionally, the preface to the Operator's Manual clearly states that the aircraft should never be flown into locations in which a successful no-power landing cannot be made. [See Exhibit L.] In the instant case, decedent Simeone and decedent Lengyel flew the ultralight into an unfamiliar location (York Airport), one in which they were unable to successfully execute a no-power landing (assuming the engine ceased to operate during flight, which Defendants do not concede). Mr. Losey testified that decedent Simeone was "definitely not" familiar with York Airport. [See Exhibit Q, T47:L14-22.]

In view of decedent Simeone's general knowledge that ultralight flying was dangerous, a previous incident involving ultralight which required an emergency landing, specific knowledge that the engine in his Skyboy ultralight aircraft was subject to sudden stoppage, and his failure to adhere to the Rotax Operator's maintenance guide concerning the replacement of spark plugs, he assumed the risk of injury and/or death when he chose to fly his Skyboy on July 22, 2000.

## C.    **Decedent Lengyel Impliedly Assumed the Risk that Injury and/or Death Could Result from Flying Ultralight Aircraft**

Decedent Lengyel's conduct, prior to flying with decedent Simeone on July 22, 2000, demonstrates that he, too, voluntarily assumed the risks associated with flying ultralight aircraft.

433549.1A

Decedent Lengyel had been a general aviation pilot prior to becoming an ultralight pilot and instructor. Further, Decedent Lengyel owned an ultralight Challenger aircraft, equipped with a Rotax 503 engine, which he flew two or three times a week. [See Exhibits Q, T22:L10-T23:6; and Exhibit R, T18:L3-12; T42:12-15.]  Because decedent Lengyel's ultralight was also equipped with a Rotax engine, he would have had knowledge, based on his Rotax Operator's Manual, that Rotax engines were subject to sudden stoppage [See Rotax Operator's Manual for 503 engine, attached to Kelly Certification as Exhibit BB.] In fact, the Operator's Manual which would have been provided to decedent Lengyel when he purchased his ultralight aircraft specifically states:

### 4.2 Safety information

WARNING:  This engine, by its design, is subject to sudden stoppage!  Engine stoppage can result in crash landings.  Such crash landings can lead to serious bodily injury or death.

WARNING:  This is not a certified aircraft engine.  It has not received any safety or durability testing, and conforms to no aircraft standards.  It is for use in experimental, uncertificated aircraft and vehicles only in which an engine failure will not compromise safety.

User assumes all risk of use, and acknowledges by his use that he knows the engine is subject to sudden stoppage.

WARNING:  Never fly the aircraft equipped with this engine at locations, airspeeds, altitudes, or other circumstances from which a successful no-power landing cannot be made, after sudden engine stoppage…(Emphasis added.)

[See Exhibit BB.]

Moreover, as an ultralight instructor, decedent Lengyel would by definition have been thoroughly familiar with all of the inherent risks of ultralight operation that could occur,

- 29 -

433549.1A

including engine stoppage, during an ultralight flight. Mr. Dawson testified that, as an instructor, safety issues are discussed with students, including the fact that "flying is inherently dangerous and…is a risky adventure and therefore you're assuming the risk when you do fly." [See Exhibit E, T12:23-T13:5.] It is only logical to conclude that decedent Lengyel was aware of the risks associated with flying ultralight aircraft. In fact, it likely that he too, in connection with his responsibilities to provide flight instruction to decedent Simeone, discussed with decedent Simeone the risks associated with flying ultralight aircraft.

Additionally, Mr. Losey testified that decedent Lengyel also enjoyed flying low patterns on the opposite side of airports, something that Mr. Losey stated there was no reason to do. [See Exhibit Q, T67:L13-19; T83:L7-15.] Further, like decedent Simeone, decedent Lengyel voluntarily chose to fly into an unfamiliar location (York Airport), one in which they were unable to successfully make a no-power landing (Defendants do not concede that the engine ceased to operate during flight). Mr. Losey testified that he suspected that decedent Lengyel was not familiar with York Airport. [See Exhibit Q, T47:L14-22.] Decedent Lengyel's Rotax Operator's Manual clearly states that the aircraft should never be flown into locations in which a successful no-power landing cannot be made. [See Exhibit BB.]

There can be no other conclusion, based on the facts in this case, that decedent Lengyel fully understood the risks of flying ultralight aircraft, and especially aircraft outfitted with certain Rotax engines. However, he nevertheless voluntarily chooses to take that risk. Restatement (Second) of Torts, Section 496C.

**D.    As a Matter of Law, Decedents Assumed the Risk that Injury and/or Death Could Result from Flying Ultralight Aircraft**

There is no genuine issue of material fact as to whether decedents assumed the risk on the date of the accident. There is only one reasonable conclusion-that the conduct of decedents, set forth above, shows two (2) individuals who were aware of possible engine stoppage and other dangers associated with flying ultralight aircraft and, notwithstanding this knowledge, voluntarily decided to engage in flying the Skyboy ultralight aircraft on July 22, 2000.

Accordingly, Defendants submit that decedents Simeone and Lengyel assumed the risk of injury and/or death and therefore Plaintiffs' claims must be dismissed in their entirety as a matter of law.

**POINT III**

**PLAINTIFFS STRICT LIABILITY CLAIMS FAIL AS A MATTER OF LAW BECAUSE PLAINTIFFS CANNOT PROVE THE SUBJECT PRODUCT WAS DEFECTIVE WHEN IT LEFT THE HANDS OF DEFENDANTS AND PLAINTIFF CANNOT PROCEED ON A MALFUNCTION THEORY**

**A.    Pennsylvania Product Liability Law Requires Proof that the Subject Product was Defective when it Left the Hands of the Manufacturer**

Plaintiffs' claims of strict liability and negligence claims should be dismissed as a matter of law. As set forth above, Pennsylvania has adopted §402A of the Restatement (Second) of Torts for products liability cases, which provides that:

> (1)    One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a)    the seller is engaged in the business of selling such a product, and

(b)    it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

Restatement (Second) of Torts § 402A (1965). Webb v. Zern, 422 Pa. 424, 220 A.2d 853 (1966).

To prevail on a cause of action in products liability, the plaintiff must prove that: (1) the product was defective; (2) that the defect existed when it left the hands of the defendant, and; (3) that the defect proximately caused injury to him or her. See Putt v. Yates-American Machine Co., 722 A.2d 217, 220 (Pa. Super. 1998); Riley v. Warren Manufacturing, Inc., 455 Pa. Super. 384, 390; 688 A.2d 221, 224 (1997). Thus, "the plaintiff must prove that the defendant sold the product involved in a defective condition." Azzarello v. Black Brothers Co., 480 Pa. 547, 550; 391 A.2d 1020 (1978). Liability applies to any manufacturer, wholesaler or retail dealer, distributor and all suppliers of a defective product in the chain of distribution, including retailers, partmakers, and assemblers. See, Balczon v. Machinery Wholesalers Corp., 993 F. Supp. 900, 903-904 (W.D. Pa. 1998), citing Restatement (Second) of Torts § 402A cmt f. (1965). Simply put, a defendant that exercises no control or possession over the defective product is not liable for injuries sustained by a plaintiff in the use or consumption of that product. Balczon v. Machinery Wholesalers, supra, 933 F. Supp. at 905.

**B.    Plaintiffs Cannot Prove that the Rotax Engine was Defective at the Time it Left the Manufacturer**

In the instant case, Defendants are entitled to summary judgment because Plaintiffs cannot prove that the Rotax engine was defective at the time left Defendants' hands. Assuming for purposes of this motion only that the Rotax engine was defective at the time of the subject incident (which Defendants do not concede), Plaintiffs still cannot prove that it was defective

- 32 -

when it left the "hands" of Defendant. A review of the evidence indicates that decedent Simeone

originally took delivery of a partially disassembled Skyboy, which decedent Simeone assembled.

[See Exhibit N.] Further, the Skyboy was damaged upon delivery to decedent Simeone. [Id.]

However, there is no evidence whatsoever that suggests that the aircraft was assembled properly

or that the engine, and/or other components of the aircraft were not damaged during the assembly

process. Further, there is no evidence that the aircraft was assembled by a qualified aircraft

mechanic. [See Exhibit M, T22:L17-T:23-1.]

The evidence in the instant case also reveals that decedent Simeone crashed the Skyboy

ultralight aircraft shortly before the July 22, 2000 flight. [See Exhibit Q, T158:L1-T159:L13;

Exhibit M, T47:L11-20.] The accident involved throttle/engine trouble, requiring decedent

Simeone and his flying companion to crash-land in a cornfield, resulting in the plane hitting a

rock and damaging the landing gear. [See Exhibit Q, T158:L1-T159:L13.] There is simply no

evidence that suggests decedent Simeone did anything to correct the throttle problem that caused

this accident. Even assuming that he did correct the problem, there is nothing to indicate that a

certified aircraft mechanic was engaged to perform the work. Therefore, it is unlikely that the

aircraft and its engine were in their original condition. Further, Plaintiffs are unable to show that

decedent Simeone's aircraft and engine, after his assembly and prior accident, were not

substantially altered prior to the subject incident.

### 1.    Intentional Spoliation of Evidence

Notwithstanding requests through their experts, Defendants were deprived of the

opportunity to test the subject engine prior to Plaintiffs' agent, Mr. McSwain, disassembling the

engine. [See Exhibit W.] Mr. McSwain's refusal, in consultation with Plaintiffs' counsel, to

permit Defendants' experts to examine and test the subject product in its most pristine state,

- 33 -

amounts to knowing spoliation of evidence. <u>Roselli v. General Electric Co.</u>, 410 Pa. Super. 223,

599 A.2d 685 (1991). The best evidence of the condition of the engine on the date of the

incident was intentionally and irreversibly altered by Plaintiffs through disassembly. Indeed,

Defendants were severely prejudiced by not being permitted to test the engine prior to its

disassembly, considering that Plaintiffs allege that the engine ceased to operate during the

decedents' flight, causing the fatal crash. Moreover, it was reported by Officer Yatsko that the

engine had compression and was operating at the time of crash. [<u>See</u> Exhibit U.] In fact, Officer

Yatsko, who had engaged a local certified auto mechanic (Don Warner) to inspect the engine and

whose opinions he relied on in reaching his conclusions, testified at his deposition as follows:

> Q. Next entry is, Only 38 hours on engine, paren, run time, close paren. Engine not seized. Maintained compression. Is that observation that you made on your own?
>
> A. No. That would have been Don Warner again pointing that out to me. The way he described the engine would have been compression and would have been running...
>
>                         ***
>
> Q. ...it was a lay opinion of yours that the propeller on the accident aircraft was rotating at the time it crashed?
>
> A. That's correct.
>
> Q. And as I understood your testimony, that lay opinion was based upon one thing, that being the observation of some of the corn in and around the vicinity of the aircraft?
>
> A. Well, that combined—as I stated before, the totality of the circumstances led me to my conclusion...the information that I got from a certified mechanic, the compression that he noted in the engine, what he explained to me that was and meant, that all led to my final conclusion.

[See Exhibit T, T72:L12-22; and T97:L8-T98:L11.] At the very least, based on the fact that Plaintiffs apparently intended to institute suit, following the disassembly, Defendants were entitled to test the engine in order to determine whether it was in fact operating at the time of the crash. However, this cannot now be accomplished because of Plaintiffs' intentional acts. Therefore, summary judgment is warranted.

**C.      Plaintiffs Cannot Proceed under a Malfunction Theory because They Failed to Eliminate other Possible Causes of the Subject Accident**

Plaintiffs cannot meet their requisite burden of proof in order to proceed under a malfunction theory. Under a malfunction theory, plaintiff must establish the following: "(1) the product malfunctioned; (2) plaintiffs used the product as intended or reasonably expected by the manufacturer; and (3) the absence of other reasonable secondary causes." Peaco v. GF Mgmt. of Pa., Inc., 2003 U.S. Dist. LEXIS 21017 *7 (E.D. Pa. 2003) citing O'Neill v. Checker Motors Corp., 389 Pa. Super. 430, 567 A.2d 680, 682 (1989); Altronics of Bethlehem, Inc. v. Repco, Inc. 957 F.2d 1102, 1105 (3d Cir. 1992).

Plaintiffs have clearly failed to show that the engine was properly maintained, as would reasonably be expected by the manufacturer, and have failed to put forth any evidence eliminating other reasonable causes of the crash or alleged engine failure. Specifically, Plaintiffs' experts all conclude that the alleged engine trouble initiated as a result of fouled spark plugs. None of the experts' reports discuss what other "reasonable" causes of the alleged engine failure and crash were specifically considered and eliminated including, but not limited to, decedent Simeone's failure to maintain the spark plugs. [See Exhibits X; Y; Z; and AA.] Based on Plaintiff's failure to exclude any other possible causes of the alleged engine failure and crash,

433549.1A

they cannot meet their burden and thus, they should be permitted to proceed on a malfunction theory.

Accordingly, Plaintiffs are unable to prove that the Rotax engine was defective at the time left the manufacturer and therefore Plaintiffs' strict liability claims must be dismissed in their entirety as a matter of law.

**POINT IV**

**PLAINTIFFS REMAINING CLAIMS FAIL AS A MATTER
OF LAW AND SHOULD BE DISMISSED**

**A.    Plaintiffs Breach of Warranty Claims are Without Merit**

In Pennsylvania, the law concerning third-party beneficiaries of warranties is governed by case law and 13 Pa.C.S. § 2318, which states:

> § 2318.  Third party beneficiaries of warranties express or implied
>
> The warranty of a seller whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty. A seller may not exclude or limit the operation of this section.

**1.    Defendants did not provide either decedent with an express warranty**

In the instant case, it is clear that Defendants did not provide decedents with any express warranties relating to the subject engine.  In fact, Defendants, through Interplane's agreement with Decedent Simeone, specifically disclaimed any express or implied warranties relating to the

Skyboy ultralight aircraft and its engine. [See Exhibit G.]  Further, in Goodman v. PPG Industries, Inc., 849 A.2d 1239, 1246 (Pa. Super. 2004), the court held that,

> ...in order to preserve the unique character of express warranties, we hold that third parties may enforce express warranties only under circumstances where an objective fact-finder could reasonably conclude that (1) the party issuing the warranty intends to extend the specific terms of the warranty to the third party (either directly, or through an intermediary); and (2) the third party is aware of the specific terms of the warranty, and the identity of the party issuing the warranty.

Id. at 1246.  Defendants did not provide an express warranty to decedent Lengyel or to any person, contemplated in 13 Pa.C.S. § 2318, by which a warranty would be extended to decedent Lengyl.  Additionally, Plaintiffs do meet any of the criteria set forth in Goodman.

### 2.    Any implied warranty owed to decedents was expressly waived by decedent Simeone

As set forth above, decedent Simeone expressly acknowledged and accepted, by way of a valid agreement, that Interplane disclaimed any warranties, express or implied. [See Exhibit G.] Therefore, Defendants cannot be liable to either decedent Simeone or decedent Lengyel based on a theory of implied breach of warranty.

### a.    Decedent Lengyel has no greater warranty claim then decedent Simeone

Since decedent Simeone is the one to whom an implied warranty, relating to the alleged product, could have been issued to, decedent Lengyel "stands in the shoes" of decedent Simeone. Pennsylvania courts have dispensed with the horizontal privity requirement, thus permitting non-parties to a contract to institute suit based on breach of implied warranty. Salvador v. Atlantic Steel Boiler Co., 457 Pa. 24; 319 A.2d 903 (1974).  However, in the instant case, decedent

Simeone, the purchaser and user of the engine, expressly waived any implied warranty relating to his purchase of the Skyboy and its engine. [See Exhibit G.]  Certainly,  it flies in the fact of logic to afford decedent Lengyel, whose implied warranty claim is derivative of any claim decedent Simeone may have had, more protection than that afforded decedent Simeone.

**B.**     **There is no evidence of Recklessness, Wilful or Wanton Conduct or Fraud on the part of Defendants**

In order to successfully prosecute a case based on theories of recklessness, Willful or wanton conduct or fraud, "a plaintiff must prove by clear and convincing evidence six elements:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

Debbs v. Chrysler Corp., 810 A.2d 137, 155 (2002), quoting Gibbs v. Ernst, 538 Pa. 193, 647 A.2d 882, 889 (1994) (footnote omitted).  There is no evidence that Defendants made any false or reckless statement concerning the engine product at issue in this case.    Conversely, Defendants, in writing, warned potential purchasers and users of its engines that flying ultralight aircraft was dangerous and that the engine was subject to sudden stoppage.  The Operator's Manuals for the 582 and 503 engines both describe, in detail, the potential dangers associated with ultralight aircraft and its engines. [See Exhibits L; and BB.]

Accordingly, Defendants are entitled to an Order of summary judgment of the counts of the Complaint that allege recklessness, Willful or wanton conduct or fraud.

## POINT V

## PLAINTIFFS ARE NOT ENTITLED TO PUNITIVE DAMAGES
## BECAUSE THERE IS NO EVIDENCE OF OUTRAGEOUS CONDUCT

Pennsylvania has adopted §908A of the <u>Restatement (Second) of Torts</u> as the rule regarding the imposition of punitive damages. <u>Restatement (Second) of Torts</u> §908A states:

> (1) Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future.
>
> (2) Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.

In the instant case, Plaintiffs have not put forth any evidence of "outrageous conduct" or "evil motive" on the part of Defendants. Indeed, Defendants' conduct, relating to its product, was entirely reasonable under the circumstances. As set forth above, Defendants routinely advised purchasers of the dangers associated with flying ultralight aircraft and, specifically apprised purchasers that its engines were subject to sudden stoppage. Plaintiffs cannot make out a case for punitive damages and, thus, Defendants are entitled to a dismissal of all punitive damages claims.

## CONCLUSION

Based upon the legal authority cited above and the factual recitation, it is respectfully requests that this Court grant Defendant BRP-Rotax GmbH & Co. KG f/k/a Bombardier-Rotax

433549.1A

GmbH & Co. and Bombardier Inc.'s motion for summary judgment and that Plaintiffs' First Amended Complaint, alleging claims of strict products liability, negligence and breach of warranty, recklessness, Willful or wanton conduct or fraud, be dismissed in favor of Defendants as a matter of law.

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
Attorney for Defendant BRP-Rotax GmbH & Co. KG

BY: _____
Robert J. Kelly, Esquire
33 Washington Street – 18th Floor
Newark, N.J. 07102

And

By:    Jonathan Dryer, Esq.
P.A. Attorney ID 34496
The Curtis Center-Suite 1130 East
Independence Square West
Philadelphia, PA 19106

Date: August 17, 2005

- 40 -

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THERESA MARIE SIMEONE, et al.     :

        Plaintiffs,     :

        v.     :    CIVIL ACTION NO. 02CV4852

BOMBARDIER-ROTAX GmbH & Co. KG, et al., :

        Defendants.     :

## ORDER

        And now, this    day of        , 2005, upon consideration of defendants BRP-Rotax GmbH & Co. KG. and Bombardier, Inc.'s Motion for Summary Judgment, and any response thereto, it is hereby ORDERED that summary judgment is entered in defendants' favor, and plaintiff's complaint is hereby DISMISSED WITH PREJUDICE.

                       BY THE COURT:

                       _____