## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THERESA MARIE SIMEONE, Personal
Representative of the Estate of Albert Francis
Simeone, Jr., Deceased, and THERESA MARIE
SIMEONE, In Her Own Right, and
MARY ANN LENGYEL, Personal
Representative of the Estate of George Lengyel,
Deceased, and MARY ANN LENGYEL,
In Her Own Right

       v.

BOMBARDIER-ROTAX GmbH, et al.

:
:
:   CIVIL ACTION NO. 02CV4852
:
:
:
:   JURY TRIAL DEMANDED
:
:
:
:
:

---

## PLAINTIFFS' RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Arthur Alan Wolk, Esquire
Christopher J. Cerski, Esquire
Alan D. Mattioni, Esquire
THE WOLK LAW FIRM
1710-12 Locust Street
Philadelphia, PA 19103

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………..ii

STATEMENT OF FACTS………………………………………………………….1

    INTRODUCTION……………………………………………………………...1

    PURCHASE OF SKYBOY AIRCRAFT…………………………………………....2

    PRIOR SHIPPING DAMAGE…………………………………………………4

    PRECAUTIONARY LANDING…………………………………………………5

    THE ACCIDENT FLIGHT………………………………………………………5

    THE INVESTIGATION…………………………………………………………6

LEGAL ARGUMENT……………………………………………………………6

    STANDARD OF REVIEW………………………………………………………6

    RELEASE AND WAIVER………………………………………………………7

    ASSUMPTION OF THE RISK…………………………………………………18

    ENGINE WAS DEFECTIVE AT TIME OF MANUFACTURE……………….39

    MALFUNCTION THEORY……………………………………………………43

    WARRANTY CLAIMS…………………………………………………………45

    PUNITIVE DAMAGES…………………………………………………………45

CONCLUSION……………………………………………………………………48

## TABLE OF AUTHORITIES

*Berkebile v. Brantly Helicopter Corp.*,
337 A.2d 893 (Pa. 1975)............................................................................19, 34

*Bortz v. Noon*,
720 A.2d 555 (Pa. 1999)................................................................….…..47

*Brown v. Racquetball Centers, Inc.*,
534 A.2d 842 (Pa. Super. 1987)..................................................................8

*Childers v. Power Line Equipment Rentals, Inc.*,
681 A.2d 201 (Pa. Super. 1996)................................................................36

*Employers Liability Assurance Corp. v. Greenville Business Men's Association*,
224 A.2d 620 (Pa. 1966)...........................................................................7, 16

*Ferraro v. Ford Motor Co.*,
223 A.2d 746 (Pa. 1966)...........................................................................19

*Flores v. The Home Depot, Inc.*,
C.A. No. 01-6908 (E.D. Pa., April 3, 2003).................................................6

*Gallison v. Shawnee Mountain Ski Area*,
32 Pa. D. & C. 4th 450 (Ct. Com. Pleas, Monroe County)..............................17

*Hutchison v. Luddy*,
766 A.2d 870 (Pa. 2005)...........................................................................47

*Jankowski v. Ski Roundtop Inc.*,
45 Pa. D. & C 3d 671 (Ct. Com. Pleas, Adams County 1986)..............................17

*Jara v. Rexworks, Inc.*,
718 A.2d 788, 793 (Pa. Super. 1998)..........................................................34

*Keystone Aeronautics Corp. v. R.J Enstrom Corp.*,
499 F.2d 146 (3rd Cir. 1974).....................................................................16

*Kimco Development v. Michael D's Carpet*,
637 A.2d 603 (Pa. 1993)...........................................................................36

*Kuisis v. Baldwin-Lima-Hamilton Corp.*,
319 A.2d 914 (Pa. 1974)...........................................................................39

*Madonna v. Harley Davidson, Inc.*,
708 A.2d 507, 509 (Pa. Super. 1998)..........................................................34

*Mavreshko v. Resorts USA, Inc.*,
2005 WL 1309060 (M.D. Pa. 2005)……………………………………………..16

*McCown v. International Harvester Co.*,
342 A.2d 381 (Pa. 1975)………………………………………………………36

*Mullan v. Quickie Aircraft Corporation*,
797 F.2d 845 (10th Cir. 1986)………………………………………………..16

*Robinson v. B.F. Goodrich Co.*,
664 A.2d 616 (Pa. Super. 1995)………………………………………………20

*Rogers v. Johnson & Johnson Products, Inc.*,
565 A.2d 751 (Pa. 1989)………………………………………………………44

*Roselli v. General Electric Co.*,
599 A.2d 685 (Pa. Super. 1991)………………………………………………42

*Schmid v. Milwaukee Tool Corporation*,
13 F.3d 76 (3rd Cir. 1994)…………………………………………………….43

*Schroder v. Commonwealth*,
710 A.2d 23 (Pa. 1997)……………………………………………………42, 43

*Weiner v. Mt. Airy Lodge, Inc.*,
719 F. Supp. 342 (M.D. Pa. 1989)……………………………………………17

## STATUTES

13 Pa.C.S.A. § 2316…………………………………………………………...45

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THERESA MARIE SIMEONE, Personal :
Representative of the Estate of Albert Francis :
Simeone, Jr., Deceased, and THERESA MARIE : CIVIL ACTION NO. 02CV4852
SIMEONE, In Her Own Right, and :
MARY ANN LENGYEL, Personal :
Representative of the Estate of George Lengyel, :
Deceased, and MARY ANN LENGYEL, : JURY TRIAL DEMANDED
In Her Own Right :
:
                    v. :
:
BOMBARDIER-ROTAX GmbH, et al. :

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I.    STATEMENT OF FACTS**

**A.    Introduction**

On July 22, 2000, Albert Simeone and George Lengyel were fatally injured when

the Rotax 582 engine in Mr. Simeone's Interplane Skyboy aircraft failed while on final

approach to the York Airport in York, Pennsylvania.  The only witness to the accident

was Ron Madison who at the time was repairing the roof of his house located along the

approach path to Runway 35.  Mr. Matison observed the aircraft as it was making a

normal approach to the airport and then saw it turn deliberately to the right and glide

silently into a corn field. [Matison, Exhibit "A", 33:9-34:22]

At the time of the crash, the aircraft (and its 2-stroke, Rotax 582 engine) was

nearly new having accumulated less than forty (40) hours of operation. [Yatsko, Exhibit

"B", 72:12-13]

As part of Plaintiffs' investigation, the spark plugs from the subject engine were

examined and noted to be coated with carbonaceous material. [Exhibit "C"]  Subsequent

functional testing of the spark plugs demonstrated that they incapable of firing properly. [Exhibit "C"]  Testing of the oil injection system in accordance with the manufacturer's procedures determined that the pump was flowing too much oil at a position corresponding to reduced power. [Exhibit "C"]  Flow testing of the engine's carburetors also revealed abnormal operation. [Exhibits "C" and "D"]

### B.    Purchase of the Skyboy Aircraft

On March 5, 2000, Mr. Simeone met with Ben Dawson, a representative of Interplane USA, for the purpose of taking a ride in the company's demonstrator Skyboy aircraft. [Dawson, Exhibit "E", 51:4-22]  Prior to riding in the company's demonstrator aircraft, Mr. Simeone was required to sign an Interplane USA Waiver and Release form. [Exhibit "F"]  Despite Defendants' suggestion to the contrary, the sole purpose of the document was to release claims against Interplane USA "aris[ing] out of (1) Any attempt by him, whether successful or not, to ride, fly or otherwise operate the heretofore mentioned ultralight vehicle or 'aircraft.'" [Exhibit "F"]  As will be discussed below, there was never any intention to release claims against Defendants arising from the operation of an entirely different aircraft.

After riding in the demonstrator aircraft, on March 6, 2005, Mr. Simeone decided to purchase a Skyboy aircraft from Interplane USA and, for this reason, completed an Order form which contained language in the nature of a release:

> I understand that flying ultralight aircraft is a potentially dangerous activity that can result in mishap, injury or death.  I acknowledge that no warranties, either express or implied, have been given to me concerning the fitness of the aircraft or any of its parts.  I agree to indemnify and hold harmless ***Interplane USA and its suppliers*** from any action or cause arising from the sale and use of this aircraft and/or parts. [emphasis added]

[Exhibit "G"]

2

Despite previous claims to the contrary, Defendants now argue they are "suppliers" of Interplane USA in an effort to profit from this language. As will be explained more fully hereinafter, Defendants never supplied an engine, or any other part, to Interplane USA.

Defendants also make much of what they call the "risk of ultralight flying" by clipping and pasting quotations from various documents and depositions – and leaving out other important details.

For example, the highlighted portions were omitted:

**Q.**    **Did you discuss the language that I read just now with Mr. Simeone?**

**A.**    **I don't remember whether I particularly went over that or not.**

Q.    Was it part of Interplane's regular practice and procedure to discuss with customers the risks involved in ultralight flying **as set forth in that paragraph?**

**MR. MATTIONI: Objection; form.**

THE WITNESS:

A.    We would, of course, talk about safety as part of the thing. Flying again, like that thing says, is potentially dangerous and we would tell him just how dangerous it really is and we would say everything has got to be done with these rules because -- so you don't get hurt. And, like I say, safety is -- we went over -- that is why we did stalls over and over again was to cover, make    sure that they were capable of doing stall recovery and stuff.

[Dawson, Exhibit "E", 30:6-24]

Similarly, while Defendants claim "[i]t was the policy of Interplane representatives to discuss with purchasers of its aircraft, the risks of flying the aircraft, specifically pointing out the operating manuals for the Rotax engine," the testimony of the person who sold Mr. Simeone the aircraft is to the contrary:

> Q.    And as part of your sales or training practice, did you go through the manuals with your customers?
>
> A.    Not generally.

[Dawson, Exhibit "E", 35:25-36:3]

Defendants even try to make Mr. Simeone a sales representative for Interplane USA on the assumption that his "duties would have included advising customers that the Rotax 582 engine was subject to sudden stoppage." But again, the evidence tells a different story:

> Q.    Now, going back to when Mr. Simeone helped sell a Skyboy or two at one of the air shows. *Did he receive any training from you as to what he should do?*
>
> A.    *No. He just discussed the parameters of how to fill out the paperwork and stuff like that. He didn't do any demonstration of aircraft or anything like that, no.* He was there in the tent and around the airplanes.
>
> Q.    So he was helping out?
>
> A.    I believe he helped out at Sun & Fun. In fact, I know he helped out at Sun & Fun.
>
> Q.    *Was he ever told to or given a manner in which to discuss risks involved in ultralight flying with prospective customers of Interplane?*
>
> A.    *I don't remember.*

[Dawson, Exhibit "E", 37:23-38:12]

**C.    Prior Shipping Damage**

Defendants also try to elevate the fact that the Skyboy aircraft was damaged while being shipped from Interplane USA to Mr. Simeone's farm. However, there has been no suggestion by anyone that the damage, which was repaired before the first flight, had anything to do with the fatal crash. An interesting fact is that Interplane USA even

attempted to buy back the aircraft after it was repaired to use as a company demonstrator. [Mandarino, Exhibit "H", 35:16-24]

### D.  Precautionary Landing

Prior to the fatal crash, Mr. Simeone made a precautionary landing in a field without injury and only minor damage to the aircraft after the throttle allegedly stuck open and thus prevented a reduction in power. [Losey, Exhibit "I", 158:1-8] Assuming the testimony is reliable, this "problem" did not cause the engine to stop running. Further, there is no evidence that the throttle ever stuck open again. Indeed, there was speculation that the true cause was the passenger accidentally sitting on the throttle. [Losey, Exhibit "I", 160:5-14]

### E.  The Accident Flight

On the day of the fatal accident, Mr. Simeone and Mr. Lengyel intended to fly the Skyboy aircraft from Mr. Simeone's farm in Jennersville, Pennsylvania to the Franklin County Regional Airport in Chambersburg, Pennsylvania. [Losey, Exhibit "I", 30:19-31:4] Mr. Lengyel, who was an ultralight flight instructor, planned to give Mr. Simeone instruction in the principles of cross-country flying while another of Mr. Lengyel's students, William Losey, flew solo in Mr. Lengyel's Challenger aircraft along the same route. [Losey, Exhibit "I", 28:19-24; 122:2-11]

After preflighting the aircraft, the flight of two proceeded west in loose formation along the planned route communicating at designated points with handheld radios. [Losey, Exhibit "I", 33:17-34:3] Although they had not intended to do so, and both aircraft had plenty of fuel to safely reach their destination, it was nevertheless decided

that they would stop at York Airport in York, Pennsylvania since the selected route took them nearly directly overhead. [Losey, Exhibit "I", 39:6-16; 45:11-21]

While nobody saw the aircraft in the traffic pattern, the testimony of Mr. Madison indicates that it was properly established on its final approach to Runway 35 when it made a deliberate turn to the east and silently glided into a corn field. [Matison, Exhibit "A", 33:9-34:22]

### F.    The "Investigation"

Defendants' reference to the investigation performed by Officer Joseph Yatsko of the Jackson Township Police Department is misleading.  Officer Yatsko had never before investigated an aircraft accident. [Yatsko, Exhibit "B", 95:12-18]  He admitted not knowing much about engines [Yatsko, Exhibit "B", 73:6-7] and made no observation of his own about the engine in the accident aircraft. [Yatsko, Exhibit "B", 72:14-20]  While Officer Yatsko would have preferred to send the engine out to an expert for further inspection, it was not Plaintiffs that precluded him from doing so, but rather a lack of funds. [Yatsko, Exhibit "B", 32:22-33:2]  In light of the foregoing, it is not surprising that Officer Yatsko concluded his official report by noting that "I have no formal training in these types of investigations." [Yatsko, Exhibit "B", 85:5-22]

## II.    LEGAL ARGUMENT

### A.    Standard of Review

As discussed by the Court in *Flores v. The Home Depot, Inc.*, C.A. No. 01-6908 (E.D. Pa., April 3, 2003),

> Summary judgment is appropriate when the record discloses no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  In reviewing the record, "a court

must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir.1994). The moving party bears the burden of showing that the record reveals no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson,* 477 U.S. at 247. Once the moving party has met its burden, the non-moving party must go beyond the pleadings to set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 249. "Such affirmative evidence-- regardless of whether it is direct or circumstantial--must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance."

**B.     Mr. Simeone did not, on behalf of himself or his heirs, waive any claims against Bombardier or Rotax by signing a "release and waiver" form for the purpose of taking an "introductory flight" in a Skyboy demonstrator aircraft owned by Interplane USA. Nor did Mr. Simeone waive any such claims by filling out an Interplane USA Order form for a Skyboy aircraft.**

Defendants note correctly that exculpatory agreements are not favored in the law

and that, to be valid, certain criteria must be met:

> Generally speaking, an exculpatory clause is valid if: (a) 'it does not contravene any policy of the law, that is, if it is not a matter of interest to the public or State ***.' [citation omitted]; (b) '(the contract is) between persons relating entirely to their own private affairs' [citation omitted]; (c) 'each party is a free bargaining agent' and the clause is not in effect 'a mere contract of adhesion, whereby (one party) simply adheres to a document which he is powerless to alter, having no alternative other than to reject the transaction entirely.' [citation omitted]

*Employers Liability Assurance Corporation v. Greenville Business Men's Association*,

224 A.2d 620 (Pa. 1966).

Conveniently, however, Defendants have failed to set forth the stringent standards

that must be met before an exculpatory provision will be interpreted and construed to

relieve a person of liability:

> (1)     contracts providing for immunity from liability for negligence must be construed strictly since they are not favorites of the law;

7

(2)     such contracts must spell out the intention of the parties with the greatest particularity and show the intent to release from liability beyond doubt by express stipulation and no inference from words of general import can establish it;

(3)     such contracts must be construed with every intendment against the party who seeks the immunity from liability;

(4)     the burden to establish immunity from liability is upon the party who asserts such immunity.

*Id*. at 623.

By way of example, in *Brown v. Racquetball Centers, Inc.*, 534 A.2d 842 (Pa. Super. 1987), the plaintiff was injured when he slipped on a wet tile floor in the shower facilities at the Westend Racquetball Club and brought suit alleging negligent maintenance.  Prior to joining the Club, the plaintiff had been required to sign an application form that contained the following provision:

I hereby and do assume all risks of injury to my person and property that may be sustained in connection with the stated and associated activities in and about those premises.

Applying the above principles, the court found that the release in question did not spell out the intention of the parties with the necessary particularity:  "The language does not set forth in an unambiguous manner that the releaser, in signing the agreement, intends to absolve the releasee of liability for the releasee's own negligence.  Instead, the language can more clearly be interpreted to relieve the Club of liability as the result of injuries sustained by a member while participating in certain activities of the Club."  *Id.* at 843.

Against this backdrop, Defendants contend that Mrs. Simeone's claims should be dismissed in their entirety because:

8

decedent Simeone executed a written release specifically relieving ***Interplane, and all of its parts suppliers***, from any claims he may have had relating [to] the purchase and operation of his Interplane Skyboy Ultralight. He also executed another release, absolving ***Interplane and its suppliers*** in connection with his familiarization flight. [emphasis added]

[Defendants' Memorandum of Law at p. 14.][1]

Once again, Defendants have omitted important details. First, there are two "separate and distinct" Interplane companies: (1) Interplane USA, the Florida-based company that imported and sold Skyboy aircraft in the United States; and (2) Interplane s.r.o., the Czech Republic company that manufactured Skyboy aircraft. [Dawson, Exhibit "E", 8-25] Second, both the Waiver and Release form and the Order form containing the release language are agreements between Mr. Simeone and Interplane USA, not Interplane s.r.o. [Exhibits "F" and "G"] Third, Defendants have apparently forgotten that they claim to supply engines to no one other than their own authorized distributors and that neither Interplane USA nor Interplane s.r.o. is an authorized distributor of Rotax engines. [*See*, pp. 14-15, *infra.*]

Bearing these facts in mind, Defendants' attempt to profit from exculpatory language in the agreements between Mr. Simeone and Interplane USA is disingenuous.

### 1.     The Interplane USA Release and Waiver Form

On March 5, 2000, Mr. Simeone met with Ben Dawson, a representative of Interplane USA, for the purpose of taking a ride in the company's demonstrator Skyboy aircraft. [Dawson, Exhibit "E", 4-22] Prior to riding in the company's demonstrator

---

[1] In every case cited by Defendants, the party seeking application of the exculpatory language was actually a party to the agreement. Defendants have not cited one case where a party claimed to be a third party beneficiary (without even being named in the agreement) so as to obtain the benefit of an exculpatory provision.

aircraft, Mr. Simeone was required to sign an Interplane USA Waiver and Release form.

In pertinent part, that document provides as follows:

> The undersigned releaser is desirous to ride, fly and otherwise operate a motorized ultralight vehicle or "aircraft", and ***in order to be permitted to ride, fly and otherwise operate such ultralight vehicle or "aircraft"***, he is willing to take upon himself, and release all others from, the full responsibility for any and all injuries, losses and damages which or his property, or the property or person of any other individual or entity, including the owner of such ultralight vehicle or "aircraft", and the undersigned releaser fully understands that any instructions which are given to him concerning the operation of such ultralight vehicle or "aircraft" and any permission to ride, fly or otherwise operate such "aircraft", have been undertaken and permitted ONLY because of his willingness to waive and release the claims and rights mentioned in this document. [emphasis added]
>
> ***In consideration of the permission granted to him to ride, fly and otherwise operate such ultralight vehicle or "aircraft"***, and the instructions relating thereto, the undersigned releaser unconditionally agrees as follows:
>
> 1.      He hereby waives and releases any and all claims, rights and/or causes of action which he now has or may have against: (a) Any person(s), firm or corporation who provided materials, or parts, be they unassembled, partially, or completely assembled, ***which constitute the ultralight vehicle or "aircraft"***, or (b) Any person(s), firm or corporation selling, providing, or mixing fuel, oil and lubricants, or (c) An [sic] person(s), firm or corporation selling or operating ***the aforementioned ultralight vehicle or "aircraft"***, or (d) Any person(s), firm or corporation providing basic or advanced ground school and/or flight instruction, or instruction of any kind, or (e) Any person(s), firm or corporation providing certification for any instructor, or (f) Any person(s), firm or corporation providing facilities, space or land, airport or airpark, ***for operating the aforementioned ultralight vehicle or "aircraft"***, for any and all injuries, losses or damages which may occur to or be inflicted upon himself or his property, which relate to, or which may, in any way, ***arise out of (1) Any attempt by him, whether successful or not, to ride, fly or otherwise operate the heretofore mentioned ultralight vehicle or "aircraft"***, and (2), Any instruction provided by him concerning such activity. [emphasis added]

[Exhibit "F"]

As if the face of the document were not clear enough, Mr. Dawson expressly

stated that the Interplane USA Release and Waiver form was solely for the purpose of

releasing claims associated with Mr. Simeone riding in the Interplane USA demonstrator Skyboy aircraft:

> Q.   … can we conclude then that the Release and Waiver related to Mr. Simeone riding in the company's aircraft?
>
> A.   Yes.
>
> Q.   That was the purpose of Simeone 11, to provide a release and waiver for a flight in the Interplane company aircraft?
>
> A.   Yes.
>
> Q.   And when I talk about the Interplane company aircraft, we're talking about Interplane USA?
>
> A.   Correct.
>
> Q.   As opposed to the Czech Republic company?
>
> A.   Yes.

[Dawson, Exhibit "E", 51:11-22]

At the risk of overstating the obvious, Mr. Simeone was not killed during a flight in the Interplane USA demonstrator aircraft.  Therefore, when interpreted in accordance with the strict standards set forth above, it is apparent that the Interplane USA Release and Waiver form provides Defendants with no immunity.

## 2.   The Interplane USA Order Form

Defendants next attempt to caste themselves as "suppliers" of Interplane USA so as to profit from a "release" contained in the Interplane USA Order form that Mr. Simeone was required to sign in connection with the purchase of the accident aircraft.

The exculpatory provision in that document states:

I understand that flying ultralight aircraft is a potentially dangerous activity that can result in mishap, injury or death.  I acknowledge that no warranties, either express or implied, have been given to me concerning the fitness of the aircraft or

11

any of its parts.  I agree to indemnify and hold harmless ***Interplane USA and its suppliers*** from any action or cause arising from the sale and use of this aircraft and/or parts. [emphasis added]

[Exhibit "G"]

As mentioned previously, Interplane USA and Interplane s.r.o. are entirely "separate and distinct." [Dawson, Exhibit "E", 47:8-25]  Of significance, Interplane s.r.o. shipped "complete aircraft" to Interplane USA with Rotax engines already installed. [Dawson, Exhibit "E", 48:8-16]  In fact, aircraft received from Interplane s.r.o. had already been test flown with all engine "break-in" having been completed in the Czech Republic. [Dawson, Exhibit "E", 49:11-16]  As such, it is not surprising that Interplane USA never purchased a Rotax engine from anyone, let alone Rotax:

> Q.    The Czech Republic company, was that known as Interplane SRO?
>
> A.    I believe so.
>
> Q.    And so if anybody was purchasing Rotax engines, it was the Interplane SRO company?
>
> A.    Correct.
>
> Q.    ***The American Interplane company wasn't buying Rotax engines?***
>
> A.    ***We were not.***

[Dawson, Exhibit "E", 49:21-50:4]

Likewise, Mr. Ralph Mandarino, who was involved with Interplane s.r.o., testified that that company never purchased engines from Rotax:

> Q.    Under Item 7 in you letter, which is on page 2, you state that "Several years ago Interplane wrote to Rotax in Austria seeking a OEM relationship."  Do you see that?
>
> A.    Yes, I do see it.
>
> Q.    Were you personally involved in that effort on behalf of Interplane?

> A.      I recall that I was involved in that activity.
>
> Q.      Could you describe it for me, please?
>
> A.      I recall that I recommend to our – my recollection is that I recommended to the purchasing people within Interplane SRO to make that contact, and as I recall they did make the contact.
>
> Q.      What was the purpose of making that contact?
>
> A.      To obtain better pricing.
>
> Q.      And is the rest of Paragraph 7 true and accurate to the best of your recollection?
>
> A.      Which part are you referring to?
>
> Q.      Well, the entirety of Paragraph 7.
>
> A.      Yes to the best of my recollection.

[Mandarino, Exhibit "H", 54:9-55:7]

In its entirety, Paragraph 7 reads as follows:

> Several years ago, Interplane wrote to Rotax in Austria seeking a OEM relationship.  Interplane was directed to contact the United States representative, Kodiak Research Ltd., in Nassau, Bahamas.  Upon contacting Kodiak, we were asked to provide documentation as to prior engine purchases, and other general information on our Company.  ***To my knowledge this was never done, instead our factory continued to purchase engines from the Czech distributor,*** who upon learning of our contact with Kodiak, afforded us OEM pricing.  We could not find this correspondence, however I can attest to its occurrence. [emphasis added]

[Exhibit "H", Mandarino 9]

As is apparent, Defendants never supplied an engine, or any other part, to Interplane USA.  The only supplier that Interplane USA ever had was Interplane s.r.o.

[Dawson, Exhibit "E", 49:21-50:4]   Furthermore, Interplane s.r.o. never purchased

engines from Rotax. Instead, it bought Rotax engines from the Czech distributor who, in turn, obtained them from Rotax. [Exhibit "H", Mandarino 9]

Despite the obvious lack of any connection to Interplane USA, Rotax now claims "supplier" status in a self-serving attempt to benefit from an agreement to which it was never a party and when, throughout this litigation (in an effort to avoid personal jurisdiction), it has steadfastly stated that it has no idea where Rotax engines go after they are sent to its authorized distributors:

> Q.    … could a United States citizen call up Rotax and purchase an engine?
>
> A.    No.
>
> Q.    They have to go through the distributor; is that right?
>
> A.    Rotax sells only engines to the authorized distributor.
>
> Q.    So if you want to purchase a new engine from Rotax, you have to go through one of the authorized distributors, right?
> A.    Correct.

[Furlinger 12/3/04, Exhibit "K", 84:3-13]

> Q.    So are you saying once they leave the factory, you don't now where they go?
>
> A.    We have no control over where these products may going to end up.

[Furlinger 12/3/04, Exhibit "K", 85:21-24]

> Q.    But Rotax does know where the majority of Bombardier's products end up that contain Rotax engines, do they not?
>
> A.    As I said before, for the – our customers such as Bombardier, Inc., are – they are the ones responsible for the product which going to be distributed through its distribution network. We don't have any information – or at least we don't have any information where it's specific defining us exactly where the product goes.

Q.  Okay. And when you say you don't have any specific information, are you referring to all of your customers, or are you just referring to Bombardier, Inc.?

A.  All our customers.

[Furlinger 12/3/04, Exhibit "K", 88:19-89:10]

Q.  Would you say that the – that the distributors act as a liaison between Rotax and the end user?

Mr. Kelly:  Object to the form.

A.  The authorized distributor of Rotax aircraft engines is a total independent organization, corporation of a company, which performs – he does business on his own and he is – on his own responsibility.

[Furlinger 12/3/04, Exhibit "K", 139:7-15]

Q.  My first question is on No. – Page 2, Paragraph 6, the last sentence here where it says, "Rotax does not know the destination of any particular engine or exercise any control over the engine," when you say you don't know the destination of any particular engine, do you mean you don't know when that engine leaves where – where it's actually going to, any particular end user?  Is that what you mean, or do you mean that when you send it to Kodiak, you have absolutely no idea where it may end up?

A.  According to the contract and the – we have – we have defined it in the contract, Rotax sells ex-works their products to the authorized distributor for Rotax aircraft engines, and from there on – that's the transfer of title of the products in Austria.  They will take possession of the product in Austria.  From there on we have no control over how the transport or where it – the product goes.

[Furlinger 12/3/04, Exhibit "K", 147:13-148:7]

If either Mr. Simeone or Interplane USA had truly intended to release Rotax, then the agreements needed to spell out that intention with the "greatest particularity" and they clearly do not.  Since no inference from words of general import can establish the application of such a release, reading "supplier" to include Rotax is entirely improper,

15

especially in light of the surrounding factual background.  *Employers Liability Assurance Corporation v. Greenville Business Men's Association*, 224 A.2d 620 (Pa. 1966)[2]

### 3.    Prospective Release of Strict Product Liability Claims

Defendants' reliance on *Mullan v. Quickie Aircraft Corporation*, 797 F.2d 845 (10th Cir. 1986) is interesting to say the least.  Disregarding the fact that the contract containing the exculpatory language actually named Quickie Aircraft as a party, in the end, the Court left open the question as to whether the contracting parties were even permitted to waive a strict product liability claim under Colorado law. *Id.* at 853.

In *Keystone Aeronautics Corp. v. R.J Enstrom Corp.*, 499 F.2d 146 (3rd Cir. 1974), the Third Circuit Court of Appeals held that the Pennsylvania Supreme Court was likely to adopt Comment *m* to Restatement (Second) of Torts § 402A.  In pertinent part, that comment reads as follows:

> The consumer's cause of action does not depend upon the validity of his contract with the person from whom he acquires the product, ***and it is not affected by any disclaimer or other agreement***, whether it be between the seller and his immediate buyer, or attached to and accompanying the product into the consumer's hands. [emphasis added]

> The Court went on to state,

> If a disclaimer on the label of a product or in a printed form sales contract would be effective to limit liability under § 402A, then obviously sellers would utilize such devices to nullify their responsibility.  And it is significant that the application of § 402A is limited to a '... product in a defective condition unreasonably dangerous...'  A social policy aimed at protecting the average consumer by prohibiting blanket immunization of a manufacturer or seller

---

[2] It is worth noting as well that there is there is no expression in the Interplane USA Order form that Mr. Simeone intended to release ANY claims on behalf of his heirs. *See, Mavreshko v. Resorts USA, Inc.*, 2005 WL 1309060 (M.D. Pa. 2005) (Release signed by father for his own snowboarding activities did not release claim for medical expenses associated with injuries sustained by son while he was snowboarding.)

through the use of standardized disclaimers engenders little resistance. But when the setting is changed and the buyer and seller are both business entities, in a position where there may be effective and fair bargaining, the social policy loses its raison d'etre. [footnote omitted]  The transaction then tends to be more influenced by gravitational pull of the Uniform Commercial Code than by the consumer oriented § 402A.

499 F.2d at 149.

Since *Keystone*, two Pennsylvania courts - one state and one federal - have found exculpatory provisions invalid in the context of a strict product liability claim.

In *Jankowski v. Ski Roundtop Inc.*, 45 Pa. D. & C 3d 671 (Ct. Com. Pleas, Adams County 1986), the Court permitted a strict liability claim to proceed against a resort that had rented defective bindings to the Plaintiff, in spite of a rental agreement that released all claims, finding that such a release contravened the essence of strict tort liability.

Likewise, in *Weiner v. Mt. Airy Lodge, Inc.*, 719 F. Supp. 342 (M.D. Pa. 1989), the Court refused, on social policy grounds, to dismiss a strict liability claim against a ski lodge that had rented defective ski equipment even in the face of a rental agreement that specifically released "any liability for damage and injury."[3]

More recently, in *Gallison v. Shawnee Mountain Ski Area*, 32 Pa. D. & C. 4th 450 (Ct. Com. Pleas, Monroe County), the Court upheld an exculpatory provision in a strict product liability action against a ski lodge by relying upon the Pennsylvania Skier's Responsibility Act, 42 Pa.C.S. § 7102 and noting that the *Keystone* decision preceded passage of the Act ("Since Pennsylvania considers downhill skiing to merit special attention, we do not find that this falls into the 'garden variety' consumer transaction contemplated by *Keystone*.")

---

[3] The court also found no assumption of the risk as defendant failed to present sufficient evidence of plaintiff's subjective knowledge, appreciation, and voluntary assumption of the risk noting that "[t]here is a dispute as to whether plaintiff fully appreciated the specific dangers involved." *Id*. at 345.

Given that this action does not involve skiing, and there is no counterpart Pennsylvania legislation applicable to ultralight aircraft, the subject release would not provide Interplane USA with immunity from Plaintiffs' strict liability claims so it certainly cannot protect Defendants (neither of whom is named in the release).

**C.    Neither Mr. Simeone nor Mr. Lengyel assumed any risk associated with the specific defects in the Rotax 582 engine simply by flying in an Interplane Skyboy aircraft.**

Defendants contend that Plaintiffs' claims are barred because (1) "Decedent Simeone expressly and impliedly assumed the risk that injury and/or death could result from flying ultralight aircraft"; and (2) "Decedent Lengyel impliedly assumed the risk that injury and/or death could result from flying ultralight aircraft."

Of course, this argument is entirely in the alternative because Defendants have refused to admit the existence of ANY defect in the Rotax 582 engine or even that the subject engine failed.  To the contrary, it is Defendants' position that the engine was producing power at the time of impact.

Nevertheless, each facet to Defendants' argument will be addressed in turn.

**1.    Under Pennsylvania law, assumption of the risk is not a defense to a product liability action unless the buyer knows of the specific defect in the product and voluntarily and unreasonably proceeds to use the product or encounter a known danger.**

Defendants have tried to generalize their assumption of the risk argument so as to avoid any specific defect claiming instead (without authority) that flying an ultralight aircraft is "inherently dangerous" and that, by participating in this activity, Mr. Simeone and Mr. Lengyel assumed any and all risk of injury. [Defendants' Memorandum of Law at p. 16]  No expert testimony or statistics have been provided to support this assumption.

Nor has any data been cited to show that flying an Interplane Skyboy aircraft is any more hazardous than flying in an Boeing 737. In fact, when pressed, Rotax ultimately took the position that its 582 engine is no more subject to "sudden stoppage" than any other aircraft engine in the world. [Furlinger 7/22/05, Exhibit "L", 224:4-12]

Given the foregoing, Defendants cannot establish an assumption of the risk defense.

In *Ferraro v. Ford Motor Co.*, 223 A.2d 746 (Pa. 1966) the Pennsylvania Supreme Court addressed the question as to whether or not contributory negligence or assumption of the risk by the buyer would constitute a defense in actions brought pursuant to Restatement (Second) Torts § 402A and held that,

> After studied consideration, it appears to us that if the buyer knows of the defect and voluntarily and unreasonably proceeds to use the product or encounter a known danger, this should preclude recovery and constitute a complete defense to the action even in cases of strict liability.

*Id*. at 748.

Later, in *Berkebile v. Brantly Helicopter Corp.*, 337 A.2d 893 (Pa. 1975) the Court reiterated that,

> A plaintiff cannot be precluded from recovery in a strict liability case because of his own negligence. He is precluded from recovery only if he knows of the ***specific defect*** eventually causing his injury and voluntarily proceeds to use the product with knowledge of the danger caused by the defect. [citations omitted; emphasis added] Furthermore, a finding of assumption of the risk must be based on the individual's own subjective knowledge, not upon the objective knowledge of a "reasonable man."

*Id*. at 901.

The distinction between negligence and assumption of the risk has been explained as follows:

> It has been said that assumption of the risk and contributory negligence may sometimes overlap because certain conduct may exhibit elements of both. [citations omitted]  In general, however, the concepts are distinguishable. "Contributory negligence connotes carelessness; assumption of the risk connotes venturousness in voluntarily incurring a risk the nature and extent of which are fully appreciated. [citation omitted]  Assumption of the risk involves the meeting of a subjectively known risk; whereas, contributory negligence may involve a plaintiff exposing himself to a danger of which he was unaware but which would have been apparent had he used due care. [citation omitted]

*Robinson v. B.F. Goodrich Co.*, 664 A.2d 616, 618 (Pa. Super. 1995).

In *Robinson*, the plaintiff was inflating an automobile tire for a customer when the sidewall exploded causing injury to his eye and ear.  He claimed that the accident was the result of defective manufacture of the tire.  The manufacturer denied liability contending that there was no defect in the tire and that plaintiff, an experienced tire worker, voluntarily assumed the risk of an explosion by not utilizing available safety measures.

On appeal from a decision in favor of the manufacturer, it was held that the trial court had erred by instructing the jury on assumption of the risk:

> the evidence did not show that appellant was subjectively aware of a specific defect in the tire.  Indeed, the defendants contended at trial that there was no defect in the tire.  However, if the jury were to disagree and find the tire defective, it was the defendants' additional contention that appellant, an experienced tire worker, should have been aware of the danger of explosion and should have utilized available safety measures.  If they were correct in this, however, appellant was guilty of contributory negligence; he did not knowingly and voluntarily assume the risk of a specific defect in the tire.

*Id.* at 618-19.

Plaintiffs' experts have determined that the oil injection pump on the accident engine was supplying more oil than is called for in the Rotax Manual. [Exhibit "C"] Further, functional testing of the engine's carburetors revealed a malfunctioning float and erratic fuel flow. [Exhibit "C" and "D"]  Ultimately, it was concluded that these conditions lead to fouling of the spark plugs and resultant engine failure. [Exhibit "C"]

Defendants have produced no evidence that either Mr. Simeone or Mr. Lengyel knew these specific defects existed in the subject Rotax 582 engine. Accordingly, there is no basis whatsoever for finding that they voluntarily and unreasonably proceeded to use the Rotax 582 engine in the face of known defects. Claiming, without authority, that ultralight flying in general may be dangerous is not a substitute for evidence.

      2.      **Mr. Simeone did not <u>expressly</u> assume the risks associated with the defects that were ultimately discovered in the subject Rotax 582 engine.**

Defendants contend that "by contract, decedent Simeone agreed to assume the risks associated with flying the ultralight Skyboy that he purchased, and he waived his (and his heirs') right to sue Interplane and its suppliers based on any theory of liability." [Defendants' Memorandum of Law at p. 24] Obviously, Defendants have simply recast the argument that they are intended beneficiaries of the release language contained in the Interplane USA Order form. For this reason, Plaintiffs will simply refer the Court to their previous response.

However, it is worth repeating here that Ben Dawson, the Interplane USA employee who sold Mr. Simeone the aircraft, did not even remember discussing the release language with Mr. Simeone:

Q.      Did you discuss the language that I read just now with Mr. Simeone?

A.      I don't remember whether I particularly went over that or not.

[Dawson, Exhibit "E", 30:6-9]

Consequently, it is impossible to conclude that Mr. Simeone expressly assumed the risk of specific defects in the Rotax 582 engine on the basis of the referenced document.

3.  **Mr. Simeone did not** <u>impliedly</u> **assume the risks associated with the defects that were ultimately discovered in the subject Rotax 582 engine.**

There are a number of aspects to this argument, each of which will be addressed below.

a.  **The "Sales Representative" Assumption**

Defendants contend that Mr. Simeone "was well aware that the Rotax 582 engine was subject to sudden stoppage" because "[h]is knowledge of this fact is the only reasonable conclusion, based on the fact that [sic] was an Interplane sales representative (who sold at least one (1) aircraft and received a commission for same), whose duties would have included advising customers that the Rotax 582 engine was subject to sudden stoppage." [Defendants' Memorandum of Law at p. 27][4]

Defendants' supposition is not supported by the record:

Q.  Now, going back to when Mr. Simeone helped sell a Skyboy or two at one of the air shows.  *Did he receive any training from you as to what he should do?*

A.  *No.  He just discussed the parameters of how to fill out the paperwork and stuff like that.  He didn't do any demonstration of aircraft or anything like that, no.*  He was there in the tent and around the airplanes.

Q.  So he was helping out?

A.  I believe he helped out at Sun & Fun.  In fact, I know he helped out at Sun & Fun.

Q.  *Was he ever told to or given a manner in which to discuss risks involved in ultralight flying with prospective customers of Interplane?*

A.  *I don't remember.*

[Dawson, Exhibit "E", 37:23-38:12]

---

[4] Defendants appear to have incorrectly cited the basis for this contention as Exhibit F is not a deposition transcript.

### b.    The Rotax "sudden stoppage" warning

Defendants next suggest that Mr. Simeone impliedly assumed the all risks associated with flying in a Skyboy aircraft, including specific defects in the Rotax 582 engine, because the "Operator's Manual clearly stated that the engine was subject to sudden stoppage." [Defendants' Memorandum of Law at p. 27] [5]

It is illogical to conclude, however, that anyone could knowingly assume a risk associated with the Rotax 582 engine when the "warnings" in the Operators Manual are non-specific, self-serving, unsupported, and often incorrect statements by a company that is merely attempting limit its liability.

Page 4-2 of the Operators Manual contains the following statements:

WARNING:    This engine, by its design, is subject to sudden stoppage.  Engine stoppage can result in crash landings, forced landings or no power landings.  Such crash landings can lead to serious bodily injury or death.

WARNING:    This is not a certificated aircraft engine.  It has not received any safety or durability testing, and conforms to no aircraft standards. It is for use in experimental, uncertificated aircraft and vehicles only in which an engine failure will not compromise safety.

---

[5]  Once again, the testimony does not support Defendants' assumptions:

Q. And as part of your sales or training practice, did you go through the manuals with your customers?
A. Not generally.  We covered the routine problems with the engine, if it had such, or what might be potential -- let me rephrase that -- potential problems with the engine, you know, about changing your spark plugs and how they had to do it and checking for leaks and, you know, water, checking the water.   All of that was done on preflight, and so that kind of stuff we covered pretty much there.  As far as the full operator's manual, no, it's pretty dry reading.  We gave that to them.

[Dawson, Exhibit "E", 35:25-36-13]

> User assumes all risk of use, and acknowledges by his use that he knows this engine is subject to sudden stoppage.

[Exhibit "J"]

These "warnings" were discussed in detail with Mr. Furlinger, the designated representative for both Rotax and Bombardier:

Q.    This section, 4.2, is entitled "Safety Information," correct?

A.    Yes.

Q.    And the first warning there states, "This engine by it's design is subject to sudden stoppage." Do you see that?

A.    I see there is a warning which is one of the warnings, several warnings which is here on this page.

Q.    We are going to go step-by-step. The first sentence, did I read it correctly?

A.    Yes.

Q.    And the second sentence of that warning states, "Engine stoppage can result in crash landings, forced landings or no power landings" and it continues on to say, "Such crash landings can lead to serious bodily injury or death." Did I read that correctly?

A.    Yes.

Q.    Do you know if, in fact, sudden stoppage in a Rotax 582 engine has resulted in serious bodily injury?

    MR. KELLY: Object to the form. You can answer it.

    THE WITNESS: Well, this is the case where we are in today. Yes, I heard about it and this is the case what we have here today and – but this warning is here to be seen in connection with other warnings and the consequences of the warning.

BY MR. MATTIONI:

Q.    I understand.

24

A.    And that's, basically, in the way here to highlight the risk of an "off" engine applied to an aircraft application even though the engine is designed for it, there is a remaining risk.  If someone not respect the boundary conditions of this, there could be a risk of getting injured or death.

Q.    My question was whether Rotax has become aware of sudden stoppage that has resulted in serious bodily injury?

MR. KELLY:  Can I ask for clarification on that?  If you want, he can leave.  If you want me to not to do it in front of the witness --

MR. MATTIONI:  I prefer he answer.

MR. KELLY:  I want it to be clear to him the difference between alleged and established.  I think that distinction is missing in the question.

BY MR. MATTIONI:

Q.    *I'm trying to find out the basis of this statement and, therefore, I want to know if Rotax has seen cases of sudden stoppage that lead to serious bodily injury?*

A.    *I don't recall.*

[Furlinger 7/22/05, Exhibit "L", 213:13-216:4]

Q.    *Does anybody at Rotax have any knowledge whatsoever as to why this particular provision was put in the operator's manual?*

A.    *I don't know.*

Q.    *Since you joined Rotax, have you become aware of any sudden stoppage in a Rotax 582 engine that lead to serious bodily injury or death?*

A.    *I don't recall*, except those cases what we have discussed in regard which may be litigation cases.  I have no any further information and there is, since litigation, there may be different reasons why there was a crash not due to an engine stoppage.

Q.    To your knowledge, was the first warning on page 4-2 placed in the operator's manual for the Rotax 582 engine as a result of allegations made in lawsuits against Rotax?

A.    No, that's not what I'm saying.  It's, basically -- the manual was even before we entered into the market with the product.  So, it was already. Before we had any lawsuit, we had such a warning in place.

Q.    So this warning, to your knowledge, was developed before the Rotax 582 engine?

A.    Yes.

[Furlinger 7/22/05, Exhibit "L", 217:15-218:20]

Q.    … My question was:  Of the thirty to thirty-five thousand 582 engines that Rotax has produced, do you know, does the company know how many of them have experienced a failure?

A.    As I said before, the failure is make cast for many other areas.

MR. KELLY:  He is asking if you know how many.

THE WITNESS:  No, I don't know.

BY MR. MATTIONI:

Q.    Does the company know?

A.    No.

Q.    Are there any records which would tell us how many of the thirty to thirty-five thousand 582 engines have experienced a failure?

A.    No, we don't have any such record.

Q.    Is there any record which would show us how many of the 582 engines have experienced a sudden stoppage?

A.    No.

[Furlinger 7/22/05, Exhibit "L", 84:2-24]

Since Rotax apparently has no idea how many 582 engines have experienced "sudden stoppage" and, likewise, has no knowledge that "sudden stoppage" has lead to serious bodily injury or death (except perhaps by way of litigation), one can only

26

conclude that this part of the warning is hypothetical, at best. Certainly, Mr. Simeone could not be expected to have assumed any specific risk on the basis of such a "warning."

Q.    ***What is it about the design of the Rotax 582 engine that makes it subject to sudden stoppage?***

A.    You have to see the design in the context of complicated aircraft and it's an engine which is installed and designed for aircraft use, but if some of the boundary conditions would not be respected like fuel tank or running out of fuel, that could be a root cause for a sudden stoppage and here it's different compared to a motorcycle where you can stand by and stop while with an aircraft, you have to fly and that means the person have to maintain a certain skill to be able to land also the aircraft without power.

Q.    Okay. But ***I want to focus on the design aspect because the warning says this engine, meaning this Rotax 582 engine, by its design, is subject to sudden stoppage. What design in the 582 engine makes it subject to sudden stoppage?***

A.    Well, sir, this sentence has to be read also in the context of the other warnings. What you find here, the root cause and consequences on the page 4.3, and I just say any engines here and it says here exactly you should be aware that any engine may seize or stall at anytime." Here, we want to be very precise in highlighting that the engine is one of the components of a complicated aircraft.

Q.    I understand, sir. ***Should we be rewriting this warning on page 4-2 to say any engine by its design is subject to sudden stoppage or is there something about the 582 engine and its design that makes it subject to sudden stoppage?***

A.    I'm not getting your question.

Q.    Okay. (Testimony read back as follows: "I understand, sir. Should we be rewriting this warning on page 4-2 to say any engine by its design is subject to sudden stoppage or is there something about the 582 engine and its design that makes it subject to sudden stoppage?")

MR. KELLY: Do you understand it now?

THE WITNESS: ***There is nothing wrong with the Rotax 582 engine*** if it's used in its given boundary conditions and also the installations, maintenance, instructions or operations conditions would be used within the boundary conditions.

[Furlinger 7/22/05, Exhibit "L", 219:3-221:13]

Q.    Listen, the warning here relates to the Rotax 582 engine, doesn't it?  The first warning on page 5-2, excuse me, on 4-2, does it relate to a Rotax 582 engine?

A.    As I said before, the warning is here to make or to caution people there a risk if you are not respecting certain boundary conditions and it's normal that *any engines even a jet plane would fail if they would not provide enough fuel into it or it would not do the proper maintenance.*

Q.    Sir, Rotax has not seen fit to say in the first warning on page 4-2 that any engine, whether it be a jet engine or a motorcycle engine is, by its design, subject to sudden stoppage.  What Rotax has said is that this engine, the 582 engine, by its design is subject to sudden stoppage.  What is it about the design of the 582 engine that makes it subject to sudden stoppage, do you know?  Do you know?

MR. KELLY:  Will you let him answer the question?

THE WITNESS:  Sir, I can only repeat what I said before.  You are taking this out of context.  There is also other root causes that could lead.

[Furlinger 7/22/05, Exhibit "L", 222:11-223:15]

Q.    Sir, we were talking about the first warning on page 4-2 and my question related to the design of the Rotax 582 engine.  Let me try and put it this way:  *Is there anything about the design of the Rotax 582 engine which makes it more subject to sudden stoppage than any other airplane engine in the world?*

A.    *No.*

[Furlinger 7/22/05, Exhibit "L", 224:4-12]

Since there is, according to Rotax, nothing inherently wrong with the design of the 582 engine (as compared to every other engine in the world), what risk could Mr. Simeone have possibly assumed by virtue of reading the "warning"?

Q.    The second warning states that this is not a certificated aircraft engine.  That also applies to the Rotax 582 UL engine, correct?

A.    Yes.

Q.   And the warning goes on to state that it has not received any safety or durability testing and conforms to no aircraft standards.  Did I read that correctly?

A.   Yes.

Q.   That sentence also pertains to the Rotax 582 engine, doesn't it?

A.   Yes.

Q.   I think we established that the Rotax 582 engine had, in fact, received durability testing, didn't it?

A.   Yes.

Q.   So, this statement is not entirely true then or should I say it's not entirely accurate?

A.   That's not the case because Rotax engine has been durability tested, but Rotax has not applied to get the top certificate of Civil Aviation Authority.

Q.   I understand.  I just want to be very clear with regard to this second warning in the statement that the 582 engine had not received durability testing.  That's not accurate, is it?

A.   I read the sentence different.  What the durability is in regard, sorry.  It has to be seen in construction that it has not got any certified status, but it does not mean that the engine has been not tested and we have discussed this previous that there have been severe testing ongoing where we have done testing according to different standards.

Q.   I understand, but it doesn't say that.  The warning says that the 582 engine has not received any durability testing and that's not accurate, is it?

A.   While it makes a reference here to the aircraft standards and that by aircraft standard means it's a certified standards, that's why the durability testing has not been done.  That's why we put the warning on it.

Q.   I understand, sir, but I'm really trying to focus my question.

     MR. KELLY:  The question he is trying to get an answer to is whether that statement is entirely accurate or not entirely accurate because it says no testing has been, no durability testing has been performed when in fact testing has been performed.  So, he needs to know whether you consider the statement to b e entirely accurate or not, is that right?

MR. MATTIONI:  Thank you.

MR. KELLY:  Do you know what entirely accurate means?

THE WITNESS:  I try to -- I don't know.

BY MR. MATTIONI:

Q.    *Sir, I think we established earlier that the Rotax 582 engine had, in fact, undergone durability testing.  We used that terminology, correct?*

A.    *Yes.*

Q.    *This statement here, this warning, is to the effect that the engine did not receive durability testing, correct?*

A.    *Yes.*

Q.    *So the statement, then would not be entirely accurate, wouldn't you agree?*

A.    *Yes.*

Q.    Okay.   Now, with regard to the reference to safety testing, is that something different than durability testing?

A.    Yes.

Q.    What is safety testing as it relates to an aircraft engine?

A.    A part of the durability testing contains all the safety because there is the durabilities used to find out what the durability limits of the engine.  There may be some other safety tests which have been carried out which has not been done in a safety test, which is not an endurance test.

Q.    Would it be your testimony, then, that the Rotax 582 engine had received safety testing?

A.    Yes.

[Furlinger 7/22/05, Exhibit "L", 225:8-228:20]

Q.    *... Given your testimony, would you agree that the second warning on page 4-2 of the operator's manual with respect to the 582 engine which states that it has not received any safety testing is not entirely accurate as well?*

30

A.    *Yes.*

[Furlinger 7/22/05, Exhibit "L", 229:14-20]

Can a manufacturer make statements about its products which are "not entirely accurate" and then claim that an injured user assumed the risk on the basis of that false information?

Q.    The last part of that first paragraph of the second warning states, "Rotax 582 engine is for use and experimental and certificated aircraft and vehicles only in which an engine failure will not compromise safety." Do you see that?

A.    Yes.

Q.    Do you agree with that last sentence?

A.    Yes.

Q.    Can you explain to me how engine failure will not compromise safety in an aircraft?

A.    I'm not an aircraft designer and, therefore, I can only give you by my best knowledge a definition for it. Any aircraft has a certain gliding ratio which would allow to fly the aircraft without any power.

Q.    Okay. That's any aircraft, right?

A.    Any aircraft.

[Furlinger 7/22/05, Exhibit "L", 230:17-231:14]

Q.    I understand. Is there something about experimental aircraft that makes them less vulnerable to engine failure than other aircraft?

A.    *I don't know. We are not the aircraft designer.* We supply an engine which has a certain characteristic.

[Furlinger 7/22/05, Exhibit "L", 231:23:232:5]

Q.    … Will the failure of a Rotax 582 engine in an Interplane Skyboy aircraft compromise safety?

A.    *I don't know.*

31

MR. KELLY:  Object to the form.

BY MR. MATTIONI:

Q.    Can you think of any airplane in which engine failure will not compromise safety.

A.    *I don't know.*

[Furlinger 7/22/05, Exhibit "L", 233:19-234:5]

If Rotax does not understand the circumstances under which "engine failure compromises safety" in an aircraft, then it certainly could not (and did not) set forth a sufficient warning in the Operators Manual such that Mr. Simeone could be deemed to have assumed some unspecified risk.

Q.    Next sentence reads that, "the user assumes all risk of use and acknowledges by his use that he knows this engine," the Rotax 582, "is subject to sudden stoppage."  Where is the user of the engine supposed to obtain the information that the Rotax 582 is subject to sudden stoppage?

MR. KELLY:  Object to the form.

THE WITNESS:  This sentence has to be read in all the other context and the 582 is not more, not less subject of any sudden stoppage unless the boundary conditions could be not respected.

BY MR. MATTIONI:

Q.    *I think we went over that before.  It's your opinion that the Rotax 582 engine is no more, no less subject to sudden stoppage than any other engine in the world?*

A.    *Any other aircraft engine.*

Q.    Aircraft engine.  Whether that be a certificated engine or otherwise?

A.    Yes.

Q.    And there is nothing about the design of the 582 engine that makes it more subject to sudden stoppage than any other aircraft engine?

32

A.    Correct.

Q.    *So, when Rotax states in the second sentence, excuse me, second paragraph of the second warning on page 4-2 of the operator's manual that the user acknowledges by his use that he knows this engine is subject to sudden stoppage, that means that the user acknowledges that the engine is just as subject to sudden stoppage as any other engine?*

A.    *That's correct.*

[Furlinger 7/22/05, Exhibit "L", 234:7-235:24]

Given this admission by Rotax, it is inconceivable that Mr. Simeone could be deemed to have assumed the risk of anything.  To give effect to such a "warning" would mean that, in order to avoid liability, a manufacturer would simply have to put a label on its product that says "it's possible this product may fail."  Obviously, such a conclusion would effectively abrogate nearly forty years of Pennsylvania product liability law.

### c.    The Precautionary Landing Argument

Defendants attempt to establish that Mr. Simeone assumed the risk of defects in the Rotax 582 engine by referencing an incident where, prior to the fatal crash, Mr. Simeone made a precautionary landing in a field which resulted in minor damage to the landing gear of the aircraft but no injuries whatsoever.  As the story goes, the throttle on the aircraft stuck in the open position precluding a reduction in power so that Mr. Simeone was required to shut the engine off in order to make a precautionary landing.  According to Defendants, "[c]ertainly, this experience would have made decedent Simeone aware that flying ultralight aircraft was dangerous." [Defendants' Memorandum of Law at p. 27, emphasis in the original]

Even if Defendants were correct that Mr. Simeone should have had some apprehension about flying in general, a prior experience with a throttle that stuck open

does not lead to the conclusion that Mr. Simeone assumed the risk of defects in the oil injection system and carburetors which resulted in stoppage of the engine. *See, Berkebile v. Brantly Helicopter Corp.*, 337 A.2d 893, 901 (Pa. 1975) ("A Plaintiff cannot be precluded from recovery in a strict liability case because of his own negligence. He is precluded only if he knows of the *specific* defect eventually causing his injury and voluntarily proceeds to use the product with knowledge of the danger caused by the defect.")

### d.    The Spark Plug Maintenance Schedule

Next, Defendants contend that Mr. Simeone "assumed the risk that his engine would fail during flight because he did not follow the appropriate maintenance schedule concerning replacement of spark plugs in his Rotax engine." [Defendants' Memorandum of Law at p. 27] Despite Defendants' best efforts, there has been no testimony that Mr. Simeone did NOT change his spark plugs at the 25 hour interval suggested in the Rotax Operators Manual.[6]

Moreover, Pennsylvania courts have repeatedly held that

A user's negligence is not relevant if the product defect contributed in any way to the harm. However, where the defense offers evidence to establish that the accident was ***solely*** the result of the user's conduct, and not related in any way with a product defect, it is relevant and admissible for the purpose of proving causation. [emphasis in the original]

*Madonna v. Harley Davidson, Inc.*, 708 A.2d 507, 509 (Pa. Super. 1998); *Jara v. Rexworks, Inc.*, 718 A.2d 788, 793 (Pa. Super. 1998).

Consequently, even if one assumes for the sake of argument that Mr. Simeone did not change the spark plugs as recommended by the Operators Manual, such ***conduct***

---

[6] It is interesting to note that even though Defendants' experts claim the spark plugs were not changed by Mr. Simeone, they contend that the plugs were capable of firing. Indeed, Defendants' experts all state that the engine was producing power at the time of impact.

would neither establish an assumption of the risk defense nor bar Plaintiffs' claims. For as noted in the report of Donald Sommer, the spark plugs fired properly AFTER the carbonaceous material was removed and the source of that carbonaceous material was defects in the oil injection system and carburetors. [Exhibit "C"] (*Cf. Madonna, supra,* where the defense sought to prove that the sole cause of the accident was plaintiff's intoxication as opposed to a broken mounting bolt for the motorcycle's brake caliper.)

### e.    Attempting to land a Skyboy airplane at York Airport

Finally, Defendants rely upon the third warning in the Operators Manual to suggest that Mr. Simeone assumed all risk of injury and death:

> WARNING: Never fly the aircraft equipped with this engine at locations, airspeeds, altitudes, or other circumstances from which a successful no-power landing cannot be made, after sudden engine stoppage.

[Exhibit "J"]

Incredibly, Defendants suggest that "decedent Simeone and decedent Lengyel [improperly] flew the ultralight into an unfamiliar location (York Airport), one in which they were unable to successfully execute a no-power landing...." [Defendants' Memorandum of Law at p. 28]   They go on to state that "decedent Simone was 'definitely not' familiar with York Airport" – citing the testimony of Mr. Losey.  Of course, Defendants fail to mention that Mr. Losey had no idea whether *Mr. Lengyel* was familiar with York Airport, ignore the fact that Mr. Lengyel radioed to Mr. Losey that he had York Airport in sight, and omit that the aircraft crashed while on a short final approach to the airport. [Losey, Exhibit "I", 47:15-19;53:11-17]

Even if one assumes, for the sake of argument, that Mr. Simeone or Mr. Lengyel did something improper by attempting to land an airplane at an airport, such *conduct*

does not support an assumption of the risk defense or bar Plaintiffs' claims. Once again, Defendants have confused assumption of the risk with allegations of contributory negligence. In this regard, the Pennsylvania Supreme "has been adamant that negligence concepts have no place in a strict product liability action." *Childers v. Power Line Equipment Rentals, Inc.*, 681 A.2d 201, 207 (Pa. Super. 1996) *quoting*, *Kimco Development v. Michael D's Carpet*, 637 A.2d 603 (Pa. 1993) and *McCown v. International Harvester Co.*, 342 A.2d 381 (Pa. 1975). To provide a defense in this case, Defendants would have to demonstrate that attempting to land a Skyboy Aircraft at the York Airport was "highly reckless" and that the accident was ***solely*** the result of that conduct. This, they have not done.

### 4.    Mr. Lengyel did not impliedly assume the risks associated with the defects that were ultimately discovered in the subject Rotax 582 engine.

Defendants also argue that "Decedent Lengyel's conduct, prior to flying with decedent Simeone on July 22, 2000, demonstrates that he, too, voluntarily assumed the risks associated with flying ultralight aircraft." [Defendants' Memorandum of Law at p. 28]

What conduct specifically?

- **"Decedent Lengyel had been a general aviation pilot prior to becoming an ultralight pilot and instructor."**

Just how this fact leads to the conclusion that Mr. Lengyel was aware of specific defects in the subject Rotax 582 engine is not explained. But suffice to say that "general aviation" aircraft do not use the Rotax 582 engine.

- **"Decedent Lengyel owned an ultralight Challenger aircraft equipped with a Rotax 503 engine, which he flew two or three times a week."**

Disregarding the fact that the Rotax 503 engine is different from the Rotax 582 engine, the evidence is clear that the engine in Mr. Lengyel's Challenger aircraft did not have an oil injection system like the accident aircraft. [Losey, Exhibit "I", 29:4-5]

- **"Because decedent Lengyel's ultralight was also equipped with a Rotax engine, he would have had knowledge, based on his Rotax Operator's Manual, that Rotax engines were subject to sudden stoppage. In fact, the Operators Manual would have been provided to decedent Lengyel when he purchased his ultralight aircraft...."**

Conspicuous by its absence is reference to any supporting testimony. Instead of developing evidence concerning the sales practices of the unspecified company that sells Challenger aircraft, Defendants choose to speculate about what they think may have happened. In fact, there is no evidence to suggest that Mr. Lengyel had such a manual.

- **"as an ultralight instructor, decedent Lengyel would by definition have been thoroughly familiar with all the inherent risks of ultralight operation that could occur, including engine stoppage, during an ultralight flight."**

Once again, speculation and supposition are substituted for evidence. While Mr. Lengyel was an ultralight instructor, his aircraft did not utilize an oil injection system. Nor have Defendants presented any evidence that Mr. Lengyel was aware of the defects in the Rotax 582 engine installed in Mr. Simeone's aircraft.

- **"It is only logical to conclude that decedent Lengyel was aware of the risks associated with flying ultralight aircraft. In fact, it [sic] likely that he too, in connection with his responsibilities to provide flight instruction to decedent Simeone, discussed with decedent Simeone the risks associated with flying ultralight aircraft."**

Defendants again substitute assumptions for hard evidence. There has been no evidence presented with respect to the discussions that Defendants speculate may have occurred.

37

- **"Mr. Losey testified that decedent Lengyel also enjoyed flying low patterns on the opposite side of the airports, something that Mr. Losey stated there was no reason to do."**

How this "fact" proves that Mr. Lengyel assumed the risk of anything is unclear. But even if it had some relevance, Defendants have conveniently omitted important details yet again.

First, there is no evidence to suggest that Mr. Lengyel even flew the pattern at York Airport on the day of the accident – it is believed that Mr. Simeone was actually flying.

Second, there is no evidence to indicate that they flew anything other than a "standard" pattern on the day of the accident. In fact, the testimony of the only witness to the accident, Ron Madison, indicates that the airplane was lined up for final approach to the airport and then made a silent gliding turn toward the field where it crashed. [Madison, Exhibit "A", 33:9-34:22]

Third, Mr. Losey testified that "[t]here is a circular that's been -- I don't know if the FAA generated it or not -- that indicates for ultralights there are other alternate patterns where they can do a low inside pattern on the opposite nontraffic side of the airport" because they operate at slower speeds and can impede the flow of other traffic. [Losey, Exhibit "I", 67:3-12]

- **"Further, like decedent Simeone, decedent Lengyel voluntarily chose to fly into an unfamiliar location (York Airport), one in which they were unable to successfully make a no-power landing (Defendants do not concede that the engine ceased to operate during flight). Mr. Losey testified that he suspected that decedent Lengyel was not familiar with York Airport. Decedent Lengyel's Rotax Operator's Manual clearly states that the aircraft should never be flown into locations in which a successful no-power landing cannot be made."**

Once again, Defendants rely on supposition instead of facts. As mentioned previously, Mr. Losey did not know whether or not Mr. Lengyel was familiar with the York Airport. But whether or not he had ever been there is entirely irrelevant because Mr. Lengyel radioed that he had the airport in sight and the testimony of the only witness to the accident indicates that the aircraft was properly lined up on its final approach to the airport when the engine failed. If it is the position of Rotax that aircraft equipped with its engines cannot safely be flown into certificated public airports because of defects in its engines, then that needs to be clearly stated in the manual.

**D.    Plaintiffs have established that the subject Rotax 582 engine was defective when it left the hands of the manufacturer.**

Defendants cite a litany of reasons why Plaintiffs supposedly cannot prove that the subject engine was defective when it left the hands of Rotax. As explained below, each is without merit.

### 1.    Pennsylvania Product Liability Law

The questions of when and were a defect originated should be left to the finder of fact so long as reasonable and well balanced minds [could] be satisfied from the evidence adduced that the defective condition existed when the machine was delivered. [citations omitted]

*Kuisis v. Baldwin-Lima-Hamilton Corp.*, 319 A.2d 914, 922 (Pa. 1974).

### 2.    The Shipping Damage Argument

Defendants first refer to shipping damage that occurred before Mr. Simeone took delivery of the aircraft and suggest that

Decedent Simeone originally took delivery of a partially disassembled Skyboy, which decedent Simeone assembled.[7] Further, the Skyboy was damaged upon delivery to decedent Simeone. However, there is no evidence whatsoever that suggests that the aircraft was assembled properly or that the engine, and/or other

---

[7] Defendants refer to the shipping documents for this assertion. Needless to say, those documents do not state that Mr. Simeone assembled the aircraft.

components of the aircraft were not damaged during the assembly process. Further, there is no evidence that the aircraft was assembled by a qualified aircraft mechanic.

[Defendants' Memorandum of Law at p. 33]

The product at issue in this action is the Rotax 582 engine, not the Interplane Skyboy aircraft. Consequently, it is entirely irrelevant for present purposes that the aircraft suffered shipping damage that was *limited to the airframe* as opposed to the engine. There has never been any indication that the engine itself was damaged when the aircraft was shipped from Florida to Pennsylvania and no one has suggested that the crash on July 22, 2000 was in any way related to the repairs done as a result of the shipping damage.

As far as the actual shipping damage is concerned, that *is* documented in photographs and none show damage to the Rotax 582 engine. [Simeone, Exhibit "M", 21:17-24] It is also interesting to note, that Interplane USA itself was undeterred by the shipping damage, and the manner in which it was repaired, because the company was actually interested in buying back Mr. Simeone's airplane and using it as a demonstrator. [Mandarino, Exhibit "H". 35:16-24]

As for Defendants' suggestion that the aircraft and/or engine *may* have been damaged during the assembly process, once again there is no evidence or expert testimony to support such an assertion - let alone any claim that this "damage" caused or contributed to the accident. Recall that Defendants believe the engine was running at impact. In reality, the only reassembly that needs to be done after the aircraft arrives from the Czech Republic is to reattach the wings. [Dawson, Exhibit "E", 48:22-24]

### 3.    The Precautionary Landing

As mentioned above, prior to the accident, Mr. Simeone made a precautionary landing in a field without injury due to what has been reported as a throttle problem. Labeling this incident now as a "crash" Defendants once again attempt to prove something from nothing:

> There is simply no evidence that suggests decedent Simeone did anything to correct the throttle problem that caused this accident. Even assuming that he did correct the problem, there is nothing to indicate that a certified mechanic was engaged to perform the work. Therefore, it is unlikely that the aircraft and its engine were in their original condition.

[Defendants' Memorandum of Law at p. 33]

First, the precautionary landing, according to Mr. Losey, resulted from a condition which caused the throttle to "stick" open. Even assuming that this is reliable testimony – which is debatable – then, unlike the accident flight, this "problem" did not cause the engine to stop running. Further, there is no evidence that this "problem" ever reoccurred. Indeed, Mr. Losey speculated that there was never any real problem at all: "I said he could sit on it, yes, could sit on the throttle, get his leg on it and trap it." [Losey, Exhibit "I", 158:1-8]

Second, there is no requirement that an ultralight aircraft be repaired by a "certified mechanic" although it is worth noting that Mr. Simeone was an automobile mechanic by trade. [Simeone, Exhibit "M", 10:18-22]

Lastly, Defendants' experts have in no way suggested that any damage incurred during the precautionary landing was repaired improperly or, more importantly, had any role in the accident. All the evidence suggests that there was simply minor damage to the landing gear. [Simeone, Exhibit "M", 47:11-20]

### 4.    Intentional Spoliation of Evidence

Defendants next request that this action be dismissed on the basis of spoliation of evidence claiming "[t]he best condition of the engine on the date of the incident was intentionally and irreversibly altered by Plaintiffs through disassembly." Defendants go on to say that they were "severely prejudiced by not being permitted to test the engine prior to its disassembly." [Defendants' Memorandum of Law at p. 34][8]

Simply stated, this claim is ridiculous.

Defendants' request to run the engine after the accident was denied for good reason. Running the engine at that time would have potentially destroyed (or created) evidence in the process. Since it was determined that the engine had stopped running prior to impact, and it was known that Rotax engines are subject to "seizure" and cylinder scoring (which was discovered), it was determined that running the engine was not plausible.

Moreover, Defendants were never deprived of any opportunity to test components that they desired to test. After Plaintiffs had observed problems with the carburetors during a flow bench test, Defendants requested, and were permitted, to install the subject carburetors on an exemplar engine to perform a functional test. Likewise, Defendants requested, and were permitted, to perform a functional test of the oil injection pump. The fact that the pump was not installed on an engine for testing purposes was strictly Defendants' decision.

---

[8] Defendants cite *Roselli v. General Electric Co.*, 599 A.2d 685 (Pa. Super. 1991). Disregarding the fact that *Roselli* has been supplanted by the Pennsylvania Supreme Court's decision in *Schroder v. Commonwealth*, 710 A.2d 23 (Pa. 1997), the facts of this case are entirely different. In *Roselli*, the broken pieces of the coffee carafe that shattered were lost before they could be examined by defendant. Here, Defendants had free reign to examine and test any engine components that they desired. They just were not permitted to potentially destroy evidence by running the engine before that examination and testing was accomplished.

Defendants' reliance upon Officer Yatsko's opinions to support a spoliation claim is troubling. Officer Yatsko has admitted time and again that he has no experience with aircraft accident investigation. [*See*, p. 6, *supra.*] Furthermore, the fact that a local automobile mechanic (certified or otherwise) reported finding compression in a cylinder and concluded that the engine had not seized is irrelevant. Nobody is suggesting that the engine lacked compression or seized. Rather, the focus of this case is on the oil injection system and the carburetors, both of which have examined and tested by Defendants.

Even if there had been spoliation of evidence (which is wholeheartedly denied), dismissal would not be the appropriate remedy.

In *Schroder v. Commonwealth*, 710 A.2d 23 (Pa. 1997), the Pennsylvania Supreme Court adopted the approach to spoliation issues set forth by the Third Circuit Court of Appeals in *Schmid v. Milwaukee Tool Corporation*, 13 F.3d 76 (3rd Cir. 1994):

> the key considerations in determining whether such a sanction is appropriate should be: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

13 F.3d at 79.

Here, no evidence was destroyed, no party was prejudiced, and no sanction is appropriate.

**E.      Plaintiffs have identified specific defects in the subject Rotax 582 engine and, therefore, do not need to proceed on a "malfunction theory." However, a "malfunction theory" is available under Pennsylvania law based upon the facts of this case.**

Pennsylvania law has long recognized what is known as the "malfunction theory."

In most instances the plaintiff will produce direct evidence of the product's defective condition. In some instances, however, the plaintiff may not be able to

prove the precise nature of the defect in which case reliance may be had on the "malfunction" theory of product liability. This theory encompasses nothing more than circumstantial evidence of product malfunction. *See MacDougall*, 214 Pa.Super. at 391, 257 A.2d at 680. It permits a plaintiff to prove a defect in a product with evidence of the occurrence of a malfunction and with evidence eliminating abnormal use or reasonable, secondary causes for the malfunction. *See Thompson*, 325 Pa.Super. at 394, 473 A.2d at 125; *MacDougall*, 214 Pa.Super. at 391, 257 A.2d at 680. It thereby relieves the plaintiff from demonstrating precisely the defect yet it permits the trier-of-fact to infer one existed from evidence of the malfunction, of the absence of abnormal use and of the absence of reasonable, secondary causes. *See Thompson*, 325 Pa.Super. at 394, 473 A.2d at 125; *MacDougall*, 214 Pa.Super. at 391, 257 A.2d at 680. We now accept this evidentiary approach as appropriate in ascertaining the existence of a defect in the manufacturing process.

<u>*Rogers v. Johnson & Johnson Products, Inc.*</u>, 565 A.2d 751, 754 (Pa. 1989).

Based on functional testing of the oil injection pump and carburetors from the subject Rotax 582 engine, Plaintiffs' experts have opined that they were defective and a cause of the accident. [Exhibit "C"] As to the oil injection pump in particular, a functional test was done in accordance with the manufacturer's instructions and it was determined that the pump flowed as much as 67 cc of oil from one port when the manual states that a properly functioning pump should flow 50 cc. [Exhibit "C"] It is the opinion of Plaintiffs' experts that this excessive oil flow, in conjunction with the abnormalities observed in regard to the carburetors, caused a "rich" condition that fouled the spark plugs. Additional testing was done on the spark plugs to determine if they were capable of firing properly in the condition in which they were found after the accident and the test showed they were not. [Exhibit "C"]

In light of the foregoing, Plaintiffs do not need to utilize the "malfunction theory." However, the suggestion that Plaintiffs' experts have failed to eliminate other reasonable causes of the accident is incorrect. The subject engine was disassembled in order to eliminate the very real possibility of piston seizure. Likewise, Defendants' assertion that

44

improper maintenance caused the engine to fail is not even supported by their own experts as they claim the engine was running at impact. More importantly, Defendants' have offered no logical explanation as to why Messrs. Lengyel and Simeone would attempt to land an airplane in a field while on short final approach to the airport if in fact the engine was operating properly.

**F.    The release language contained in the Interplane USA Order form does not provide Defendants with immunity against Plaintiffs' Breach of Warranty claims.**

In short, Defendants claim that Mr. Simeone (and Mr. Lengyel through Mr. Simeone) waived any and all warranty claims because of the language in the Interplane USA Order form. For the reasons cited previously, the release language does not afford Defendants with any such immunity.[9]

**G.    Punitive damages are appropriate in this action as Defendants have acted with reckless indifference to the rights of Plaintiffs.[10]**

In Pennsylvania,

"Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742, 747 (1984) (*quoting* Restatement (Second) of Torts § 908(2) (1979)); *see also Chambers v. Montgomery,* 411 Pa. 339, 192 A.2d 355, 358 (1963). As the name suggests, punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct. *See SHV Coal,*

---

[9] 13 Pa.C.S.A. § 2316 (b) governs exclusion or modification of warranties:

Subject to subsection (c), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

As pointed out above, there is no language (conspicuous or otherwise) which identifies Defendants as intended beneficiaries of the release language.

[10] Count Three of Plaintiffs' First Amended Complaint is entitle "Reckless, Willful and Wanton Misconduct, Fraud and Deceit. Defendants' Memorandum of Law appears to address only fraud.

*Inc. v. Continental Grain Co.,* 526 Pa. 489, 587 A.2d 702, 704 (1991); *Feld,* 485 A.2d at 747-48; *Chambers,* 192 A.2d at 358.  *See also* Restatement (Second) of Torts § 908, comment b.  The purpose of punitive damages is to punish a tortfeasor for outrageous conduct and to deter him or others like him from similar conduct.  *Kirkbride v. Lisbon Contractors, Inc.,* 521 Pa. 97, 555 A.2d 800, 803 (1989); Restatement (Second) of Torts § 908(1) ("Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future.").  Additionally, this Court has stressed that, when assessing the propriety of the imposition of punitive damages, "[t]he state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious." *See Feld,* 485 A.2d at 748; *see also Martin v. Johns-Manville Corp.,* 508 Pa. 154, 494 A.2d 1088, 1097 n. 12 (1985) (plurality opinion). [footnote omitted]  In *Martin,* this Court considered the requisite state of mind which would constitute reckless indifference in this context, and we set forth the standard the courts are to apply when called upon to determine whether the evidence supports a punitive damages award on such a basis.  Noting that Comment *b* to Section 908(2) of the Restatement refers to Section 500 as defining the requisite state of mind for punitive damages based on reckless indifference, this Court turned to Section 500, which states: § 500 Reckless Disregard of Safety Defined.  The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.  Restatement (Second) of Torts § 500.  Noting that Section 500 sets forth two very different types of state of mind as to reckless indifference, *Martin* stated that the first is "where the 'actor knows, or has reason to know, ... of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk;'" and that the second is "where the 'actor had such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so.'" *Martin,* 494 A.2d at 1097 (quoting Restatement § 500 Comment *a*).  *Martin* recognized that the first type of reckless conduct described in Section 500 "demonstrates a higher degree of culpability than the second on the continuum of mental states which range from specific intent to ordinary negligence [,]" because "[a]n 'indifference' to a known risk under Section 500[,] is closer to an intentional act than the failure to appreciate the degree of risk from a known danger." *Id.*  The *Martin* Court then stated that "[u]nder Pennsylvania law, only the first type of reckless conduct described in comment *a* to Section 500, is sufficient to create a jury question on the issue of punitive damages [,]" rejecting as insufficient the second type of recklessness, which is premised on a "reasonable man standard." *Id.* at 1097-98.  In other words, this Court concluded that "an appreciation of the risk [of harm] is a necessary element of the mental state required for the imposition of [punitive] damages." *Id.* at 1097 n. 12.  In this regard, we reasoned

that: The only purpose of punitive damages is to deter outrageous conduct. It is impossible to deter a person from taking risky action if he is not conscious of the risk. Thus, in *Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742 (1984), we addressed the issue of when punitive damages are warranted and stressed that, in determining whether certain conduct is outrageous, "[t]he state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious." Similarly, the Restatement explains that "reckless indifference to the rights of others and conscious action in *deliberate* disregard of them ⋯ may provide the necessary state of mind to justify punitive damages." Comment *b* (emphasis added). Therefore, an appreciation of the risk is a necessary element of the mental state required for the imposition of such damages. *Id.* Thus, in Pennsylvania, a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk. *Id.* at 1097-98.

*Hutchison v. Luddy*, 766 A.2d 870 (Pa. 2005).

In this case, Defendants have intentionally marketed the 2-stroke, Rotax 582 engine (with an "off-the-shelf" oil injection system) for use in aircraft while attempting to limit their liability by the use of inaccurate, misleading, and self-serving "warnings" in the Operator's Manual.[11]    At the same time, Defendants admit they have no idea (or apparent care) how many engines are failing in the field, utilize sporadic quality control testing procedures, and maintain little contact with the manufacturer of the oil injection system (only through the purchasing department). [Furlinger 7/22/05, Exhibit "L", 56:1-22, 266:5-20] Despite the inaccurate nature of the warnings in the Operators Manual, the fact that they are employed at all, evidences knowledge on the part of Defendants that the consequences of engine failure in an aircraft are quite serious. Under the circumstances,

---

[11] In Pennsylvania, to establish a claim for intentional misrepresentation, a plaintiff must allege: (1) a representation, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false, (4) with the intent of misleading another into relying on it, (5) justifiable reliance on the misrepresentation, and (6) the resulting injury was proximately caused by the reliance. *Bortz v. Noon*, 720 A.2d 555, 560 (Pa. 1999).

a jury could properly find that Defendants acted with reckless indifference to the rights of Mr. Simeone and Mr. Lengyel.

**III.    CONCLUSION**

Defendants have failed to meet the stringent requirements for enforcement of an exculpatory release.    Neither the Interplane USA Waiver and Release form nor the Interplane USA Order form refers to Defendants because they were not intended for their benefit.

Likewise, Defendants have failed to establish that either Mr. Simeone or Mr. Lengyel assumed the specific risks associated with the defects that were discovered in the subject Rotax 582 engine following the fatal crash.    Claiming, without authority, that ultralight flying is generally hazardous does not support a conclusion that Mr. Simeone and Mr. Lengyel assumed any and all risks associated with flying in an Interplane Skyboy aircraft equipped with a Rotax 582 engine.    Nor do Defendants' self-serving, unsupported, and incorrect "warnings" in the Rotax 582 Operators Manual afford them any relief against claims for specific defects in the subject engine.

For all of the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion for Summary Judgment.

**THE WOLK LAW FIRM**

Arthur Alan Wolk, Esquire
Christopher J. Cerski, Esquire
Alan D. Mattioni, Esquire
1710-12 Locust Street
Philadelphia, PA 19103

48

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on September 6, 2005, a true and correct copy of the foregoing was served upon the following via first class mail, postage prepaid, upon the following:

Robert J. Kelly, Esquire
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
33 Washington Street, 18th Floor
Newark, NJ 07102

THE WOLK LAW FIRM

Alan D. Mattioni, Esquire
1710-12 Locust Street
Philadelphia, PA 19103
(215) 545-4220
(215) 545-5252 (facsimile)