## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THERESA MARIE SIMEONE, Personal    :
Representative of the Estate of Albert Francis    :
Simeone, Jr., Deceased, and THERESA MARIE    :   CIVIL ACTION NO. 02CV4852
SIMEONE, In Her Own Right, and    :
MARY ANN LENGYEL, Personal    :
Representative of the Estate of George Lengyel,    :
Deceased, and MARY ANN LENGYEL,    :   JURY TRIAL DEMANDED
In Her Own Right    :
   :
                Plaintiffs,    :
   :
       v.    :
   :
BOMBARDIER CORPORATION GmbH, et al.    :
   :
             Defendants.    :

---

## REPLY MEMORANDUM OF LAW IN SUPPORT OF
## SUMMARY JUDGMENT ON BEHALF OF DEFENDANTS
## BRP-ROTAX GMBH & CO. KG AND BOMBARDIER INC.

---

Robert J. Kelly, Esq.
Of Counsel

Mr. Kelly and
Christopher W. McClanahan, Esq.
On the Brief

437890.1B

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................ii, iii

PRELIMINARY STATEMENT .................................................................................. 2

SUPPLEMENTAL STATEMENT OF FACTS .......................................................... 3


LEGAL ARGUMENT

POINT I

DECEDENT SIMEONE EXPRESSLY WAIVED ALL CLAIMS
HE OR HIS HEIRS MAY HAVE HAD AGAINST DEFENDANT..................................8

    A.    Introduction

    B.    Defendants Supplied the Engine for the Subject Aircraft

    C.    Decedent Simeone (and his heirs) expressly waived any rights he may have had against Defendants

POINT II

BOTH DECEDENTS EXPRESSLY AND/OR IMPLIEDLY
ASSUMED THE RISK OF FLYING ULTRALIGHTAIRCRAFT…..............................12

    A.    Introduction

    B.    Decedent Simeone expressly assumed the risk of ultralight flying

    C.    Decedent Simeone impliedly assumed the risk of ultralight flying

    D.    Decedent Lengyel impliedly assumed the risk of ultralight flying

POINT III

PLAINTIFFS ARE UNABLE TO ESTABLISH THAT TH SUBJECT
ENGINE WAS DEFECTIVE WHEN IT LEFT THE HANDS OF DEFENDANTS…............21

    A.    Plaintiffs intentionally despoiled crucial evidence

    B.    Plaintiffs cannot proceed under a malfunction theory

POINT IV

PLAINTIFFS' BREACH OF WARRANTY CLAIMS
SHOULD BE DISMISSED...................................................................................23

POINT V

PLAINTIFFS CANNOT SHOW THAT DEFENDANTS' ACTIONS
CONSTITUTED RECKLESS OR WILFUL CONDUCT OR FRAUD............................24

POINT VI

PLAINTIFFS ARE NOT ENTITLED TO PUNITIVE DAMAGES................................24


CONCLUSION...............................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

Nicholson v. Mount Airy Lodge,
1997 U.S. Dist. LEXIS 21035 (E.D. Pa. 1997) ...................................................12

Schillachi v. Flying Dutchman Motorcycle Club,
751 F.Supp. 1169 (E.D. Pa. 1990) ..............................................................11,15

Wagner v. Firestone Tire & Rubber Co.,
890 F. 2d 652 (3d. Cir. 1989)........................................................................14

Weiner v. Mt. Airy Lodge,
719 F. Supp. 342, 345 (M.D. Pa. 1989) ..........................................................12

## STATE CASES

Berman v. Radnor Rools, Inc.,
374 Pa. Super. 118,136 (1988)......................................................................14

Brown v. Racquetball Centers, Inc.,
39 Pa. Super 13; 534 A.2d 842 (Pa. Super. 1987.............................................10

Employers Liability Assur. Corp. v. Greenville Business Men's Association,
423 Pa. 288; 244 A.2d 620 (1966) ................................................................10

Mucowski v. Clark,
404 Pa. Super. 197, 201 (1990).....................................................................14

Seaton v. East Windsor Speedway, Inc.,
400 Pa. Super. 134; 582 A2d 1380, 1382 (1990)..............................................15

Staymates v. ITT Holub Industries,
364 Pa. Super. 37, 49; 537 A.2d 140, 146 (1987).............................................14

Valeo v. Pocono International Raceway, Inc.,
347 Pa. Super 230; 50 A.2d 492 (1985).........................................................11

Zimmer v. Mitchell & Ness,
254 Pa.Super. 474; 385 A.2d 437 (1978)....................................................10, 12

## STATUTES

Pennsylvania Code, 42 Pa. C.S. § 2318 ...........................................................23

## MISCELLANEOUS

Restatement (Second) of Torts, §496B ..............................................................................13

Restatement (Second) of Torts, §496C (1965) ...........................................................13, 14

437890.1B

## PRELIMINARY STATEMENT

Defendants BRP-Rotax GmbH & Co. KG f/k/a Bombardier-Rotax GmbH & Co. KG (hereinafter referred to as "Rotax") and Bombardier Inc. have clearly demonstrated in their Memorandum of Law, and through the record in this case, that Plaintiffs' claims of strict product liability; negligence; breach of warranty (express and implied); and willful and wanton misconduct, fraud and deceit are without any factual or legal basis. Specifically, Defendants have shown that decedent Simeone expressly waived any claim he (or his heirs) may have had against Defendants; that both decedents assumed the risk associated with flying ultralight aircraft; that Plaintiffs intentionally spoiled crucial evidence; and that Plaintiffs will be unable to prove that the subject engine was defective at the time that it left the "hands" of Defendants. Additionally, Defendants have shown that there is no evidence that Defendants breached any warranty owed to either decedent or Plaintiffs, or that it engaged in any willful and wanton misconduct and/or fraud and deceit.

Plaintiffs' Opposition misinterprets certain aspects of the law and frequently misapplies it to the facts of this case. Similar liberties are taken in Plaintiffs' factual recitations. Such actions bespeak the desperation of Plaintiffs' position. Defendants are entitled to summary judgment as a matter of law.

## SUPPLEMENTAL STATEMENT OF FACTS

Defendants rely on the statement of facts set forth in their Memorandum of Law in Support of Defendants' Motion for Summary Judgment, and add the following facts in order to

437890.1B

clarify and correct the liberal rendition of "statements" asserted to be fact by Plaintiffs in their Opposition:[1]

- Plaintiffs incorrectly state, as fact, that the "engine failed" while on "final approach" to York Airport. This statement is merely supposition as to what occurred. There were no eyewitnesses to the "accident," including Ronald Madison.

- Plaintiffs wishfully state, as fact, that the aircraft was "on short final approach" and "deliberately" made a right hand turn. In support of this assertion, Plaintiffs cite the testimony given by Mr. Madison at his deposition. However, nowhere in Mr. Madison's deposition testimony does he state that the aircraft, which he only viewed for fifteen (15) seconds via his peripheral vision during which time he was working on the roof of his home and conversing with his brother-in-law, was "on short final approach" and "deliberately" made a right hand turn. In fact, Mr. Madison's testimony reveals that the subject aircraft was *not* on final approach because it was so far away from the normal traffic pattern for aircraft landing at York Airport. Mr. Madison testified as follows concerning the subject aircraft that was flying in the vicinity of York Airport:

> Q.    And what direction was it heading in when you first saw it?
>
> A.    It was sort of heading towards the airport but bearing off and going down to the right, more or less. It just like—I don't know. Off to the right.
>                                    * * *
> Q.    When planes are coming in to land at the airport, are you typically able to hear engine noise?
>
> A.    Yes.
>                                    * * *

---

[1] Defendants will also refer to Exhibits "A-BB", annexed to the Certification of Robert J. Kelly which was previously filed with Defendants' Motion for Summary Judgment; and additional Exhibits contained in Appendix to this Reply Memorandum, beginning with "CC".

- 3 -

> Q.    Did you expect to hear the sound of an engine?
>
> A.    Not really.   He was far enough away and low, I wasn't expecting, no.

[See Appendix Exhibit CC, June 30, 2005 deposition testimony of Ronald Madison, T13:L1-7; T14:L18-21; and T20:L1-5.]

- Plaintiffs incorrectly state, as fact, that "functional testing of the spark plugs demonstrated that they are incapable of firing properly...Testing of the oil injection system...determined that the pump was flowing too much oil at a position corresponding to reduced power...Flow testing of the engine's carburetors also revealed abnormal operation" [Plaintiffs' Opposition at pages 1-2.]   These statements are, at best, theories and not facts. Defendants dispute these theories in their entirety. [See copy of Weldon Garrelts' report, dated July 29, 2005, attached to Kelly Certification as Exhibit W.]

- Plaintiffs incorrectly state, as fact, that Defendants "suggest" that the Release and Waiver which decedent Simeone executed in connection with his March 5, 2000 familiarization flight, released claims that he or his heirs may have had against Defendants.   Defendants offered this fact only for the purpose of demonstrating decedent Simeone's subjective knowledge of the risks of flying ultralight aircraft.

- Plaintiffs incorrectly state, as fact, that Defendants did not supply the subject engine to Interplane, USA.   There cannot be any dispute that Defendants' Rotax 582 engine was the powerplant for the Skyboy ultralight aircraft that decedent Simeone purchased from Interplane, USA.   Plaintiffs' entire case rests on an allegedly defective engine supplied by Defendants.

- Plaintiffs incorrectly state, as fact, that it was not "the policy of Interplane representatives to discuss with purchasers of its aircraft, the risks of flying the aircraft,

- 4 -

specifically pointing out the operating manuals for the Rotax engine, which was the powerplant

for the Skyboy." [Plaintiffs' Opposition at p.3; Defendants' Memorandum at p. 7.] Interplane's

Ralph Mandarino testified as follows:

> Q.    Was it Interplane LLC's policy to conduct a discussion with
>        potential customers concerning the risks of flying
>        Interplane aircraft?
>
> A.    Yes.
>
> Q.    And in as much detail as you can recall, what was
>        Interplane's policy for the content of that discussion?
>
> A.    The only thing I can recall is Interplane LLC's management
>        pointing out the operating manuals of the Rotax 582 versus
>        the Rotax 912 family of engines, and that is where there is
>        a statement in the operating manual that the 582
>        occasionally stops running, and one must be aware of that.
>
> Q.    And was it Interplane LLC's policy to have this discussion
>        prior to the release of the aircraft to the customer?
>
> A.    Yes.

[See Exhibit H, attached to Kelly Certification, T26:L10-T27:L3.]


In fact, Plaintiffs mischaracterize the testimony of another Interplane representative, Ben

Dawson, who sold the Interplane Skyboy ultralight aircraft to decedent Simeone, by suggesting

Mr. Dawson's testimony indicated that it was not the company policy to go over the risks of

flying ultralight aircraft or the contents of the operation manual with customers. To the contrary,

Mr. Dawson specifically testified that, at a minimum, he reviewed the important sections of

operator's manual's with customers and, specifically, with decedent Simeone. Mr. Dawson

testified as follows;

> Q.    And was it Interplane LLC's policy to have this discussion
>        prior to the release of the aircraft to the customer?

- 5 -

A.    Not generally.  We covered the routine problems with the engine, you know, about changing your spark plugs and how they had to do it and checking for leaks, and you know, water, checking the water.  All of that.

\*\*\*

Q.    It is a Rotax 582 operator's manual and I want to direct your attention to page 4.

A.    "This engine by its design is subject to sudden stoppage. Engine stoppage can result in crash landings.  Such crash landings can lead to serious bodily injury or death.  Never fly the aircraft equipped with this engine at locations, air speeds, altitudes or other circumstances from which a successful no-power landing cannot be made after sudden stoppage."

\*\*\*

Q.    Did you ever discuss that particular language with Mr. Simeone?

A.    Yes.  I will say very probably, okay.  Because one of the things that we teach as part of our flight training when we're flying with the 2-cycle motors is that you always have an emergency landing field in sight.  And because of that the ultralight aircraft would take—if they were going from point A to point B, they may take a varied route flying from this emergency landing spot to that emergency landing spot, and so forth.  So emergency landing spots, again, that is something that we always covered.

[See Appendix Exhibit DD, August 12, 2005 deposition testimony of Ben Dawson, T35:L25-T37:L22.]

•    Plaintiffs incorrectly state, as fact, that decedent Simeone did not act as a sales representative for Interplane and that he did not advise customers that the Rotax 582 engine was subject to sudden stoppage.  In fact, Interplane paid decedent Simone one thousand one-hundred dollars ($1,100.00) as commission, in connection with the sale of an aircraft that decedent Simeone made in his capacity as a sales representative for the company.  [See Exhibit S, attached to Kelly Certification.]  Plaintiffs have offered no evidence that decedent Simeone did not

- 6 -

provide potential customers with these warnings.  All Plaintiffs can do is offer Mr. Dawson's testimony that he "doesn't remember" whether he told decedent Simeone to discuss the risks with customers.  However, based on Interplane policy, decedent Simeone would have discussed the risks associated with ultralight flying and that the Rotax engine was subject to sudden stoppages, with at least the customer to whom he sold an aircraft. [See Exhibit H, attached to Kelly Certification, T26:L10-T27:L3.]

- Plaintiffs mischaracterize, as a "precautionary landing," an incident in which decedent Simeone and another individual were forced to make an emergency landing in decedent Simeone's Skyboy.  Decedent Simeone was required to make an emergency landing in his Skyboy shortly before the subject flight and this accident caused at least damage to the aircraft's landing gear.  Mr. Losey confirmed this fact during his deposition:

> A.    ...they got up and the engine was at fully throttle and instead of—and [decedent Simeone] was flying on this occasion...Instead of leaving the throttle at full throttle and coming back to the airport and setting up and landing and then turning off, they turned it off right there and went down in a farm field.  They hit in a farm field and they hit a rock and they bent the landing gear.

[See Exhibit Q, attached to Kelly Certification, T158:L1-13.]

Nowhere, other than in the words of Plaintiffs' counsel, does the term "precautionary landing" appear.

- Plaintiffs incorrectly state, as fact, that "[d]espite Defendants' best efforts, there has been no testimony that Mr. Simeone did NOT change his spark plugs at the 25 hour interval suggested in the Rotax Operator's Manual." [See Plaintiffs' Opposition, p. 34.]    In fact Plaintiffs' expert, Manual Raefsky, made such an admission in his report (last page of unnumbered report) and later confirmed it at his deposition:

- 7 -

437890.1B

Q.      …There is no evidence that the engine had been adjusted or that the plugs were not the original plugs.

A.   That's correct.

Q.   Do you stand by that statement today?

A.   Well, I stand by it in that there's no evidence they were not.

[See Exhibit X to Certification of Kelly; and Appendix Exhibit EE, August 24, 2005 deposition testimony of Manual Raefsky, T74:L21-T75:L4.]

## LEGAL ARGUMENT

### POINT I

### DECEDENT SIMEONE EXPRESSLY WAIVED ALL CLAIMS HE OR HIS HEIRS MAY HAVE HAD AGAINST DEFENDANTS

**A.     Introduction**

Plaintiffs incorrectly assert that decedent Simeone did not waive any claims on behalf of himself, or his heirs, by executing a "release and waiver" in connection with his taking a familiarization flight on an Interplane ultralight aircraft or by executing a waiver (absolving Interplane USA and its suppliers of any liability relating to decedent Simeone's use of the aircraft) in connection with his purchase of the subject Skyboy ultralight aircraft.  The thrust of Plaintiffs' argument is the contention that Defendants were not a "supplier" of Interplane USA. This argument is without merit.

**B.     Defendants Supplied the Engine for the Subject Aircraft**

Plaintiffs incorrectly assert that Defendants did not supply the engine which powered the Skyboy ultralight aircraft that decedent Simeone purchased.   Plaintiffs allege that because Interplane USA, a Florida-based company, imported and sold the Skyboy and Interplane s.r.o., a Czech Republic company, manufactured the Skyboy, that Defendants did not supply the engine

- 8 -

to Interplane USA. This logic is misplaced. It is irrelevant whether Interplane USA purchased the engine directly from Defendants. The proper question is who (what company) supplied the engine that powered the Skyboy engine that was sold with the subject aircraft? Thus, Plaintiffs' argument fails and begs the following question: If Defendants did not supply the aircraft engine which is the subject of this lawsuit, who did?

### C. Decedent Simeone (and his heirs) expressly waived any rights he may have had against Defendants

The sales agreement between decedent Simeone and Interplane states:

RELEASE

I understand that flying ultralight aircraft is a potentially dangerous activity that can result in mishap, injury or death. I acknowledge that no warranties, either express or implied, have been given to me concerning the fitness of the aircraft or any of its parts. I agree to indemnify and hold harmless Interplane USA and *its suppliers from any action or cause arising from the sale and use of this aircraft and/or parts*. [Emphasis added.]

[See Exhibit G, attached to Kelly Certification.]

Plaintiffs do not claim that decedent Simeone did not read and voluntarily execute the subject agreement, thereby releasing Defendants of any liability in connection with decedent Simeone's operation of the subject Skyboy ultralight aircraft. Plaintiffs also do not contend that the release was a contract of adhesion. Instead, Plaintiffs allege that Defendants were not "suppliers" of the engine (discussed above) and that Defendants "[c]onveniently...failed to set forth the stringent standards that must be met before an exculpatory provision will be interpreted and construe to relieve a person of liability." [Plaintiffs' Opposition at p. 7.] Again, Plaintiffs misstate the facts. Defendants, in their Memorandum, set forth the following criteria concerning exculpatory clauses:

In order for an exculpatory agreement to be valid, the following criteria must be met:

- 9 -

437890.1B

1.   The contract must not contravene any policy of the law;
2.   It must be a contract between individuals relating to their private affairs;
3.   Each party must be a free bargaining agent, not simply one drawn into an adhesion contract, with no recourse but to reject the entire transaction;
4.   The agreement must spell out the intent of the parties with the utmost particularity; and
5.   The agreement must be construed strictly and against the party asserting it.

Zimmer v. Mitchell & Ness, 254 Pa. Super. 474, 478; 385 A.2d 437 (1978), affirmed, 490 Pa. 428; 416 A.2d 437 (1980); See also, Employers Liability Assur. Corp. v. Greenville Business Men's Ass'n., 423 Pa. 288; 224 A.2d 620 (1966).

[See, Defendants' Memorandum at p. 16.]

The subject agreement is valid because all of the criteria have been met.

Plaintiffs further assert that the facts and law set forth in Brown v. Racquetball Centers, Inc., 39 Pa. Super 13; 534 A.2d 842 (Pa. Super. 1987) should control the instant case. They do not. In Brown, plaintiff was injured when he slipped and fell in the shower area of a health club. Prior to the incident, plaintiff had executed a release in favor of defendant which stated, in pertinent part:

> I hereby and do assume all of the risks of injury to my person and property that may be *sustained in connection with the stated and associated activities in and about those premises*." [Emphasis added.]

Id. at 14.

The court held that the release did not preclude recovery because the incident, in which plaintiff was injured (falling in the shower area), did not occur while plaintiff was engaging in club activities.

The instant case is distinguishable from Brown if only for the fact that decedent Simeone was fatally injured while engaging in the very activity (flying ultralight aircraft) for which he

- 10 -

specifically released Defendants from liability.  It is clear that <u>Brown</u> is not applicable to the

instant case.  Moreover, Plaintiffs failed to discuss or distinguish the cases set forth in

Defendants' Memorandum which more directly support Defendants' arguments.  Specifically,

Plaintiffs do not mention <u>Schillachi v. Flying Dutchman Motorcycle Club</u>, 751 F. Supp. 1169

(E.D. Pa. 1990) and <u>Valeo v. Pocono International Raceway, Inc.</u>, 347 Pa. Super. 230; 50 A.2d

492 (1985), cases involving releases in the context of dangerous activities such as all terrain

vehicles and automobile racing.  Indeed, the plaintiff in <u>Schillachi</u>, 751 F. Supp. 1169 (plaintiff

sustained injuries as a result of an accident while racing an all terrain vehicle), claimed that

<u>Brown</u>, 39 Pa. Super 13, supported his position.  The court held "that Brown is not controlling.

The release at issue in Brown was not clearly as stated as the releases at issue…" <u>Schillachi</u>, 751

F. Supp. 1174.

The release that decedent Simeone executed in favor of Interplane (and Defendants as the

supplier of the engine) could not be more clear.

> RELEASE
>
> ***I understand that flying ultralight aircraft is a potentially
> dangerous activity that can result in mishap, injury or death***.  I
> acknowledge that no warranties, either express or implied, have
> been given to me concerning the fitness of the aircraft or any of its
> parts.  ***I agree to indemnify and hold harmless Interplane USA
> and its suppliers from any action or cause arising from the sale
> and use of this aircraft and/or parts***. [Emphasis added.]

[<u>See</u> Exhibit G, attached to Kelly Certification.]

The contract clearly spells out who the releasor and releasees (Interplane USA and its suppliers)

are and clearly defines the liability (any action or cause arising from the sale and use of this

aircraft and/or parts) from which decedent Simeone agreed to release Defendants.  In the instant

case, decedent Simeone was fatally injured while operating his aircraft, allegedly as a result the

failure (which Defendants do not concede), of a part (engine) that was supplied by Defendants.

- 11 -

Plaintiffs appear to allege that the intention of the parties is not spelled out. While Defendants are unclear how Plaintiffs reached this conclusion, "the court 'must use common sense in interpreting the agreement.'" Nicholson v. Mount Airy Lodge, 1997 U.S. Dist. LEXIS 21035 (E.D. Pa. 1997), at 7, citing Weiner v. Mt. Airy Lodge, 719 F. Supp. 342, 345 (M.D. Pa. 1989). Here, the court can look to the agreement which clearly spells out the intention of the parties- "[decedent Simeone agree[s] to indemnify and hold harmless Interplane USA and its suppliers from any action or cause arising from the sale and use of [the] aircraft and/or parts." [See Exhibit G, attached to Kelly Certification.] There can be no doubt that decedent Simeone, by executing this release, intended to relieve from liability Defendants as suppliers of parts to the Skyboy ultralight aircraft. In sum, the agreement meets all of the requirements of a valid release. Zimmer, 254 Pa. Super. 474.[2]

### POINT II

### BOTH DECEDENTS EXPRESSLY AND/OR IMPLIEDLY ASSUMED THE RISK OF FLYING ULTRALIGHT AIRCRAFT.

A.      Introduction

Although it is the position of Defendants that the subject engine was operating at the time of the incident, for purposes of the underlying motion in which the court is required to view the facts in the light most favorable to the non-moving party (Plaintiffs), Defendants will assume arguendo that the aircraft engine stopped running prior to the crash.

The doctrine of assumption of risk is controlled by the following:

---

[2] Defendants do not contend that decedent Simeone expressly waived any rights that he (and his heirs) may have had concerning the subject fatal flight as a result of his execution of the Release and Waiver in connection with his March 5, 2000 familiarization flight. Defendants offer this fact only for the purpose of demonstrating decedent Simeone's subjective knowledge of the risks of flying ultralight aircraft.

437890.1B

Restatement (Second) of Torts, §496C (Implied Assumption of Risk) states, in pertinent part:

> … a plaintiff who fully understands a risk of harm to himself or his things caused by the defendant's conduct or by the condition of the defendant's land or chattels, and who nevertheless voluntarily chooses to enter or remain, or to permit his things to enter or remain within the area of that risk, under circumstances that manifest his willingness to accept it, is not entitled to recover for harm within that risk.

Restatement (Second) of Torts, §496B (Express Assumption of Risk) states,

> A plaintiff who by contract or otherwise expressly agrees to accept a risk of harm arising from the defendant's negligent or reckless conduct cannot recover for such harm, unless the agreement is invalid as contrary to public policy.

Plaintiffs, in their Opposition state,

> "[d]efendants have tried to generalize their assumption of the risk argument so as to avoid any specific defect claiming instead (without authority) that flying an ultralight aircraft is "inherently dangerous" and that, by participating in this activity, Mr. Simeone and Mr. Lengyel assumed any and all risk of injury.

[Plaintiffs' Opposition at p. 18.]

Plaintiffs mischaracterize Defendants' arguments, presumably because it is clear decedents assumed the risk of flying ultralight aircraft. Plaintiffs correctly point out that Defendants have not furnished any "data…to show that flying an Interplane Skyboy aircraft is any more hazardous than flying a Boeing 737." [Plaintiffs' Opposition at p. 19.] Quite frankly, common sense compels such a finding and Plaintiffs' suggestion that flying ultralight aircraft may not be a "high risk" recreational activity is absurd.

Plaintiffs also claim that Defendants have not identified any specific defect that decedents were aware of. Plaintiffs appear to argue that decedents must have been aware of allegedly

- 13 -

defective components in the aircraft engine in order for decedents to have assumed any risk.  In

other words, by way of example, Plaintiffs contend that decedents would have needed to be

aware that the engine had a faulty carburetor and proceeded in spite of this knowledge.  This

logic is flawed.  "Assumption of risk is based on the notion that, by taking the chance of injury

from a known risk, the plaintiff has consented to relieve the defendant of its duty toward him."

Wagner v. Firestone Tire & Rubber Co., 890 F.2d 652 (3d Cir. 1989). See Green v. Sanitary

Scale Co., 431 F.2d 371, 374 (3d Cir. 1970); Restatement (Second) of Torts § 496C.  The

defense is predicated on a plaintiff's "subjective awareness of the risk inherent in the activity and

a willingness to accept it. Mucowski v. Clark, 404 Pa. Super. 197, 201 (1990), quoting Berman

v. Radnor Rools, Inc., 374 Pa. Super. 118, 136 (1988).

Applying the decisional authority to the facts of this case, it is clear that decedents'

subjective knowledge concerning the risks associated with flying ultralight aircraft, and the fact

that the engine which powered the aircraft was subject to sudden stoppage, is enough to

demonstrate that decedents' voluntarily assumed of the risk that injury or death could have

resulted when they chose to fly on July 22, 2000.  Moreover, as set forth in Defendants'

Memorandum, a plaintiff's knowledge of the risk may "be proved 'by circumstantial evidence

sufficient to permit an inference that the plaintiff was aware [of] and understood the risk.'" Id.,

citing Staymates v. ITT Holub Industries, 364 Pa. Super. 37, 49; 537 A.2d 140, 146 (1987).

**B.    Decedent Simeone expressly assumed the risk of ultralight flying**

Plaintiffs contend, for the same reasons set forth in their Opposition to the enforcement of

the express waiver agreement, that decedent Simeone did not expressly assume the risk of injury

and or death as a result of flying ultralight aircraft.  Defendants, for the reasons set forth in their

Memorandum of law and above in this Reply, contend that the valid agreement entered into by

- 14 -

decedent Simeone and Interplane clearly shows that decedent Simeone expressly assumed the risks associated with flying ultralight aircraft. Plaintiffs do not dispute that the language in the release, which states:

> I understand that flying aircraft is a potentially dangerous activity that can result in mishap, injury or death. I acknowledge that no warranties, either express or implied, have been given to me concerning the fitness of the aircraft or any of its parts...

[See Exhibit G, attached to Kelly Certification.]

As set forth above, decedent Simeone expressly acknowledged that flying ultralight aircraft could result in a fatal accident and he still chose to fly. Plaintiffs also now imply that perhaps Mr. Dawson did not discuss the release language with decedent Simeone. This is irrelevant because "[t]he law of Pennsylvania is clear. One who is about to sign a contract has a duty to read that contract first." Schillachi, 751 F. Supp. at 1174; See also, Seaton v. East Windsor Speedway, Inc., 400 Pa. Super. 134; 582 A2d 1380, 1382 (1990). Moreover, there is nothing to suggest that decedent could not or did not ask Mr. Dawson any questions about the release language prior to signing the contract. In any event, it is irrelevant because decedent Simeone read and signed the agreement, acknowledging that he could be injured or even killed.

### C.    Decedent Simeone impliedly assumed the risk of ultralight flying

Plaintiffs allege that "[d]efendants have confused assumption of risk with allegations of contributory negligence." [Plaintiffs' Opposition at p. 36.] This is not correct. While Defendants may contend that decedents' actions contributed to the incident on July 22, 2000, Defendants' discussion relating to decedents' conduct is only featured for the purpose of demonstrating their subjective knowledge of risks associated with flying ultralight aircraft and their knowledge that the engine was one which was subject to sudden stoppages.

- 15 -

To that end, there are several factors (set forth in detail in Defendants' Memorandum), which clearly illustrate both decedent Simeone's general knowledge of the risk associated with flying ultralight aircraft and, specific knowledge that the Rotax 582 engine which powered his aircraft was subject to sudden stoppages. Even with this knowledge, decedent Simeone voluntarily assumed the risks associated with flying ultralight aircraft. The following are factors that conclusively demonstrate decedent Simeone's knowledge of the risks associated with flying ultralight aircraft:

- Decedent Simeone, on March 5, 2000, executed a release in favor of Interplane (and its suppliers), acknowledging "that the flight is attempted solely at his own risk," prior to taking a familiarization flight in an Interplane ultralight aircraft. [See Exhibit F, attached to Kelly Certification.]

- Decedent Simeone, on March 6, 2000, the day following his familiarization flight, executed another release in favor of Defendants in connection with his purchase of the subject Skyboy ultralight aircraft. The release states, in pertinent part: "I understand that flying ultralight aircraft is a potentially dangerous activity that can result in mishap, injury or death." [See Exhibit G, attached to Kelly Certification.]

- Decedent Simeone took ultralight aircraft flying lessons from Mr. Dawson, who testified that he apprised decedent Simeone of the need to be able to land the aircraft in the event of an engine failure, and that that this type of procedure was "heavily stressed." [See Exhibit E, attached to Kelly Certification, T13:L13-20.]

- Decedent Simeone practiced stall maneuvers during his instruction with Mr. Dawson. [Id., T31:L13-20.]

- 16 -

• Decedent Simeone's Operator's Manual clearly states that the Rotax 582 engine, which powered decedent Simone's Skyboy ultralight aircraft, was subject to sudden stoppages. [See Exhibit L, attached to Kelly Certification.]

• Decedent Simeone, not long before the fatal incident, experienced an incident (throttle sticking) associated with flying his Skyboy, requiring him to make an emergency landing in a cornfield. This caused damage to his aircraft.

• Decedent Simeone's Operator's Manual specifically states that the spark plugs should be inspected after twelve and one-half (12 ½) hours of engine use and the spark plugs should be replaced after twenty five (25) hours of operation. [See Exhibit L, attached to Kelly Certification, Chapter 32.] Manual Raefsky, Plaintiffs' expert, concluded that there is no evidence that the spark plugs were not the original plugs. [See Exhibit X, attached to Kelly Certification.] There were thirty eight (38) hours of run time on the engine at the time of the accident. Therefore, even though decedent Simeone knew his spark plugs needed to be changed, he chose to operate his aircraft engine for an additional thirteen (13) hours without changing the spark plugs.

• It is obvious that decedents did not check the spark plugs during their pre-flight inspection of the Skyboy ultralight aircraft on July 22, 2000. If they had, according to Plaintiffs' experts, they would have seen the alleged "deposits" and/or fouling on the plugs. Manual Raefsky, Plaintiffs' expert, testified:

> Q.    Could the fouling of the spark plugs have been discovered by Mr. Simeone and Mr. Lengyel prior to their flight on July 22nd 2000?
>
> MR. MATTIONI:    Object to the form.
>
> THE WITNESS:    Well, it's possible if they pulled plugs.

- 17 -

BY MR. KELLY:

Q.    Was there anything preventing them from pulling the plugs and examining them before their flight on July 22nd 2000, to your knowledge?

        MR. MATTIONI:    Same objection.

        THE WITNESS:    Well, there's nothing that prevented it and there's nothing that prevented them from not taking off, you know, its that kind of situation.

BY MR. KELLY:

Q.    In other words, that fouling was there to be seen before they took off, correct?

        MR. MATTIONI:    Same objection.

        THE WITNESS:    They would—I think—in my opinion, they would have seen something had they looked at the time.

[See Appendix Exhibit EE, T93:L7-T94:L13.]

Similarly, Herbert Newbold, another expert retained by Plaintiffs, testified:

Q.    What was your understanding of how long the final flight of this aircraft was in terms of time?

A.    Maybe just a little bit over an hour.

Q.    Do you believe that the deposits that you saw on the spark plugs were visible before the beginning of the flight that day?

        MR. MATTIONI:    Object to the form.

        THE WITNESS:    It's possible.  I would think it's more probable that those deposits would occur a little bit—over a longer period of time than just an hour, particularly the deposits that you see in the pistons.  But it may be possible.

- 18 -

BY MR. KELLY:

Q.    But if one had examined the spark plugs before the commencement of flight on the day of the accident one would have seen the deposits, correct?

MR. MATTIONI:    Object to the form.

THE WITNESS:    You may have seen some deposits. Whether you would have seen the deposits to this degree, probably not.  But you should have probably seen some deposits.

[See Appendix Exhibit FF, August 26, 2005 deposition testimony of Herbert Newbold, T80:L22-T82:L6.]

Further, any deposits on the plugs or potential fouling condition would have been obvious to decedent Simeone, since he was an auto mechanic and would have been intimately familiar with these types of spark plugs, which are automotive spark plugs.  Notwithstanding decedent Simeone's knowledge of the risk of not inspecting and/or replacing the spark plugs, he proceeded to fly his ultralight aircraft.

•    Decedent Simeone chose to fly the subject ultralight aircraft over a cornfield and into an area (near York Airport) that was unknown to him.  The preface to the Operator's Manual clearly states that ultralight aircraft should never be flown into locations in which a successful no-power landing cannot be made. [See Exhibit L, attached to Kelly Certification.]

**D.    Decedent Lengyel impliedly assumed the risk of ultralight flying**

Similarly, decedent Lengyel, a certified ultralight instructor, had knowledge that that flying ultralight aircraft was dangerous and could result in injury or even death, and that the engine on decedent Simeone's Skyboy was subject to sudden stoppages.  Notwithstanding, decedent Lengyel voluntarily assumed the risks associated with flying ultralight aircraft.  There are several factors, all which are set forth in detail in Defendants' Memorandum, that

- 19 -

demonstrate decedent Lengyel's subjective knowledge of the risks associated with flying ultralight aircraft. The following highlights those factors:

- Decedent Lengyel owned an ultralight Challenger aircraft, equipped with a Rotax 503 engine, which he flew two or three times a week. The operator's manual for decedent Lengyel's aircraft engine states, among other things, that the Rotax 503 engine was also subject to sudden stoppages and "User assumes all risk of use, and acknowledges by his use that he knows the engine is subject to sudden stoppage." [See Exhibit BB, attached to Kelly Certification.] Plaintiffs' contention that decedent Lengyel's Rotax 503 is different from the Rotax 582 engine is irrelevant-decedent Lengyel was provided with the same warnings concerning ultralight flying in general and, specifically, that certain Rotax engines (namely the 503 and 582) were subject to sudden stoppages.

- Decedent Lengyel, as an ultralight instructor, was thoroughly familiar with the inherent risks associated with flying ultralight aircraft, including engine stoppage. Plaintiffs allege that because decedent Lengyel's own aircraft had an engine that did not utilize an oil injection system, he somehow was not aware of the risks associated with ultralight flying or that his (or decedent Simeone's) engine was not subject to sudden stoppages. This assertion is a non sequitur.

- Decedent Lengyel enjoyed flying low patterns on the opposite of the airports. This fact is relevant as it tends to show, circumstantially, that Lengyel took risks in connection with flying ultralight aircraft. Specifically, Mr. Losey testified that he refused to fly those patterns when requested to by decedent Lengyel because there was no need to do so. [See Exhibit Q, attached to Kelly Certification, T67:L13-19; T83:L7-15.] Additionally, Plaintiffs mischaracterize the testimony of Mr. Madison by asserting that "the airplane was lined up for

final approach to the airport..." [See Plaintiffs' Opposition at page 38.]  As set forth above in Defendants' Supplemental Statement of Facts, Mr. Madison never testified that decedents' aircraft was lined up for final approach to the York Airport. [See Appendix Exhibit CC, T13:L1-7; T14:L18-21; and T20:L1-5.]

- •     Decedent Lengyel, too, voluntarily flew into an unfamiliar location (near York Airport).  Despite Plaintiffs' protests, decedents' failure to follow the warnings in the operator's manual is extremely relevant.  Plaintiffs claim that the fact that decedent Lengyel flew into the vicinity of York Airport (although it was unfamiliar to him) is irrelevant because decedent Lengyel had the airport in sight, "and the testimony of the only witness to the accident indicates that the aircraft was properly lined up on its final approach to the airport when the engine failed." [See Plaintiffs' Opposition at p. 39.]  Once again, Mr. Madison did not so testify and such a characterization can only be considered a wishful invention of Plaintiffs.  In fact, Mr. Madison's testimony reveals that the subject aircraft was *not* on final approach because it was far from the normal traffic pattern for aircraft landing at York Airport. [See Appendix Exhibit CC, T13:L1-7; T14:L18-21; and T20:L1-5.]

## POINT III

### PLAINTIFFS' ARE UNABLE TO ESTABLISH THAT THE SUBJECT ENGINE WAS DEFECTIVE WHEN IT LEFT THE HANDS OF DEFENDANTS

The several reasons why Plaintiffs cannot prove that the subject engine was defective when it left the hands of Defendants are set forth at length in Defendants' Memorandum. Indeed, these factors when viewed together, clearly demonstrate that reasonable minds would be unable to determine that the aircraft engine was defective at the time that it left Defendants'

- 21 -

hands.   The following summarizes why Plaintiffs cannot prove that the subject engine was defective when it left the hands of Defendants:

- Decedent Simeone's Skyboy ultralight aircraft was damaged when decedent took delivery of it.  Plaintiffs contend that the damage "was limited to the airframe." [See Plaintiffs' Opposition at page 40.]  While photographs may show damage to the structure of the aircraft, Plaintiffs cannot tell for certain whether the engine and/or other parts of the aircraft were damaged as well.  In fact, decedent Simeone claimed over seven thousand dollars ($7,000.00) in damages to the aircraft, which had a selling price of less than twenty thousand dollars ($20,000.00). [See Exhibit O, attached to Kelly Certification.]

- Shortly before the subject incident, Decedent Simeone was required to make an emergency landing due to a problem with the throttle (causing the engine to operate continuously at full power) on his aircraft.  The aircraft landed in a cornfield and struck a rock, causing damage to at least the landing gear.  Again, there is no evidence to suggest that a certified aircraft mechanic repaired the damage to the landing gear or any other part of the aircraft that may have sustained damage, or cleared the aircraft for further use.  Plaintiffs claim that there is no legal requirement that an aircraft mechanic repair the damage but the operator's manual requires it.

### A.    Plaintiffs intentionally despoiled crucial evidence

Plaintiffs, by their own admission, intentionally despoiled evidence concerning the subject engine.  Put into context, Defendants' experts requested the opportunity to run the engine before it was disassembled. [See, Exhibit W,  attached to Kelly Certification.]  This request was denied, and the opportunity to determine whether the engine was in running condition was forever lost.  Plaintiffs, in their Opposition state,

> "[d]efendants' request to run the engine after the accident was denied for good reason.  Running the engine at that time would

- 22 -

> have potentially destroyed (or created) evidence in the process. Since it was determined that the engine had stopped running prior to impact, and it was known that Rotax engines are subject to "seizure" and cylinder scoring (which was discovered), it was determined that running the engine was not plausible.

[See Plaintiffs' Opposition at P. 42.]

Defendants certainly have not "determine[d] that the engine stopped running prior to impact," nor does counsel explain how it singularly reached that conclusion prior to examining the engine. Plaintiffs theorize that the engine ceased to operate during decedents' flight, causing the subject aircraft to crash. Because Plaintiffs refused Defendants' request, the opportunity to test the engine in the condition that most closely reflects its condition on the day of the crash is lost. Clearly, by their own admission, Plaintiffs' unilateral decision to disassemble the engine prior to testing, thereby destroying crucial evidence, irreparably harmed Defendants. Thus, the court should impose the harshest sanction available to it.

**B.    Plaintiffs cannot proceed under a malfunction theory**

For the reasons set forth in Defendants' Memorandum, Plaintiffs did not offer other reasonable causes of the crash or alleged engine failure and, therefore, are precluded from proceeding under a malfunction theory.

## POINT IV

### PLAINTIFFS' BREACH OF WARRANTY CLAIMS SHOULD BE DISMISSED

For the reasons set forth in their Memorandum, third-party beneficiaries of warranties law is governed by governed by case law and 13 Pa.C.S. § 2318. Simply put, Plaintiffs' claims fail for the following reasons:

- 23 -

- Defendants did not provide either decedent with an express warranty, nor have Plaintiffs provided proof of one. In fact, decedent Simeone expressly disclaimed any warranties. [See, Exhibit G, attached to Kelly Certification.]

- Any implied warranty owed to decedents was expressly waived by decedent Simeone and decedent Lengyel, under the facts of this case, cannot obtain greater rights than the purchaser, decedent Simeone. [See, Exhibit G, attached to Kelly Certification.]

## POINT V

### PLAINTIFFS CANNOT SHOW THAT DEFENDANTS' ACTIONS CONSTITUTED RECKLESS OR WILFUL CONDUCT OR FRAUD

For the reasons set forth in Defendants' Memorandum, Plaintiffs are unable to prove that Defendants' conduct was reckless or willful, or that Defendants committed fraud in connection with the Rotax engine that is the subject of this lawsuit. In fact, Defendants warned potential users of the dangers associated with flying ultralight aircraft and that the engine was subject to sudden stoppage. Plaintiffs' claims in this respect are baseless because Defendants' conduct did not rise to the level of reckless or willful conduct, or fraud.

## POINT VI

### PLAINTIFFS ARE NOT ENTITLED TO PUNITIVE DAMAGES

Plaintiffs, in their Opposition, do not set forth any valid reason why they would be entitled to punitive damages. Plaintiffs concede that they must demonstrate that Defendants' conduct was "outrageous" and the product of an "evil mind." Plaintiffs fail to discuss the fact that Defendants published warnings that flying ultralight aircraft is dangerous and that the Rotax 582 engine was subject to sudden stoppages. Clearly, Defendants' warnings undertook

- 24 -

constitute responsible conduct. Plaintiffs also contend that Defendants' warnings are "inaccurate, misleading, and self-serving…" [See Plaintiffs' Opposition at P. 47.] This assertion is completely without basis as is Plaintiffs' suggestion that Defendants do not "care" (about what happens to its engines). Id. Plaintiffs have failed to demonstrate that any conduct by Defendants rises to the level of conduct in which punitive damages may be considered.

## CONCLUSION

For all of the reasons set forth in Defendants' Memorandum and this Reply, it is respectfully requested that the Court grant Defendants' Motion for Summary Judgment and dismiss Plaintiffs' claims in their entirety.

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
Attorneys for Defendants BRP-Rotax GmbH & Co. KG and Bombardier Inc.

BY: _____
Robert J. Kelly, Esquire
33 Washington Street – 18th Floor
Newark, N.J. 07102

And

By:    Jonathan Dryer, Esq.
P.A. Attorney ID 34496
The Curtis Center-Suite 1130 East
Independence Square West
Philadelphia, PA 19106

Date:    September 14, 2005

- 25 -

437890.1B