IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THERESA MARIE SIMEONE, Personal Representative of the Estate of Albert Francis Simeone, Jr., Deceased, and THERESA MARIE SIMEONE, In Her Own Right, and MARY ANN LENGYEL, Personal Representative of the Estate of George Lengyel, Deceased, and MARY ANN LENGYEL, In Her Own Right | : : : : CIVIL ACTION NO. 02CV4852 : : : : : JURY TRIAL DEMANDED : : |
| Plaintiffs, | : : |
| v. | : : |
| BOMBARDIER-ROTAX GmbH, et al. | : : |
| Defendants. | : |

**PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE
EVIDENCE OF INTERPLANE USA WAIVERS/RELEASES**

It is believed that Defendants will attempt to offer into evidence or otherwise use two Interplane USA documents in order to show that Albert Simeone either expressly or impliedly waived any and all claims arising from his use of the Skyboy aircraft.[1] As discussed below, these documents were not intended to and cannot be read to provide Defendants with any relief from the instant claims. Likewise, use of such documents to support an assumption of the risk defense would be improper as neither document references any specific defect in the Rotax 582 engine.

On March 5, 2000, Mr. Simeone met with Ben Dawson, a representative of Interplane USA, for the purpose of taking a ride in the company's demonstrator Skyboy aircraft. Prior to riding in that aircraft, Mr. Simeone was required to sign an Interplane USA Waiver and Release form. In pertinent part, that document provides as follows:

---

[1] All supporting materials were previously filed with the Court in conjunction with Plaintiffs' Response to Defendants' Motion for Summary Judgment which is hereby incorporated by reference.

> The undersigned releaser is desirous to ride, fly and otherwise operate a motorized ultralight vehicle or "aircraft", and ***in order to be permitted to ride, fly and otherwise operate such ultralight vehicle or "aircraft"***, he is willing to take upon himself, and release all others from, the full responsibility for any and all injuries, losses and damages which or his property, or the property or person of any other individual or entity, including the owner of such ultralight vehicle or "aircraft", and the undersigned releaser fully understands that any instructions which are given to him concerning the operation of such ultralight vehicle or "aircraft" and any permission to ride, fly or otherwise operate such "aircraft", have been undertaken and permitted ONLY because of his willingness to waive and release the claims and rights mentioned in this document. [emphasis added]
>
> ***In consideration of the permission granted to him to ride, fly and otherwise operate such ultralight vehicle or "aircraft"***, and the instructions relating thereto, the undersigned releaser unconditionally agrees as follows:
>
> 1.      He hereby waives and releases any and all claims, rights and/or causes of action which he now has or may have against: (a) Any person(s), firm or corporation who provided materials, or parts, be they unassembled, partially, or completely assembled, ***which constitute the ultralight vehicle or "aircraft"***, or (b) Any person(s), firm or corporation selling, providing, or mixing fuel, oil and lubricants, or (c) An [sic] person(s), firm or corporation selling or operating ***the aforementioned ultralight vehicle or "aircraft"***, or (d) Any person(s), firm or corporation providing basic or advanced ground school and/or flight instruction, or instruction of any kind, or (e) Any person(s), firm or corporation providing certification for any instructor, or (f) Any person(s), firm or corporation providing facilities, space or land, airport or airpark, ***for operating the aforementioned ultralight vehicle or "aircraft"***, for any and all injuries, losses or damages which may occur to or be inflicted upon himself or his property, which relate to, or which may, in any way, ***arise out of (1) Any attempt by him, whether successful or not, to ride, fly or otherwise operate the heretofore mentioned ultralight vehicle or "aircraft"***, and (2), Any instruction provided by him concerning such activity. [emphasis added]

[Exhibit "A"]

As if the face of the document were not clear enough, Mr. Dawson expressly stated that the Interplane USA Release and Waiver form was solely for the purpose of releasing claims associated with Mr. Simeone riding in the Interplane USA demonstrator Skyboy aircraft:

> Q.     … can we conclude then that the Release and Waiver related to Mr. Simeone riding in the company's aircraft?

      A.      Yes.

      Q.      That was the purpose of Simeone 11, to provide a release and waiver for a flight in the Interplane company aircraft?

      A.      Yes.

      Q.      And when I talk about the Interplane company aircraft, we're talking about Interplane USA?

      A.      Correct.

      Q.      As opposed to the Czech Republic company?

      A.      Yes.

[Dawson at 51:11-22]

At the risk of overstating the obvious, Mr. Simeone was not killed during a flight in the Interplane USA demonstrator aircraft. As such, the document has no application to the subject accident.

The second document is the Interplane USA Order form that Mr. Simeone was required to sign in connection with the purchase of the accident aircraft. At trial, Defendants may attempt to caste themselves as "suppliers" of Interplane USA so as to profit from the "release" contained therein.

The exculpatory provision in that document states:

> I understand that flying ultralight aircraft is a potentially dangerous activity that can result in mishap, injury or death. I acknowledge that no warranties, either express or implied, have been given to me concerning the fitness of the aircraft or any of its parts. I agree to indemnify and hold harmless ***Interplane USA and its suppliers*** from any action or cause arising from the sale and use of this aircraft and/or parts. [emphasis added]

[Exhibit "B"]

However, Interplane USA and Interplane s.r.o. are entirely "separate and distinct." [Dawson at 47:8-25] Of significance, Interplane s.r.o. shipped "complete

3

aircraft" to Interplane USA with Rotax engines already installed. [Dawson 48:8-16] In fact, aircraft received from Interplane s.r.o. had already been test flown with all engine "break-in" having been completed in the Czech Republic. [Dawson 49:11-16] As such, it is not surprising that Interplane USA never purchased a Rotax engine from anyone, let alone Rotax:

> Q. The Czech Republic company, was that known as Interplane SRO?
>
> A. I believe so.
>
> Q. And so if anybody was purchasing Rotax engines, it was the Interplane SRO company?
>
> A. Correct.
>
> Q. ***The American Interplane company wasn't buying Rotax engines?***
>
> A. ***We were not.***

[Dawson 49:21-50:4]

Likewise, Mr. Ralph Mandarino, who was involved with Interplane s.r.o., testified that that company never purchased engines from Rotax:

> Q. Under Item 7 in you letter, which is on page 2, you state that "Several years ago Interplane wrote to Rotax in Austria seeking a OEM relationship." Do you see that?
>
> A. Yes, I do see it.
>
> Q. Were you personally involved in that effort on behalf of Interplane?
>
> A. I recall that I was involved in that activity.
>
> Q. Could you describe it for me, please?
>
> A. I recall that I recommend to our – my recollection is that I recommended to the purchasing people within Interplane SRO to make that contact, and as I recall they did make the contact.
>
> Q. What was the purpose of making that contact?

4

> A. To obtain better pricing.
>
> Q. And is the rest of Paragraph 7 true and accurate to the best of your recollection?
>
> A. Which part are you referring to?
>
> Q. Well, the entirety of Paragraph 7.
>
> A. Yes to the best of my recollection.

[Mandarino 54:9-55:7]

> In its entirety, Paragraph 7 reads as follows:
>
> Several years ago, Interplane wrote to Rotax in Austria seeking a OEM relationship. Interplane was directed to contact the United States representative, Kodiak Research Ltd., in Nassau, Bahamas. Upon contacting Kodiak, we were asked to provide documentation as to prior engine purchases, and other general information on our Company. ***To my knowledge this was never done, instead our factory continued to purchase engines from the Czech distributor,*** who upon learning of our contact with Kodiak, afforded us OEM pricing. We could not find this correspondence, however I can attest to its occurrence. [emphasis added]

[Mandarino Exhibit No. 9]

As is apparent, Defendants never supplied an engine, or any other part, to Interplane USA. The only supplier that Interplane USA ever had was Interplane s.r.o. [Dawson 49:21-50:4] Furthermore, Interplane s.r.o. never purchased engines from Rotax. Instead, it bought Rotax engines from the Czech distributor who, in turn, obtained them from Rotax. [Mandarino Exhibit No. 9]

Despite the obvious lack of any connection to Interplane USA, Rotax now claims "supplier" status in a self-serving attempt to benefit from an agreement to which it was never a party and when, throughout this litigation (in an effort to avoid personal

5

jurisdiction), it has steadfastly stated that it has no idea where Rotax engines go after they are sent to its authorized distributors.

If either Mr. Simeone or Interplane USA had truly intended to release Defendants, then the agreements needed to spell out that intention with the "greatest particularity" and they clearly do not. Since no inference from words of general import can establish the application of such a release, reading "supplier" to include Rotax is entirely improper, especially in light of the surrounding factual background. *Employers Liability Assurance Corporation v. Greenville Business Men's Association*, 224 A.2d 620 (Pa. 1966). [2]

Defendants may also attempt to use these two documents to support a general assumption of the risk argument – "flying ultralight aircraft is a potentially dangerous activity." However, no expert testimony or statistics have ever been provided to support this assertion. In fact, when pressed, Rotax ultimately took the position that its 582 engine is no more subject to "sudden stoppage" than any other aircraft engine in the world. [Furlinger 7/22/05 at 224:4-12]

Given the foregoing, Defendants cannot establish an assumption of the risk defense and should not be permitted to use the Interplane USA documents in an effort to do so.

In *Ferraro v. Ford Motor Co.*, 223 A.2d 746 (Pa. 1966) the Pennsylvania Supreme Court addressed the question as to whether or not contributory negligence or

---

[2] It is worth noting as well that there is there is no expression in the Interplane USA Order form that Mr. Simeone intended to release ANY claims on behalf of his heirs. *See, Mavreshko v. Resorts USA, Inc.*, 2005 WL 1309060 (M.D. Pa. 2005) (Release signed by father for his own snowboarding activities did not release claim for medical expenses associated with injuries sustained by son while he was snowboarding.)

assumption of the risk by the buyer would constitute a defense in actions brought pursuant to Restatement (Second) Torts § 402A and held that,

> After studied consideration, it appears to us that if the buyer knows of the defect and voluntarily and unreasonably proceeds to use the product or encounter a known danger, this should preclude recovery and constitute a complete defense to the action even in cases of strict liability.

*Id*. at 748.

Later, in *Berkebile v. Brantly Helicopter Corp.*, 337 A.2d 893 (Pa. 1975) the Court reiterated that,

> A plaintiff cannot be precluded from recovery in a strict liability case because of his own negligence. He is precluded from recovery only if he knows of the ***specific defect*** eventually causing his injury and voluntarily proceeds to use the product with knowledge of the danger caused by the defect. [citations omitted; emphasis added] Furthermore, a finding of assumption of the risk must be based on the individual's own subjective knowledge, not upon the objective knowledge of a "reasonable man."

*Id*. at 901.

There has never been any evidence presented to establish that either Mr. Simeone or Mr. Lengyel had any knowledge of ***specific defects*** in the Rotax 582 engine. Certainly, the Interplane USA documents referenced above provide no relevant support as they, like Defendants' argument, are general in nature.

Fed. R. Evid. 401 states,

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Fed. R. Evid. 402 provides,

All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

7

Because the Interplane USA documents do not apply to Defendants, and at best contain general, unsupported statements about ultralight flying, they have no relevance to any issue in this case and must be excluded.

Respectfully submitted,

*/s/ Alan D. Mattioni, Esq.*
Arthur Alan Wolk, Esquire
Alan D. Mattioni, Esquire
THE WOLK LAW FIRM
1710-12 Locust Street
Philadelphia, PA 19103
(215) 545-4220

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served upon the following via first class mail, postage prepaid, on September 30, 2005:

>Robert J. Kelly, Esquire
>WILSON ELSER MOSKOWITZ
>    EDELMAN & DICKER LLP
>33 Washington Street, 18th Floor
>Newark, NJ  07102

>**THE WOLK LAW FIRM**

>*/s/ Alan D. Mattioni, Esq.*
>Alan D. Mattioni, Esquire
>1710-12 Locust Street
>Philadelphia, PA  19103
>(215) 545-4220