# APPENDIX

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THERESA MARIE SIMEONE, Personal  
Representative of the Estate of Albert  
Francis Simeone, Jr., Deceased, and  
THERESA MARIE SIMEONE,  
In Her Own Right  
52 Pusey Mill Road  
Cochranville, PA  19330  

    and  

MARY ANN LENGYEL, Personal  
Representative of the Estate of George Lengyel,  
Deceased, and MARY ANN LENGYEL,  
In Her Own Right  
3 Cannoner Circle  
Chadds Ford, PA  19317  

    v.  

BOMBARDIER-ROTAX GmbH, Individually  
and as a Joint Venture and/or d/b/a Rotax  
A-4623 Gunskirchen, Austria  

    and  

BOMBARDIER INC., Individually and as a Joint  
Venture and/or d/b/a Rotax  
800 Rene-Levesque Boulevard  
29th Floor  
Montreal, Quebec  
Canada  H3B 1Y8  

    and  

BOMBARDIER CORPORATION, Individually  
and as a Joint Venture and/or d/b/a Rotax  
c/o CT Corporation System  
1515 Market Street, Suite 1210  
Philadelphia, PA  19102  

    and  

CIVIL ACTION NO. 02CV4852

JURY TRIAL DEMANDED

JERSEY CENTRAL POWER AND                                    :
LIGHT COMPANY, Individually and/or as a Joint  :
Venture and/or d/b/a GPU ENERGY, INC.                      :
METROPOLITAN EDISON, PENNSYLVANIA                          :
ELECTRIC, GPU, INC., AND FIRST ENERGY                      :
CORPORATION                                                :
c/o CT Corporation Systems                                 :
1515 Market Street, Suite 1210                             :
Philadelphia, PA  19102                                    :
                                                           :
                    and                                    :
                                                           :
FIRSTENERGY CORPORATION, Individually                      :
and/or as a Joint Venture and d/b/a GPU                    :
ENERGY, METROPOLITAN EDISON                                :
COMPANY, PENNSYLVANIA ELECTRIC                             :
COMPANY, GPU, INC., AND JERSEY                             :
CENTRAL POWER AND LIGHT COMPANY                            :
76 South Main Street                                       :
Akron, OH  44308                                           :

## FIRST AMENDED CIVIL ACTION COMPLAINT

### The Parties

1.      Plaintiff, Theresa Marie Simeone, is an individual, a citizen and resident of the Commonwealth of Pennsylvania, who resides at 52 Pusey Mill Road, Cochranville, Pennsylvania, and is the widow and Administratrix of the Estate of the Albert Francis Simeone, Deceased.

2.      Plaintiff, Mary Ann Lengyel, is an individual, a citizen and resident of the Commonwealth of Pennsylvania, who resides at 3 Cannoner Circle, Chadds Ford, Pennsylvania, and is the widow and Executrix of the Estate of George Lengyel, Deceased.

3.      Defendant, Bombardier-Rotax GmbH ("Bombardier-Rotax"), is believed and therefore averred to be an entity organized under the laws of Austria, with its principal place of business in Gunskirchen, Austria, and at all times material hereto is engaged

individually and/or as a wholly-owned subsidiary of Bombardier, Inc. and/or as a joint venture in the design, manufacture, product support, and sale of engines used in aircraft and in other applications, including the Rotax engine installed on a certain ultralight aircraft involved in an aircraft accident on July 22, 2000.

4.      Defendant, Bombardier Inc. ("Bombardier"), is believed and therefore averred to be a corporation organized and existing under the laws of Canada, with its principal place of business in Montreal, Quebec, Canada, and it is further alleged that Bombardier is a partner and in partnership and/or is doing business as Rotax and/or Bombardier-Rotax and/or as the Bombardier Group and/or as the Bombardier Motorized Consumer Products Group and/or Bombardier Recreational Products and/or is trading as the joint venture Bombardier-Rotax, and has made and continues to make money from the sale of Rotax engines, engine components, and product support materials.

5.      Defendant Bombardier Corporation ("Bombardier Corp.") is believed and therefore averred to be a corporation operating under the laws of the Canada with its principal place of business in Montreal, QC Canada.

6.      At all times material hereto, defendants Rotax, Bombardier, Bombardier Corp., (hereinafter collectively referred to as "the Bombardier defendants"), and each of them, were the agents, employees, servants, joint adventurers, partners, parents, subsidiaries, relatives, wholly-owned entities, or concerted actors of or with each of the remaining defendants in that, in performing or failing to perform the actions herein alleged, each was acting individually and through or in the foregoing alleged capacity and within the course and scope of said agency, employment, joint venture, partnership, subsidiary,

wholly-owned entity, or concerted action, and with the permission and consent of each of the other defendants.

7.      Defendant Jersey Central Power and Light Company, individually and as a joint venture and/or d/b/a GPU Energy, Inc., Metropolitan Edison Company, Pennsylvania Electric Company, GPU, Inc. and FirstEnergy Corporation, is believed to be and therefore averred to be a public utility, organized and existing under the laws of the State of New Jersey, and at all times material hereto, owned, maintained, operated and controlled power lines that ran southeast of the York County Airport, with an authorized agent for service of process located in Philadelphia County.

8.      Defendant, FirstEnergy, individually and as a joint venture and d/b/a Jersey Central Power and Light, GPU Energy, Pennsylvania Electric Company, GPU, Inc. and Metropolitan Edison, is believed and therefore averred to be a corporation organized and existing under the laws of the State of Ohio, and was co-owner, sole owner, or maintained, operated and/or controlled the power lines southeast of the York County Airport.

9.      FirstEnergy and Jersey Central Power and Light are collectively referred to as the "energy company defendants."


**Jurisdiction and Venue**

10.     Personal jurisdiction is proper in Pennsylvania in that defendants, and each of them, conduct a continuous and systematic portion of their business operations in the Commonwealth of Pennsylvania, availing themselves of the privilege of doing business in this Commonwealth and subjecting themselves to the jurisdiction of the courts of this Commonwealth, including the Court of Common Pleas of Philadelphia County.    All

- 4 -

defendants do business within the Commonwealth of Pennsylvania, by availing themselves to the business opportunities here, advertising, providing goods, and providing services in the Commonwealth of Pennsylvania, and receiving money from those businesses in this state who order goods, services, and publications and pay for them.

11.    The Bombardier defendants further availed themselves of the services of plaintiffs' decedents in the Commonwealth of Pennsylvania to promote and sell their products here.  In addition, defendants supply literature to aircraft owners located within the Commonwealth of Pennsylvania, and to mechanics, fixed base operators, and others who perform aircraft engine maintenance in this state for purposes of providing information and knowledge as to parts that can be purchased from the defendants for the repair or replacement of aircraft and their components.  In addition, the Bombardier defendants inject their engines and recreational vehicles into the Commonwealth of Pennsylvania for sale to Pennsylvania residents.

12.    Subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1332(a)(1) due to the diversity of citizenship between the parties, the amount in controversy being certified in excess of One Hundred and Fifty Thousand Dollars ($150,000.00), exclusive of interest and costs.

13.    Venue is proper pursuant to 28 U.S.C. § 1391 in that certain of the defendants are subject to personal jurisdiction within the Eastern District of Pennsylvania and/or substantial facts giving rise to the lawsuit took place here.

**Background**

14.    On July 22, 2000, the plaintiffs' decedents were traveling in an Interplane Ultralight aircraft with an engine designed, manufactured, sold, and supported by the

- 5 -

Bombardier defendants, and were attempting a landing at the York County Airport in York, Pennsylvania.

15.    Long prior to July 22, 2000, the Bombardier defendants supplied Rotax powerplants to Interplane manufacturers of ultralight aircraft, for distribution throughout Europe and North America.

16.    The Bombardier defendants, and each of them, are in the business of designing, manufacturing, selling, distributing and/or providing troubleshooting and product support for Rotax engines used in ultralight aircraft.

17.    While the engines are actually manufactured by Rotax, Bombardier, as the parent, co-partner, and in joint venture with Rotax, acted in a supervisory capacity by providing guidance, instructions, and management of the Rotax organization, and at all times material hereto Bombardier is one of the world's largest manufacturers of certified aircraft and, therefore, provides information to Rotax on the subject of the requirements as to reliability of engines manufactured by Rotax for use in aircraft, and it is by Bombardier's imprimatur that Rotax engines are supplied for aircraft use.

18.    The Bombardier defendants, and each of them, knew at all times material hereto that the ultralight aircraft for which its engines were supplied would be used for flight, and the in-flight occurrence of an engine failure or sudden stoppage would require an emergency landing of the ultralight.

19.    The Bombardier defendants knew at all times material hereto that ultralights, being aircraft, fly everywhere, and from time-to-time can be over areas where a safe landing cannot be accomplished in the event of an engine failure.

- 6 -

20.    The Bombardier defendants also knew, long prior to July 22, 2000, that the engines they were selling to ultralight manufacturers for use in aircraft was prone to sudden and unexplained stoppages, such that it was unpredictable as to when and where the engine would stop.

21.    The Bombardier defendants were aware from other sudden stoppages of other aircraft engines they produced that this engine was notoriously unreliable, unpredictable and could, and did, suffer engine failures that would result in serious personal injury or death.

22.    Notwithstanding the actual knowledge by the Bombardier defendants that their engines could cause serious personal injury or death and did suffer from unexplained stoppages that resulted in emergency landings, which caused injuries and deaths, the Bombardier defendants did continue to sell these engines to ultralight manufacturers for the express purpose of using these engines in aircraft that would be flown by both experienced and inexperienced pilots, but more importantly, would have passengers or students from time to time who would be completely unaware of this sudden stoppage propensity.

23.    Rather than address the defects or cease selling the engines for use in aircraft, defendants instead purported to issue so-called "legal notices" posted on the Internet and elsewhere, and placed a purported "warning" mounted on the engine itself where it would not be seen by passengers or pilots who were not owners of aircraft equipped with the Rotax engines, the sole purpose of which was not to provide notice of a danger but to evade and/or limit the Bombardier defendants' liability for their defective products.

- 7 -

24.    No warning whatsoever was provided to passengers or pilots or owners of aircraft equipped with the Bombardier-Rotax engines to enable them to know that defendants were aware that the engines were so completely and unpredictably unreliable.

25.    As the aircraft in which plaintiffs' decedents were traveling approached the airport on July 22, 2000, it was required to execute a go-around because of other aircraft on the runway, and while executing that go-around, the engine of the aircraft failed, requiring plaintiffs' decedents to commence an emergency landing procedure.

26.    Defendants FirstEnergy Corporation and Jersey Central Power and Light Company, owned, maintained, operated and controlled power lines southeast of the York County Airport which, notwithstanding the close proximity to the airport, were completely unmarked. There were no balls, flashers or other customary markings to advise pilots who were flying in the vicinity of an airport of the location, or even the existence, of the power lines.

27.    As the aircraft attempted to maneuver for the emergency landing, it struck the power lines and crashed, killing both aboard.

28.    This action is brought pursuant to the wrongful death and survival statutes of the Commonwealth of Pennsylvania for all such compensatory and exemplary damages recoverable under such statutes, and under the applicable law including, but not limited to, conscious pain and suffering, fear of impending death by mutilation, loss of life's pleasures, loss of inheritance, loss of care, comfort, companionship, guidance, tutelage, loss of net accumulations, and such other damages as are recoverable under the law.

29.    Plaintiff Theresa Marie Simeone, the wife of Albert Francis Simeone, brings this action in her capacity as personal representative of her late husband's estate and

- 8 -

in her own behalf, on behalf of the estate, as parent and natural guardian, and on behalf of all persons entitled to recover under the Pennsylvania wrongful death statute, including her three children: Stacey Marie, born August 13, 1979; Kimberly Ann, born October 7, 1981; and Kelly Lee, born July 12, 1985.

30.    Plaintiff Mary Ann Lenygel brings this action in her capacity as personal representative of her late husband's estate and in her own behalf, on behalf of the estate, as parent and natural guardian, and on behalf of all persons entitled to recover under the Pennsylvania wrongful death statute, including of her three children:  George A. Lenygel, born July 24, 1982; Virginia L. Lenygel, born September 17, 1984; and Christina M. Lenygel, born April 8, 1987.

**Theories of Recovery**

## COUNT I

### Strict Liability

#### *Plaintiffs v. The Bombardier Defendants*

31.    Plaintiffs incorporate by reference paragraphs 1 through 30 as though set forth at length herein.

32.    The Bombardier defendants, and each of them, are sellers and/or suppliers as defined by section 402A of the RESTATEMENT (SECOND) OF TORTS.

33.    The Rotax engine on the accident aircraft was in substantially the same condition at the time of this accident as it was when sold, delivered and supplied by the Bombardier defendants.

- 9 -

34.    The Rotax engine was defective and totally unsuitable for its intended use and function, as it was acknowledged by defendants to be subject to sudden and unpredictable engine stoppages in-flight as the results of assorted defects, which would and did result in crashes and serious personal injury and death.

35.    The defects in the engine include, but are not limited to, the following, which made the engine not reasonably safe for its intended and reasonably foreseeable uses:

      a.    lack of adequate tolerance of component parts;

      b.    lack of proper instructions with respect to maintenance, assembly, and operation;

      c.    insufficient manufacture and design tolerances to allow consistent, reliable operation;

      d.    high degree of probability of engine failure;

      e.    improperly monitored and controlled fuel flows;

      f.    inadequate design of pistons that would result in their seizure;

      g.    inadequate selection of materials that would result in engine seizures;

      h.    inadequate instructions with respect to preventing engine seizures; and

      i.    failure to warn of the fact the engine was subject to sudden and unpredictable engine stoppages in-flight and was otherwise dangerous and not suitable for use in aircraft,

      j.    inadequate design and manufacture of the oil supply system,

      k.       inadequate design and manufacture of the fuel system. and

      l.       inadequate design and manufacture of the engine cooling system.

36.     The defects, as described above, existed at the time of manufacture and sale of the engine and before the engine left the control of the defendants.

37.     The Rotax engine installed on the accident aircraft was being used for its intended purpose and in a way that was reasonably foreseeable, was not being misused, and had not been substantially altered in a way that was not reasonably foreseeable.

38.     The defects in the engine, as described above, resulted in engine failure on the aircraft in which plaintiffs' decedents were flying, and were a substantial factor in the happening of the accident of the crash and the fatal injuries suffered by plaintiffs' decedents.

WHEREFORE, plaintiffs pray for judgment against the Bombardier defendants in an amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00), exclusive of interest and costs, and for punitive damages in an amount to be determined at trial.

### COUNT II

#### Negligence

#### *Plaintiffs v. The Bombardier Defendants*

39.     Plaintiffs incorporate by reference paragraphs 1 through 38 as though set forth at length herein.

40.     The Bombardier defendants, and each of them, owed a duty to supply an engine that was airworthy and to otherwise act in a reasonable manner for the safety of others.

41.   As a consequence of all of the design defects, manufacturing defects, and failure to warn defects described in paragraph 36 hereof, the Bombardier defendants became aware and had actual knowledge that the powerplant could quit at any time as a result of sudden stoppage, and when applied to aircraft, would result in an emergency landing.

42.   In spite of the fact that Bombardier defendants were aware of the defects in the engines of their own design and manufacture, which could, would, and did result in engine stoppage, they continued to sell the engines for use in aircraft, knowing the defects would guarantee serious personal injury or death as a result of emergency landings.

43.   In spite of the fact that the engine was not reasonably safe for its intended and reasonably foreseeable uses, the Bombardier defendants took no steps to correct or to warn of the defects but instead mounted an alleged "warning" on the engine and out of ordinary sight to the effect that the engine does not comply with federal safety regulations for standard aircraft and is for use in experimental and uncertified aircraft only in circumstances in which an engine failure will not compromise safety, which is tantamount to no warning at all.

44.   The negligence of the Bombardier defendants, in breach of their duty of care, consisted of the following:

a.   selling and supplying an engine with lack of adequate tolerance of component parts;

b.   failing to provide proper instructions with respect to maintenance, assembly, and operation;

   c.  selling and supplying an engine with insufficient manufacture and design tolerances to allow consistent, reliable operation;

   d.  selling and supplying an engine with high degree of probability of engine failure;

   e.  selling and supplying an engine with improperly monitored and controlled fuel flows;

   f.  selling and supplying an engine with inadequate design of pistons that would result in their seizure;

   g.  inadequately selecting materials that would result in engine seizures;

   h.  inadequately proving instructions with respect to preventing engine seizures;

   i.  failing to warn of the fact the engine was subject to sudden and unpredictable engine stoppages in-flight and was otherwise dangerous and not suitable for use in aircraft;

   j.  inadequately designing and manufacturing of the oil supply system;

   k.  inadequately designing and manufacturing of the fuel system; and

   l.  inadequately designing and manufacturing of the engine cooling system.

  45.  As a direct and proximate result of the negligence of the Bombardier defendants, in breach of their duty of care, the engine stopped and plaintiffs' decedents were killed, causing plaintiffs to sustain the damages alleged herein.

WHEREFORE, plaintiffs pray for judgment against the Bombardier defendants in an amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00), exclusive of interest and costs, and for punitive damages in an amount to be determined at trial.

## COUNT III

### Reckless, Willful and Wanton Misconduct, Fraud and Deceit

#### *Plaintiffs v. The Bombardier Defendants*

46.     Plaintiffs incorporate by reference paragraphs 1 through 45 as though set forth at length herein.

47.     The Bombardier defendants, and each of them, were aware at all times material hereto that their engines were so unreliably designed, built, and manufactured that a sudden stoppage could, without any degree of predictability, occur.

48.     Defendants knew that ultralight aircraft in which their engines are installed fly in airspace that is regulated by the Federal Aviation Administration.

49.     Defendants knew, because they produced a certified aircraft engine, that the Federal Aviation Administration would never allow the use of such an unreliable powerplant in an aircraft.

50.     Defendants knew that the Ultralight Aircraft Association had obtained certain variances from the Federal Aviation Administration that allowed aircraft manufactured or assembled by its members to be exempt from certain, but not all, Federal Aviation Regulations.

51.     Notwithstanding the above, defendants knew that by their conduct they would be allowing persons in the position of plaintiffs' decedents to occupy aircraft

- 14 -

powered by an engine that had no acceptable reliability testing and had no level of reliability, and which could otherwise not be used in aircraft that were certified for flight.

52.    Notwithstanding that knowledge, the fact that the engine was unreliable, and the fact that it could not be predicted when the engine would suddenly fail, resulting in an emergency, serious personal injury, and death, defendants sold this powerplant for use in aircraft.

53.    The unreliability of the engines and their lack of suitability for use in aircraft application was material information not known to members of the flying public or to plaintiffs' decedents or to persons in the position of plaintiffs' decedents and concealed by defendants.

54.    In the face of this actual knowledge of a danger unknown to others, defendants not only sold the powerplant for use in aircraft, but engaged in a scam of deceit, designed to assure that any owner or operator would assume a legal risk of injury or death caused by defendants' defective and dangerous engine by publicly promoting their product through oral and written misrepresentation in trade publications and trade shows for at least the last ten years.

55.    Notwithstanding actual knowledge that the engines were completely unsuitable for use in aircraft, defendants nevertheless sold the engines for use in aircraft, knowing that the unpredictable failure rate of the engine would result in serious personal injury or death, and attempted instead to conceal the danger and pass along liability for the defective engine by making purported disclaimers to the effect that there was an inherent risk in using Rotax engines in aircraft and that operators of aircraft equipped with their engine assumed any and all risk relating to such use, knowing that aircraft manufacturers

and owners would never take such alleged disclaimers seriously to the extent they were even aware of same.

56.    Defendants knew that the efforts to disclaim liability were a scam, and were fraudulent and deceitful in that they would go only to the owner and/or manufacturer of the aircraft, but not to any passenger or other person who was not an owner and/or manufacturer of the aircraft.

57.    Defendants engaged in a deliberate attempt to artificially impose knowledge upon people who were uninformed of something that was unpredictable and unpreventable, when the defendants knew at all times that by selling and marketing the engine for use in aircraft, they were diminishing and eliminating the effectiveness of any alleged warnings or disclaimers provided.

58.    Defendants were deceitfully, fraudulently, and with the intent to mislead selling an engine for use in aircraft that by the sale itself implied that any warnings and disclaimers were not true or not to be regarded by aircraft manufacturers or owners.

59.    Notwithstanding the foregoing, plaintiffs had no warning, nor were any steps taken to provide plaintiffs with a warning, of the unreliability and unpredictability of sudden stoppage of the engine.

60.    As a result of the false, fraudulent, and deceitful conduct of the defendants, the engines were marketed and sold for use in aircraft, and ultralight aircraft manufacturers and owners flew these aircraft, which in this instance resulted in a crash and the deaths of plaintiffs' decedents.

61.    Plaintiffs' decedents did not know that the engines were unsuitable for use in aircraft nor did they know of any purported disclaimers and warnings and relied on the

absence of any contrary information in justifiably flying the accident aircraft on July 22, 2000, and had they known of the lack of suitability of the engines, they would not have flown the accident aircraft.

62.    The conduct of defendants in exposing plaintiffs' decedents, persons on the ground below, and those who were unaware of the lack of unreliability and unsuitability of the engine for aircraft to serious personal injury or death was a substantial factor in the happening of the accident and the fatal injuries suffered by plaintiffs' decedents, and is outrageous, wanton, and unjustified behavior, entitling plaintiffs to punitive damages.

WHEREFORE, plaintiffs pray for judgment against the Bombardier defendants in an amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00), exclusive of interest and costs, and for punitive damages in an amount to be determined at trial.

## COUNT IV

### Breach of Warranty

#### *Plaintiffs v. The Bombardier Defendants*

63.    Plaintiffs incorporate by reference paragraphs 1 through 62 as though set forth at length herein.

64.    The Bombardier defendants are now, and were at all times material hereto, merchants engaged in the business of selling aircraft engines, including the engine used on the accident aircraft.

65.    The Bombardier defendants described and advertised the accident aircraft engine for use by ultralight manufacturers.

66.    Such descriptions and advertisements included, but were not limited to, advertising, Internet publications on various websites, information in brochures, specification sheets, and other product statements, which resulted in express warranties that the accident aircraft engine and components were safe for their intended use, notwithstanding any other purported disclaimers to the contrary.

67.    By selling defective goods, the Bombardier defendants have breached their express warranties that the aircraft engine and its components were safe for their intended use, notwithstanding any other purported disclaimers to the contrary.

68.    There also arose, by operation of law, certain implied warranties of merchantability and that the engines were fit for their intended purpose; to wit, safe flight.

69.    The Bombardier defendants breached those implied warranties in that the engines were neither of a fair or average quality or fit for their intended purpose, but instead, were defective and dangerous for the reasons aforementioned.  By filing this lawsuit, plaintiffs have provided reasonable notice to the defendants that they have breached their express warranties, and any disclaimers and limitations of the above warranties constitute bad faith in commercial dealing, are unconscionable, and cause the said warranties to fail their essential purpose.

70.    The aforementioned breaches of warranties by these defendants were a direct and proximately caused the crash of the accident aircraft, and the deaths of plaintiffs' decedents, as enumerated herein.

WHEREFORE, plaintiffs pray for judgment against the Bombardier defendants in an amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00), exclusive of interest and costs, and for punitive damages in an amount to be determined at trial.

- 18 -

## COUNT VIII

### Negligence

### *Plaintiffs v. The Energy Company Defendants*

71.     Plaintiffs incorporate by reference paragraphs 1 through 70 as though set forth at length herein.

72.     The energy company defendants, and each of them, owed a duty to exercise reasonable care with respect to certain power lines each maintained.

73.     The negligence of these defendants, in breach of their respective duties of care, consisted of the following:

        a.     failing to comply with the Federal Aviation Regulations with respect to identification and marking of power lines;

        b.     failing to comply with industry standards with respect to the identification and marking of power lines;

        c.     failing to exercise reasonable care and judgment with respect to the marking of power lines in close proximity to an airport;

        d.     failing to comply with custom and usage in the industry for marking of power lines in close proximity to an airport;

        e.     failing to comply with the regulatory requirements, suggestions and recommendations of Governmental authorities with respect to the marking of power lines in close proximity to an airport;

        f.     failing to heed warnings from industry and trade sources with respect to the importance of the marking of power lines in close proximity to an airport;

g.      failing to exercise reasonable care with respect to the ownership, maintenance and control of power lines;

h.      failing to heed warnings from their own experience with regard to aircraft wire strike accidents to ensure that those power lines in close proximity to an airport are marked so as to preclude impacts between aircraft and power lines;

i.      otherwise violating the obligations of an owner, maintainer or lessee of power lines to mark them in the vicinity of an airport; and

j.      failing to advise agents, successors, assigns, employees and others that the power lines in close proximity to the York County Airport were unmarked.

74.    As a direct and proximate consequence of these defendants' failure to mark the power lines in close proximity to an airport and breach of their duty of care, the power lines were not seen by plaintiffs' decedents, and the aircraft came in contact with them, resulting in the aircraft going out of control and crashing to the ground, killing plaintiffs' decedent.

WHEREFORE, plaintiffs pray for judgment against the Energy Company defendants in an amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00), exclusive of interest and costs, and for punitive damages in an amount to be determined at trial.

WOLK & GENTER

By: _____
        Arthur Alan Wolk, Esquire
        Christopher J. Cerski, Esquire
        1710-12 Locust Street
        Philadelphia, PA 19103
        (215) 545-4220
        Attorneys for Plaintiffs

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA (Philadelphia)

| | |
|---|---|
| **Plaintiffs** | : |
| ---------------------------- | : CIVIL ACTION NO.: 2:02-cv-04852- |
| | : (BMS) |
| THERESA MARIE SIMEONE, et al., | : |
| | : |
| v. | : **ANSWER TO FIRST AMENDED** |
| | : **COMPLAINT, CROSS-CLAIMS** |
| **Defendants** | : **AND JURY DEMAND ON BEHALF** |
| ---------------------------- | : **OF BOMBARDIER INC.** |
| | : |
| BOMBARDIER-ROTAX GmbH, et al ., | : |
| | : |
| | : |
| | : |

Defendant, Bombardier Inc., doing business at 1061 Parent St., St. Bruno, Quebec,

Canada, by way of Answer to the First Amended Complaint alleges and says:

## THE PARTIES

1.    Defendant is without knowledge or information sufficient to form a belief as to

the truth of the allegation contained in Paragraph 1.

2.    Defendant is without knowledge or information sufficient to form a belief as to

the truth of the allegation contained in Paragraph 2.

3.    Defendant makes no response to the allegations contained in Paragraph 3, as the

allegations are not directed to this defendant except that any inferences contained

therein against this defendant are denied.

4.    Admitted in part, denied in part.  Bombardier Inc. admits that it is a corporation

organized and existing under the laws of Canada with a principal place of

business in Montreal, Quebec, Canada.    Bombardier Inc. denies that it is a

"partner and in partnership and/or is doing business as Rotax and/or Bombardier-Rotax and/or as Bombardier Group".   Defendant Bombardier Inc. admits that there exist divisions at Bombardier Inc. that are known as "Bombardier Motorized Consumer Products Group" and "Bombardier Recreational Products". Bombardier Inc. denies that it is "trading as the joint venture Bombardier-Rotax". Defendant Bombardier Inc. is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 4.

5.    Defendant makes no response to the allegations contained in Paragraph 5 as the allegations are not directed to this defendant except that any inferences contained therein against this defendant are denied.

6.    Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6.

7.    Defendant makes no response to the allegations contained in Paragraph 7 as the allegations are not directed to this defendant except that any inferences contained therein against this defendant are denied.

8.    Defendant makes no response to the allegations contained in Paragraph 8 as the allegations are not directed to this defendant except that any inferences contained therein against this defendant are denied.

9.    Defendant makes no response to the allegations contained in Paragraph 9 as the allegations are not directed to this defendant except that any inferences contained therein against this defendant are denied.

289547.1

## JURISDICTION AND VENUE

10.     Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 10.

11.     Defendant denies the allegations contained in Paragraph 11.

12.     Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 12.

13.     Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 13

## BACKGROUND

14.     Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 14.

15.     Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 15.

16.     Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16 except to deny that Bombardier Inc. is in the "business of designing, manufacturing, selling, distributing and/or providing troubleshooting and product support for Rotax engines used in ultralight aircraft."

17.     Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 17.

18.     Defendant denies the allegations contained in Paragraph 18.

19.     Defendant denies the allegations contained in Paragraph 19.

20.     Defendant denies the allegations contained in Paragraph 20.

289547.1

21.     Defendant denies the allegations contained in Paragraph 21.

22.     Defendant denies the allegations contained in Paragraph 22.

23.     Defendant denies the allegations contained in Paragraph 23.

24.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegation contained in Paragraph 24.

25.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegation contained in Paragraph 25.

26.     Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26.

27.     Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27.

28.     Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28.

29.     Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29.

30.     Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 30.

## THEORIES OF RECOVERY

## COUNT I

## (STRICT LIABILITY)

### PLAINTIFFS V. THE BOMBARDIER DEFENDANTS

31.    Defendant, Bombardier Inc. repeats its response to each and every allegation contained in Paragraphs 1 through 30 as if same were fully set forth herein at length.

32.    Defendant denies the allegations contained in Paragraph 32.

33.    Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 33.

34.    Defendant denies the allegations contained in Paragraph 34.

35.    Defendant denies the allegations contained in Paragraph 35.

36.    Defendant denies the allegations contained in Paragraph 36.

37.    Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 37.

38.    Defendant denies the allegations contained in Paragraph 38.

## COUNT II

## NEGLIGENCE

### PLAINTIFFS V. THE BOMBARDIER DEFENDANTS

39.    Defendant, Bombardier Inc. repeats its response to each and every allegation contained in Paragraphs 1 through 38 as if same were fully set forth herein at length.

- 5 -

289547.1

40.    Defendant denies the allegations contained in Paragraph 40.

41.    Defendant denies the allegations contained in Paragraph 41.

42.    Defendant denies the allegations contained in Paragraph 42.

43.    Defendant denies the allegations contained in Paragraph 43.

44.    Defendant denies the allegations contained in Paragraph 44.

45.    Defendant denies the allegations contained in Paragraph 45.

## COUNT III

### (RECKLESS, WILLFUL AND WANTON MISCONDUCT, FRAUD AND DECEIT)

### PLAINTIFFS V. THE BOMBARDIER DEFENDANTS

46.    Defendant, Bombardier Inc. repeats its response to each and every allegation
contained in Paragraphs 1 through 45 as if same were fully set forth herein at
length.

47.    Defendant denies the allegations contained in Paragraph 47.

48.    Defendant is without knowledge and information sufficient to form a belief as to
the truth of the allegations contained in Paragraph 48.

49.    Defendant is without knowledge and information sufficient to form a belief as to
the truth of the allegations contained in Paragraph 49.

50.    Defendant is without knowledge and information sufficient to form a belief as to
the truth of the allegations contained in Paragraph 50.

51.    Defendant denies the allegations contained in Paragraph 51.

52.    Defendant denies the allegations contained in Paragraph 52.

53.    Defendant denies the allegations contained in Paragraph 53.

54.    Defendant denies the allegations contained in Paragraph 54.

289547.1

55.    Defendant denies the allegations contained in Paragraph 55.

56.    Defendant denies the allegations contained in Paragraph 56.

57.    Defendant denies the allegations contained in Paragraph 57.

58.    Defendant denies the allegations contained in Paragraph 58.

59.    Defendant denies the allegations contained in Paragraph 59.

60.    Defendant denies the allegations contained in Paragraph 60.

61.    Defendant denies the allegations contained in Paragraph 61.

62.    Defendant denies the allegations contained in Paragraph 62.

## COUNT IV

## (BREACH OF WARRANTY)

## PLAINTIFFS V. THE BOMBARDIER DEFENDANTS

63.    Defendant, Bombardier Inc. repeats its response to each and every allegation contained in Paragraphs 1 through 62 as if same were fully set forth herein at length.

64.    Defendant denies the allegations contained in Paragraph 64.

65.    Defendant denies the allegations contained in Paragraph 65.

66.    Defendant denies the allegations contained in Paragraph 66.

67.    Defendant denies the allegations contained in Paragraph 67.

68.    Defendant denies the allegations contained in Paragraph 68.

69.    Defendant denies the allegations contained in Paragraph 69.

70.    Defendant denies the allegations contained in Paragraph 70.

## COUNT VIII (sic)

## NEGLIGENCE

## PLAINTIFFS V. THE ENERGY COMPANY DEFENDANTS

71.    Defendant, Bombardier Inc. repeats its response to each and every allegation contained in Paragraphs 1 through 70 as if same were fully set forth herein at length.

72.    Defendant makes no response to the allegations contained in Paragraph 72 as the allegations are not directed to this defendant except that any inferences contained therein against this defendant are denied.

73.    Defendant makes no response to the allegations contained in Paragraph 73 as the allegations are not directed to this defendant except that any inferences contained therein against this defendant are denied.

74.    Defendant makes no response to the allegations contained in Paragraph 74 as the allegations are not directed to this defendant except that any inferences contained therein against this defendant are denied.

## SEPARATE DEFENSES

1.    Plaintiffs' decedents were guilty of contributory negligence.

2.    Plaintiffs' claims are barred, or in the alternative, the damages to which plaintiffs are entitled must be reduced under the doctrine of comparative negligence.

3.    Plaintiffs' complaint is barred due to the Court's lack of jurisdiction over the subject matter.

- 8 -

289547.1

4.      Plaintiffs' complaint is barred due to the Court's lack of jurisdiction over the person.

5.      Plaintiffs' complaint is barred by improper venue.

6.      Plaintiffs' complaint is barred due to the insufficiency of service of process.

7.      Plaintiffs' complaint fails to state a cause of action upon which relief may be granted.

8.      The complained of occurrence was caused by third parties over whom defendant had no control.

9.      The damages alleged were the result of unforeseeable intervening or superseding acts of others independent of defendant which bars plaintiffs' cause of action.

10.      Any product furnished, manufactured, supplied, installed, repaired or sold by defendant was fit for the use intended and any damage sustained by Plaintiffs was caused in whole or in part by the misuse and/or alteration or modification of said product.

11.      Plaintiffs' claims are barred by virtue of the state of the art in manufacturing process.

12.      Plaintiffs have failed to give proper and prompt notice of any alleged breach of warranty to this answering defendant and accordingly any claims based on breach of warranty are barred according to the provisions of the Uniform Commercial Code.

13.      The punitive damage claims are unconstitutional under the due process clauses of the United States and Pennsylvania Constitutions.

14.      Plaintiffs' complaint is barred due to assumption of risk.

- 9 -

15.    Plaintiffs' claims are barred inasmuch as the characteristics of the product at issue are open and obvious.

16.    Plaintiffs' claims are barred inasmuch as plaintiffs' decedents were adequately warned and/or instructed of unavoidably unsafe aspects, if any, of the product at issue.

17.    The injuries and/or damages, if any, sustained by plaintiffs were caused solely or in part by the negligence of plaintiffs' decedent, which negligence, along with the Pennsylvania Comparative Negligence Act (42 Pa. C.S.A. §7102) bars or limits Plaintiffs' recovery on the claim set forth in Plaintiffs' First Amended Complaint.

## CROSSCLAIM FOR CONTRIBUTION

Defendant, Bombardier Inc., by way of crossclaim for contribution against all co-defendants alleges and says:

1.    Defendant denies any and all legal liability and responsibility for the acts alleged in the First Amended Complaint.

2.    If Defendant should be found liable to Plaintiffs, which liability is denied, Defendant asserts that all co-defendants except, Bombardier-Rotax GmbH Motorenfabrik and Bombardier Corporation, herein are joint tortfeasors with respect to any loss, liability or expense on account of Plaintiffs' demand for judgment.

WHEREFORE, Defendant, Bombardier Inc. demands judgment for contribution against all co-defendants except Bombardier-Rotax GmbH Motorenfabrik and Bombardier Corporation.

## CROSSCLAIM FOR INDEMNIFICATION

Defendant, Bombardier Inc., by way of crossclaim for indemnification against co-defendants alleges and says:

- 10 -

289547.1

1.    Defendant denies any and all legal liability and responsibility for the acts alleged in the First Amended Complaint.

2.    If Defendant should be found liable to Plaintiffs herein, which liability is denied, said liability will only be secondary, passive, technical, vicarious, or imputed and the liability of all co-defendants except, Bombardier-Rotax GmbH Motorenfabrik and Bombardier Corporation, herein is primary, active and direct.

Wherefore, Defendant Bombardier Inc. demands judgment against co-defendants except Bombardier Rotax-GmbH Motorenfabrik and Bombardier Corporation, herein for indemnification in full with respect to any damages, which may be recovered against Defendant, Bombardier Inc., by Plaintiffs herein together.

## ANSWER TO CROSSCLAIM FOR CONTRIBUTION AND INDEMNIFICATION

Defendant, Bombardier Inc., by way of answer to crossclaim for contribution and indemnification heretofore asserted by any co-defendant herein or which any co-defendant shall hereinafter assert or third party defendant herein says:

1.    Defendant denies each and every allegation of each such crossclaim and further denies liability in any way to any co-defendant or third party defendant herein.

2.    Defendant hereby incorporates by way of reference and asserts each and every separate defense that earlier appears in this pleading as a separate defense to the claims of Plaintiffs herein.

WHEREFORE, Defendant Bombardier Inc. demands that the Crossclaims be dismissed with prejudice and without costs.

- 11 -

## DEMAND FOR TRIAL BY JURY

Defendant demands trial by jury on all issues.

## DESIGNATION OF TRIAL COUNSEL

Robert J. Kelly is hereby designated as trial counsel.

**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP**
Attorneys for Defendant Bombardier Inc.

By: _____
**Jonathan Dryer, Esquire**
**Identification No. 34496**
Independence Square West
The Curtis Center, Suite 1130 East
Philadelphia, Pennsylvania 19106

- and -

Robert J. Kelly, Esquire
33 Washington Street, 18th Floor
Newark, New Jersey 07102

DATED:

- 12 -

## CERTIFICATION OF MAILING

I, Jonathan Dryer, certify as follows:

I am a member of the firm of Wilson, Elser, Moskowitz, Edelman & Dicker, LLP attorneys for Defendant, Bombardier Inc., in the within matter. I made service of the within Answer and Jury Demand via Regular Mail on behalf of the herein named Defendant upon all parties and where represented, on counsel as listed in the attached service list.

I certify that the original of the within Answer and Jury Demand was forwarded to the Clerk, United States District Court, Eastern District of Pennsylvania, on this same date, by First Class Mail, Postage Prepaid.

I further certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
Jonathan Dryer, Esq.

Dated:

289547.1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA (Philadelphia)

| | |
|---|---|
| **Plaintiffs** : | CIVIL ACTION NO.: 2:02-cv-04852-(BMS) |
| ----------------------------- : | |
| : | |
| THERESA MARIE SIMEONE, et al., : | |
| : | |
| v. : | **ANSWER TO FIRST AMENDED** |
| : | **COMPLAINT, CROSS-CLAIMS** |
| **Defendants** : | **AND JURY DEMAND ON BEHALF** |
| ----------------------------- : | **OF DEFENDANT BOMBARDIER** |
| : | **CORPORATION** |
| BOMBARDIER-ROTAX GmbH, et al ., : | |
| : | |
| : | |

Defendant, Bombardier Corporation, doing business at 300 North 6th Street, Boise, Idaho, 83701, by way of Answer to the First Amended Complaint alleges and says:

## THE PARTIES

1.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegation contained in Paragraph 1.

2.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegation contained in Paragraph 2.

3.    Defendant makes no response to the allegations contained in Paragraph 3, as the allegations are not directed to this defendant except that any inferences contained therein against this defendant are denied.

4.    Defendant makes no response to the allegations contained in Paragraph 4, as the allegations are not directed to this defendant except that any inferences contained therein against this defendant are denied.

5.    Admitted in part, denied in part. It is admitted Bombardier Corporation is a corporation. It is denied that Bombardier Corporation conducts business at the present, is a Canadian corporation, or has an office in Philadelphia, Pennsylvania. To the contrary, Bombardier Corporation is a corporation organized and existing under the laws of the State of Idaho and has no office in Philadelphia or anywhere else in Pennsylvania.

6.    Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6.

7.    Defendant makes no response to the allegations contained in Paragraph 7 as the allegations are not directed to this defendant except that any inferences contained therein against this defendant are denied.

8.    Defendant makes no response to the allegations contained in Paragraph 8 as the allegations are not directed to this defendant except that any inferences contained therein against this defendant are denied.

9.    Defendant makes no response to the allegations contained in Paragraph 9 as the allegations are not directed to this defendant except that any inferences contained therein against this defendant are denied.

**JURISDICTION AND VENUE**

10.    Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 10.

11.    Defendant denies the allegations contained in Paragraph 11.

12.    Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 12.

256166.4

13.     Defendant is without knowledge and information sufficient to form a belief as to

the truth of the allegations contained in Paragraph 13

## BACKGROUND

14.     Defendant is without knowledge and information sufficient to form a belief as to

the truth of the allegations contained in Paragraph 14.

15.     Defendant is without knowledge and information sufficient to form a belief as to

the truth of the allegations contained in Paragraph 15.

16.     Defendant is without knowledge and information sufficient to form a belief as to

the truth of the allegations contained in Paragraph 16 except to deny that

Bombardier Corporation is in the "business of designing, manufacturing, selling,

distributing and/or providing troubleshooting and product support for Rotax

engines used in ultralight aircraft."

17.     Defendant is without knowledge and information sufficient to form a belief as to

the truth of the allegations contained in Paragraph 17.

18.     Defendant denies the allegations contained in Paragraph 18.

19.     Defendant denies the allegations contained in Paragraph 19.

20.     Defendant denies the allegations contained in Paragraph 20.

21.     Defendant denies the allegations contained in Paragraph 21.

22.     Defendant denies the allegations contained in Paragraph 22.

23.     Defendant denies the allegations contained in Paragraph 23.

24.     Defendant is without knowledge or information sufficient to form a belief as to

the truth of the allegation contained in Paragraph 24.

256166.4

25.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegation contained in Paragraph 25.

26.  Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26.

27.  Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27.

28.  Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28.

29.  Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29.

30.  Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 30.

## THEORIES OF RECOVERY

## COUNT I

## (Strict Liability)

## Plaintiffs v. The Bombardier Defendants

31.  Defendant, Bombardier Corporation repeats its response to each and every allegation contained in Paragraphs 1 through 30 as if same were fully set forth herein at length.

32.  Defendant denies the allegations contained in Paragraph 32.

33.  Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 33.

34.  Defendant denies the allegations contained in Paragraph 34.

- 4 -

35.    Defendant denies the allegations contained in Paragraph 35.

36.    Defendant denies the allegations contained in Paragraph 36.

37.    Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 37.

38.    Defendant denies the allegations contained in Paragraph 38.

## COUNT II

### Negligence

### Plaintiffs v. The Bombardier Defendants

39.    Defendant, Bombardier Corporation repeats its response to each and every allegation contained in Paragraphs 1 through 38 as if same were fully set forth herein at length.

40.    Defendant denies the allegations contained in Paragraph 40.

41.    Defendant denies the allegations contained in Paragraph 41.

42.    Defendant denies the allegations contained in Paragraph 42.

43.    Defendant denies the allegations contained in Paragraph 43.

44.    Defendant denies the allegations contained in Paragraph 44.

45.    Defendant denies the allegations contained in Paragraph 45.

## COUNT III

### (Reckless, Willful and Wanton Misconduct, Fraud and Deceit)

### Plaintiffs v. The Bombardier Defendants

46.    Defendant, Bombardier Corporation repeats its response to each and every allegation contained in Paragraphs 1 through 45 as if same were fully set forth herein at length.

256166.4

47.    Defendant denies the allegations contained in Paragraph 47.

48.    Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 48.

49.    Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 49.

50.    Defendant is without knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 50.

51.    Defendant denies the allegations contained in Paragraph 51.

52.    Defendant denies the allegations contained in Paragraph 52.

53.    Defendant denies the allegations contained in Paragraph 53.

54.    Defendant denies the allegations contained in Paragraph 54.

55.    Defendant denies the allegations contained in Paragraph 55.

56.    Defendant denies the allegations contained in Paragraph 56.

57.    Defendant denies the allegations contained in Paragraph 57.

58.    Defendant denies the allegations contained in Paragraph 58.

59.    Defendant denies the allegations contained in Paragraph 59.

60.    Defendant denies the allegations contained in Paragraph 60.

61.    Defendant denies the allegations contained in Paragraph 61.

62.    Defendant denies the allegations contained in Paragraph 62.

## COUNT IV

### (Breach of Warranty)

### Plaintiffs v. The Bombardier Defendants

63.    Defendant, Bombardier Corporation repeats its response to each and every allegation contained in Paragraphs 1 through 62 as if same were fully set forth herein at length.

64.    Defendant denies the allegations contained in Paragraph 64.

65.    Defendant denies the allegations contained in Paragraph 65.

66.    Defendant denies the allegations contained in Paragraph 66.

67.    Defendant denies the allegations contained in Paragraph 67.

68.    Defendant denies the allegations contained in Paragraph 68.

69.    Defendant denies the allegations contained in Paragraph 69.

70.    Defendant denies the allegations contained in Paragraph 70.

## COUNT VIII (sic)

### Negligence

### Plaintiffs v. The Energy Company Defendants

71.    Defendant, Bombardier Corporation repeats its response to each and every allegation contained in Paragraphs 1 through 70 as if same were fully set forth herein at length.

72.    Defendant makes no response to the allegations contained in Paragraph 72 as the allegations are not directed to this defendant except that any inferences contained therein against this defendant are denied.

256166.4

73.     Defendant makes no response to the allegations contained in Paragraph 73 as the allegations are not directed to this defendant except that any inferences contained therein against this defendant are denied.

74.     Defendant makes no response to the allegations contained in Paragraph 74 as the allegations are not directed to this defendant except that any inferences contained therein against this defendant are denied.

## SEPARATE DEFENSES

1.     Plaintiffs' decedents were guilty of contributory negligence.

2.     Plaintiffs' claims are barred, or in the alternative, the damages to which plaintiffs are entitled must be reduced under the doctrine of comparative negligence.

3.     Plaintiffs' complaint is barred due to the Court's lack of jurisdiction over the subject matter.

4.     Plaintiffs' complaint is barred due to the Court's lack of jurisdiction over the person.

5.     Plaintiffs' complaint is barred by improper venue.

6.     Plaintiffs' complaint is barred due to the insufficiency of service of process.

7.     Plaintiffs' complaint fails to state a cause of action upon which relief may be granted.

8.     The complained of occurrence was caused by third parties over whom defendant had no control.

9.     The damages alleged were the result of unforeseeable intervening or superseding acts of others independent of defendant which bars plaintiffs' cause of action.

- 8 -

256166.4

10.    Any product furnished, manufactured, supplied, installed, repaired or sold by defendant was fit for the use intended and any damage sustained by Plaintiffs was caused in whole or in part by the misuse and/or alteration or modification of said product.

11.    Plaintiffs' claims are barred by virtue of the state of the art in manufacturing process.

12.    Plaintiffs have failed to give proper and prompt notice of any alleged breach of warranty to this answering defendant and accordingly any claims based on breach of warranty are barred according to the provisions of the Uniform Commercial Code.

13.    The punitive damage claims are unconstitutional under the due process clauses of the United States and Pennsylvania Constitutions.

14.    Plaintiffs' complaint is barred due to assumption of risk.

15.    Plaintiffs' claims are barred inasmuch as the characteristics of the product at issue are open and obvious.

16.    Plaintiffs' claims are barred inasmuch as plaintiffs' decedents were adequately warned and/or instructed of unavoidably unsafe aspects, if any, of the product at issue.

17.    The injuries and/or damages, if any, sustained by plaintiffs were caused solely or in part by the negligence of plaintiffs' decedent, which negligence, along with the Pennsylvania Comparative Negligence Act (42 Pa. C.S.A. §7102) bars or limits Plaintiffs' recovery on the claim set forth in Plaintiffs' First Amended Complaint.

## CROSSCLAIM FOR CONTRIBUTION

Defendant, Bombardier Corporation, by way of crossclaim for contribution against all co-defendants alleges and says:

1.    Defendant denies any and all legal liability and responsibility for the acts alleged in the First Amended Complaint.

2.    If Defendant should be found liable to Plaintiffs, which liability is denied, Defendant asserts that all co-defendants except, Bombardier-Rotax GmbH Motorenfabrik and Bombardier Inc.,  herein are joint tortfeasors with respect to any loss, liability or expense on account of Plaintiffs' demand for judgment.

WHEREFORE, Defendant, Bombardier Corporation, demands judgment for contribution against all co-defendants except Bombardier-Rotax GmbH  Motorenfabrik and Bombardier Inc.

## CROSSCLAIM FOR INDEMNIFICATION

Defendant, Bombardier Corporation, by way of crossclaim for indemnification against co-defendants alleges and says:

1.    Defendant denies any and all legal liability and responsibility for the acts alleged in the First Amended Complaint.

2.    If Defendant should be found liable to Plaintiffs herein, which liability is denied, said liability will only be secondary, passive, technical, vicarious, or imputed and the liability of all co-defendants except, Bombardier-Rotax GmbH Motorenfabrik and Bombardier Inc., herein is primary, active and direct.

Wherefore, Defendant, Bombardier Corporation, demands judgment against co-defendants except Bombardier Rotax-GmbH Motorenfabrik and Bombardier Inc., herein for

- 10 -

indemnification in full with respect to any damages, which may be recovered against Defendant, Bombardier Corporation, by Plaintiffs herein together.

## ANSWER TO CROSSCLAIM FOR CONTRIBUTION AND INDEMNIFICATION

Defendant, Bombardier Corporation, by way of answer to crossclaim for contribution and indemnification heretofore asserted by any co-defendant herein or which any co-defendant shall hereinafter assert or third party defendant herein says:

1.    Defendant denies each and every allegation of each such crossclaim and further denies liability in any way to any co-defendant or third party defendant herein.

2.    Defendant hereby incorporates by way of reference and asserts each and every separate defense, which earlier appears in this pleading as a separate defense to the claims of Plaintiffs herein.

WHEREFORE, Defendant, Bombardier Corporation, demands that the Crossclaims be dismissed with prejudice and without costs.

## DEMAND FOR TRIAL BY JURY

Defendant demands trial by jury on all issues.

## DESIGNATION OF TRIAL COUNSEL

Robert J. Kelly is hereby designated as trial counsel.

**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP**
Attorneys for Defendant Bombardier Corporation

By:    _____
       **Jonathan Dryer, Esquire**
       **Identification No. 34496**
       Independence Square West
       The Curtis Center, Suite 1130 East

- 11 -

Philadelphia, Pennsylvania 19106
- and -

Robert J. Kelly, Esquire
33 Washington Street, 18th Floor
Newark, New Jersey 07102

DATED:

256166.4

## CERTIFICATION OF MAILING

I, Jonathan Dryer, certify as follows:

I am a member of the firm of Wilson, Elser, Moskowitz, Edelman & Dicker, LLP attorneys for Defendant, Bombardier Corporation, in the within matter. I made service of the within Answer and Jury Demand via Regular Mail on behalf of the herein named Defendant upon all parties and where represented, on counsel as listed in the attached service list.

I certify that the original of the within Answer and Jury Demand was forwarded to the Clerk, United States District Court, Eastern District of Pennsylvania, on this same date, by First Class Mail, Postage Prepaid.

I further certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
Jonathan Dryer, Esq.

Dated:

256166.4

**EXHIBIT C**

196018.1

# REPORT OF EXAMINATION
## MADE FOR

# THE WOLK LAW FIRM
# 1710-12 LOCUST STREET
# PHILADELPHIA PA. 19103

### IN THE MATTER OF

# SIMEONE vs. BOMBARDIER-ROTAX

MANUEL RAEFSKY
17851 N SILVERGATE COURT
SURPRISE AZ, 85374
623-214-8267

IN THE MATTER OF SIMEONE Vs. BOMBARDIER-ROTAX

## HISTORY

It was reported that on July 22nd, 2000, Mr. Robert F. Simeone, piloting an ultra-light aircraft, and a passenger, Mr. George J. Lengyel, Jr., were approaching the York Pennsylvania airport, for what was apparently a fuel stop. Both men were part of a two flight formation that had departed southeastern Pennsylvania, enroute to the Chambersburg Air Show. According to Mr. William Losey, the pilot of the second aircraft, the pair refueled several times during the flight. The formation unexpectedly encountered headwinds, which forced them to refuel at the Thomasville Airport. Mr. Losey stated that he was able to land successfully, but that he was certain that his companions did not land safely, and as a result, he contacted the airport manager, a Mr. Rich Fuess. Mr. Fuess reported that he contacted the Civil Air Patrol, who dispatched a search plane.

The continuing investigation into the whereabouts of the missing aircraft fell under the jurisdiction of Detective Joseph Yatsko, who at the time was a member of the Jackson Township Police Department. He requested and received a helicopter search of the area, which located the missing aircraft in a cornfield southeast of the airport runway, just north of KBS road, and estimated to be approximately 300 feet from power lines that reportedly ran parallel to the runway. The impact area was associated with crushed corn stalks, and there was a strong odor of fuel in the area. Both occupants of the aircraft were found deceased at the site of the crash, and the coroner later concluded that the men perished on impact.

Detective Yatsko secured the area, and notified the FAA and the NTSB regarding the crash. Detective Yatsko was instructed by Chief Ruff that the Federal agencies would not be conducting the investigation, and that he was to take charge.

In interviewing the airport manager, Detective Yatsko reported that Mr. Fuess stated that the plane was forced into a missed approach due to complications at the airport, and had to circle west, then south to line up another landing attempt. He further stated that the plane never returned. Later in the interview, Detective Yatsko related that Mr. Fuess stated that there were two missed approaches, and that the plane banked east. Detective Yatsko felt that this confirmed the final location of the crash site, which was southeasterly of the runway. Finally,

Detective Yatsko secured the plane and had it removed by placing the wreakage on a "roll-back" and taken to the Old Forge Service Station.

During his investigation, Detective Yatsko concluded that the aircraft might have clipped the power line and that the propeller was turning at impact. He based his conclusions on the presence of scuff marks on the pilot's canopy, which later went missing, and the swath in the corn field. Also during his investigation, he related that Mr. Don Warner of Old Forge told him that the engine had "not seized, maintained compression," which he took to indicate that the aircraft engine was running at the time.

As a result of the crash, and the resulting deaths, it was requested that the recovered portions of the aircraft and the engine be examined to determine the nature and cause of the crash.

## EXAMINATION

The structural portions of the wreakage, along with the disassembled engine, were examined at the facilities of Anglin Aircraft Recovery Services on June 24th, 2005. The wreakage was laid out in the approximate pre-impact configuration, as shown in Enclosure 1. The fabric covered wings sustained extensive tearing of the fabric, along with bending of the tubing, such as that shown in Enclosure 2, as a typical example. The cockpit floor, instrument panel, and seating exhibited crush damage, as shown in Enclosures 3, 4, and 5, respectively. As can be seen, the nose gear had separated from the frame, as shown in Enclosure3. The landing main landing gear and it's mounting support box structure, shown in Enclosure 6, was separated from the rest of the fuselage. The fractures of the forward and aft tubular attachments, shown in Enclosures 7 and 8 respectively, revealed bending overload fracture modes, indicative of failure on ground impact. The boom and vertical and horizontal stabilizers are shown in Enclosure 9. The fractures of the tail boom and the internal control rods also exhibited bending overload failures, as shown in Enclosure 10. The wing spar attachment points exhibited overload fractures, as shown in Enclosures 11 and 12.

The engine had previously been partially disassembled at the time of this examination, and is shown in Enclosure 13. An identification tag, shown in Enclosure 14, identified the engine as having been manufactured by Bombardier-Rotax, Type 582 Motor Number 5305907, a two cylinder, two cycle engine, typical of ultra-light aircraft engines.

The cylinders and their respective hardware, bearings, wrist pins, locking rings and pins, and miscellaneous hardware were segregated in labeled bags for identification purposes. The two cylinders, pistons, and accompanying hardware were identified as either "mag" or "pto," referring to the aft and forward cylinders respectively.

The two pistons are shown in Enclosure 15 for comparison purposes, and individually in greater detail in Enclosures 16 and 17. Examination revealed that both rings on both pistons were essentially undamaged and moved freely. However, a thick baked on coating of carbonized oil was apparent on both piston heads. This engine was reported to have approximately 38 hours time since new, so this accumulation of carbonaceous material was considered unusual, and symptomatic of an improperly running engine.

The cylinder head condition, top and interior, is shown in Enclosures 18 and 19 respectively. Note also the spark plug locations of plugs 1, 2, 3, and 4, shown on Enclosure 18. Details of each cylinder head are shown in Enclosures 19 and 20. Each head revealed a build-up of burnt and caked oil, and carbonized particles in the spark plug hole threads, again indicating an improperly running engine.

The spark plugs were individually examined using a binocular microscope, at various magnifications. The results are shown in 22, 23, 24, and 25, for plugs 1, 2, 3, and 4 respectively. These plugs exhibited extremely fouled conditions, with plugs 3 and 4 being especially dirty. The gaps were examined, and found to be fouled with oil, and possibly metal particles. The measured gaps and their condition are shown in Enclosures 26, 27, 28, and 29. as can be seen, the gaps ranged from 0.021-0.025 inch. However, the gap across the debris on plug 4 was found to be 0.006 inch, as shown in Enclosure 30.

As is typical in a two cycle engine, the fuel/air mixture is combined with oil from an oil injection system in the intake port. This arrangement is shown in Enclosure 31, and in more detail in Enclosure 32. Note also that the valve is a rotary one way valve, which opens and closes the inlet port once per revolution.

An examination of the "mag" interior cylinder wall revealed the condition shown in Enclosure 33, and the "pto" interior wall is shown in Enclosure 34. Both cylinders exhibited normal cross-hatched honing signatures, although minor vertical scoring was noted at high magnifications, as shown in Enclosures 35 and 36 for the "mag" and "pto" cylinders respectively.

The three composite propeller blades and hub assembly are shown in Enclosure 37, and the individual blades are shown in Enclosures 38, 39, and 40. Examination of the leading edge of the blade with the curled tip exhibited leading edge damage, caused by contact with the corn stalks. No evidence of chordwise scratching was noted on any of the blades. These characteristics indicated that the blades were not turning on ground impact.

Finally, the fuel mixture control lever was broken at the actuator connection, as shown in Enclosure 41, while the index setting is shown in Enclosure 42.

## DISCUSSION

The results of this investigation, taken together with the incident circumstances, indicated that the ultra-light aircraft piloted by Robert F. Simeone crashed while on approach to the York airport. As a result of the crash, Mr. Simeone and Mr. George Lengyel, Jr. sustained fatal injuries.

This investigation found that the engine was either totally inoperable, or operating in a severely compromised condition. No chord wise scratching or witness markings were found to indicate that the engine was in operation. The propeller blades failed in bending, and were not damaged other than impact damage on the leading edge of one blade, due to contact with corn stalks at the impact zone.

This examination found that the four spark plugs of the two cylinder, two cycle Bombardier-Rotax engine were fouled with a wet oily deposit, with entrapped debris, that in an extreme instance, reduced the spark plug gap from the 0.020-0.025 inch expected, to as little as 0.006 inches. In addition, it was found that the piston crowns were covered with a caked or baked on tightly adhering carbonaceous material, a result of an improperly functioning engine.

A two cycle engine has certain advantages over the more widely used and accepted four cycle engine commonly found. A two cycle engine fires once each revolution, as opposed to once every other revolution in a four cycle engine. Additionally, because there are no valves in the cylinder head, the engine is able to dispense with the need for cam shafts and valve train components such as rocker arms, rocker springs, and push rods. This results in a smaller, more compact, and lighter engine. The downside is that it is necessary to add lubricating oil to the fuel/air mixture that is forced into the cylinder through the intake port by crankcase pressure and cylinder vacuum as the piston first travels downward, and then returns to compress the fuel/air/oil charge. After the spark fires, the downward travel of the piston uncovers the exhaust port, allowing the returning piston and fresh charge to purge the spent gases into the exhaust manifold. The lighter weight and less complex operation of the two cycle engine is offset by being much less fuel efficient and being heavy polluters due to the large amount of unburned fuel and oil that escapes through the exhaust system.

This examination conclusively revealed that the four spark plugs (two in each cylinder) were fouled with oil and that the gaps were filled with various amounts of soot and oily debris. These characteristics are indicators of plugs that are running "cold," resulting in a significant power loss per piston stroke, and can also be accompanied by pre-ignition or knocking. In a two cylinder engine, loosing one cylinder amounts to halving the power available, which becomes critical during slow speeds and low level flight altitude situations, such as take-offs and landings. It is clear that the engine failed, and that the failure was due to spark plug fouling.

The design of a spark plug is dependent on a number of factors, among which are two important variables, the heat range and the intended fuel/air/oil mixture ratios. The heat range refers to the temperature of the spark plug tip, and must be maintained in the proper range for proper operation. If the tip gets too hot, it can fire the fuel mixture prematurely, and the result is knocking and loss of power. If the tip runs too cool, it will not burn off the accumulated carbon and fuel deposits and the plug will foul and stop working. Either way, the power available from the engine is choked off.

The heat range of the spark plug is controlled by the length of the center electrode. A long center electrode is hotter because it takes time for the heat to be conducted away from the tip into the cylinder head. The reverse is true for a cool plug, with the center electrode being shorter, and conducting the heat of the spark discharge more quickly.

For the spark to fire properly, a voltage sufficient to jump the air gap between the center electrode and the side, or ground, electrode must be supplied from the magneto. If the plug is fouled by either oil or soot, the plug will fire early or not fire at all. This results from the current shorting out along the soot/oil path of least resistance, so there is no voltage to cause the spark to jump the electrode gap, causing the engine to quit. In this case, Mr. Simeone lost his engine during a critical phase of preparing to land.

This examination revealed that the spark plugs were so severely fouled that engine operation was impossible. This is borne out by plug tests that showed that the plugs fired erratically and intermittently, and the fact that there were no chordwise markings on the propeller blades, indicating the engine was not operational at the time of impact. When the plugs were re-tested, some improvement was noted, which would be expected, since firing the plugs burns the oil and debris away, and in the test, there is nothing to replace the vaporized oil, this allowing some improvement. The condition of the electrodes i.e., they were not worn, the insulators were not chipped or cracked, etc., indicated that if they were cleaned and gapped, they would fire properly. However, in the condition found, these plugs were incapable of supporting proper engine operation.

## OPINION

- The crash that caused the deaths of Mr. Robert F. Simeone and Mr. George J. Lengyel, Jr., was the result of a non-functioning engine.
- The engine was not operating at the time of impact.
- The engine quit due to the fouled condition of the spark plugs.
- The plugs fouled due to insufficient temperature at the tip to burn the accumulated debris and oil on the firing end of the plug.
- The spark plug tests revealed intermittent and erratic firing. A retest exhibited improved performance, indicating that if the plugs had been

properly heat rated, and the fuel/air/oil mixture properly adjusted, the engine would have performed as expected.

- At the time of the crash, the engine reportedly had approximately 38 hours since new. This would indicate that the engine was not properly adjusted or equipped with plugs of the proper temperature range to allow full power to be developed, and to prevent the engine from quitting.
- There is no evidence that the engine had been adjusted or that the plugs were not the original plugs. As such, the engine was inherently unsafe and defective at the time the aircraft was delivered to Mr. Simeone.


Respectfully submitted,


Manuel Raefsky
July 12th, 2005

# MANUEL RAEFSKY
## 17851 N SILVERGATE COURT
## SURPRISE AZ. 85374
### 623-214-8267

Consulting Engineer in Safety; Workplace Safety; Machine Guarding; Systems Failure Analysis; Metals and Components Failure Analysis; Aircraft, Marine, Railroad, Automotive, Industrial Machinery, Consumer-Commercial Products; Materials Handling Equipment; Accident Evaluation; Quality Systems Analysis; Statistical Quality Control; Systems and Quality Audits; Metallurgical Engineering

### EDUCATION

- Graduate of Drexel Institute of Technology (Drexel University) in 1959 with a Bachelor of Science Degree in Metallurgical Engineering.
- Postgraduate Studies in Materials Science at the University of Pennsylvania and Drexel Institute of Technology.
- Postgraduate studies in Statistics, Statistical Quality Control, and Design of Experiments at Widner University.
- Postgraduate studies in Fracture Mechanics at Lehigh University and UCLA.
- Postgraduate studies in Aircraft Accident Investigation and Gas Turbine Engine Accident Investigation at the University of Southern California.

### PROFESSIONAL BACKGROUND

- Private Consulting, 1999 to present. Provide technical services in industrial and forensic environments in matters of materials selection, materials processing, materials inspection, process control, and failure analysis of components. Provide analysis of machine safety, machine guarding, and safety of consumer products. Provide technical support in matters involving patent infringement matters.

- Consulting Engineers and Scientists, Inc, Malvern PA, 1980 to 1999. Responsibilities included consulting in safety, machine guarding, metallurgical engineering and failure analysis. Scope of evaluations included materials and equipment in industrial, automotive, aircraft, marine and consumer-commercial products. Nature of evaluations included the examination of industrial machinery, machine tools, and consumer products to determine the adequacy of their design with respect to guarding, safety systems and controls, and the examination of failed components to determine the nature and cause of their failure. Additional responsibilities included consulting in all aspects of quality control and quality assurance management, including statistical quality control, testing, inspection, and process capability studies, as well as patent infringement support.

- Westinghouse Electric Corp., Lester PA, 1970 to 1980. Senior Quality Assurance Engineer. Assignments included implementation of Quality Assurance Systems, and quality audits, analysis of quality costs, non-destructive test evaluation, and initiating statistical quality control concepts in heavy industrial manufacturing. Prior responsibilities as an Advanced Materials Engineer included failure analysis and design of steam and gas turbine, and large generator and heat exchanger components.

- The Boeing Co., Vertol Division, Ridley Park PA, 1961 to 1970. Senior Materials Engineer. Extensive experience included aircraft accident evaluation and failure analysis utilizing optical and electron microscopic techniques, microstructure analysis, X-ray diffraction analysis, residual stress analysis, and destructive and non-destructive testing techniques to determine

-2-

material quality level. Later responsibilities included investigating and resolving materials and processing problems, supervision of other engineers involved in analytical and design efforts, auditing of machine shop and industrial processing operations, and the design and manufacturing of aircraft components.

- Air Materials Laboratory, Naval Air Materials Center, Philadelphia Naval Base, 1959-1961. Responsibilities included failure analysis, mechanical testing, and metallography. Development work included evaluation of vacuum produced steels, mechanical testing, non-destructive test procedure development, and welding, casting development studies, as well as corrosion testing and analysis.

## PUBLICATIONS

- "Analysis of a Helicopter Blade Failure Utilizing X-Ray Diffraction Analysis." Transactions, SAE, 1969.

## PROFESSIONAL SOCIETY MEMBERSHIPS

- American Society for Metals
- American Society for Quality Control
- American Society for Testing Materials
- Society of Automotive Engineers

# Manuel Raefsky

*17851 North Silvergate Court ▪ Surprise, AZ 85374 ▪ (623) 214-8267*

## PROFESSIONAL SERVICES

$350.00 per hour plus expenses.

Charges are made in 1/4 hour increments and include time spent for clients during office consultations, inspections, laboratory examinations, research, preparation of reports, telephone consultations, court appearances, depositions, arbitration's, and hearings. Rates are subject to change, and charges are based on the prevailing fee schedule when the work is performed and include travel time from and to our offices. A 1.5-hour administrative charge will be made for each file opened. Extensive document reproduction will be billed at the rate of $25.00 per hour.

For court appearances, depositions, arbitration's, and hearings, a minimum of 4 hours plus expenses will be charged. Time in excess of 4 hours will be charged as incurred, plus expenses.

Statements to clients will be sent monthly and periodically and are due immediately upon receipt. Outstanding balances over thirty (30) days are subject to an interest charge of one and one half (1-1/2) percent per month until paid in full. Clients also shall be responsible for all collection costs incurred by Manuel Raefsky including, (without limitation) reasonable attorney's and/or collection firm charges and all costs of suit. Manuel Raefsky, without liability, may withhold delivery of reports, data, evidence, and related material, and may suspend performance of its obligation to a client pending full payment of all charges. For all matters, a retainer fee and a signed fee schedule and/or a retaining letter is required. Billing will be charged against the retainer. It should be noted that Manuel Raefsky reserves the right, at his discretion, to require a retainer from its clients for any anticipated or requested work beyond the work covered by the initial retainer fee.

Billing is not contingent on the findings and/or conclusions reached. Responsibility for payment is that of the client engaging our services and is not contingent on other client contractual agreements and/or case status. Responsibility for the notification of settlement of a matter is that of the engaging client. All charges incurred to the time of notification will be billed. Lack of notification will not obviate charges incurred even when disbursements related to this matter have been made.

## EXPENSES

TRAVEL:    Automobile expenses are billed at $.40 per mile plus tolls and parking charges. Train, air, lodging, etc. are billed as incurred. Meals are billed as incurred when time away from office exceed 4 hours.

TELEPHONE, DOCUMENT, REPRODUCTION, AND DELIVERY COSTS:
      As incurred.

OUTSIDE PREPARATION, TESTING, AND MATERIALS:
      As incurred.

PHOTOGRAPHIC:    $25.00 handling charge for each roll of film exposed, $12.00 for each 8 x 12 color print. ALL NEGATIVES REMAIN THE PROPERTY OF MANUEL RAEFSKY.

Signed: _____    Date:

DEPOSITION AND TRIAL LIST FOR MANUEL RAEFSKY

| COURT: | DATE: | CAPTION: | | |
|--------|-------|----------|------|---|
| Fed/Phl | 11/90 | Finizo v. AFG | Trial | D |
| | 11/90 | Vicars v. Hunter | Dep. | P |
| Camden,Co,NJ | 4/91 | Duess v. Supermarkets Gen. | Trial | P |
| OceanCty,NJ | 5/91 | Scalise v. Mack Pontiac | Trial | D |
| | 5/91 | Driscoll v. McDonald Douglas | Dep. | P |
| | 6/91 | Wilson v. Cincinnati | Dep. | P |
| BucksCP | 8/91 | Shaefer v. Langdon | Trial | P |
| | 8/91 | United Flt. 232 | Dep. | P |
| Fed/Dist/MD | 9/91 | Devane v. Great Lakes | Dep. | D |
| | 9/91 | Pierce v. Mikita | Dep. | P |
| | 10/91 | Zigmont v. Lehigh Valley | Arb. | P |
| SchyCtyCP | 11/91 | Davis v. School Dist. | Trial | P |
| Fed/Allentown | 11/91 | Markovich v. Bell | Trial | P |
| | 11/91 | Dawn v. Sensenich | Arb. | D |
| Phl/CP | 2/92 | Wilson v. Cincinnati | Trial | P |
| | 2/92 | Boerner v. Tel-Elec | Dep. | P |
| | 3/92 | Washington v. Blapco | Dep. | P |
| | 3/92 | Kosanke v. Berkle | Dep. | P |
| Fed/Phl | 3/92 | Rodriquez v. Niagra | Trial | P |
| | 4/92 | Woods v. Supermarket Gen. | Dep. | P |
| | 4/92 | Mays v. Toyota | Dep. | P |
| Fed/Phl | 4/92 | Schile v. Simpson | Trial | P |
| Phl/CP | 5/92 | Rosen v. City of Philadelphia | Dep. | P |
| | 5/92 | Rosen v. City of Philadelphia | Trial | P |
| Fed/Miami | 5/92 | Branca/Richter v. AvcoLycoming | Dep. | P |
| | 5/92 | Branca/Richter v. AVcoLycoming | Trial | P |
| Fed/Phl | 5/92 | Hauslet v. Conrail | Trial | P |
| Bucks/CP | 6/92 | Duc Boi v. Cerutti | Trial | P |
| | 6/92 | Islam v.VanVaalandern | Dep. | P |
| | 7/92 | Vianna v. Bell | Dep. | P |
| | 7/92 | Miller v. Aeroquip/Bell | Dep. | P |
| | 9/92 | Zigmont v. Endicott Johnson | Judicate | P |
| Judicate | 9/92 | English v. WaWa | Dep. | P |
| | 10/92 | United 232 | Dep. | P |
| Fed/Phl | 12/92 | Ciferni v. Hilty | Trial | P |
| NJ/Middlesex | 1/93 | Woods v. Supermarket Gen. | Trial | P |
| | 2/93 | Islam v. VanVallandern | Dep. | P |
| Fed/Scranton | 5/93 | Carta v. Whitton | Trial | P |
| | 6/93 | White v. Troy-Built | Dep. | P |
| Fed/Phl | 8/93 | Mack v. McGuire | Trial | D |
| | 9/93 | Lacey v. Beatty | Dep. | P |
| | 9/93 | Saunders v. Pratt & Whitney | Dep. | P |
| Fed/Phl | 10/93 | Burgos v. Kubota | Trial | P |
| Fed/Phl | 1/94 | Kerin v. Mirro | Trial | P |
| Del/KentCity | 1/94 | White v. Garden Way | Trial | P |

| COURTDATE: | | CAPTION: | | |
|---|---|---|---|---|
| | 2/94 | Saunders v. Pratt & Whitney | Dep. | P |
| Atlanta/ SupCt | 4/94 | Saunders v. Pratt & Whitney | Trial | P |
| | 4/94 | Cooper v. Signal Ind. | Dep. | P |
| CamdenCo/NJ | 4/94 | Campbell v. Stinson | Dep. | D |
| Fed/Phl | 5/94 | Sodano v. Builders Square | Trial | P |
| Fed/Phl | 7/94 | Guerin v. Chromecraft | Trial | P |
| | 9/94 | Scotties v. NJC P & L | Dep. | P |
| CamdenCo/NJ | 9/94 | Campbell v. Stinson | Trial | D |
| | 12/94 | Howard v. Ford | Dep. | P |
| | 12/94 | Farley v. Cessna | Dep. | P |
| | 1/95 | Wagner v. Hennessy | Dep. | P |
| | 3/95 | Carswell v. West Jersey Hospital | Dep. | P |
| Del Co CP | 3/95 | Hunt v. Benton Harbor | Trial | P |
| Fed/Phl | 3/95 | Wagner V. Hennesy | Trial | P |
| | 4/95 | Starkey v. Harris | Dep. | P |
| Fed/Phl | 4/95 | Starkey v. Harris | Trial | P |
| | 4/95 | Melin v. Overhead Marine | Dep. | P |
| CamdenCoSup | 5/95 | Stans v. Huffy | Trial | P |
| Fed/Phl | 5/95 | Farley v. Cessna | Trial | P |
| | 6/95 | Graco v. Draco | Dep. | D |
| | 7/95 | Elliot v. Miehle | Dep. | P |
| | 8/95 | Murphey v. Beech | Dep. | P |
| | 9/95 | Weinhold v. TCM | Dep. | P |
| Phl/CP | 9/95 | Scott v. Marquip | Trial | P |
| Fla Cir. Ct | 9/95 | Melin v. Overhead Machine | Trial | P |
| | 9/92 | Kaiser v. Precision Automotive | Dep. | P |
| Fed/Phl | 10&11/95 | Graco v. Century | Trial | D |
| | 11/95 | Kruzits v. Okuma | Dep | P |
| CumbCo. | 12/95 | Dunn v. Nat'l Drying | Trial | P |
| NJSup.Ct. | | | | |
| Toledo,OH | 12/95 | Schwartz v. GM | Trial | P |
| | 12/95 | QDP v. Moyco | Dep. | D |
| Fed/Phl | 12/95 | Goodman v. Sears | Trial | P |
| Cumb. Co. | 12/95 | Dunn v. National Drying | Trial | P |
| NJ SupCt | | | | |
| Toledo, OH | 12/95 | Schwarze v. GM | Trial | D |
| | 12/95 | QDP v. Moyco | Dep. | D |
| Fed/Phl | 12/95 | Goodman v. Sears | Trial | P |
| Phil/CP | 1/96 | Smith v. New Durfold | Trial | P |
| | 1/96 | Kruzits v. Okuma | Dep. | P |
| | 1/96 | Farrell v. Davis Accura | Dep. | P |
| Fed/Phl | 1/96 | Farrell v. Davis Accura | Trial | P |
| | 2/96 | Clayton v. Farrell-Birmingham | Dep. | P |
| | 2/96 | Leiggi v. Loggy Bayau | Trial | P |
| Fed/Phl | 4/96 | Romer v. Fernd-Washington | Dep. | P |
| DelCoCP | 4/96 | Ulark v. Henderson Group | Trial | P |
| CamdenCoSup | 5/96 | Romer v. Ferno-Washington | Trial | P |
| | 6/96 | Kessner v. Pratt & Whitney | Dep. | P |

| COURT | DATE: | CAPTION: | | |
|---|---|---|---|---|
| | 6/96 | Balbanuvik v. Melroe | Dep. | P |
| PhilaCP | 6/96 | Schaffer v. Univex | Trial | P |
| | 7/96 | Rogers v. Rebok | Dep. | P |
| | 8/96 | Thomas v. Pratt & Whitney | Dep. | P |
| PhilaCP | 10/96 | Vanderslice v. Rolling Hill Hosp. | Trial | P |
| MontcoCP | 10/96 | Krolikowski v. American Blower | Trial | D |
| | 2/97 | West v. The Brake Shop | Dep. | P |
| Fed/Phila | 4/97 | Longo v. Woolworth | Trial | D |
| | 5/97 | Tucker v. Bergan | Dep. | D |
| Fed/Phila | 7/97 | Longo v. Woolworth | Trial | D |
| | 10/97 | DeLeo v. McKinney | Dep. | P |
| | 12/97 | Cassoutt v. Cessna | Dep. | P |
| CamdenCoSup | 1/98 | Davis v. O'Sullivan | Trial | P |
| | 2/98 | Kinniry v. Comm. Laundry | Trial | P |
| Monmouth CoSup | 3/98 | Retz v. Toastmaster | Trial | D |
| Dallas Co TX | 3/98 | DeLeo v. McKinney | Trial | P |
| Fed/Easton PA | 4/98 | Ryan v. Terex & GM | Trial | P |
| | 4/98 | Rolan v. Garluck | Dep. | P |
| | 7/98 | Stephenson v. P/W | Dep. | P |
| | 8/98 | McCollough v. GM | Dep. | P |
| | 8/98 | Reed v. Coyne | Trial | P |
| | 9/98 | Stone v. GM | Trial | P |
| | 10/98 | Keystone v. Paramount | Dep. | D |
| Fed/Baltimore | 1/99 | Stevenson v. P & W | Trial | P |
| | 4/99 | Wheeler v. Ashtech | Dep. | P |
| | 5/99 | Kovach v. Beloit | Dep. | P |
| | 6/99 | Densply v. Moyco | Mediation | D |
| PhilaCP | 6/99 | Torres v. Episcopal Hospital | Trial | D |
| | 6/99 | Densply v. Moyco | Arbitration | D |
| PhilaCP | 10/99 | Shay v. Flight "C" | Trial | P |
| Fed/MidDistPA | 11/99 | Hall v. Roybi | Trial | P |
| MonmouthCoSup | 11/99 | Rice v. Milar | Trial | P |
| Chester CoCp | 3/00 | Tunnell v. Reynolds | Trial | D |
| | 5/00 | Stankowicz v. Deere | Dep. | P |
| | 5/00 | Uchima v. Durst | Dep. | D |
| PhilaCP | 6/00 | Kauffman v. Ethicon | Trial | P |
| | 6/00 | Thomas v. Precision Aerospace | Dep. | P |
| 1st CirCourt/HI | 6/00 | Uchima v. Durst | Trial | D |
| DelcoCP | 9/00 | Gardener v. Accuflex | Trial | P |
| | 10/00 | Townsend v. Witmer | Dep. | P |
| | 7/01 | Sanchez v. OmniFilter | Dep. | P |
| Escambia Cty, FL | 8/01 | Cassout v. Cessna | Trial | P |
| Dallas TX | 1/02 | Lippman Sierra v. Heli-Dyne et.al. | Dep | P |
| Broomfield CO | 6/02 | Hinkle v. Hasseatic | Dep | P |
| MontCo CP | 1/03 | Krous v. BLAPCO | Trial | P |
| Broomfield CO | 2/03 | Nolan v. Dallas Airmolive | Dep. | P |
| Del Co PA | 2/03 | Shivers v. Dempster | Trial | P |
| | 4/03 | Carson v Boeing | Dep | P |
| | 7/03 | Graham v Kia | Dep | P |
| | 8/03 | Isreali/Shade v CavAir | Dep | P |
| Broward FL | 11/03 | Isreali/Shade v CavAir | Trial | P |

# EXHIBIT D

 # AEROSCOPE, INC.

11901 Allison St.
Broomfield, CO 80020
303.465.4414 - Fax 303.465.4116
aerosope@aeroscopeinc.com

15 July 2005

Mr. Arthur Wolk
The Wolk Law Firm
1710-12 Locust Street
Philadelphia, PA 19103

Re: Estate of Albert F. Simeone and Estate of George Lengyel
    Aircraft: Skyboy
    Date of Accident: 22 July 2000
    Location: York, Pennsylvania

## Report of Findings

The following materials and activities contained in Appendix 1 support my conclusions contained within this document both in the conclusion section and in the body of the report. I have the credentials outlined in Appendix 2. Below is a report of my accident investigation regarding the aircraft crash, which occurred on 22 July 2000 in York, Pennsylvania involving Mr. Albert Simeone. Appendix 3 is my Fee Schedule.

## SCENARIO

The Jackson Township Police Department report and investigation showed that on 22 July 2000 at 12:20 pm Eastern Daylight Time (EDT), an ultralight aircraft, designated as number A10AFS impacted terrain during an approach into the York Airport, York, PA.

The accident aircraft piloted by Mr. Albert Simeone Jr. and Mr. George Lengyel and another ultralight piloted by Mr. William Losey departed Mr. Simeone's farm in southeastern Pennsylvania on the day of the accident. Mr. George Lengyel was instructing Mr. Simeone in the accident aircraft. They were en-route to the Chambersburg Air Show in Chambersburg, PA and had agreed to make a fuel stop at the York Airport, per Mr. Losey's deposition. According to Mr. Losey, the scheduled stop at the York Airport was the first and only planned fuel stop on the day of the flight that

occurred prior to the accident. Mr. Losey did not see any part of the accident sequence of Mr. Simeone's ultralight during their approach to the York Airport. Mr. Simeone and Mr. Lengyel were killed from injuries sustained from the crash.

Mr. Madison was a witness to the accident from a vantage point on the backside of the top of a house where he was performing roofing work. Mr. Madison indicated in his deposition that he did not hear any engine noise coming from the aircraft during the accident sequence.

Mr. John Schmidt, a resident of Spring Grove, PA contacted the Jackson Township Police Department on 31 August 2000, indicating that on the day of the crash around noon, the power at his house and the store next to him went out. Another Spring Grove resident, Gwendolyn Walker also reported a power outage. According to Officer Joseph Yatsko, the power lines near the airport were never inspected because the power company refused to shut-off the power.

Weather:

The Automated Surface Observation System (ASOS) located at York, PA airport indicated the following weather at 12:53 EDT (11:53 Local Standard Time):

Winds from 290 degrees at 6 knots, visibility 10 statue miles with clouds scattered at 4700 feet and broken at 6000 feet, a temperature and dew point of 24 degrees and 14 degrees Celsius respectively, and an altimeter setting of 30.02 inches of mercury.

Aircraft and Engine:

The Skyboy ultralight, registration number A10AFS was registered to Mr. Albert F. Simeone Jr. of Cochranville, PA. A Bombardier / Rotax two cylinder, two cycle, model 582 engine, serial number 5305907 powered the accident ultralight aircraft. At the time of the crash the engine was reported to have only 34.9 total hours of operation.

The Rotax 582 engine is a relatively low inertia engine. It is typically operated with a light, small diameter propeller. With only two cylinders it is extremely important that both these cylinders be in top operating condition. When one of these two cylinders misfires or operates improperly, especially during low power or low RPM operation, the engine often stops rotating. The combination of a low rotational inertial engine and a light low rotational inertia propeller, unlike other larger aircraft engines and propellers, does not allow the engine to sustain rotation after power sensation. The pilot is now in a position where he has to execute a restart while attempting to control the aircraft. This is particularly difficult during low altitude operations.

## INSPECTIONS

Aeroscope, Inc. personnel conducted an inspection of the accident aircraft and engine on 9 August 2004, and 7 July 2005 at Anglin Aircraft Recovery Services in Clayton, Delaware.

During the Anglin Aircraft Recovery Services inspection of 9 August 2004 all four spark plugs were found coated with carbonaceous material, indicating abnormal engine operation. The Rotax 582 has two spark plugs for each cylinder. These spark plugs have part number 897 055 and are designated BR8ES resistance type plugs. According to the Rotax 582 Maintenance Manual, normal spark plugs will have a brownish color on their firing end, while fouled spark plugs have black firing ends.



normal
(brownish)

fouled
(black)

The four spark plugs from the subject aircraft are shown below.



Number 1 spark plug – in power take off
(PTO) cylinder closest to PTO



Number 1 spark plug gap – .025 inch
should be .020 inch



Number 2 spark plug - in PTO cylinder
furthest from PTO



Number 2 spark plug gap - .024 inch
should be .020 inch



Number 3 spark plug – in magneto
cylinder furthest from magneto



Number 3 spark plug gap - .023 inch
should be .020 inch



Number 4 spark plug – in magneto
cylinder closest to magneto



Number 4 spark plug gap - .006 inch
should be .020 inch

Marking on the power takeoff (PTO) piston (piston closest to the power takeoff end of the engine) exhibited rubbing and high friction between the aluminum piston and steel cylinder. Scuffmarks were located on the piston skirt of the PTO piston as well as in the PTO cylinder. The pistons and cylinders were carefully measured to determine the dimensional accuracy of the systems and discover if the scuffing could be attributed to manufacturing or wear problems. Lubrication of these pistons is accomplished by an oil injection pump, which is intended to distribute oil to the cylinders evenly during operation. Since the wear and dimensions were found to be normal, the scuffmarks on the PTO piston were determined to be indicative of lubrication deficiencies between the piston and cylinder wall during the relatively young life of this engine (34.9 hours). The MAG piston (piston closest to the magneto end of the engine) did not exhibit similar scuffmarks.

The windscreen of the ultralight, which was not available for examination during inspection, was documented as having been studied as part of the Jackson Township police investigation and was discussed in their report. According to the reporting officer, there was clear evidence of a wire strike on the windscreen. The report also indicated that an antenna located on the upper surface of the fuselage had been scraped off, as it would be during a wire strike. These descriptions are consistent with the wire strike evidence on the engine.

During the Anglin Aircraft Recovery Services on 7 July 2005 the four spark plugs were installed in a plug bomb tester and tested under high pressure with high voltage. All plugs were noted to fire intermittently and in areas other than the electrodes. This intermittent firing is consistent with the condition of the plugs as noted in this report.

The physical condition the spark plugs being fouled and their inability to fire properly suggests that this engine was operating with an improper fuel/air/oil mixture for some period during its operation.

On 12 July 2005 an inspection and analysis of the engine parts was held at the facilities of Aeroscope, Inc. in Broomfield, Colorado. During this inspection the oil injection pump was disassembled and analyzed and the cylinders were measured.

Carburetor Testing

Both Bing 54 carburetors were examined on a flow test bench at Firewall Forward in Fort Collins, Colorado, on 14 July 2005. The two carburetors were set up independently on an air and fuel flow bench. The air flow and fuel flow were set up in various test configurations and for various throttle settings. Please see the photo of the test set up below.



Both carburetors were tested to determine fuel flow at the various throttle positions for various levels of manifold pressure. During the tests it was observed that the MAG carburetor exhibited unsteady flow rates for all of the settings. In one of the tests, the MAG carburetor flowed erratically and then finally flooded. This was evident by the expulsion of large amounts of fuel out of the air vent hose that is connected in two places to the carburetor bowl.

The PTO carburetor was flow tested using the exact same configurations, air flow rates, manifold pressures, and fuel pressures. The PTO carburetor exhibited considerably more uniform and steady flow rates throughout all of the different test configurations. The PTO carburetor never flooded or exhibited the erratic and erroneous fuel flow rates that were found during the testing of the MAG carburetor.

The Bing 54 carburetor operates by filling of the float bowl with fuel, causing each of the two floats to rise along two vertical guide shafts attached to the bottom of the bowl. These floats contact the float lever which is attached via a small metal clip to the float needle valve. As the fuel level in the float bowl rises, the floats and float lever move the float needle valve up and down inside the needle valve seat. As the fuel level in the bowl reaches the set float bowl level, the needle valve restricts the fuel flow to the float bowl.



### 8) Carburetion
**BING Carburetor - typical description**
(Note: this is not a parts list)

1) BING-double float carburetor
2) carburetor housing
3) carburetor piston
4) jet needle
5) idler jet
6) needle jet
7) mixing tube
8) main jet
9) sieve sleeve
10) float needle valve
11) float
12) float chamber
13) air screw
14) idle adjustment screw
15) vent tube
16) starting piston
17) fuel pump assy.,

Ill. 8

Ill. 10

Ill. 9

Ill. 10.1

needle position

12-1990    ROTAX    582 UL

If the float and needle valve system does not operate properly the proper fuel level will not be maintained in the bowl and the engine will not receive the proper fuel/air mixture.

Malfunction of the float and needle valve system will cause an overly rich fuel/air mixture to be delivered to the engine. A build up of fuel in the bowl, if allowed to go on, will eventually exit the float bowl through the air vent hose attached to the air vents for the carburetor bowl as was seen in the testing on the MAG carburetor. An overly rich fuel/air mixture during combustion will leave black coke-like material on the insides of

Report of Findings    7

the cylinders, pistons, and spark plugs.  Excessive running of the engine using an over rich mixture will build up coke on the spark plugs and eventually cause them to foul; ceasing to fire properly.

## OPINIONS

1. The crash of A10AFS was caused by a failure of the Rotax 582 engine due to the inability of the Rotax 582 engine to sustain combustion during pilot Simeone's approach to the York Airport, York, PA.

2. The Bombardier/Rotax 582 engine installed in the accident aircraft had improper fuel scheduling due to a malfunctioning carburetor, improper spark plug firing due to buildup of carbon, lead and debris in the electrode area of the spark plugs, and improper oil distribution due to a defective oil distribution system which is further evidences by piston scuffing.

3. When the power was reduced by pilot Simeone for approach to the airport, the engine malfunctioned and ceased rotation.

4. The propeller of the accident aircraft shows signatures of having been stationary (engine stopped) at the time of the crash.

I reserve the right to alter or change these opinions if new evidence is discovered.

Sincerely,

Donald E. Sommer

Appendix 1

Materials In Support of Conclusions

1. Jackson Township Police Department Report
2. Jackson Township Police Department Photos
3. Jackson Township Police Department Video of Wreckage
4. Notes
5. Photographs
6. NCDC Weather Data
7. Deposition of Joseph Yatsko
8. Chambersburg Municipal Airport Information
9. Airport Layout Drawing
10. Witness interview of Ron Matison
11. Witness interview of John Schmidt
12. Witness interview of Gwendolyn Walker
13. Correspondence
14. Rotax 582 Operators Manual
15. Rotax 582 Installation Manual
16. Rotax 582 Parts Catalog
17. Rotax 582 Maintenance Manual
18. Rotax 582 Articles and Literature
19. Skyboy User's Manual

Activities In Support of Conclusions

1. 9 August 2004 Inspection at Anglin Aircraft Recovery Services, Clayton, DE
2. 7 July 2005 Inspection at Anglin Aircraft Recovery Services, Clayton, DE
3. 12 July 2005 Inspection at Aeroscope, Inc., Broomfield, CO
4. 14 July 2005 Carburetor Bench Flow Demonstration at Firewall Forward, Fort Collins, CO

Appendix 2

# CURRICULUM VITAE

# DONALD E. SOMMER

## CURRENT POSITION

President and owner of Aeroscope, Inc., 11750 Airport Way, Hangar B12B, Broomfield, Colorado, 80021. Aeroscope, Inc., is involved in forensic engineering, computer modeling, failure analysis of airframes, engines and aircraft systems. Aeroscope, Inc., also holds an FAA repair station authorization for work on aircraft transparencies.

## EDUCATION AFTER HIGH SCHOOL

✈ Bachelor of Science - Engineering (Mechanical Engineering)
University of Michigan

✈ Graduate work in instrumentation, testing systems and Cryogenics.

## FAA RATINGS

✈ Airline Transport Pilot
Citation Jet Type Rating
Airplane - Single Engine Land
Airplane - Multi-Engine Land

✈ Commercial Pilot
Glider
Airplane - Single Engine Sea
Rotorcraft/Helicopter

✈ Certified Flight Instructor
Airplane - Single Engine Land
Airplane - Single Engine Sea
Airplane - Multi-Engine Land
Instrument - Airplane
Glider

Report of Findings

10

**CURRICULUM VITAE**
**DONALD E. SOMMER**
Page Two

FAA RATINGS continued

> ✈ Ground Instructor
>     Primary
>     Advanced
>     Instrument

> ✈ Mechanic
>     Airframe
>     Powerplant

> ✈ FAA Inspection Authorization

> ✈ Second Class FAA Medical

ENGINEERING EXPERIENCE

> ✈ Mechanical systems design and testing
> ✈ Hydraulic systems design and testing
> ✈ Instrumentation - Mobile and fixed
> ✈ Design and production of new products and sub-components
> ✈ Failure analysis

AERONAUTICAL EXPERIENCE

> ✈ Over 16,000 hours Pilot in Command
> ✈ Operated numerous single engine, most twin engine, Turbo Commander,
>   Conquest, King Air, Mitsubishi, and Citation jets
> ✈ Owned and operated several aircraft maintenance facilities for major and minor
>   repairs and alterations
> ✈ Owned and operated business aircraft.
> ✈ Airport manager of active metropolitan Detroit airport
> ✈ Owned and operated several air charter businesses
> ✈ Owned and operated new aircraft franchised dealership
> ✈ Numerous aircraft appraisals - large and small aircraft

Report of Findings                                                    11

**CURRICULUM VITAE**
**DONALD E. SOMMER**
**Page Three**

PROFESSIONAL MEMBERSHIPS

- Aircraft Owners and Pilots Association
- International Society of Air Safety Investigators
- Society of Automotive Engineer
- The Twin Cessna Flyer

AREAS OF SPECIALIZATION

- Aircraft Accident Reconstruction
- In-flight and Stationary Instrumentation Systems and Testing
- Mechanical and Hydraulic Systems
- Aircraft Performance
- Aircraft Engine Design and Operation
- Failure Analysis
- FAA Regulations
- Pilot Reactions
- Pilot Training
- Aircraft Appraisals

Appendix 3

# AEROSCOPE, INC.
# FEE SCHEDULE
## for
## Donald E. Sommer

The prices for AEROSCOPE, INC., services are as follows;

1) $5,000.00 retainer and file opening fee, which will be applied to our work. This fee is non-refundable.

2) Research, consultation, data procurement, testing and case review is $225.00 per hour.

3) Testimony at either trial or deposition is $1,400.00 per half day (4 hours or less) and $2,800.00 per day (4 to 8 hours)

4) Engineering support and lab work is $120.00 - $160.00 per hour.

5) Administrative Support is billed at $75.00 per hour.

6) Flight tests, ground tests, and instrumentation, etc., may be flat rated depending on prior discussions with AEROSCOPE, INC.

7) Charges for expenses will be billed at cost. Travel time is billed portal to portal at the rate of $112.50 per hour unless work is being conducted on the case while traveling in which event the rate would be billed at $225.00 per hour.