## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THERESA MARIE SIMEONE, Personal Representative of the Estate of Albert Francis Simeone, Jr., Deceased, and THERESA MARIE SIMEONE, In Her Own Right, and MARY ANN LENGYEL, Personal Representative of the Estate of George Lengyel, Deceased, and MARY ANN LENGYEL, In Her Own Right, | : : : : : : : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. 02CV4852 |
| v. | : : : | JURY TRIAL DEMANDED |
| BOMBARDIER-ROTAX GmbH, Individually and as a Joint Venture and/or d/b/a Rotax, and BOMBARDIER INC., Individually and as a Joint Venture and/or d/b/a Rotax, | : : : : : | |
| Defendants. | : : | |

### JOINT PRETRIAL STIPULATION

**I.    AGREED FACTS**

1.    Theresa Marie Simeone is the wife of Albert Francis Simeone, Jr., deceased.

2.    Mary Ann Lengyel is the wife of George Lengyel, deceased.

3.    On July 22, 2000, Albert Francis Simeone, Jr. and George Lengyel were fatally injured when a Skyboy aircraft crashed in the vicinity of York Airport in Thomasville, Pennsylvania.

4.    The Skyboy aircraft was equipped with a 2-stroke Rotax 582 engine.

5.    The Skyboy aircraft had dual controls.

445225.1

6.      At the time of the crash, the Skyboy aircraft was owned by Albert Simeone.

7.      At the time of the crash, George Lengyel owned a Challenger aircraft.

8.      At the time of the crash, George Lengyel was a FAA-Certificated Private Pilot and Ultralight Flight Instructor.

9.      At the time of the crash, Albert Francis Simeone, Jr. was a student pilot.

10.     On July 22, 2000, Mr. Simeone and Mr. Lengyel were flying to Chambersburg, Pennsylvania from Mr. Simeone's residence in Cochranville, Pennsylvania.

11.     On July 22, 2000, William Losey took off first in Mr. Lengyel's Challenger aircraft.

12.     On July 22, 2000, Mr. Simeone and Mr. Lengyel departed after Mr. Losey in the Skyboy aircraft.

13.     During the flight, a decision was made to land at the York Airport to top off with fuel.

14.     On July 22, 2000, William Losey landed at York Airport.

## II.    **DISPUTED FACTS**

### A.    **PLAINTIFFS**

Plaintiffs intend to prove the following:

1.      The crash of the Skyboy aircraft on July 22, 2000 was the result of an engine malfunction.

2

445225.1

2.    The accident engine was not operating properly at the time of the accident.

3.    The oil injection system on the accident engine was not operating properly before and at the time of the accident.

4.    The carburetor/s on the accident engine were not operating properly before and at the time of the accident.

5.    Spark plugs on the accident engine were fouled.

6.    Spark plugs on the accident engine were not capable of firing properly at the time of the accident.

7.    The aircraft experienced engine trouble while on approach to Runway 35 at the York Airport in Thomasville, PA.

8.    Mr. Lengyel and Mr. Simeone were forced to make an emergency landing in a corn field located south of the airport.

9.    Ron Madison witnessed the aircraft glide into the cornfield.

10.    Ron Madison heard no engine noise from the aircraft as it was gliding into the cornfield.

11.    The propeller of the accident aircraft supports that there was a malfunction of the engine.

12.    The accident engine had less than 40 hours of use at the time of the accident.

13.    The Rotax 582 engine and its component parts were defective.

14.    Defendants were negligent, grossly negligent, and acted with reckless disregard to the rights of Plaintiffs in the design, manufacture, marketing, and sale of the Rotax 582 engine and its components.

3

445225.1

15.    Defendants warranted, among other things, that the Rotax 582 engine was suitable for use in aircraft.

16.    Mr. Lengyel was not aware of specific defects in the Rotax 582 engine.

17.    Mr. Simeone was not aware of specific defects in the Rotax 582 engine.

18.    Mr. Simeone did not waive any claims against Defendants. (See Plaintiffs' Response to Motion for Summary Judgment and Motion in Limine filed on September 30, 2000.)

19.    Mrs. Simeone did not waive any claims against Defendants.

20.    Mrs. Lengyel did not waive any claims against Defendants.

21.    The crash did not result from any previously repaired shipping damage to the aircraft.  (See Motion in Limine filed on September 30, 2000.)

22.    The crash did not result from any previously repaired damage to the aircraft.  (See Motion in Limine filed on September 30, 2000.)

23.    Mr. Lengyel was a properly trained pilot and instructor.

24.    The crash was not the result of pilot error.

25.    Bombardier-Rotax is the alter ego of Bombardier, Inc. and vice-versa (if necessary).

26.    The Simeone Plaintiffs suffered recoverable damages under the Pennsylvania Wrongful Death and Survival Statutes, 42 Pa.C.S.A. § 8301, 8302, including but not to the following:[1]

Lost Earnings

Past          $106,272

Future        $288,457 to $475,070

---

[1] Figures from report of Bunin Associates dated 8/2004.

4

445225.1

Lost Household Services

     Past        $56,890

     Future     $262,548

Lost Social Services

     Past        $72,462

     Future     $414,886

Funeral/Administration Expenses

Services, Society and Comfort

27.    The Lengyel Plaintiffs suffered recoverable damages under the Pennsylvania Wrongful Death and Survival Statutes, 42 Pa.C.S.A. § 8301, 8302, including but not to the following:[2]

Lost Earnings

     Past        $402,786

     Future     $1,998,738 to $2,489,101

Lost Fringe Benefits

     Past        $102,621

     Future     $509,233 to $634,166

Lost Household Services

     Past        $31,606

     Future     $199,290

Lost Social Services

     Past        $69,581

---

[2] Figures from report of Bunin Associates dated 8/2004.

445225.1

Future          $503,140

Funeral/Administration Expenses

Services, Society and Comfort

28.    See also, Plaintiffs' Complaint and the Reports and Depositions of Plaintiffs' Experts which are incorporated herein by reference.

**B.    DEFENDANTS**

1.    **Defendants intend to prove the following contested facts with regard to liability:**

a.    Defendant Rotax is a company authorized under the laws of Austria, with a principal place of business in Gunskirchen, Austria.

b.    Defendant Bombardier is a Canadian corporation with a principal place of business in Montreal, Quebec, Canada.

c.    Defendant Rotax is a subsidiary of Defendant Bombardier.

d.    Defendant Rotax designs and manufactures engines, including engines that are used in ultralight aircraft.

e.    The subject Rotax 582 engine was designed and manufactured by Rotax.

f.    The subject engine, which Plaintiffs allege was a substantial factor in the accident and death of decedents, was not defectively designed and was fit for its intended purpose.

g.    The subject engine was not defectively manufactured and was fit for its intended purpose.

h.    The subject engine was the state of the art in manufacturing process.

i.    There were no eyewitnesses to the actual crash of the Interplane Skyboy ultralight aircraft being operated by decedents.

j.    The flight controls in the Skyboy ultralight aircraft made it possible for either decedent to fly the aircraft.

k.    At the time of the crash, the subject Rotax 582 engine had between thirty six (36) and thirty nine (39) hours of run time on it.

l.     The Federal Aviation Administration and the National Transportation Safety Board declined to investigate the cause of the crash.

m.     An investigation into the cause of the accident was conducted by Joseph Yatsko, an Officer with the Jackson Township, Pennsylvania Police Department.

n.     Subsequent to the accident, the subject engine was stored for a period of time in a hanger located on Plaintiff Simeone's property.   Thereafter, it was moved to Anglin Aircraft Recovery in Clayton, Delaware.

o.     In or around January 2002, the subject engine was sent to McSwain Engineering, Inc. for the purpose of inspection and disassembly, which occurred on January 21-22, 2002.

p.     Prior to the disassembly of the subject engine, experts on behalf of Defendants requested to be allowed to run the engine.   Plaintiffs' experts did not permit Defendants' experts to run the engine prior to disassembly.

q.     Plaintiffs filed a Complaint with the United States District Court, Eastern District of Pennsylvania, on July 19, 2002.

r.     Plaintiffs filed a First Amended Complaint on June 12, 2003.[3]

s.     Plaintiffs' causes of action sounding in strict product liability, negligence, breach of warranty (express and implied), willful and wanton misconduct, and fraud and deceit against Rotax, the alleged designer, manufacturer and seller of the subject aircraft engine; and Bombardier Inc; Bombardier Corporation; as well as other entities.[4]

t.     Defendants deny all of the material allegations set forth in Plaintiffs' First Amended Complaint.

u.     On or about March 5, 2000, Decedent Simeone, took a "familiarization" flight on an ultralight aircraft distributed by Interplane U.S.A.  In connection with the familiarization flight, decedent Simeone executed a Waiver & Release, agreeing to waive any and all claims, relating to his

---

[3] Plaintiffs also filed an identical state court Complaint on July 19, 2002 and, subsequently, on June 12, 2003, an Amended Complaint in the Court of Common Pleas, Philadelphia County.  Plaintiffs' state court action was dismissed.

[4] Plaintiffs also brought a cause of action for negligence against Jersey Central Power and Light Company; Metropolitan Edison; Pennsylvania Electric Company; GPU, Inc.; GPU Energy, Inc.; and First Energy Corporation in connection with the maintenance of power lines over the York County airport.  All of these defendants have been dismissed from the case.

445225.1

familiarization flight, that he might have against any
company that furnished materials or parts of the ultralight.

v.      The next day, on March 6, 2000, Decedent Simeone signed
a contract to purchase a new Interplane Skyboy ultralight
aircraft.

w.      The Interplane ultralight aircraft that decedent Simeone
purchased was powered by a Rotax 582 engine.

x.      In connection with the purchase of the subject Interplane
ultralight, Decedent Simeone executed a release.

y.      The release contained the following language:

RELEASE

I understand that flying ultralight aircraft is
a potentially dangerous activity that can
result in mishap, injury or death.    I
acknowledge that no warranties, either
express or implied, have been given to me
concerning the fitness of the aircraft or any
of its parts.  I agree to indemnify and hold
harmless Interplane USA and its suppliers
from any action or cause arising from the
sale and use of this aircraft and/or parts.

z.      Between March 5 and 7, 2000, Decedent Simeone took
approximately six and one half (6 ½) hours of flight
instruction from Interplane U.S.A employee and flight
instructor Ben Dawson.

aa.     On or about May 22, 2000, Decedent Simeone took
delivery of the subject Interplane Skyboy ultralight aircraft.
At the time of delivery, the aircraft was damaged.

bb.     The subject Interplane Skyboy ultralight aircraft was a two
(2) seat trainer ultralight aircraft.

cc.     Decedent Simeone received a Skyboy User's Manual and a
Rotax Operator's Manual with the purchase of the subject
ultralight.

dd.     Decedent Lengyel received a Rotax Operator's Manual
with the purchase of his Challenger ultralight aircraft.

ee.     The subject engine did not contain defective or inadequate
warnings.

ff.     The subject engine did not lack proper instructions with
respect to maintenance, assembly, and operation.

8

gg.   Decedents were adequately warned and/or instructed of unavoidably unsafe aspects, if any.

hh.   The Rotax 582 engine is not more prone to sudden stoppage than other engines.

ii.   The warnings given with the subject engine are not unique to Rotax engines.

jj.   The engine that Defendants supplied was airworthy.

kk.   Defendants adequately warned potential users, including decedents, that the Rotax 582 engine was subject to sudden stoppages.

ll.   Defendants did not breach any duty of care owed to decedents with respect to the design or manufacture of the subject engine.

mm.   Defendants did not engage in a scam of deceit or otherwise engage in any conduct that was reckless, willful and wanton misconduct, or commit fraud against decedents.

nn.   Defendants did not provide an express warranty to decedent Simeone.

oo.   Decedent Simeone expressly waived any express warranties.

pp.   Defendants did not provide an express warranty to decedent Lengyel.

qq.   Defendants did not breach any implied warranty owed to decedent Simeone.

rr.   Decedent Simeone expressly waived any implied warranties.

ss.   Defendants did not breach any implied warranty owed to decedent Lengyel.

tt.   Sometime between the date of delivery of the subject ultralight, May 22, 2000, and the date of the accident, July 22, 2000, decedent Simeone, was forced to make an emergency landing in a farm field after the subject aircraft's throttle became stuck.   As a result of this unscheduled landing, decedent Simeone's aircraft sustained damage including damage to its landing gear.

uu.   Decedent Simeone received a check from Interplane, in the amount of $1,100.00, as a commission payment in connection with sale that he made in connection with work that he did for Interplane.

9

vv.     The subject accident did not occur as a result of the engine malfunctioning or ceasing to operate during the flight.

ww.     The subject engine was operating at the time of the crash.

xx.     Plaintiffs and/or Plaintiffs' agents destroyed useful evidence relating to the engine.

yy.     Plaintiffs' experts conducted substantive engine testing without first notifying counsel for Defendants and/or Defendants' experts that testing was going to be conducted.

zz.     It is more probable than not that Plaintiffs' experts made improper adjustments to certain engine components, thus compromising the test results.

aaa.    The subject engine had proper fuel scheduling; a functioning carburetor; and spark plugs that were firing properly at the time the accident occurred.

bbb.    The spark plugs were in good, operable condition at the time of the accident.

ccc.    Spark plug testing performed by Plaintiffs' experts was not consistent with good testing procedures and was totally unreliable.

ddd.    Carburetor testing performed by Plaintiffs' experts was not consistent with good testing procedures and was totally unreliable.

eee.    The subject engine pistons and cylinders were in good, operable condition, with no evidence of scuffing or seizure.

fff.    Carbon deposits during engine operation were very light.

ggg.    The combustion chambers in the cylinder heads exhibited a normal, brownish appearance.

hhh.    The propeller was rotating and thrust (power) was being generated at the time of the accident.

iii.    The subject engine was producing at or near rated full power at the time of the accident.

jjj.    The opinions of Plaintiffs' experts are incorrect.

kkk.    The opinions of Defendants' experts are correct.

lll.    Decedents misused the subject product.

mmm.    Decedent Simeone substantially altered the product prior to the subject accident.

nnn.    The cause of the accident was pilot error.

445225.1

ooo.  The injuries and/or damages, if any, sustained by Plaintiffs were caused solely or in part by decedents.

ppp.  Decedent Simeone expressly waived his right to institute this lawsuit by executing a release, on March 6, 2000, in favor of Interplane.

qqq.  Defendants are third-party beneficiaries of the aforementioned March 6, 2000 release that decedent Simeone executed in favor of Interplane.

rrr.  Defendants did not breach any warranties owed to decedents; In any event Plaintiffs are not beneficiaries of any warranties that could have been owed to decedents.

sss.  Decedent Simeone expressly and impliedly assumed the risk associated with flying ultralight aircraft.

ttt.  Plaintiff Lenygel is not a beneficiary or third party beneficiary of any warranty.

uuu.  Decedent Lengyel impliedly assumed the risk associated with flying ultralight aircraft.

vvv.  Decedent Simeone failed to comply with the Rotax 582 engine maintenance schedule.

www.  Defendant Rotax is not an alter ego of Defendant Bombardier.

xxx.  Defendant Bombardier is not an alter ego of Defendant Rotax.

yyy.  See also, Defendants' Answers and Affirmative Defenses and reports of Defendants' experts which are incorporated herein by reference.

zzz.  Mr. Lengyel's Challenger aircraft was equipped with a Rotax 503 engine.

aaaa.  Decedent Simeone practiced stall procedures with a licensed ultralight flight instructor.

bbbb.  At the time of the crash, George Lengyel was a licensed general aviation pilot and certified ultralight aircraft pilot and Flight Instructor.

cccc.  At the time of the crash, Albert Francis Simeone, Jr. was an ultralight aircraft student pilot and an auto mechanic.

2.  **Defendant intends to prove the following contested facts with regard to damages:**

a.  Decedents died upon impact and thus did not suffer any pain.

b.   The cause of the accident was pilot error.

c.   The injuries and/or damages, if any, sustained by Plaintiffs were caused solely or in part by decedents, which negligence, along with the Pennsylvania Comparative Negligence Act, bars or limits Plaintiffs' recovery.

d.   Decedent Simeone expressly waived his right to institute this lawsuit by executing a release, on March 6, 2000, in favor of Interplane.

e.   Defendants are third-party beneficiaries of the aforementioned March 6, 2000 release that decedent Simeone executed in favor of Interplane.

f.   Decedent Simeone expressly and impliedly assumed the risk associated with flying ultralight aircraft.

g.   Plaintiff Lenygel is not a third party beneficiary of any warranty.

h.   Decedent Lengyel impliedly assumed the risk associated with flying ultralight aircraft.

i.   If Defendants are determined to be liable, Plaintiffs are not entitled to punitive/exemplary damages because they are unable to meet the requirements set forth in Restatement (Second) of Torts §908A (see discussion of applicable law, set forth in detail below). Further, Plaintiffs are not entitled to punitive damages under the Wrongful Death Act of the Commonwealth of Pennsylvania.

j.   Plaintiffs are not entitled to damages because the accident occurred as result of pilot error.

k.   Decedents did not experience pain and suffering.

l.   Defendants did not engage in a scam of deceit or otherwise engage in any conduct that was reckless, willful and wanton misconduct, or commit fraud.

m.   Defendants conduct was not outrageous or evil minded.

n.   Defendant Rotax is not the alter ego of Defendant Bombardier.

o.   Defendant Bombardier is not the alter ego of Defendant Rotax.

p.   Defendants are entitled to a setoff for any monies already paid to Plaintiffs by insurance proceeds.

12

445225.1

III.    **WITNESSES**

    A.    **PLAINTIFFS**

See Witness List attached hereto as Exhibit "A." Plaintiffs reserve the right to call any and all witnesses identified during discovery and/or those witnesses identified by Defendants but do not waive any objections thereto.

    B.    **DEFENDANTS**

See Witness List below. In addition, Defendants reserve the right to call any and all witnesses identified during discovery and/or those witnesses identified by Plaintiffs but do not waive any objections thereto.

        1.    **On liability, defendants intends to call the following witnesses who will testify in accordance with the following summaries:**

            a.    Theresa Marie Simeone (Plaintiff)

Generally, Plaintiff Simeone will testify as to all matters raised at her deposition taken on June 22, 2005, all those exhibits marked at such deposition, and all documents discovered in this case which she authored, received or reviewed.

Pursuant to her deposition testimony, Plaintiff will testify about her husband, decedent Francis Simeone's interest in flying ultralight aircraft; decedent's flight training; decedent's purchase of the subject Interplane Skyboy ultralight aircraft; the damage to the Skyboy upon delivery; the receipt by decedent of a Skyboy User's Manual and a Rotax Operator's Manual; and an incident prior to the subject accident, when decedent and another individual who were flying the Skyboy, were required to make an unscheduled landing after the throttle stuck. Plaintiff will also testify that she has no first hand information regarding the sequence of events at or near the time of the accident.

            b.    Mary Ann Lengyel (Plaintiff)

Generally, this witness will testify as to all matters raised at her deposition taken on June 22, 2005, all those exhibits marked at such deposition, and all documents discovered in this case which she authored, received or reviewed.

Specifically, Plaintiff Lengyel is expected to testify that her husband was an experienced general aviation pilot as well as a certified ultralight pilot and instructor. Plaintiff will also testify that her husband owed an ultralight Challenger aircraft, which he

13

flew often. Plaintiff will also testify that she has no first hand information regarding the sequence of events at or near the time of the accident.

c.     William J. Losey
329 Faggsmanor Road
Cochransville, PA 19330

Generally, this witness will testify as to all matters raised at his deposition on June 17, 2005, all those exhibits marked at such deposition, and all documents discovered in this case which he authored, received or reviewed.

Specifically, Mr. Losey will testify that he flew with decedents (in another aircraft) on July 22, 2000. Mr. Losey will testify that he and decedents planned to fly to Chambersburg, Pennsylvania to attend an air show and that he flew decedent Lengyel's ultralight Challenger while decedents flew in the Skyboy ultralight owned by decedent Simeone. During the flight, decedent Lengyel was going to provide flight instruction to decedent Simeone. After communicating with decedents via of a hand held radio, at the request of decedents, Mr. Losey landed at the York Airport in York, Pennsylvania. Mr. Losey will testify that he alerted airport personnel after decedents failed to land.

Mr. Losey will further testify that he took ultralight flying lessons from decedent Lengyel and that decedent Lengyel enjoyed flying low patterns on the opposite side of airports, something that Mr. Losey, a general aviation pilot, deemed unnecessary and dangerous. Mr. Losey will also testify that he was aware that decedent Simeone had an incident where he was forced to make an unscheduled landing in a cornfield as a result of the throttle sticking, and that the aircraft his a rock and damaged the landing gear.

d.     Ralph Mandarino
Interplane, LLC
30 Lee Gate Lane
Gross Pointe Farms, MI 48236

Generally, this witness will testify as to all matters raised at his deposition taken on July 28, 2005, all those exhibits marked at such deposition, and all documents discovered in this case which he authored, received or reviewed.

Specifically, this witness will testify that he is the Trustee of a pension plan that invests in Interplane companies, and that was familiar with the companies' policies and procedures. He will testify that it was the policy of Interplane to require every purchaser of its aircraft to sign a release, absolving Interplane and its suppliers of any liability in connection with the purchase and operation of Interplane ultralight aircraft. Mr. Mandarino will also testify that it was company policy to discuss the risks of flying and, in particular, to discuss with customers that the Rotax 582 engine occasionally stops running. He will further testify that it was company policy to provide purchasers with manuals that pertained to the aircraft.

14

e.    Joseph Yatsko
      Newbury Township Police Department
      905 Old Trail Road
      Etters, PA 17319

Generally, this witness will testify as to all matters raised at his deposition taken June 21, 2005, all those exhibits marked at such deposition, and all documents and photos discovered in this case which he authored, received or reviewed.

Specifically, Officer Yatsko will testify that, after the Federal Aviation Administration declined to investigate the cause of the subject accident, he was assigned the task by his Chief of Police, Nathaniel Ruff. Officer Yatsko will testify regarding his investigation of the subject incident and his conclusion that pilot error caused the accident.

f.    Benjamin Dawson
      180 Lake Michigan Drive
      Mulberry, Florida 33802

Generally, this witness will testify as to all matters raised at his deposition taken on August 12, 2004, all those exhibits marked at such deposition, and all documents and photos discovered in this case which he authored, received or reviewed.

Specifically, this witness will testify about his work with Interplane. He will testify that he provided decedent Simeone a "familiarization" flight in an Interplane ultralight aircraft and that the next day he sold the subject Interplane Skyboy ultralight to decedent Simeone. Mr. Dawson will testify that he required decedent Simeone to sign a Release and Waiver before the familiarization flight and another release at the time that he signed the contract to purchase the Skyboy.

Mr. Dawson will also testify that he provided decedent Simeone with six and one-half (6 ½ ) hours of ultralight flight instruction and that decedent Simeone worked for a short period of time for Interplane. He will testify that he told his students that flying was inherently dangerous and that pilots assumed the risk of injury or death when they flew. Mr. Dawson will testify that decedent Simeone was also apprised of the need to be able to land the aircraft in the event of an engine failure and that this type of procedure was "heavily stressed." Further, he will testify that he practiced engine out stalls with decedent Simeone.

g.    Marcus Nathaniel Ruff
      York County Sheriff's Dept.
      York County Judicial Center
      45 North George Street
      York, PA  17401

Generally, this witness will testify as to all matters raised at his deposition taken on June 21, 2005, all those exhibits marked at such deposition, and all documents and photos discovered in this case which he authored, received or reviewed.

15

445225.1

Specifically, this witness will testify that he assigned the investigation into the cause of the subject incident to Officer Yatsko. Chief Ruff will also testify that he contacted an individual, whom he knew owned an ultralight aircraft, to help reconstruct the accident. He will testify that the markings on the windshield and the wing indicated that the aircraft had hit something and, based on the fact that there were high tension wires in the vicinity of the crash site, he believes that it is likely (not conclusive) that the aircraft hit the wires. Chief Ruff will also testify that he released the subject aircraft, post-accident, to decedent Simeone's family.

> h.  Terry Lee McCandless
> 792 Jackson Square Road
> Spring Grove, Pa 17362

Generally, this witness will testify as to all matters raised at his deposition taken on June 21, 2005, all those exhibits marked at such deposition, and all documents and photos discovered in this case which he authored, received or reviewed.

Specifically, Mr. McCandless will testify that on the date of the accident, he was the Thomasville, Pennsylvania Deputy Fire Chief and that he was dispatched to search for a aircraft that went down. He will further testify that he set up a command outside the crash scene although he never saw the crash scene. Mr. McCandless will also testify that he prepared an incident report based on the reports of his crew's actions and that he never learned anything about how the crash occurred.

> i.  Richard Fuess
> York Aviation, Inc.
> York Airport
> 054 Lincoln Highway
> Thomasville, PA 1736

Generally, this witness will testify as to all matters raised at his depositions taken on June 16, 2005 and August 5, 2005, all those exhibits marked at such depositions and all documents and photos discovered in this case which he authored, received or reviewed.

Specifically, Mr. Feuss will testify that he was the York Airport Aviation Operations Manager and he was working at the Airport on the date of the accident. He will testify that York Airport has one physical runway, which is used as two (2) runways (south to north; north to south) depending on the wind, and that the airport is equipped with Precision Approach Path Indicators ("PAPI") system, which is operational twenty-four (24) hours a day and which helps guide pilots in their landing approach. Mr. Feuss will testify that if a pilot is flying with the PAPI system, there are no obstructions with respect to landing at the airport. He will testify the traffic pattern altitude is one thousand five hundred (1,500) feet and that ultralight aircraft are supposed to follow all the rules that other aircraft follow.

445225.1

Mr. Feuss will testify that he first became aware that there might be a problem when the airport received a phone call that an aircraft went down on KBS road. He also spoke with an unidentified gentleman (William Losey) who indicated that his partners were flying an ultralight and had not landed. Mr. Feuss will testify that when he apprised Mr. Losey that they had received a phone call concerning a downed aircraft, Mr. Losey stated that there was no way that the plane crashed because there was an ultralight instructor on board and that the aircraft had probably landed in a cornfield. Mr. Feuss will testify that he then dismissed the possibility of an accident but, after the airport received another call he went back out and informed the Mr. Losey of the second call and then called "911." Thereafter, the crash site was discovered.

Mr. Feuss will also testify that on the day of the crash the airport was lively, very normal and it was a nice day. He will testify that never knew whether the decedents' attempted to land their aircraft prior to the crash nor is he aware of any power outages around the time of the accident and that he never spoke with any officials about the investigation.

j.      Ronald Madison
        1517 KBS Road
        Spring Grove, Pa 17362

Generally, this witness will testify as to all matters raised at his deposition taken on June 30, 2005, all those exhibits marked at such deposition, and all documents and photos discovered in this case which she authored, received or reviewed.

Specifically, this witness will testify that he was working on his roof on the date of the accident and he saw the ultralight going down. He will testify that he thought something was wrong because of the way the aircraft was going down (towards the airport) and turning to the right (east). Mr. Madison will testify that he saw the aircraft out of the corner of his eye for approximately fifteen (15) seconds and he thought the aircraft either crashed into, or glided above, a cornfield. He will testify that he asked his daughter to call the York Airport and report this incident, which she did. He then drove to the location where he believed the crash may have occurred but did not see or hear anything. Thereafter, another call was placed to the airport.

Mr. Madison will further testify that, during the time that he viewed the ultralight, he did not hear any engine noise and he did not hear any noise when the aircraft crashed. Mr. Madison will also testify that he does not believe the power lines played a role in the accident because the aircraft was "on the other side" (east) of the power lines and the plane's altitude was above the power lines. He will testify that he did not witness the accident.

k.      Josef Fürlinger
        Rotax-Linz, Austria

Generally, this witness will testify as to all matters raised at his depositions taken on December 3, 2004 and July 22, 2005, all those exhibits marked at such depositions,

17

445225.1

and all documents and photos discovered in this case which he authored, received or reviewed.

Specifically, this witness will testify about the corporate structure of BRP-Rotax GmbH & Co KG f/k/a Bombardier-Rotax GmbH & Co. KG and the relationship between BRP-Rotax and Bombardier Inc. Mr. Furlinger will also testify about the design, manufacture, and sale of engines, in particular the Rotax 582 engine. He will further testify about the warnings contained in manuals and on the Rotax 582 engine itself, as well as maintenance of the Rotax 582 engine.

> **2.    On damages defendants intend to call the following witnesses who will testify in accordance with the following summaries**:

None at this time. Defendants reserve the right to supplement this answer.

> **3.    Defendants' expert witnesses**:

a.    Weldon E. Garrelts
      107 East Eisenhower Drive
      Philo, IL 61864

Mr. Garrelts is a Professor of Aviation Emeritus and has operated an aviation consultancy practice based out of Philo, Illinois since 1993. Mr. Garrelts received a Bachelor of Science degree from the University of Illinois, Urbana; and a Master of Education degree from University of Illinois in 1968. Since that time he has completed numerous courses and training programs relating, generally, to aviation and, specifically, to aircraft maintenance and aviation accident investigation. Mr. Garrelts has also authored several publications.

Beginning in 1966, Mr. Garrelts has held various Instructor and Assistant/Associate Professor positions at University of Illinois, Institute of Aviation. At one point, he was the Head of the Department of Aircraft Maintenance and Aircraft Maintenance Technology. He is currently an Associate Professor of Aviation Emeritus.

Mr. Garrelts issued a report, dated July 29, 2005. He was not deposed concerning his opinions in this matter. Mr. Garrelts will testify about the opinions set forth in his report, which can be summarized as follows:

- The Bombardier-Rotax 582 engine was producing at or near rated full power at the time of the accident; and

- The spark plug and carburetor tests performed by Plaintiffs' experts were not consistent with good testing procedures and were totally unreliable. They did not provide any useful information concerning the power output of the engine at the time of impact.

    b.     Kenneth L. Orloff, Ph.D.
            Orloff Consulting
            21010 Elderberry Way
            Groveland, CA 95321

Dr. Orloff is a principal with Orloff Consulting, an aviation consulting firm located in Groveland, California. He received a Masters degree in Physics and a Ph.D. in Mechanical Engineering from the University of California. Dr. Orloff worked for the National Aeronautics and Space Administration from 1971 until 1084, during which time he was involved in the application of laser optical measurement to airplane and helicopter aerodynamics research. This work resulted in more than thirty five (35) technical publications, three (3) patents, and a NASA Exceptional Service Medal in 1978.

Dr. Orloff has taught university level courses in physics, aerodynamics and other aeronautics courses. He is a licensed Airframe and Powerplant Mechanic and holds FAA Inspection Authorization. Dr. Orloff also holds a Airline Transport Pilot Certificate and has accumulated over 6500 hours of flight time. He is a Certified Flight Instructor for both airplanes and helicopters. Dr. Orloff began his aviation consulting work in 1983 and since that time has analyzed a number of fixed wing and rotary wing accidents.

Dr. Orloff, with technical support by Kas Osterbuhr, issued a report, dated July 29, 2005. He was not deposed concerning his opinions in this matter. Dr. Orloff will testify about the opinions set forth in his report, which can be summarized as follows:

- The pilot in command failed to maintain sufficient terrain and/or obstacle clearance to execute a successful off-airport landing in the event of engine failure;

- The pilot in command touched down in a steep, nose down attitude, exacerbating the impact forces of the off-airport landing;

- An open field, immediately adjacent the cornfield, would have provided a more suitable area for emergency landing. It is not apparent why, if the pilot were in control of the aircraft, he failed to maneuver for a landing in this cleared area;

- The location and orientation of the wreckage is consistent with the pilot having struck powerlines immediately west of the crash site, then descending to the ground in a nose down attitude;

- The damage to the trailing edge of the right wing is due to a rotating propeller;

- The leading edges of the propeller, propeller tips and blades are significantly damaged, the result of dissipating rotational energy, consistent with a propeller that is powered by a functioning engine; and

- The installation of the Rotax 582 UL DCDI engine in this particular

19

aircraft was not in compliance with the recommendations of the Rotax approved installation manual; additionally, due to lack of documentation, it is unknown if the engine was maintained in accordance with Rotax approved methods.

•     Testing and measurement of engine components performed by Plaintiff's experts is not representative of the engine's actual operating characteristics as installed in the Interplane Skyboy and does not, in my opinion, yield measurements or observations that can be relied upon in opining as to the serviceability of those components;

•     Testing of the spark plugs and carburetors on the exemplar 582 engine has demonstrated that those components were capable of functioning properly when installed in the accident aircraft.

•     A bench test of the oil injection pump suggests the lubrication system was functioning properly when installed in the accident aircraft. The lack of scoring on the piston skirts and cylinder walls supports this conclusion.

      c.     Kas Osterbuhr
                Orloff Consulting
                21010 Elderberry Way
                Groveland, CA 95321

Mr. Osterbuhr received a Bachelor of Science degree in Metallurgy and Materials Engineering from the Colorado School of Mines. Since his graduation in 1996, he has worked in the field of aviation and has worked on projects involving assembly, flight testing and maintenance of a Rans S-12 kitplane and development of a small remotely piloted helicopter. Mr. Osterbuhr has also worked for a company tailored to the experimental aircraft industry. Most recently, he has been working as an aviation consultant for Orloff Consulting in Groveland, California, where he analyses and reconstructs events leading to aviation accidents.

Mr. Osterbuhr will testify about his work on this case and the opinions set forth in the report, by Kenneth Orloff, dated July 29, 2005, which he supported.

      d.     Roger W. Stallkamp
                3548 Old Oaks Drive
                Beavercreek, OH 45432

Mr. Stallkamp received his Bachelors degree from the United States Naval Academy and a Masters of Science degree from the University of Dayton. From 1959 through 1974, he was an operational and flight test pilot with the United States Air Force. From 1974 until 1977, we work at Wright-Patterson Airforce Base in the capacity of Flight Safety Officer and Chief of Safety, Aeronautical System Division, Air Force Systems Command. His job responsibilities included, among other things, reviewing all

445225.1

USAF aircraft accident and incident reports for design deficiencies and providing pertinent information to the Division to ensure that similar defects were not incorporated into the current design efforts. Mr. Stallkamp worked at Andrews Airforce Base as Chief of System Safety Branch and Deputy Chief of Safety, from 1977 until 1978.

From 1978 until 1998, Mr. Stallkamp worked at Hartzell Properties, Inc. first as Manager of Field Investigations and, in 1988 he became Vice President, Field Operations. He was responsible for accident/investigation efforts involving Hartzell products including on-sight and follow up inspections with the FAA, NTSB, and foreign government accident investigating authorities. Since 1998, Mr. Stallkamp has worked as a consultant in propeller accident investigation. He has taken several courses relating to propeller accident investigation, has over 1,000 hours of flying experience in a variety of military jet, turboprop and reciprocation engine aircraft, and he was a flight instructor.

Mr. Stallkamp issued a report, dated July 28, 2005. He was not deposed concerning his opinions in this matter. Mr. Stallkamp will testify about the opinions set forth in his report, which can be summarized as follows:

- The propeller was rotating at the time of impact; and

- The specific amount of power being absorbed by the propeller could not be determined, but was considered to be at "thrusting" mode of operation.

## IV.    EXHIBITS

### A.    PLAINTIFFS

See Exhibit List attached hereto as Exhibit "B." Plaintiffs reserve the right to revise this list and offer any and all documents and things produced during discovery and/or those documents and things identified by Defendants but do not waive any objections thereto.

### B.    DEFENDANTS

See Exhibit List attached hereto as Exhibit "C." Defendants reserve the right to revise this list and offer any and all documents and things produced during discovery and/or those documents and things identified by Plaintiffs but do not waive any objections thereto.

445225.1

## V.    ESTIMATED LENGTH OF TRIAL

The parties estimate that it will take approximately 1-2 weeks to complete the trial of this matter.

## VI.    PROPOSED VOIR DIRE QUESTION

### A.    PLAINTIFFS

See voir dire questions attached hereto as Exhibit "D."

### B.    DEFENDANTS

See voir dire questions attached hereto as Exhibit "E."

## VII.    APPLICABLE LAW

### A.    PLAINTIFFS[5]

#### 1.    Jurisdiction

Jurisdiction is proper pursuant to 28 U.S.C. 1332 as there is diversity of citizenship and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

#### 2.    Applicable Law

The substantive law of Pennsylvania should govern since Plaintiffs are citizens of this Commonwealth, or were at the time the action accrued, and the crash occurred in Thomasville, Pennsylvania. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S. Ct. 1020, 85 L.Ed. 1477 (1941); *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964).

---

[5] Plaintiffs incorporate by reference their Response to Defendants' Motion for Summary Judgment and their Proposed Jury Instructions.

445225.1

###       3.       Strict Liability

In *Webb v. Zern*, 422 PA. 424, 220 A.2s 853 (1966), the Pennsylvania Supreme

Court adopted the strict products liability doctrine of Restatement (Second) of Torts, §

402A.

Later, in *Salvador v. Atlantic Steel Boiler Co.*, 319 A.2d 903, 907 (Pa. 1974), the

Court held:

> Today, . . . a manufacturer . . . is effectively the guarantor of his products' safety. .
> . . Our courts have determined that a manufacturer by marketing and advertising
> his product impliedly represents that it is safe for its intended use.  We have
> decided that no current societal interest is served by permitting the manufacturer
> to place a defective article in the stream of commerce and then to avoid
> responsibility for damages caused by the defect.

Elaboration was provided in *Berkebile v. Brantly Helicopter Corp.*, 337 A.2d 893,

902 (Pa. 1975) where it was held that "the seller must provide with the product every

element necessary to make it safe for use."

Evidence pertaining to industry standards is irrelevant and therefore inadmissible

in a strict liability action.  *Lewis v. Coffing Hoist Div., Duff-Nortion Co.*, 528 A.2d 590,

594 (Pa. 1987).

As discussed in *Madonna v. Harley Davidson, Inc.*, 708 A.2d 507 (Pa. Super.

1998),

> negligence concepts are not to be introduced into a strict liability case.  Evidence
> of a user's negligence cannot be introduced to excuse a defective product, nor can
> negligence be used to reduce recovery by comparing fault.  *Kimco Development v.*
> *Michael D's Carpet*, 536 Pa. 1, 637 A.2d 603 (1993).  We have stated:
> "Throughout the development of strict products liability, our supreme court has
> been adamant that negligence concepts have no place in a strict liability action."
> *Childers v. Power Line Equipment Rentals*, 452 Pa. Super. 94, 681 A.2d
> 201(1996).  This is not to say however, that plaintiff's conduct in a product's case
> is always irrelevant.  Inquiry into the plaintiff's use of the product may be relevant
> as it relates to causation.  *Id.*
>           *           *           *           *

445225.1

[However] a user's negligence is not relevant if the product defect contributed in any way to the harm. However, where the defense offers evidence to establish that the accident was *solely* the result of the user's conduct, and not related in any way with a product defect, it is relevant and admissible for the purpose of proving causation.

*Id*. at 507-08.

Further, "[b]efore the theory [of assumption of the risk] may be submitted to a jury, the defendant must produce evidence that the plaintiff fully understood the specific risk, and yet voluntarily chose to encounter it." *Robinson v. B.F. Goodrich Tire Co.*, 664 A.2d 616, 618 (Pa.Super. 1995). Accord, *Childers v. Power Line Equip. Rentals*, 681 A.2d 201, 208 (Pa.Super. 1996), *app. denied*, 690 A.2d 236 (Pa. 1997).

### 4.    Exculpatory Releases

Stringent standards that must be met before an exculpatory provision will be interpreted and construed to relieve a person of liability:

(1)    contracts providing for immunity from liability for negligence must be construed strictly since they are not favorites of the law;

(2)    such contracts must spell out the intention of the parties with the greatest particularity and show the intent to release from liability beyond doubt by express stipulation and no inference from words of general import can establish it;

(3)    such contracts must be construed with every intendment against the party who seeks the immunity from liability;

(4)    the burden to establish immunity from liability is upon the party who asserts such immunity.

*Employers Liability Assurance Corporation v. Greenville Business Men's Association*, 224 A.2d 620, 623 (Pa. 1966).

In *Keystone Aeronautics Corp. v. R.J Enstrom Corp.*, 499 F.2d 146 (3rd Cir. 1974), the Third Circuit Court of Appeals held that the Pennsylvania Supreme Court was

445225.1

likely to adopt Comment *m* to Restatement (Second) of Torts § 402A. In pertinent part, that comment reads as follows:

> The consumer's cause of action does not depend upon the validity of his contract with the person from whom he acquires the product, ***and it is not affected by any disclaimer or other agreement***, whether it be between the seller and his immediate buyer, or attached to and accompanying the product into the consumer's hands. [emphasis added]

The Court went on to state,

> If a disclaimer on the label of a product or in a printed form sales contract would be effective to limit liability under § 402A, then obviously sellers would utilize such devices to nullify their responsibility. And it is significant that the application of § 402A is limited to a '... product in a defective condition unreasonably dangerous...' A social policy aimed at protecting the average consumer by prohibiting blanket immunization of a manufacturer or seller through the use of standardized disclaimers engenders little resistance. But when the setting is changed and the buyer and seller are both business entities, in a position where there may be effective and fair bargaining, the social policy loses its raison d'etre. [footnote omitted] The transaction then tends to be more influenced by gravitational pull of the Uniform Commercial Code than by the consumer oriented § 402A.

499 F.2d at 149.

### 5.       Damages

#### a.       Wrongful Death Action

42 Pa.C.S.A. § 8301 provides as follows:

**(a) General rule.**--An action may be brought, under procedures prescribed by general rules, to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another if no recovery for the same damages claimed in the wrongful death action was obtained by the injured individual during his lifetime and any prior actions for the same injuries are consolidated with the wrongful death claim so as to avoid a duplicate recovery.

**(b) Beneficiaries.**--Except as provided in subsection (d), the right of action created by this section shall exist only for the benefit of the spouse, children or parents of the deceased, whether or not citizens or residents of this Commonwealth or elsewhere. The damages recovered shall be distributed to the beneficiaries in the proportion they would take the personal estate of the decedent

25

in the case of intestacy and without liability to creditors of the deceased person under the statutes of this Commonwealth.

**(c) Special damages.**--In an action brought under subsection (a), the plaintiff shall be entitled to recover, in addition to other damages, damages for reasonable hospital, nursing, medical, funeral expenses and expenses of administration necessitated by reason of injuries causing death.

### b.    Survival Action

42 Pa.C.S.A. § 8302 states that "All causes of action or proceedings, real or personal, shall survive the death of the plaintiff or of the defendant, or the death of one or more joint plaintiffs or defendants."

Under Pennsylvania's Survival Act, the decedent's estate can recover loss of net earnings  damages are properly measured by the loss of earning power less personal maintenance expenses from the time of death through a decedent's estimated working life span. *Incollingo v. Ewing*, 444 Pa. 263, 282, A.2d 206 (1971).

Pennsylvania also utilizes the total offset method in which inflation and interest rates are assumed to be offsetting. *Kaczkowski v. Bolubasz*, 421 A.2d 1027 (Pa. 1980)

### c.    Punitive Damages

In Pennsylvania, "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Hutchison v. Luddy*, 766 A.2d 870 (Pa. 2005) (*quoting Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742, 747 (1984)).

### B.    DEFENDANTS[6]

### A.    Jurisdiction

Jurisdiction is based upon 28 U.S.C § 1332, diversity of citizenship, in that Plaintiffs and Defendants are citizens of different states and the amount in controversy,

---

[6] Defendants incorporate their Motion for Summary Judgment by reference.

exclusive of interest and costs is in the excess of Seventy Five Thousand Dollars ($75,000.00) per plaintiff. Plaintiffs are residents of the State of Pennsylvania and Defendants are foreign corporations with principal places of business in Canada and Austria.

The incident which is the subject of this lawsuit occurred in the State of Pennsylvania. Since the Court's jurisdiction in this case is based on diversity of citizenship, the court should apply the substantive law of Pennsylvania. Erie R.R. v. Tompkins, 204 U.S. 64 (1938).

### B.     Applicable law

### Plaintiffs' Product Defect Claims

### 1.     Strict Liability

a.     Plaintiffs have the burden of proving their strict product liability claims by a preponderance of the evidence.

b.     §402A of the Restatement (Second) of Torts and presidential case law govern Plaintiffs claims that the subject Rotax 582 engine was defectively designed, manufactured, and contained inadequate warnings.

c.     Assumption of risk: Restatement (Second) of Torts, §496B and §496C and presidential case law apply to support Defendants' affirmative defenses that Decedents assumed the risk and therefore Plaintiffs' claims are barred.

d.     Substantial change/alteration: A seller is responsible only for defects that exist at the time the product leaves his or her control. The seller is not liable for defective conditions created by substantial changes in the product occurring after the product has been sold. The seller is also not liable for injuries resulting from the plaintiffs' misuse of the product. Dillinger v. Caterpillar, Inc., 95 F.2d 430, 445 (3rd Cir. 1992).

e.     Intentional spoliation of evidence: Roselli v. General Electric Co., 410 Pa. Super. 223, 599 A.2d 685 (1991) and other presidential case law.

### 2.     Plaintiffs' Claims of Negligence and Defendants' Defenses

a.     Plaintiffs have the burden of proving their negligence claims by a preponderance of the evidence.

b.     Plaintiffs' negligence claims are governed by case law which provides that,

i.     A duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct for the protection of others against unreasonable risks;

445225.1

ii.       A failure to conform to the standard required;

iii.      A causal connection between the conduct and the resulting injury; and

iv.      Actual loss or damage resulting to the interests of another.

c.        Contributory/comparative   negligence:   Pennsylvania   recognizes   the doctrine of contributory negligence.  Contributory negligence is conduct on the part of a plaintiff which falls below the standard [of care] to which he should conform for his own protection and which is a legally contributing cause, cooperating with the negligence of the defendant, in bringing about the plaintiff's harm. Contributory fault may stem either from a plaintiff's careless exposure of himself to danger or from his failure to exercise reasonable diligence for his own protection. Thompson v. Goldman, 382 Pa. 277, 280 (1955).

Pennsylvania's Comparative Negligence Act, as is set forth in 42 Pa. Cons. Stat. Ann. § 7102, and presidential case law govern Plaintiffs' claims

**3.       Breach of Warranty**

a.        Plaintiffs have the burden of proving their breach of warranty claims by a preponderance of the evidence.

b.        Breach of express, implied, and third-party warranties are governed by 13 Pa. Cons. Stat. Ann.§ 2313 through § 2318 and presidential case law.

c.        Exculpatory clause: Pennsylvania courts recognize as valid, agreements that exculpate a party from liability.  In order for an exculpatory agreement to be valid, the following criteria must be met:

1.       The contract must not contravene any policy of the law;
2.       It must be a contract between individuals relating to their private affairs;
3.       Each party must be a free bargaining agent, not simply one drawn into an adhesion contract, with no recourse but to reject the entire transaction;
4.       The agreement must spell out the intent of the parties with the utmost particularity; and
5.       The agreement must be construed strictly and against the party asserting it.

Zimmer v. Mitchell & Ness, 254 Pa. Super. 474, 478; 385 A.2d 437 (1978), affirmed, 490 Pa. 428; 416 A.2d 437 (1980); See also, Employers Liability Assur. Corp. v. Greenville Business Men's Ass'n., 423 Pa. 288; 224 A.2d 620 (1966); Valeo v. Pocono

<u>International Raceway, Inc.</u>, 347 Pa. Super. 230; 50 A.2d 492 (1985); <u>Schillachi v. Flying Dutchman Motorcycle Club</u>, 751 F. Supp. 1169 (E.D. Pa. 1990).

### i.    Third-party beneficiary law

In <u>Scarpitti v. Weborg</u>, 530 Pa. 366; 609 A.2d 147 (1992), the Pennsylvania Supreme Court re-affirmed the test in <u>Guy v. Liederbach</u>, 501 Pa. 47, 459 A.2d 744 (1983), setting forth the criteria with which to determine whether a party is an intended third-party beneficiary.

> There is thus a two part test for determining whether one is an intended third party beneficiary: (1) the recognition of the beneficiary's right must be "appropriate to effectuate the intention of the parties," and (2) the performance must "satisfy an obligation of the promisee to pay money to the beneficiary" or "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." <u>Scarpitti</u>, 530 Pa. at 371, <u>citing</u> <u>Guy v. Liederbach</u>, 501 Pa. at 60.

### 4.    Recklessness, willful and wanton misconduct and fraud and deceit

a.    Claims of reckless, willful and wanton misconduct as well as claims of fraud and deceit must be established by Plaintiffs through clear and convincing evidence.

b.    Reckless conduct is intentional acting or failing to act in complete reckless disregard of a risk of harm to others that is known or should be known to be highly probable and with a conscious indifference to the consequences. Reckless conduct is also acting or failing to act when existing danger is actually known and with an awareness that harm is reasonably certain to result.

c.    Willful conduct means that the actor *desired* to bring about the result that followed or realized that it was substantially certain to ensue.

d.    Wantonness means that the defendant *acted* intentionally *without regard* to the consequences, despite a known risk to another.

e.    Fraud and deceit: In order to succeed under this theory of liability, Plaintiffs must prove by clear and convincing evidence, (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. <u>Debbs v. Chrysler Corp.</u>, 810 A.2d 137, 155 (2002), <u>quoting</u> <u>Gibbs v. Ernst, 538 Pa. 193, 647 A.2d 882, 889</u> (1994) (footnote omitted).

5.    **Punitive damages**

§908A of the <u>Restatement (Second) of Torts</u> and presidential case law govern the imposition of punitive damages.

6.    **Relevant evidence**

Evidence that is not relevant, pursuant to <u>F.R.E.</u> 401, is not admissible. <u>F.R.E.</u> 403.

## VIII.  <u>UNUSUAL LEGAL ISSUES</u>

A.    <u>**PLAINTIFFS**</u>

1.    The Court found that Bombardier-Rotax and Bombardier, Inc. were alter egos of one another in conjunction with Defendants' Motion to Dismiss for lack of personal jurisdiction. Plaintiffs believe it is unnecessary to relitigate this issue for purposes of liability since the standard is the same. If Plaintiffs are required to address this issue again at trial, additional documents and witnesses will need to be presented.

2.    Defendants have unearthed no evidence that either Mr. Simeone or Mr. Lengyel knew of the specific defects in the Rotax 582 engine. Under the circumstances, it would be unduly prejudicial to permit the introduction of "evidence" that they assumed any risk of injury and/or death associated with use of the Rotax 582 engine.

3.    Plaintiffs believe the Court has already ruled that any waiver/release between Mr. Simeone and Interplane USA provides no relief to Defendants. Accordingly, Plaintiffs have filed a Motion in Limine to preclude admission of any documentation related thereto.

4.    Plaintiffs have filed a number of other Motions in Limine addressing unique to this case.

445225.1

### B.    DEFENDANTS

a.    Was the subject engine reasonably fit, suitable or safe for its intended or reasonably foreseeable use?

b.    Have Plaintiffs proved by a preponderance of the evidence that Defendant Rotax defectively designed the subject 582 Rotax engine?

c.    Have Plaintiffs proved by a preponderance of the evidence that Defendant Bombardier defectively designed the subject 582 Rotax engine?

d.    Have Plaintiffs proved by a preponderance of the evidence that the allegedly defectively designed 582 Rotax engine caused decedents' death?

e.    Have Plaintiffs proved by a preponderance of the evidence that the allegedly defectively designed subject 582 Rotax engine proximately caused decedents' death?

f.    Have Plaintiffs proved by a preponderance of the evidence that Defendant Bombardier defectively manufactured the subject 582 Rotax engine?

g.    Have Plaintiffs proved by a preponderance of the evidence that the allegedly defectively manufactured subject 582 Rotax engine proximately caused decedents' death?

h.    Have Plaintiffs proved by a preponderance of the evidence that the subject engine contained  inadequate warnings or instructions?

i.    Have Plaintiffs proved by a preponderance of the evidence that the failure to warn proximately caused decedents' death?

j.    Have Plaintiffs proved by a preponderance of the evidence that Defendant Bombardier failed to provide adequate warnings or instructions?

k.    Have Plaintiffs proved by a preponderance of the evidence that Defendant Rotax failed to provide adequate warnings or instructions?

l.    Have Plaintiffs proved by a preponderance of the evidence that Defendant Bombardier provided decedent Simeone with an express warranty  concerning the subject engine?

m.    Have Plaintiffs proved by a preponderance of the evidence that Defendant Rotax provided decedent Simeone with an express warranty  concerning the subject engine?

n.    Have Plaintiffs proved by a preponderance of the evidence that Defendant Bombardier provided decedent Lengyel with an express warranty concerning the subject engine?

o.    Have Plaintiffs proved by a preponderance of the evidence that Defendant Rotax provided decedent Lengyel with an express warranty  concerning the subject engine?

p.    Have Plaintiffs proved by a preponderance of the evidence that Defendant Bombardier breached any express warranties it owed to decedents?

31

q.      Have Plaintiffs proved by a preponderance of the evidence that Defendant Rotax beached any express warranties it owed to decedents?

r.      Have Plaintiffs proved by a preponderance of the evidence that Defendant Bombardier breached any implied warranties that it owed decedent Simeone?

s.      Have Plaintiffs proved by a preponderance of the evidence that Defendant Rotax breached any implied warranties that it owed decedent Simeone?

t.      Have Plaintiffs proved by a preponderance of the evidence that Defendant Bombardier breached any implied warranties that it owed decedent Lengeyl?

u.      Have Plaintiffs proved by a preponderance of the evidence that Defendant Rotax breached any implied warranties that it owed decedent Lengeyl?

v.      Have Plaintiffs proved by a preponderance of the evidence that decedent Simeone relied on any alleged express warranties provided by Defendant Bombardier?

w.      Have Plaintiffs proved by a preponderance of the evidence that decedent Simeone relied on any alleged express warranties provided by Defendant Rotax?

x.      Have Plaintiffs proved by a preponderance of the evidence that decedent Lengyel relied on any alleged express warranties provided by Defendant Bombardier?

y.      Plaintiffs proved by a preponderance of the evidence that decedent Lengyel relied on any alleged express warranties provided by Defendant Rotax?

z.      Have Plaintiffs proved by clear and convincing evidence that Defendant Bombardier's conduct as to decedent Simeone was reckless, willful and wanton?

aa.     Have Plaintiffs proved by clear and convincing evidence that Defendant Rotax's conduct as to decedent Simeone was reckless, willful and wanton?

bb.     Have Plaintiffs proved by clear and convincing evidence that Defendant Bombardier's conduct as to decedent Lengyel was reckless, willful and wanton?

cc.     Have Plaintiffs proved by clear and convincing evidence that Defendant Rotax's conduct as to decedent Lengyel was reckless, willful and wanton?

dd.     Have Plaintiffs proved by clear and convincing evidence that Defendant Bombardier's conduct as to decedent Simeone amounted to fraud and deceit?

ee.     Have Plaintiffs proved by clear and convincing evidence that Defendant Rotax's conduct as to decedent Simeone amounted to fraud and deceit?

ff.     Have Plaintiffs proved by clear and convincing evidence that Defendant Bombardier's conduct as to decedent Lengyel amounted to fraud and deceit?

gg.     Have Plaintiffs proved by clear and convincing evidence that Defendant Rotax's conduct as to decedent Lengyel amounted to fraud and deceit?

hh.     Was there a practical and technically feasible alternative design at the time that the subject engine left  the control of Defendant Rotax, which would have prevented the harm without substantially impairing the engine's reasonably anticipated use or function.

32

445225.1

ii.    Was there a practical and technical feasible alternative design available at the time the engine left the control of Defendant Rotax, which would have prevented the harm without substantially impairing its reasonably anticipated or intended function?

jj.    Were decedents' actions and/or omissions the sole proximate cause of their injuries?

kk.    Were decedents' actions and/or omissions a substantial factor in causing their injuries?

ll.    Did decedents assume the risk that injury or death might occur when flying the ultralight aircraft?

mm.    Did decedent Simeone expressly waive any right he or his heirs may have had to institute suit against Defendants?

nn.    Were decedents contributorily negligent?

oo.    Was the subject engine in the same condition on the date of the accident as it was when it left the hands of Rotax?

pp.    Have Plaintiffs proved that Defendant Bombardier's conduct was outrageous and evil minded?

qq.    Have Plaintiffs proved that Defendant Rotax's conduct was outrageous and evil minded?

rr.    Has Plaintiff Simeone proved by a preponderance of the evidence that she is a third party beneficiary of any warranty owed any decedent?

ss.    Has Plaintiff Lengyel proved by a preponderance of the evidence that she is a third party beneficiary of any warranty owed any decedent?

tt.    Defendants believe that the court has not ruled on the issue on the issue of assumption of risk and Defendants have already set forth voluminous evidence concerning assumption of risk, and will do so at trial, and Defendants would be unfairly prejudiced if they were not permitted to put forth this defense.

uu.    Defendants believe that the court has not ruled on the issue on the issue of the waivers/releases, which Defendants believe are valid and provide relief to Defendants.

vv.    Defendants will/have filed Opposition to many of Plaintiffs' motions *in limine*.

ww.    Such additional legal issues that may become known during preparation for and during trial

Arthur Alan Wolk, Esquire
*Attorney for Plaintiffs*

Robert J. Kelly, Esquire
*Attorney for Defendants*

445225.1